**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| GERALD McNAMARA,<br>Cushman & Wakefield of Pennsylvania, Inc.<br>1650 Market Street, 33rd Floor<br>Philadelphia, PA 19103, and | : : : : : | CIVIL ACTION |
| COLLEEN KUDRICK,<br>Cushman & Wakefield of Pennsylvania, Inc.<br>1650 Market Street, 33rd Floor<br>Philadelphia, PA 19103, and<br>Plaintiffs, | : : : : : : | |
| v. | : : | |
| GURBIR S. GREWAL, in his official capacity as<br>New Jersey Attorney General,<br>RJ Hughes Justice Complex<br>25 Market Street, Box 080<br>Trenton, NJ 08625-0080, | : : : : : : | |
| NEW JERSEY STATE REAL   :<br>ESTATE APPRAISER BOARD,          :<br>124 Halsey Street, Newark, NJ 07102 | : | |
| MICHELLE L. MILLER, in her official<br>capacity as Director of the New Jersey<br>Division of Law,      :<br>124 Halsey Street, Newark, NJ 07102 | : : : | |
| PAUL R. RODRIGUEZ, in his official<br>capacity as Acting Director of the<br>New Jersey Division of Consumer Affairs, and | : : : : | |
| BARRY J. KRAUSER,<br>JOHN McCANN, and<br>JOSEPH PALUMBO, in their official capacities<br>as Members of the New Jersey State   :<br>Real Estate Appraiser Board<br>124 Halsey Street, Newark, NJ 07102<br>Defendants. | : : : : : : | NO. 3:19-cv-173 (FLW) |

**AMENDED COMPLAINT FOR**
**DECLARATORY AND INJUNCTIVE RELIEF**

Gerald McNamara ("McNamara") and Colleen Kudrick ("Kudrick") (McNamara and Kudrick are collectively referred to as "Plaintiffs"), by and through their undersigned attorneys, file this Complaint for Declaratory and Injunctive Relief and allege in support thereof as follows:

1.      This is a complaint for declaratory and injunctive relief challenging: (a) the constitutionality of certain provisions of New Jersey laws and regulations governing the licensing and discipline of real estate appraisers, both as adopted and as applied to Plaintiffs in this action; and (b) the jurisdiction of the New Jersey State Real Estate Appraiser Board ("Board") in filing disciplinary actions against the Plaintiffs.

2.      Plaintiffs allege that N.J.A.C. 13:40A-6.1 and related regulations are facially unconstitutional and unconstitutional as applied to Plaintiffs under the Fifth and Fourteenth Amendments to the United States Constitution.

## Parties

3.      Plaintiff Gerald McNamara is over the age of 18, resides and is a citizen of the Commonwealth of Pennsylvania, and is a commercial real estate appraiser licensed in, *inter alia*, New Jersey to serve as a commercial real estate appraiser.

4.      Plaintiff Collen Kudrick is over the age of 18, resides and is a citizen of the Commonwealth of Pennsylvania, and is a licensed commercial real estate appraiser.

5.      Gurbir S. Grewal is the New Jersey Attorney General.  He and his office are legally obligated to ensure the provisions of the laws and regulations of New Jersey are enforced.  This includes investigating, disciplining, enforcing, and/or affecting the license status of any licensed commercial real estate appraiser.

6.      The New Jersey State Real Estate Appraiser Board was created by the New Jersey Legislature to regulate the appraisal profession and evaluate the credentials of

applicants for licensure and certification.  The Board is responsible for the regulation of real estate appraisers is New Jersey.

7.      Michelle L. Miller, in her official capacity, is the Director of the New Jersey Division of Law, which has responsibility to oversee the actions of the New Jersey Division of Consumer Affairs, within which the Board is housed.

8.      Paul R. Rodriguez, in his official capacity as Acting Director of the New Jersey Division of Consumer Affairs, has responsibility to oversee the actions of the Board.

9.      Barry J. Krauser, John McCann, and Joseph Palumbo, in their purported official capacities as putative Members of the Board, believed on November 21, 2017, and apparently still believe, that they are responsible to enforce and discipline licensed commercial real estate appraisers in New Jersey.

### Jurisdiction and Venue

10.     This Court has original jurisdiction pursuant to 28 U.S.C. § 1331, 42 U.S.C. §§ 1983 & 1988, and the federal common law jurisdictional doctrine established in *Ex parte Young,* 209 U.S. 123 (1908), to redress the deprivation under color of state law of rights secured by the federal constitution.

11.     This Court also has jurisdiction under 28 U.S.C. §§ 1331 & 2201 over Plaintiffs' facial challenges to New Jersey laws and regulations.

12.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' claim of ultra vires because it is so related to Plaintiffs' claims within this Court's original jurisdiction that it forms part of the same case or controversy under Article III of the United States Constitution.

13.     The relevant acts and omissions occurred, and are likely to continue, in the State

of New Jersey; therefore, venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).  A preliminary injunction, enjoining Defendants from taking any action to enforce the challenged New Jersey laws and regulations, will protect Plaintiffs' rights while these proceedings are pending.  A permanent injunction, enjoining Defendants from enforcing the challenged provisions of the Act, will protect Plaintiffs' rights after the final resolution of these proceedings.

## The Board's Notice of Claim

### A.     The Statutory and Regulatory Framework for USPAP in New Jersey

14.     The State of New Jersey, through the office of the Attorney General, has sought to discipline the Plaintiffs for violations of the Uniform Standards of Professional Appraisal Practice ("USPAP") as more set forth in the attached Complaints marked Exhibits A ("McNamara Complaint") and B (the "Kudrick Complaint").

15.     Gerald McNamara ("McNamara") filed a Response to the McNamara Complaint ("McNamara and Kudrick Response").  *See* Exhibit C.

16.     Colleen Kudrick ("Kudrick") filed a response to the Kudrick Complaint.  *See* Exhibit D.

17.     The parties wish to address the Constitutional issues raised by the Plaintiffs in the McNamara and Kudrick Response.  Administrative Law Judge, the Honorable Jeff S. Masin, issued an Order staying the disciplinary proceedings pending the outcome of this constitutional challenge to facilitate judicial review of the issues so raised.

18.     Exhibits A and B assert that McNamara and Kudrick were guilty of failing to abide by the dictates of USPAP and should be disciplined accordingly.

19.    USPAP was originally created by non-governmental / private party appraisal industry representatives, which were improperly and impermissibly delegated the responsibility to promulgate regulations that governmental employees intended to enforce against citizens.

20.    TITLE XI of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") was passed in the aftermath of the Savings and Loan crisis of the late 1980s and the Law and Public Safety Division of the Division of Consumer Affairs promulgated real estate appraisal requirements for Federally Related Transactions ("FRTs").

21.    The stated purpose of FIRREA was to protect federal financial and public policy interests in real estate related transactions.

22.    The Federal Financial Institutions Examinations Council ("FFIEC") consists of the representatives of the heads of the agencies comprising the FFIEC (the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration Board.)

23.    The FFIEC was established to "prescribe uniform principles, standards, and report forms for the federal examination of financial institutions."

24.    FIRREA added the Appraisal Subcommittee ("The Appraisal Subcommittee") to the FFIEC.

25.    FIRREA Title XI created real estate appraisal requirements for FRTs.

26.    FRTs were defined in FIRREA as any real estate related financial transaction that: (1) the FDIC or any regulated institution engages in or contracts for; and (2) requires the services of an appraiser.

27.     Real estate related financial transactions are defined as sales, refinancing, and mortgages.

28.     FIRREA designated the Appraisal Standards Board ("ASB") of The Appraisal Foundation ("TAF") to create "generally accepted standards of practice" for real estate appraisals.

29.     FIRREA designated the Appraisal Qualifications Board ("AQB") of TAF to create requirements for real estate appraiser qualification.

30.     FIRREA permitted states to establish a "state licensed appraiser" category that did not specifically meet TAF / AQB requirements.

31.     Each federal financial institution regulatory agency is statutorily required to establish appraisal standards that meet the minimum requirements adopted by a private organization, the Appraisal Foundation, or TAF.

32.     According to its bylaws, TAF "is a private, not-for-profit corporation charged by [Title XI of FIRREA] with the responsibility of establishing, improving and promoting minimum uniform appraisal standards and appraiser qualifications criteria."

33.     The Dodd-Frank Act (the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010) substantially overhauled major portions of the U.S. financial and banking systems in response to the financial crisis of 2008.

34.     The Mortgage Reform and Anti-Predatory Lending Act ("MRAPLA") was originally passed as a standalone bill by the U.S. House of Representatives in 2009, but was never passed by the U.S. Senate.  A revised version of the standalone bill later became Title XIV of the Dodd-Frank Act.

35.     MRAPLA required a "state licensed appraiser" to meet the TAF / AQB requirements.

36.     MRAPLA gave the Appraisal Subcommittee the specific authority to enforce the AQB requirements for a "Trainee Appraiser" and/or a "Supervisory Appraiser."

37.     The ASB and AQB were described as part of TAF.

38.     There is no federal oversight of USPAP before it becomes law as to non-FRTs in NJ.

39.     There is no State oversight of USPAP before it becomes law as to non-FRTs in NJ.

40.     The Appraisal Subcommittee of the Federal Financial Institutions Examining Council ("FFIEC") was designated as the federal governmental entity to oversee compliance with FIRREA.

41.     In MRAPLA, the Appraisal Subcommittee was given the ability to prescribe regulations.

42.     MRAPLA limited the areas in which the Appraisal Subcommittee could prescribe regulations.

43.     FIRREA gave the Appraisal Subcommittee the specific function of:

    a)      monitoring states on certification / licensing of appraisers, including "USPAP;" and,

    b)      monitoring the Appraisal Foundation.

44.     The Appraisal Subcommittee does not have oversight authority on the substantive creation, revision, or promulgation of USPAP.

45.     FFIEC was not given oversight authority regarding the substantive creation, revision, or promulgation of USPAP, either directly or indirectly as a result of FFIEC oversight of the Appraisal Subcommittee.

46.     States only needed to conform to USPAP as to FRTs.

47.     The Appraisal Subcommittee Policy Statements do not include authority to oversee creation, or amendment, of USPAP.

48.     Congress delegated USPAP creation, amendment, and administration by TAF and the ASB.

49.     The Appraisal Subcommittee does not have legal authority to supervise TAF, as to the creation of USPAP, under the original version of FIRREA.

50.     The Appraisal Subcommittee does not have legal authority to supervise TAF, as to the creation of USPAP, under the amended version of FIRREA.

51.     "The Appraisal Foundation is directed by a Board of Trustees ("BOT") that is responsible for the governance of the organization.  The BOT appoints members and provides financial support and oversight to two independent Boards: the Appraiser Qualifications Board ['AQB'] and the Appraisal Standards Board ['ASB']."  https://www.appraisalfoundation.org/imis/TAF/About_Us/TAF_Boards/TAF/TAF_Boards.aspx?hkey=7b71f017-fd58-4c72-bf3c-90fdfb06cd56.

52.     The membership of the two independent boards overseen by the BOT are created as follows:

> a.) The AQB is composed of five to nine members who are appointed by the BOT and may serve up to eight years.  Activities of the Board are directed by the Chair, who is appointed by the BOT for a one-year term; and,

> b.) The ASB is composed of five to nine members who are appointed by the BOT and may serve up to eight years.  Activities of the Board are directed by the Chair, who is appointed by the BOT for a one-year term.  *Id.*

53.     No officer, director, or committee member of TAF, past or present, has been elected to that position — *i.e.*, elected by the general public, as opposed to being elected from within TAF — or appointed by anyone who holds any government office.

54.     The USPAP was copyrighted and the copyright was donated to TAF on April 27, 1987.

55.     The USPAP is currently updated every two years by TAF.  https://www.appraisal foundation.org/mis/TAF/Standards/Appraisal_Standards/Uniform_Standards_of_Professional_A ppraisal_Practice/TAF/USPAP.aspx.   The USPAP was updated every year between 1992 and 2006.

56.     TAF is a private, non-profit organization comprised of appraisal industry representatives.

57.     TAF adopted USPAP as the "generally acceptable standards of practice" for real estate appraisal.

58.     The ASB was designated in FIRREA to promulgate "generally accepted appraisal practices."

59.     The ASB was designated in FIRREA to promulgate "generally accepted appraisal standards" for FRTs.

60.     Each Federal Institutions Regulatory Agency was prescribed appraisal standards with the "generally accepted appraisal standards" of TAF's ASB as a minimum standard.

61.     TAF was, and is, a Section 501(c)(3) corporation under the Internal Revenue Code.

62.     TAF does not have governmental constraints over its staff and officers.

63.     TAF's BOT is chosen by appraisal industry organizations.

64.     The CEO of TAF is appointed by its BOT.

65.     Officers and employees of TAF are appointed by the CEO.

66.     ASB members are appointed by the BOT of TAF.

67.     The ASB promulgates USPAP with no official signoff by the Appraisal Subcommittee.

68.     USPAP is created, amended, and administered by competitors of the Plaintiffs.

69.     The New Jersey Appraiser Board is comprised of competitors of Plaintiffs and their employer, Cushman & Wakefield of Pennsylvania, Inc. ("C&W").

70.     Neither the Appraisal Subcommittee, nor any other federal entity, has oversight of the creation, amendment, promulgation, publishing, sale, or interpretation of USPAP by the ASB and/or TAF.

71.     The Appraisal Subcommittee does not make amendments to USPAP.

72.     The final determination of USPAP amendment is made by the ASB in a private meeting without a record.

73.     The Appraisal Subcommittee does not act as though it has legal authority to either approve or disapprove any amendments to USPAP.

74.     Between 1989 and 2010, there were no amendments to FIRREA regarding Congressional delegation of authority to TAF, ASB, and/or AQB.

75.     Between 1989 and 2010, there were no amendments to FIRREA regarding Congressional delegation of authority to the Appraisal Subcommittee oversight of TAF.

76.     Between 1989 and 2010, there were no amendments to FIRREA regarding USPAP.

77.     USPAP 2005 became effective on January 1, 2005, and was in effect and purportedly applied to non-FRT appraisals in New Jersey at the time of Plaintiffs' Appraisal.

78.     USPAP 2005 contains the statement: "[appraisers must] be aware of, understand, and correctly employ those recognized methods and techniques that are necessary to produce a credible appraisal."

79.     The 1991 NJ Appraiser Act did not provide the Board with authority to regulate any appraisals, beyond those prepared for FRTs, pursuant to FIRREA.

80.     The 1991 NJ Appraiser Act did not include a requirement for non-FRT appraisals to conform with federal requirements.

81.     The Board's proposed initial regulations regarding the NJ Appraiser Act were Chapter 40A, State Real Estate Appraiser Board, adopted as R.1991 d.598, effective December 16, 1991.

82.     The State's proposed initial regulations regarding the NJ Appraiser Act were amended several times since.

83.     The 1996 amendments to the NJ Appraiser Act expanded the authority of the Board to include all appraisals / valuations performed in the State, whether those appraisals were FRTs, as defined in FIRREA, or appraisals for purposes other than an FRT ("non-FRTs").

84.     Neither the New Jersey legislature nor any administrative agency ever constitutionally delegated the authority to TAF to set standards governing appraisals in New Jersey.

85.     No New Jersey regulatory or administrative body, nor any individual(s) delegated or appointed thereby, nor anyone with any connection to any level of New Jersey government ever had any involvement in, comment on, or participation in the original creation of the standards in the USPAP.

- 11 -

86.     No New Jersey regulatory or administrative body, no individual(s) delegated or appointed thereby, nor anyone with any connection to any level of New Jersey government ever had any involvement in, comment on, or participation in the updates to the standards in the USPAP.

87.     No New Jersey regulatory or administrative body has ever constitutionally adopted the standards in the USPAP as being the standards to which appraisals in New Jersey must adhere or that a failure by an appraiser to do appraisals in compliance with the standards in the USPAP can result in civil, criminal, and/or administrative penalties.

88.     Simply put, there is no State oversight of the development of USPAP or its amendments before it becomes effective in New Jersey.

89.     At no time since the adoption of USPAP in 1991, did any of the standards in or amendments to USPAP promulgated by the TAF undergo any part of the Administrative Procedure Act in New Jersey.

90.     The Board is comprised of purported members who are competitors of Plaintiffs and their employer, C&W.

91.     At the time of the filing of the complaint by the Attorney General of New Jersey in this matter, there were no governmental employees who were active participants of the Board.  The only purported Board members who deliberated on the filing of the charges against the Plaintiffs were competitors of the Plaintiffs and their employer, C&W.

92.     There has been no legislative action on any amendments to USPAP in New Jersey since 1997.  USPAP has been amended and/or modified numerous times from 1997 until the relevant version of USPAP published in 2005.

93.     In expressing their collective opinions concerning the work of the Plaintiffs on the Property, the purported members of the Board were performing an "appraisal" governed by the

requirements of USPAP, yet in expressing their individual and collective opinions, they failed to follow the requirements of USPAP or the Board's regulations.

94.     The 2005 version of USPAP does not contain a definition or explanation of "recognized methods and techniques that are necessary to produce a credible appraisal."

### B.     The Board's Structure and the Members' Term Limits

95.     The Board was created by Section 3 of the New Jersey Real Estate Appraisers Act. N.J.S.A. 45:14F-3 ("There is created . . . a State Real Estate Appraiser Board.").

96.     The Board is "within the Division of Consumer Affairs in the Department of Law and Public Safety . . . ."  N.J.S.A. 45:14F-3.

97.     The Board is to be comprised of 11 members: (a) two are to be "public members"; (b) one is to be a "State executive department member" appointed under N.J.S.A. 45:1-2.2; (c) three are to be "State licensed real estate appraisers"; (d) three are to be "State certified real estate appraisers"; and (e) two are to be "representatives of the appraisal management company industry, each of whom shall be State certified real estate appraisers or State licensed real estate appraisers." N.J.S.A. 45:14F-3.

98.     All 11 members are to be appointed by the Governor, with the advice and consent of the Senate.  N.J.S.A. 45:14F-3 ("The Governor shall appoint the [ten non-executive department members] with the advice and consent of the Senate."); N.J.S.A. 45:1-2.2(b) ("the Governor shall appoint [the executive department member] in the same manner as presently prescribed by law for the appointment of members . . . .").

99.     The term of office for the Board members is three years, aside from the initial members when the Board was created in 1991 or 1992.  N.J.S.A. 45:14F-3 ("The Governor shall appoint each member for a term of three years . . . ."); N.J.S.A. 45:1-2.2(b) (the executive

department member "shall be appointed for the term prescribed for the other members of the board . . . .").

100.    "No member of the board shall serve more than two successive terms in addition to any unexpired term to which he has been appointed."  N.J.S.A. 45:14F-3; *see also* N.J.S.A. 45:1-2.2(b) (executive department member is "appointed for the term prescribed for the other members of the board . . . .").

101.    The disciplinary actions against Plaintiffs — the McNamara and Kudrick Complaints — were filed on November 21, 2017, with the "State of New Jersey Department of Law and Public Safety, Division of Law, New Jersey State Board of Real Estate Appraisers."  *See* Exhibits A & B hereto.

102.    On November 21, 2017, the purported Board members were: (a) Defendant Barry J. Krauser ("Krauser"); (b) Defendant John McCann ("McCann"); (c) Defendant Joseph Palumbo ("Palumbo"); and (d) Cheryl A. Randolph-Sharpe ("Randolph-Sharpe").

103.    Aside from Randolph-Sharpe, this is consistent with the Board's website showing its purported "current members" — three Board members and the other eight seats vacant:

| Name | Status | Member Type |
|---|---|---|
| Barry J. Krauser | Current | Certified General Appraiser |
| John A. McCann | Current | Certified General Appraiser |
| Joseph Palumbo | Current | Certified Residential Appraiser |
| | Current | Licensed Appraiser |
| | VACANT | Licensed Appraiser |
| | VACANT | Licensed Appraiser |
| | VACANT | Public |
| | VACANT | Public |
| | VACANT | State Executive |
| | VACANT | Appraisal Management Company |
| | VACANT | Appraisal Management Company |

https://www.njconsumeraffairs.gov/rea/Pages/members.aspx (last visited Apr. 14, 2020).

104.    According to the first available Meeting Minutes posted on the Board's website for February 13, 2001, both Krauser and McCann were listed as Board members present at that meeting.    https://www.njconsumeraffairs.gov/rea/Pages/meetings.aspx (last visited Apr. 14, 2020).

105.    Krauser and McCann are listed as Board members at every monthly meeting held from February 13, 2001, through to the last meeting for which Meeting Minutes are posted on January 15, 2020.  *See* Addendum A at A-1 to A-7.

106.    The first meeting at which the Meeting Minutes show Randolph-Sharpe attending as a Board member is January 10, 2006.  *See* Addendum A at A-2.

107.    The last meeting at which the Meeting Minutes show Randolph-Sharpe attending as a purported Board member is June 20, 2018.  *See* Addendum A at A-6.

108.    The first meeting at which the Meeting Minutes show Palumbo attending as a Board member is April 26, 2011.  *See* Addendum A at A-4.

109.    Palumbo is listed as a purported Board member at the last meeting for which Meeting Minutes are posted on January 15, 2020.  *See* Addendum A at A-7.

110.    As of November 21, 2017, when the McNamara and Kudrick Complaints were filed with the Board, the purported Board members had been in that position for the following periods of time:

| Member | Time on Board | Duration |
|---|---|---|
| Barry J. Krauser | 2/13/01 to 11/21/17 | **16 yrs., 9 mos.** |
| John A. McCann | 2/13/01 to 11/21/17 | **16 yrs., 9 mos.** |
| Cheryl A. Randolph-Sharpe | 1/10/06 to 11/21/17 | **11 yrs., 10 mos.** |
| Joseph Palumbo | 4/26/11 to 11/21/17 | **6 yrs., 6 mos.** |

**C.**      **The Board's Powers and Duties Under the Appraisers Act**

111.    The Appraiser Act gives the Board broad powers and duties.  N.J.S.A. 45:14F-8. These powers and duties include, but are not limited to, the following:

    **a.**  **Licensing:**  The power and duty to issue and renew licenses and certificates for appraisers in New Jersey.  N.J.S.A. 45:14F-8(c).

    **b.**  **Regulating:**  The power and duty to promulgate rules and regulations governing appraisals in New Jersey.  N.J.S.A. 45:14F-8(n).

    **c.**  **Ethics:**  The power and duty to create a code of professional ethics for appraisers in New Jersey.  N.J.S.A. 45:14F-8(g).

    **d.**  **Investigation:**  The power and duty to investigate appraisers under the Uniform Enforcement Act, N.J.S.A. 45:1-14.  N.J.S.A. 45:14F-8(e).

e.  **Hearings:**  The power and duty to conduct investigative hearings at which it can administer oaths to witnesses and for which it has the power to issue subpoenas for compulsory attendance and the production of pertinent books, papers, and records. N.J.S.A. 45:14F-8(i).

f.  **Discipline:**  The power and duty to suspend, revoke, or refuse to issue or renew a license, certificate, or registration.  N.J.S.A. 45:14F-8(e).

g.  **Final Discipline:**  In contested cases for which an administrative law judge ("ALJ") hears claims of alleged violations, N.J.S.A. 52:14B-9, the ALJ issues a recommended report and decision.  N.J.S.A. 52:14B-10(c).  The Board may then "adopt, reject or modify the recommended report and decision . . . ."  N.J.S.A. 52:14B-10(c).

h.  **Judicial Review:**  If an appraiser seeks judicial review of the Board's investigation, the hearing, and/or its decision to adopt, reject, or modify an ALJ's recommended report and decision, the appraiser will be required to show that the Board's decision was "arbitrary, capricious, or unreasonable or [if] it is not supported by substantial credible evidence in the record as a whole."  *Acoli v. New Jersey State Parole Bd.*, 462 N.J. Super. 39, 50, 224 A.3d 269, 276 (App. Div. 2019) (internal quotations omitted).

**Count I**
**(All Defendants — Due Process,**
**42 U.S.C. §§ 1983 & 1988)**

112.    Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

113.    The Fifth Amendment to the United States Constitution precludes the government from "depriving any person of life, liberty, or property, without the due process of law." U.S. CONST. amend. X, § 1.

114.    The Fourteenth Amendment to the United States Constitution precludes any State government from "depriving any person of life, liberty, or property, without the due process of law." U.S. CONST. amend. XIV, § 1.

115.    The property interest of licensed professionals is a well-established liberty and property right protected by the Due Process Clause of the United States Constitution.

116.    Plaintiffs have a liberty and property interest in their rights as a licensed professional and should be entitled to the certain rights, responsibilities, benefits, and protections prior to which the State can revoke any professional license.  Requirements of procedural due process apply to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property. *Board of Regents v. Roth*, 408 U.S. 564, 569 (1972).

117.    Defendants violate the liberty interests of the Plaintiffs in four respects;

    a)    The State violated the non-delegation rule relating to the delegation to private individuals of governmental legislative functions by permitting private individuals, without any government oversight, to establish standards of conduct and measures by which such standards are to be

- 18 -

judged;

b)    In seeking to discipline the Plaintiffs, the State is using a Board of private individuals who are competitors of the Plaintiffs and who are using standards created by private individuals to judge Plaintiffs while failing to abide by those same regulations in doing so;

c)    In seeking to discipline Plaintiffs by filing the McNamara and Kudrick Complaints, the Board is attempting to take State action and exercise the State's police power against Plaintiffs when there was not — on November 21, 2017, when those Complaints were filed or currently — a single "Board member" who was vested with any power or authority because the term limits of all such purported "Board members" had expired, making the Board's actions "ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 789 (2d Cir. 2007); and

d)    The delegation of the governance of every step of the appraisal process in New Jersey to the Board — from licensing, to investigation, to prosecution, to discipline — constitutes a violation of due process by commingling all these different powers and duties in a single entity.  Although commingling all of these powers and duties via N.J.S.A. 45:14F-8 and 52:14B-10(c) in a single Board is facially unconstitutional in itself, it is likewise unconstitutional as applied in this case because: (1) the Board currently is, and was at the time the administrative actions were brought on November 21, 2017, acting ultra vires because none of the "Board members" was

validly sitting as a Board member; (2) the Board, in its investigation and in bringing the disciplinary actions, was not following the USPAP standards or its own regulations; and (3) the sitting "Board members" are the Plaintiffs' competitors and lack any degree of objectivity in the "administration of justice."

118.    Defendants' infringement upon the Plaintiffs' liberty and property right to enjoy the rights and privileges of their licenses violates the Due Process Clause.

119.    Defendants' interference upon Plaintiffs' liberty and property right toenjoy the rights and privileges of their licenses violates the Plaintiffs' fundamental rights and fundamental freedom in liberty and property under the Fourteenth Amendment.

120.    The New Jersey laws and regulations relating to the licensing and lawful practice as a property appraiser facially and as applied to Plaintiffs deprives Plaintiffs of their Due Process rights under the Fourteenth Amendment and is not narrowly tailored to serve a compelling governmental interest.

121.    In the administrative actions, Plaintiffs have been charged with violating N.J.A.C. 13:40A-6.1(a) & (b), as well as various USPAP standards.  As a result, Plaintiffs' challenge in this action is that that regulation is unconstitutional, as well as the imposition of the USPAP standards by way of that regulation.

122.    To the extent other New Jersey statutory and/or regulatory provisions impose USPAP standards on other non-FRT appraisals, they too may be impacted by a determination that N.J.A.C. 13:40A-6.1 is unconstitutional, but Plaintiffs do not have standing to challenge related statutory or regulatory provisions because they have not been charged with violating them.  *See, e.g.*, *Raines v. Byrd*, 521 U.S. 811, 819 (1997) ("To meet the standing requirements of Article III,

[a] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." (internal quotations omitted)); *Duhe v. City of Little Rock*, 902 F.3d 858, 866 (8th Cir. 2018) (affirming the district court's ruling that "plaintiffs lacked standing to challenge the permit ordinance [as unconstitutional] because they were neither arrested nor charged under it, and were not prohibited from protesting even though they lacked a permit."), *cert. denied*, 139 S. Ct. 1178 (2019).

123.    Defendants have taken the position in their briefing, however, that N.J.A.C. 13:40A-6.1 was promulgated pursuant to a legislative mandate in N.J.S.A. 45:14F-8(g) and 45:14F-8(h).

124.    Plaintiffs disagree, but to the extent this Court finds that N.J.A.C. 13:40A-6.1 was in whole or in part driven by or compelled by N.J.S.A. 45:14F-8(g) and/or 45:14F-8(h) and/or 45:14F-8(n), Plaintiffs allege that those statutory provisions are unconstitutional for all the same reasons that they allege N.J.A.C. 13:40A-6.1 is unconstitutional.

125.    Defendants, attempting to act under color of state law, are depriving Plaintiffs of their rights secured by the Due Process Clause of the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

126.    Plaintiffs are entitled to their costs, including their reasonable attorneys' fees, pursuant 42 U.S.C. § 1988.

127.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, and Fed. R. Civ. P. 57, Plaintiffs seek a declaratory judgment that N.J.A.C. 13:40A-6.1 and related regulations, as well as N.J.S.A. 45:14F-8 and 42:14B-10(c), violate the Due Process Clause of the Fifth and Fourteenth Amendment to the United States Constitution.

128.    Plaintiffs have no other adequate remedy at law.

**Count II**
**(All Defendants — Request for a**
**Preliminary and Permanent Injunction)**

129.   Plaintiffs incorporate by reference all preceding allegations as if fully stated

herein.

130.   Defendants violate the liberty interests of the Plaintiffs in four respects;

    a)    The State violated the non-delegation rule relating to the delegation to private individuals of governmental legislative functions by permitting private individuals, without any government oversight, to establish standards of conduct and measures by which such standards are to be judged;

    b)    In seeking to discipline the Plaintiffs, the State is using a Board of private individuals who are competitors of the Plaintiffs and who are using standards created by private individuals to judge Plaintiffs while failing to abide by those same regulations in doing so;

    c)    In seeking to discipline Plaintiffs by filing the McNamara and Kudrick Complaints, the Board is attempting to take State action and exercise the State's police power against Plaintiffs when there was not — on November 21, 2017, when those Complaints were filed or currently — a single "Board member" who was vested with any power or authority because the term limits of all such purported "Board members" had expired, making the Board's actions "ultra vires and, as a result, sufficiently arbitrary to amount to a substantive due process violation." *Cine SK8, Inc. v. Town of Henrietta*, 507 F.3d 778, 789 (2d Cir. 2007); and

d)      The delegation of the governance of every step of the appraisal process in New Jersey to the Board — from licensing, to investigation, to prosecution, to discipline — constitutes a violation of due process by commingling all these different powers and duties in a single entity. Although commingling all of these powers and duties via N.J.S.A. 45:14F-8 and 52:14B-10(c) in a single Board is facially unconstitutional in itself, it is likewise unconstitutional as applied in this case because: (1) the Board currently is, and was at the time the administrative actions were brought on November 21, 2017, acting ultra vires because none of the "Board members" was validly sitting as a Board member; (2) the Board, in its investigation and in bringing the disciplinary actions, was not following the USPAP standards or its own regulations; and (3) the sitting "Board members" are the Plaintiffs' competitors and lack any degree of objectivity in the "administration of justice."

131.      Defendants' infringement upon the Plaintiffs' liberty and property right to enjoy the rights and privileges of their licenses violates the Due Process Clause.

132.      Plaintiffs seek the entry of a preliminary and permanent injunction enjoining Defendants and Defendants' officers, agents, servants, employees, attorneys, and other persons in active concert or participation with Defendants or Defendants' officers, agents, servants, employees or attorneys from enforcing N.J.A.C. 13:40A-6.1 and related regulations.

## Count III
### (All Defendants — Ultra Vires,
### Declaratory Judgment Act)

133.     Plaintiffs incorporate by reference all preceding allegations as if fully stated herein.

134.     Actions by State actors that are "utterly beyond the [actor's] jurisdiction" are "Ultra vires in the primary sense and void . . . ."  *Summer Cottagers' Ass'n of Cape May v. City of Cape May*, 19 N.J. 493, 504, 117 A.2d 585, 590 (1955); *see also City of Hoboken v. City of Jersey City*, 347 N.J. Super. 279, 295-96, 789 A.2d 668, 677 (Law Div. 2001) (Planning Board's actions were ultra vires because members' term limits had expired); *Hollar v. Gov't of V.I.*, 857 F.2d 163, 168 (3d Cir. 1988) ("An ultra vires act is one which is impermissible as beyond the power or capacity of the entity in question").

135.     The legislative term limits for Board members is clear: (a) "The Governor shall appoint each member for a term of three years . . . ."; and (b) "No member of the board shall serve more than two successive terms . . . ."  N.J.S.A. 45:14F-3.

136.     The McNamara and Kudrick Complaints were filed at a time (November 21, 2017) when no purported sitting "Board member" was actually vested with any authority or power because their respective terms had expired.

137.     Assuming, for purposes of argument only, that each of the "sitting Board members" was appointed by the Governor for a second term, and were deemed so qualified to take the position by the Senate upon its advice and consent, their respective terms expired: (a) Krauser's terms expired on February 14, 2007; (b) McCann's terms expired on February 14, 2007; (c) Randolph-Sharpe's terms expired on January 11, 2012; and (d) Palumbo's terms expired on April

26, 2017.[1]

138.     As a result, the Board's action in bringing the administrative disciplinary actions against Plaintiffs Gerald McNamara and Colleen Kudrick on November 21, 2017, was "utterly beyond the [Board's] jurisdiction" and was therefore "Ultra vires in the primary sense and void . . . ." *Summer Cottagers'*, 19 N.J. at 504, 117 A.2d at 590; *see also City of Hoboken*, 347 N.J. Super. at 295-96, 789 A.2d at 677.

139.     Because the Board's action in bringing the administrative actions against Plaintiffs McNamara and Kudrick is void as ultra vires, Plaintiffs seek to have this Court declare those disciplinary actions void under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

140.      Because the Board's action in bringing the administrative actions against McNamara and Kudrick is void as ultra vires, Plaintiffs seek to have this Court preliminarily and permanently enjoin Defendants and Defendants' officers, agents, servants, employees, attorneys, and other persons in active concert or participation with Defendants or Defendants' officers, agents, servants, employees or attorneys from enforcing N.J.A.C. 13:40A-6.1 and related regulations.

---

[1] Krauser and McCann were apparently Board members before the first published Meeting Minutes from February 13, 2001: (a) it appears that the Senate approved the appointment of Krauser to the Board on November 15, 1999, *see* N.J. Legis. Dig. (Nov. 15, 1999); and (b) it appears that the Senate approved the appointment of McCann to the Board on June 28, 2001, *see* N.J. Legis. Dig. (June 28, 2001).  How McCann could be sitting as a Board member (and as the Vice President of the Board) on February 13, 2001, when his confirmation apparently did not pass the Senate until June 28, 2001, is unclear, but it may be that it was for his second term.

**<u>Prayer for Relief</u>**

WHEREFORE, Plaintiffs pray that this Court:

(A)    Enter a judgment declaring that N.J.A.C. 13:40A-6.1 and related regulations violate the Due Process Clause of the Fifth Amendment to the United States Constitution;

(B)    Enter a judgment declaring that N.J.A.C. 13:40A-6.1 and related regulations, as well as N.J.S.A. 45:14F-8 and 42:14B-10(c), violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

(C)    Enter a preliminary and permanent injunction enjoining Defendants from enforcing N.J.A.C. 13:40A-6.1 and related regulations, as well as N.J.S.A. 45:14F-8 and 42:14B-10(c), under the Due Process Clause of the Fourteenth Amendment, as challenged herein;

(D)    Enter a judgment declaring that the disciplinary actions against Plaintiffs — *In re Gerald McNamara*, OAL Dkt. No. 4156-18 (N.J. Office Admin. Law), and *In re Colleen Kudrick*, OAL Dkt. No. 4157-18 (N.J. Office Admin. Law) — are void as ultra vires having been commenced and prosecuted by the State Real Estate Appraiser Board that had on November 21, 2017, and currently has no valid, de jure, bona fide member(s);

(E)    Enter a preliminary and permanent injunction enjoining Defendants from prosecuting or proceeding with the disciplinary actions against Plaintiffs — *In re Gerald McNamara*, OAL Dkt. No. 4156-18 (N.J. Office Admin. Law), and *In re Colleen Kudrick*, OAL Dkt. No. 4157-18 (N.J. Office Admin. Law) — on the grounds that such actions are void as ultra vires having been commenced and prosecuted by the State Real Estate Appraiser Board that had on November 21, 2017, and currently has no valid, de jure, bona fide member(s);

(F)    Award costs and expenses to Plaintiffs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988; and

(G)    Award such additional relief as this Curt deems just and proper.

By:    /s/ Kevin F. Berry
      Kevin F. Berry, Esquire
      **O'HAGAN MEYER**
      46 West Main Street
      Maple Shade, NJ  08052
      267-386-4353
      kberry@ohaganmeyer.com


By:    /s/ Dennis A. Scardilli
      Dennis A. Scardilli, Esquire
      **LAW OFFICE OF DENNIS A. SCARDILLI LLC**
      105 Woods Road
      Absecon, NJ  08201
      609-568-0432
      dennis@scardillilaw.com


Dated:  May 6, 2020

# EXHIBIT A

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, New Jersey 07102



By:   Michael Antenucci
      Deputy Attorney General
      Attorney ID No. 032862011
      Tel. (973) 648-4741

STATE OF NEW JERSEY
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CONSUMER AFFAIRS
NEW JERSEY STATE BOARD OF REAL ESTATE
APPRAISERS

| | |
|---|---|
| IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE CERTIFICATION OF | Administrative Action |
| **GERALD MCNAMARA CERTIFICATION NO. 42RG00081100** | **NOTICE OF HEARING and NOTICE TO FILE ANSWER** |
| TO PRACTICE REAL ESTATE APPRAISING IN THE STATE OF NEW JERSEY | |

TO:   Kevin Berry, Esq.
      O'Hagan Meyer
      100 N. 18th Street, Suite 700
      Philadelphia, Pennsylvania 19103

      Dennis A. Scardilli, Esq.
      Law Office of Dennis A. Scardilli L.L.C.
      105 Woods Road
      Absecon, NJ 08201

**PLEASE TAKE NOTICE** that a Complaint, copy annexed hereto, has been made to the New Jersey State Real Estate Appraiser Board ("Board") to consider the matter of the suspension or revocation of your certification to engage in real estate appraising, pursuant to the authority conferred upon the Board by N.J.S.A. 45:1-14 et seq., N.J.S.A. 45:1-21, N.J.S.A. 45:14F-1 et

1

seq., and related administrative regulations, as well as the imposition of penalties and costs. The Board requires you to file an Answer to the above charges within thirty-five (35) days from service of the Complaint. You may file an Answer by mail to the address listed below.

Your answer should admit or deny each allegation in the Complaint. If you deny only a part of an allegation, you shall specify as much of it as is true and shall deny only the remainder. If you are without knowledge or information sufficient to answer an allegation you shall so state. If you wish to present any affirmative defenses to the charges, your answer should set forth that statement of facts separately.

If you admit that the allegations of the Complaint are correct, or you state that you do not contest the charges, or that your violation of the cited laws or rules or accepted standards of practice was unintentional, then no contested hearing in this proceeding will be necessary. Your case will then be presented to the Board for a final determination. You will be notified, and you will have the opportunity to appear at a brief hearing to offer written material or to make an oral presentation in mitigation of the penalty or sanction which would otherwise be imposed. The Board will then determine whether your license and/or certification to practice should be suspended or revoked or a lesser sanction imposed. The Board will also consider whether investigative costs and/or monetary penalties and attorney fees should be assessed and, if so, the appropriate amount thereof pursuant to the authority conferred upon the Board by N.J.S.A. 45:1-14 et seq.

A denial of the charges in the Complaint will result in a formal hearing being conducted at a date, time and place to be determined by the Board or its designee which, upon notice to you, will hear the Complaint. Adjournments will not be granted except upon timely written application to the Board for good cause shown; any expenses incurred by the Board as a result

2

thereof may be taxed to you. You may appear at the hearing either in person or by attorney or both and you shall be afforded an opportunity to make defense to any or all of the charges.

Failure to respond to this Notice of Hearing and Notice to File an Answer or failure to appear as set forth herein may result in the matter being considered in your absence. A decision rendered by the Board may affect your privilege to practice your licensed and/or certified profession in this State.

BOARD OF REAL ESTATE APPRAISERS

By: _____

Charles Kirk
Executive Director

Dated: November 2/, 2017

3

KINDLY ADDRESS AN ORIGINAL AND ONE COPY OF ALL CORRESPONDENCE TO:

    NEW JERSEY STATE BOARD OF REAL ESTATE APPRAISERS
    Charles Kirk
    Executive Director
    P.O. Box 45032
    Newark, New Jersey 07101

WITH A COPY TO:

    CHRISTOPHER S. PORRINO
    ATTORNEY GENERAL OF NEW JERSEY
    Attention:  Michael Antenucci, Deputy Attorney General
    Division of Law
    P.O. Box 45029
    Newark, New Jersey 07101

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, New Jersey 07102

```
FILED
November 21, 2017
BOARD OF
REAL ESTATE APPRAISERS
CHARLES F. KIRK
Acting Executive Director
```

By:     Michael Antenucci
        Deputy Attorney General
        Attorney ID No. 032862011
        Tel. (973) 648-4741

STATE OF NEW JERSEY
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
NEW JERSEY STATE BOARD OF REAL ESTATE
APPRAISERS

| | |
|---|---|
| IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE CERTIFICATION OF | Administrative Action |
| **GERALD MCNAMARA CERTIFICATION NO. 42RG00081100** | **COMPLAINT** |
| TO PRACTICE REAL ESTATE APPRAISING IN THE STATE OF NEW JERSEY | |

Christopher S. Porrino, Attorney General of New Jersey ("Attorney General"), by Michael

Antenucci, Deputy Attorney General, appearing, with offices located at 124 Halsey Street, 5th Floor,

P.O. Box 45029, Newark, New Jersey 07101, by way of Administrative Complaint says as follows:

## GENERAL ALLEGATIONS

1.      Complainant, the Attorney General, is charged with the duty and responsibility of

enforcing the laws of the State of New Jersey, pursuant to N.J.S.A. 52:17A-4(h), and is empowered

to initiate administrative disciplinary proceedings against persons licensed and/or certified by the

New Jersey State Board of Real Estate Appraisers ("Board"), pursuant to N.J.S.A. 45:1-14 et seq.

1

2.      The Board is charged with the duty and responsibility of regulating the practice of

real estate appraising in New Jersey, pursuant to N.J.S.A. 45:14F-1 et seq. and N.J.A.C. 13:40A-1.1

et seq.

3.      Furthermore, pursuant to N.J.A.C. 13:40A-6.1(a), all real estate appraisals executed in

this State must, at a minimum, conform to the Uniform Standards of Professional Appraisal Practices

("USPAP"). According to N.J.A.C. 13:40A-6.1(b), a failure to comply with the USPAP in rendering

a real estate appraisal may be construed by the Board to be professional misconduct, thereby

empowering the Board to suspend or revoke a licensee's authority to practice real estate appraising

in this State pursuant to N.J.S.A. 45:1-21(e) and N.J.A.C. 13:40A-7.9(d)(5).[1]

4.      Gerald B. McNamara ("Respondent"), at all times relevant hereto, has been a certified

as a general real estate appraiser in the State of New Jersey, with certification number

42RG00081100. The current status of Respondent's certification is "Active".

5.      During all times relevant hereto, Respondent practiced at Cushman & Wakefield of

Pennsylvania, Inc. ("Cushman & Wakefield"), at 1717 Arch Street, 30th Floor, Philadelphia,

Pennsylvania 19103.

6.      Colleen M. Kudrick, a certified general real estate appraiser in New Jersey, as of

March 17, 2008, with certification number 42RG00218000, at all times relevant hereto, was an

associate of Respondent at Cushman & Wakefield.

7.      On April 16, 2003, an Agreement of Sale for 9601 Atlantic Avenue, Lower

Township, New Jersey ("subject property"), was entered between Diamond Beach Resort, LLC, as

seller ("seller"), and Eustace Mita, as buyer ("buyer"), for a contract purchase price of $18,500,000.

The agreement encompassed, among other items, a sale of the land and all attached buildings,

---

[1] Since the appraisal under review was prepared in May 2005, it is subject to the 2005 edition
of the USPAP, effective January 1, 2005.

2

structures and fixtures, including a 197-unit hotel known as the "Grand Hotel", in addition to the seller's rights, title and interest to the hotel.[2]

8.     On March 4, 2004, April 1, 2004, and June 3, 2004, hearings occurred before the Board of Adjustment of the Township of Lower ("zoning board") on the buyer's application for certain use, density and hardship variances to allow construction of the "Grand Resort and Spa" ("Grand Resort" or "development") on the subject property.   As originally proposed, the development consisted of a hotel, residential condominium and spa integrated project, with a 12-story condominium building on the subject property's larger beachfront parcel of land east of Atlantic Avenue, and a 12-story 150-unit hotel on the property's smaller parcel of land west of Atlantic Avenue, with a bridge over Atlantic Avenue connecting the two structures.   During the course of the hearings, however, the buyer withdrew from consideration the hotel portion of the project and its associated variances, and indicated he would return to the zoning board with a substantially downsized structure that would conform to height and setback requirements.  Also, as part of the requested approvals, the buyer agreed to deed restrict portions of the owned beach area, including a 50 foot wide access corridor to the mean high water line and a 50 foot wide strip of beach along the mean high water line of the Atlantic Ocean, which would provide beach access and a free public beach in excess of what was required by the State's "Public Trust Doctrine".

---

[2]   There was also an Addendum to the Agreement of Sale, dated June 30, 2003, which modified the payment and handling of deposit monies and extended the closing date for the sale from March 31, 2004 to March 31, 2005.  Copies of the Agreement of Sale and Addendum were not contained in the work file of Respondent and Ms. Kudrick (collectively, "Appraisers") for the appraisal subject to this action.   Those documents were subsequently obtained from Lower Township through an Open Public Records Act ("OPRA") request, pursuant to N.J.S.A. 47:1A-1 et seq., dated August 13, 2012, made by Ms. Kudrick in connection with the Board's inquiry into this matter.

9.     On June 3, 2004, the zoning board granted approvals on the buyer's application for certain variances pertaining to building height, multiple uses on the same lot, and frontage requirements on the subject property.

10.     On March 30, 2005, the deed to the subject property was transferred to the buyer at a sale price of $18,000,000. The deed of this sale was subsequently recorded with the county clerk's office on April 6, 2005.

11.     On April 7, 2005, the zoning board granted the buyer preliminary and final site plan approval for a 12-story, 125-unit condominium building on the subject property's larger beachfront parcel of land east of Atlantic Avenue. However, no actions were taken and no approvals were granted regarding the smaller parcel of land west of Atlantic Avenue.[3]

12.     On May 4, 2005, Respondent and Ms. Kudrick were hired by The Carlyle Group ("Carlyle"), to complete an appraisal ("appraisal report") of the subject property, for the purpose of evaluating potential financing.[4] An engagement letter executed on that date by the Appraisers and Carlyle specified a May 31, 2005 delivery date for the appraisal report, with a "verbal indication of value" to be provided "within one week of receipt of the necessary property information."

13.     On May 13, 2005, Ms. Kudrick inspected the subject property, and later submitted the prepared report to Carlyle on May 31, 2005. The appraisal report describes the subject property as two non-contiguous parcels of land containing four acres, or 174,196 square feet, in the aggregate.

---

[3] Copies of these approvals were not contained in the Appraisers' work file for the subject appraisal. They were subsequently obtained from Lower Township through an OPRA request dated August 13, 2012, made by Ms. Kudrick in connection with the Board's inquiry in this matter.

[4] USPAP 2-2 identifies three types of written real property appraisal reports: Self-Contained, Summary, or Restricted Use. These distinctions are based upon the intended users, and the content and level of information provided in the report. Moreover, USPAP Standard Rules may apply differently, depending on the type of report. The appraisal report here was identified as a "Self-Contained Appraisal Report".

The larger parcel, containing 2.80 acres and located on the east side of Atlantic Avenue, extends through to Wildwood Crest beach to the north and was improved with a 195-unit beachfront hotel. The smaller parcel, containing 1.20 acres and located directly opposite to the larger parcel on the west side of Atlantic Avenue, was described as vacant and unimproved. Moreover, despite acknowledging an "April 6, 2005" sale of the subject property for $18,000,000 and the buyer's intent to drastically redevelop the site,[5] the appraisal report was prepared under the hypothetical condition that the entire property was vacant and available for development, with no consideration given to the existing or proposed improvements.[6]

14.      Since the subject property was valued as "vacant" land, the only method of valuation utilized by the Appraisers was the "Sales Comparison Approach", and, accordingly, they did not develop a "Cost Approach" or "Income Capitalization Approach" in the appraisal report. Under the Sales Comparison Approach, a value indication is derived by comparing similar properties that have recently sold with the property being appraised, and making adjustments to the sale prices of the comparable properties based on relevant, market-derived elements of comparison, such as differences in property rights appraised, the motivations of buyers and sellers, financing terms, market conditions at the time of sale, size, location, physical features, and, if the properties produce income, economic characteristics. The Sales Comparison Approach may be used to value improved

———————————

[5] The appraisal report notes the proposed development would include up to "128 upscale condominium units . . . with an adjoining 150-room hotel . . . to be connected by a gilded crosswalk traversing Atlantic Avenue[,]" as well as a "structured parking garage, gourmet restaurant, poolside bar and grill, health club, full service spa and oceanfront pool complex and entertainment area."

[6] Notably, the appraisal report further acknowledges a market value of the subject property, based on its 2005 property tax assessment with current improvements, at $14,418,182.

properties, vacant land, or land being considered as though vacant when an adequate supply of comparable sales data is available.[7]

15.     To this end, five "vacant" land sales were identified and analyzed in the appraisal report, including parcels with standing structures, which had been or were to be demolished. Moreover, all of the sales were located in Wildwood Crest, the adjacent municipality immediately to the north of the subject property. After making adjustments to the five comparable sales, the Appraisers concluded a market value of the subject property, as of May 23, 2005, at $375 per square foot, which was then applied to the total site area of 174,196 square feet, resulting in the Appraisers' calculation of a total market value of "$65,323,665",[8] rounded to $65,300,000.[9]

16.     On May 25, 2010, Carlyle filed a complaint with the Board against Respondent and Ms. Kudrick alleging that they had "falsified" comparable sales data and market information in their appraisal report, and that they generally failed to comply with USPAP requirements, resulting in a grossly inflated valuation of the subject property, as vacant land, at three and a half times its actual sale price of $18,000,000 just two months prior to the appraisal.

17.     Specifically, Carlyle pointed to evidence of falsification in the Appraisers' identification and analysis of comparable sales 1 and 5. To illustrate, the manner in which the Appraisers identified and analyzed these comparable sales, and which, in part, led them to achieve a

----

[7] See generally, The Dictionary of Real Estate Appraisal. 5th ed. Chicago: Appraisal Institute, 2010; The Appraisal of Real Estate. 14th ed. Chicago: Appraisal Institute, 2013.

[8] The Appraisers' appear to have miscalculated this figure. The product of 174,196 square feet, multiplied by $375, results in a value of $65,323,500.

[9] Subsequent to the completion of the appraisal report, and after obtaining all required permits, the buyer eventually demolished the existing Grand Hotel located on the larger beachfront parcel of land, and constructed the 12-story, 125-unit Grand Resort condominium complex that exists today on the subject property. The smaller parcel of land west of Atlantic Avenue, which had been utilized as a parking lot for the Grand Hotel, was subsequently not improved with a 150-unit hotel, as understood by the Appraisers, but rather a small one-story building utilized as a sales office for the Grand Resort.

flawed market value conclusion of $375 per square foot, as alleged by Carlyle, is summarized as follows:

    a.   Comparable sale 1 was reported to be a $5,000,000 sale of an "8,303 square foot parcel" of vacant land at 8500-8506 Atlantic Avenue in Wildwood Crest, New Jersey, in May of 2005, set for "development with condominiums." Based on these figures, the Appraisers computed the per square foot value of the sale at $602.20, which resulted in a comparable "adjusted unit value of $430.36 per square foot."

    b.   Comparable sale 5 was reported to be a November 2004 sale of a "35,837 square foot parcel" at 8401 Atlantic Avenue in Wildwood Crest, New Jersey, for "$7,500,000 or $209.28 per square foot of land area." The Appraisers further note that the sale was for the "site of the former Summer Sands Motel, which was demolished for redevelopment with condominiums" and, after all adjustments, was given a comparable value of $354.98 per square foot, ostensibly, as vacant land.

18.    In response to these findings, Carlyle alleged in its complaint that the Appraisers falsely identified the property subject to comparable sale 1 as an 8,303 square foot site, when in fact the true area of the lot, as recorded in Cape May County land records, was approximately 49,912 square feet, aggregated from two separate land sales totaling $5,000,000. Consequently, the Appraisers' calculation that the property had sold for $602.20 per square foot was grossly overstated, as a result of their inaccurate reporting of the lot size, which in actuality would have shown a $100.18 per square foot value. As to comparable sale 5, Carlyle asserted that the Summer Sands Motel had not

7

been demolished, as stated by the Appraisers, but existed at the time of the appraisal, and was subsequently converted to condominiums.[10]

19.   On June 26, 2012, as part of the Board's investigation into Carlyle's complaint, Respondent and Ms. Kudrick, appearing separately, gave sworn testimony to the Board. Ms. Kudrick, who was the first to appear before the Board, testified that at the time the subject appraisal report was prepared, she did not hold a license or certificate issued by the Board, nor did she secure any temporary permit to appraise the subject property. Notwithstanding, she completed the majority of the appraisal report, including identifying, inspecting, and analyzing the comparable sale properties. Moreover, she acknowledged that she had incorrectly reported the size of the property in comparable sale 1 as approximately six times smaller than its actual size, although possessing in her work file deeds detailing that transaction as two separate land sales totaling $5,000,000, and her own visual inspection of the area. As to comparable sale 5, Ms. Kudrick further acknowledged that she incorrectly suggested in the appraisal report that the Summer Sands Motel had been demolished at the time of the appraisal, in spite of her alleged inspection of that property. Moreover, among other Board concerns, Ms. Kudrick could not sufficiently explain the rationale for adjustments she made to all of the comparable sales in the appraisal report, and her failure to analyze, in any significant way, the recent sale of the of the subject property for $18,000,000, as it related to her appraised market value of $65,300,000.

20.   In his appearance before the Board, Respondent testified that he did not assist in the preparation of the appraisal report, and that, typically, he reviews Ms. Kudrick's work "at the end,

---

[10] Carlyle further alleged that the Appraisers "falsified information" in the subject appraisal report by supplying data in it regarding the "residential housing stock within Cape May County" unchanged from a 2001 appraisal report completed by Cushman & Wakefield, but for the attribution of "a more current year."

8

after she's written the report, done her analysis[.]" He further testified that he conducted an "exterior inspection" of the subject property separately from Ms. Kudrick, but did not select or inspect any of the comparable sales, do market research, or review any zoning approvals in place at the time of the appraisal, and would normally assume the "validity and accuracy" of Ms. Kudrick's analysis. He also could not recall whether Ms. Kudrick had a temporary permit to conduct an appraisal in New Jersey, as well as other details of the review process, and thus was unable to answer many of the questions posed regarding his specific work and contributions to the report. Nonetheless, Respondent signed the appraisal report, and thus took full responsibility for its content.

## COUNT I

21.     The Attorney General repeats and re-alleges the General Allegations above as if fully set forth verbatim herein.

22.     Pursuant to USPAP 1-1(b), an appraiser must not commit a substantial error of omission or commission that significantly affects the appraisal. Also, according to USPAP 1-1(c), an appraiser must not render appraisal services in a careless or negligent manner, such as by making a series of errors that, although individually might not significantly affect the results of an appraisal, in the aggregate affects the credibility of those results. Lastly, pursuant to USPAP 2-2(a)(iii), an appraisal report must, at a minimum, describe information sufficient to identify the real estate involved in the appraisal, including the physical and economic property characteristics relevant to the assignment. The appraisal report here contains several errors, including significant factual errors regarding the description of the subject property and two of the comparable sales that, in their totality, meaningfully impact the credibility of the appraisal by Respondent and Ms. Kudrick.

23.     As a preliminary matter, the block and lot identifications of the subject property were not accurately reported and are incomplete in the appraisal report. The block and lot identification errors of the appraisal report are identified as follows:

a.  The appraisal report identifies the subject property as consisting of two non-contiguous parcels of land containing four acres in the aggregate. The first parcel, identified as "Block 700-1, Lot 3", is noted to be a 2.80-acre parcel of land, improved with a 5-story hotel building containing 195 guest rooms. The second parcel, identified as "Block 699, Lot 3" is reported to be an unimproved 1.20-acre parcel of land.

b.  The correct description of subject property, according to the detailed legal description in the property's deed from the March 30, 2005 sale, and which was included in the Appraisers' work file, identifies the first parcel as having 2.796 acres, and consisting of four municipal blocks (Blocks 700.01, 700.02, 705.01, and 705.02), and 32 total lots. The second parcel is identified as a municipal block of 1.157 acres (Block 699), and includes 13 lots. The total aggregate land area of the two parcels is 3.953 acres, or approximately 172,200 square feet.

c.  In addition to these two parcels, and as referenced in detail in the March 30, 2005 deed, the subject property includes a third parcel (Block 700.02, Lots 1.04 and 1.0), which comprises of a privately owned beach that extends 3,495 feet out to the exterior riparian grant line, with a total area of 27.27 acres, including 1.83 acres of beach above the mean high water line. Significantly, the appraisal report makes no mention of this privately owned beach land, suggesting that the Appraisers were unaware of its inclusion in the subject property when they

10

prepared the appraisal report, notwithstanding its reference in the deed to the subject property. This omission is significant as private beach ownership is an amenity that would typically be expected to enhance the value of property, yet this portion of the property is not referenced anywhere in the appraisal report, including the property description, or the analysis and valuation.

24.     In addition to the Appraisers' failure to accurately report an exact description of the subject property and their exclusion of valuable physical and economic characteristics of the subject property from their appraisal analysis, the appraisal report contains numerous factual errors in the reporting and analysis of comparable sales data, namely as to comparable sales 1 and 5, which, collectively, have an substantial effect on the credibility of the Appraisers' conclusions. The manner in which the Appraisers analyzed those sales is described, in pertinent part, as follows:

a.    The Appraisers identified comparable sale 1 as a $5,000,000 sale of an 8,303 square foot parcel of land in May 2005, which would reflect cost of $602.20 per square foot, or $26,231,893 per acre.  To the contrary, comparable sale 1 included two parcels of land sold by separate deeds between the same seller and buyer on the same date, April 20, 2005.  One parcel included 44,810 square feet of land and sold for $4,500,000, and the other parcel contained 5,103 square feet of land and sold for $500,000, according to the deeds of those sales, which were included in the Appraisers' work file.

b.    Notwithstanding the existence of the two deeds in the Appraisers' work file that contained a detailed legal description of the dimensions and specific reference to all included block and lot identifications, and Ms. Kudrick's own physical inspection of the property subject to comparable sale 1, the Appraisers

11

ascertained a lot size of 8,303 square feet for that sale by relying on two data sheets from "Win2Data", a computer application available to real estate and mortgage finance professionals nationwide, that provides access to publically recorded deed and mortgage information, according to Ms. Kudrick's investigative inquiry testimony. These data sheets identify the parcel that sold for $4,500,000 as having 3,201.66 square feet, and the parcel that sold for $500,000 as having 5,100.876 square feet, for a total lot area of 8,302.536 square feet, rounded to 8,303 square feet, and resulting in a price per square foot of $602.20, as reported in the appraisal and utilized in the analysis, instead of an accurate amount of $100.17 per square foot.

c.   As to comparable sale 5, the Appraisers falsely reported it as a 35,837 square foot land sale for "the site of the former Summer Sands Motel" for $7,500,000 in November 2004, which reflected a value of $209.28 per square feet of vacant land area. The Appraisers further claimed in their report, without verifying documentation, and in spite of Ms. Kudrick's reported physical inspection of that comparable sale property, that the Summer Sands Motel had been "demolished for redevelopment with condominiums." In actuality, the Summer Sands Motel was not demolished, but physically existed at the time of the appraisal report, and was converted to condominiums in October 2005. Ultimately, the fact that the Summer Sands Motel was not demolished undermines the reliability of this sale as an indication of land value alone.

25.   The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or

incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, <u>N.J.A.C.</u> 13:40A-6.1(a), <u>N.J.A.C.</u> 13:40A-6.1(b), USPAP 1-1(b), USPAP 1-1(c), and USPAP 2-2(a)(iii).  Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to <u>N.J.S.A.</u> 45:1-21 (b), (d),  (e), and (h), as well as <u>N.J.A.C.</u> 13:40A-7.9(d)(2), (4), (5), and (8).

<u>COUNT II</u>

26.     The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One above as if fully set forth verbatim herein.

27.     Pursuant to USPAP 2-2(a)(ix), an appraisal must describe the information analyzed, the appraisal procedures followed, and the reasoning that supports the analyses and opinions, and conclusions.  Although the appraisal report here documents information analyzed, appraisal procedures followed, and adjustments made to comparable sales, there is insufficient information provided to enable the intended user to adequately understand the rationale for the adjustments, and the resulting opinions and conclusions.  Specifically, the analysis and adjustments made to the comparable sales data contain inconsistencies, apparent contradictions, and adjustments made without discussion or explanation of the reasoning that supports the adjustments.  This series of errors in analysis, in addition to the aforementioned factual errors regarding the description of the subject property and comparable sales 1 and 5, in the aggregate, further establish that Respondent and Ms. Kudrick rendered their appraisal services in a careless or negligent manner, in violation of USPAP 1-1(c).

28.     To begin with, substantial errors were made in the reporting and analysis of comparable sale 1, resulting in an overstated indication of value.  Specifically, the error in

13

determining the lot size of comparable sale 1 and the correspondent gross overstatement of the indicated value of $602.20 per square feet, versus an actual sale value of $100.17 per square feet, carried throughout the analysis and adjustments, and led to an erroneous adjusted unit value of that sale of $430.36 per square feet. The other four sales were adjusted upward 65 to 70 percent, based on this error, resulting in adjusted unit values of $322.26 to $364.38 per square foot. Based on these adjustments, the average adjusted unit price was calculated to be $366.17 per square foot, resulting in a concluded market value opinion for the subject property at $375 per square feet, or $65,300,000.

29.    In addition to the substantial errors made in the reporting and analysis of comparable sale 1, the Appraisers made several adjustments to comparable sales data, without supporting discussion or explanation, that were either inconsistent or contradictory. The manner in which the Appraisers inaccurately or insufficiently analyzed adjustments to comparable sales data is described, in part, as follows:

a.    The Appraisers supplied a downward adjustment of 25 percent to comparable sale 1 for a "Motivated Buyer", who they described as an "adjacent property owner . . . motivated to acquire that particular tract of land for proposed development." However, the Appraisers give no discussion or reference to the source of this information to support the adjustment.

b.    The Appraisers also asserted, in a section titled "Discussion of Adjustments", that "an annual adjustment of 3.00 percent" was applied to account for market changes between comparable sales dates of November 2004 to May 2005. However, in the "LAND SALE ADJUSTMENT GRID" the Appraisers actually applied a five percent adjustment for "annual change in market conditions" in their calculations. Moreover, the Appraisers also both acknowledged, during

14

their appearances before the Board, that even a five percent adjustment was inconsistent with the significant appreciation of value in the local market in early 2005.

c.  In terms of location adjustments, all of the comparable sales, which were all located to the north in Wildwood Crest, were considered inferior to the subject property, and were accordingly adjusted upward between 5 and 10 percent. However, Wildwood Crest is generally recognized, in the Cape May County real estate market, as a more desirable location than Lower Township, and therefore downward adjustments, rather than upward adjustments would be expected.[11]

d.  Although the subject property was reported to include 174,196 square feet, and the comparable sales' lot sizes ranged from 8,303 to 35,837 square feet, the Appraisers make a uniform, upward 25 percent size adjustment to all of the comparable sales, without providing supporting details for each adjustment and how the adjustment relates to the respective comparable sale lot sizes. Moreover, the Appraisers offer the conclusion, in the "Discussion of Adjustments" section, that "larger parcels of land situated within a barrier island beach community will typically sell at a higher unit price than a smaller site. . . [due to a] scarcity of larger sites available for development" in "established seasonal beach communities." However, this conclusion is contradicted by the Appraisers' erroneous data. Specifically, comparable sale 1 was incorrectly noted to be the

---

[11] The Appraisers, in a section titled "Local Area Characteristics", described the Wildwood area as having greater attractions than the subject property's location in Diamond Beach, including a "World Famous Boardwalk, with five amusement piers, over 150 rides, two water parks, movie theaters, fireworks, hundreds of specialty shops, and a variety of restaurants . . . [and] the Wildwood Convention Center [which] offers a wide variety of special events and activities year round."

15

smallest lot, containing 8,303 square feet, but had the highest unit price at $602.20 per square feet. Yet, the Appraisers fail to identify this apparent contradiction, let alone reconcile it with their prior conclusion regarding the relationship between unit price and lot size in seasonal beach communities.

e.  The Appraisers also summarily concluded that comparable sales 2 through 5 were inferior to the subject property in terms of "utility" and provided a uniform, upward adjustment of those sales of 35 percent. The appraisal report includes no discussion explaining the rationale for such a substantial utility adjustment, other than describing those properties as having an "average utility", presumably compared to the subject property. Alternatively, comparable sale 1, despite being directly adjacent and less than one block from comparable sale 5, was deemed by the Appraisers to have superior utility to the subject property, with no clear factual support, and thus was adjusted downward 25 percent.

f.  The appraisal report also contains no discussion, analysis or adjustments made regarding the status of approvals of the subject property and the comparable sales. This is a factor that warrants consideration in the valuation of land due to the time and cost involved in obtaining approvals. Whether a property sold with or without approvals, or was purchased subject to the buyer obtaining approvals, typically has an impact on the price paid. However, the Appraisers gave no consideration to this factor in their analysis of the comparable sales.

30.  The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and

regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.1(a), N.J.A.C. 13:40A-6.1(b), USPAP 1-1(c), and USPAP 2-2(a)(ix). Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8).

## COUNT III

31.    The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One and Two above as if fully set forth verbatim herein.

32.    Pursuant to USPAP 1-5(b), in developing a real property appraisal, when the value opinion to be developed is market value, an appraiser must analyze all sales of the subject property that occurred within three years prior to the effective date of the appraisal. Moreover, USPAP 2-2(a)(ix) further requires that, when reporting an opinion of market value, a summary of the results of the analysis of the subject sales, in accordance with USPAP 1-5 is required, and if such information is unobtainable, a statement on the efforts undertaken by the appraiser to obtain the information is required, or if such information is irrelevant, a statement acknowledging the existence of the information and citing its lack of relevance is required.

33.    Notwithstanding the extraordinary difference between the $18,000,000 sale price of the subject property less than two months before the appraisal report's value date and the Appraisers' market value conclusion of $65,300,000, the appraisal report lacks any analysis of this implausible leap in value that would assist the intended user in properly understanding this conclusion. Alternatively, the Appraisers give no explanation as to why an analysis of the sale of the subject property, less than two months prior to their appraisal, was irrelevant to their overall market value conclusions.

34.     To begin with, the sale of the subject property for $18,000,000 is referenced in the appraisal report only twice, and both times with the date of sale incorrectly identified as April 6, 2005. The appraisal report also lacks reference to or analysis of the April 2003 Agreement of Sale and the two-year period between the formation of the contract and the actual sale of March 30, 2005 in the "RECONCILIATION AND FINAL VALUE OPINION" section ("Reconciliation") of the appraisal report.

35.     The extent of the Appraisers' discussion of the March 30, 2005 sale in the Reconciliation, with regard to development potential of the subject property, includes only that: "no development approvals [were] in place" when the "property was placed under agreement of sale"; "[c]urrent ownership has taken the property through the zoning process and obtained preliminary development approvals for the dwelling units and all amenities." However, the appraisal report does not document a reference to the actual Agreement of Sale or the zoning variances or resolutions obtained by the buyer, which were later acquired by Ms. Kudrick pursuant to an OPRA request relating to the Board's investigation, to establish the report's claim that ownership has taken the property through the zoning process and received preliminary approvals.

36.     The Appraisers also assert in the Reconciliation that in 2002, the seller had been "sued by the State of New Jersey for allegedly misleading consumers through" false advertisements that "depicted the hotel's facilities as clean and luxurious even though it was in a serious state of disrepair and had been fined for fire code violations." However, the Appraisers provided no documented support for this claim. Ms. Kudrick testified before the Board that she only came upon this knowledge by an internet search, which was also not included in the Appraisers' work file.

37.     The Appraisers' last contention in the Reconciliation that the "improvements were in very poor condition and the seller was considered to be motivated to achieve a quick sale" is further

belied by the fact that the Agreement of Sale was entered on April 16, 2003, approximately two years before the sale date of March 30, 2005, and the hotel remained open and operating through the summer of 2005.

38.     No further explanation and/or analysis is included in the appraisal report that supports how "seller motivation, time, costs incurred, entrepreneurial incentive, and improved market conditions in the subject area," lends to a conclusion that the subject property, as vacant land, is worth an additional $47,300,000 over and above the sale price of $18,000,000, to achieve a value opinion of $65,300,000 as "reasonable and market oriented." This conclusion seems implausible and warrants further relevant explanation, discussion and/or analysis so the intended user can properly understand the Appraisers' reasoning.

39.     The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.1(a), N.J.A.C. 13:40A-6.1(b), USPAP 1-1(c), USPAP 1-5(b), and USPAP 2-2(a)(ix). Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8).

## COUNT IV

40.     The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One, Two, and Three above as if fully set forth verbatim herein.

41.     Pursuant to USPAP 2-1(a) and USPAP 2-1(b), each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be

misleading, and must contain sufficient information to enable the intended users of the appraisal to understand the report properly, respectively.

42.    Due to the aforementioned errors and inaccuracies in the Appraisers' reporting of significant details of the dimensions and scope of the subject property and the comparable sales, as well as their insufficient analysis relating to adjustments made to comparable sales on various factors and to the March 30, 2005 sale of the subject property for an amount $47,300,000 less than their final value opinion, the appraisal report is misleading to the intended user and results in an implausible market value conclusion.

43.    The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.1(a), N.J.A.C. 13:40A-6.1(b), USPAP 2-1(a), and USPAP 2-1(b). Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8).

## COUNT V

44.    The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One, Two, Three, and Four above as if fully set forth verbatim herein.

45.    Pursuant to USPAP 2-2(a)(xii), a certification, in accordance with USPAP 2-3, must be signed by an appraiser and included with the appraisal report. The Appraisers' completed and signed a certification; however, there is an inconsistency between the appraisal report and the certification, which affects the credibility of the Appraisers' certification.

46.     Specifically, the Appraisers' certification states under paragraph eight: "[Ms. Kudrick] made a personal inspection of the [subject property]. [Respondent], MAI, Managing Director, Valuation Services, reviewed and approved the report and inspected the property." (Emphasis added). Respondent also testified before the Board that he had inspected the subject property, but not the comparable sales.

47.     However, an earlier section of the appraisal report titled "Dates of Inspection and Valuation", states: "[t]he property was inspected on May 13, 2005 by [Ms. Kudrick]. [Respondent], MAI reviewed the report but did not inspect the property." (Emphasis added).[12]

48.     The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.1(a), N.J.A.C. 13:40A-6.1(b), USPAP 2-2(a)(xii), and USPAP 2-3. Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8).

## COUNT VI

49.     The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One, Two, Three, Four, and Five as if fully set forth verbatim herein.

50.     Pursuant to N.J.S.A. 45:14F-21(c), only a State certified or licensed real estate appraiser may "perform an appraisal assignment in regard to real estate located in this State", with

---

[12] When confronted about this inconsistency during the Board's inquiry, Respondent asserted that he had undertaken an "exterior inspection" of the subject property, and further testified that the statement in the appraisal report stating that he did not inspect the subject property was a "typo."

limited exception for those "assisting" in the preparation of an appraisal under "the direct supervision" of a certified or licensed appraiser. Moreover, according to N.J.A.C. 13:40A-7.3(a)(5), an appraiser certified in this State "shall not permit his or her name and designation to be used on an appraisal where the appraiser has not participated in the appraisal pursuant to the [USPAP]."

51.     The appraisal report here indicates that the "property was inspected by and the report was prepared by [Ms. Kudrick] under the supervision of [Respondent]." In an addendum to the appraisal report titled "Qualifications of the Appraisers", it is documented that, although Respondent was certified in this State as a general appraiser, Ms. Kudrick was neither licensed nor certified in this State at the time she prepared the appraisal of the subject property, having certification only in Delaware and Pennsylvania. Ms. Kudrick further co-signed the appraisal report as a "Senior Appraiser" and necessarily took full responsibility for all of the content of the report.[13]

52.     Further at her investigative inquiry before the Board, Ms. Kudrick admitted that she did not hold a license or certificate from the Board at the time the appraisal report was prepared, nor did she secure a temporary permit that would authorize her appraisal of the subject property in this State. Notwithstanding, she disclosed that she completed the majority of the appraisal work, including, but not limited to, identifying, inspecting, and analyzing the comparable sale properties. Respondent also provided, during his appearance before the Board, that he typically reviews Ms. Kudrick's work "at the end, after she's written the report, done her analysis," and that he did not select or inspect any comparable sales, conduct market research, or review any zoning approvals in place at the time of the appraisal, and would normally assume the "validity and accuracy" of Ms. Kudrick's analysis.

---

[13] The comments to USPAP 2-3 provide that any appraiser who signs a certification accepts full responsibility for all elements of the certification, for the assignment results, and for the contents of the appraisal report.

22

53.     Ms. Kudrick's substantial involvement in the preparation of the appraisal report, and her co-signing of it, are beyond the scope of the more restricted activity that could be considered "assisting" in the preparation of an appraisal. Accordingly, Respondent permitted an unlicensed person to perform an act for which a license or certification is required by the Board.

54.     The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including namely, N.J.S.A. 45:14F-21(c) and N.J.A.C. 13:40A-7.3(b), in aiding and abetting an unlicensed person to perform an act for which a license is required by the Board. Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), (h), and (n), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), (8), and (12).

WHEREFORE, Complainant respectfully demands the entry of an Order:

1.     Revoking or suspending Respondent's authority to practice real estate appraising in the State of New Jersey pursuant to N.J.S.A. 45:1-21;

2.     Assessing civil penalties against Respondent for each and every separate unlawful act as set forth in the individual counts above, pursuant to N.J.S.A. 45:1-22(b) and N.J.S.A. 45:1-25;

3.     Compelling Respondent to attend and successfully complete professional courses as determined by the Board before resumption of the practice of real estate appraising in the State of New Jersey;

4.     Requiring Respondent to pay costs, including attorney's fees; investigative costs; expert and fact witness fees and costs; costs of trial; and transcript costs, pursuant to N.J.S.A. 45:1-25(d); and

23

5.    Ordering such other and further relief as the Board shall deem just and appropriate under the circumstances.

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF NEW JERSEY

By:

Michael Antenucci
Deputy Attorney General

Dated: November _20_, 2017

24

# EXHIBIT B

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, New Jersey 07102

```
┌─────────────────────────────────┐
│           FILED                 │
│      November 21, 2017          │
│         BOARD OF                │
│    REAL ESTATE APPRAISERS       │
│       CHARLES F. KIRK           │
│    Acting Executive Director    │
└─────────────────────────────────┘
```

By:    Michael Antenucci
       Deputy Attorney General
       Attorney ID No. 032862011
       Tel. (973) 648-4741

STATE OF NEW JERSEY
DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF CONSUMER AFFAIRS
NEW JERSEY STATE BOARD OF REAL ESTATE
APPRAISERS

| | |
|---|---|
| IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE CERTIFICATION OF | Administrative Action |
| **COLLEEN KUDRICK CERTIFICATION NO. 42RG00218000** | **NOTICE OF HEARING and NOTICE TO FILE ANSWER** |
| TO PRACTICE REAL ESTATE APPRAISING IN THE STATE OF NEW JERSEY | |

TO:    Kevin Berry, Esq.
       O'Hagan Meyer
       100 N. 18th Street, Suite 700
       Philadelphia, Pennsylvania 19103

       Dennis A. Scardilli, Esq.
       Law Office of Dennis A. Scardilli L.L.C.
       105 Woods Road
       Absecon, NJ 08201

**PLEASE TAKE NOTICE** that a Complaint, copy annexed hereto, has been made to the

New Jersey State Real Estate Appraiser Board ("Board") to consider the matter of the suspension

or revocation of your certification to engage in real estate appraising, pursuant to the authority

conferred upon the Board by N.J.S.A. 45:1-14 et seq., N.J.S.A. 45:1-21, N.J.S.A. 45:14F-1 et

1

seq., and related administrative regulations, as well as the imposition of penalties and costs. The Board requires you to file an Answer to the above charges within thirty-five (35) days from service of the Complaint. You may file an Answer by mail to the address listed below.

Your answer should admit or deny each allegation in the Complaint. If you deny only a part of an allegation, you shall specify as much of it as is true and shall deny only the remainder. If you are without knowledge or information sufficient to answer an allegation you shall so state. If you wish to present any affirmative defenses to the charges, your answer should set forth that statement of facts separately.

If you admit that the allegations of the Complaint are correct, or you state that you do not contest the charges, or that your violation of the cited laws or rules or accepted standards of practice was unintentional, then no contested hearing in this proceeding will be necessary. Your case will then be presented to the Board for a final determination. You will be notified, and you will have the opportunity to appear at a brief hearing to offer written material or to make an oral presentation in mitigation of the penalty or sanction which would otherwise be imposed. The Board will then determine whether your license and/or certification to practice should be suspended or revoked or a lesser sanction imposed. The Board will also consider whether investigative costs and/or monetary penalties and attorney fees should be assessed and, if so, the appropriate amount thereof pursuant to the authority conferred upon the Board by N.J.S.A. 45:1-14 et seq.

A denial of the charges in the Complaint will result in a formal hearing being conducted at a date, time and place to be determined by the Board or its designee which, upon notice to you, will hear the Complaint. Adjournments will not be granted except upon timely written application to the Board for good cause shown; any expenses incurred by the Board as a result

2

thereof may be taxed to you. You may appear at the hearing either in person or by attorney or both and you shall be afforded an opportunity to make defense to any or all of the charges.

Failure to respond to this Notice of Hearing and Notice to File an Answer or failure to appear as set forth herein may result in the matter being considered in your absence. A decision rendered by the Board may affect your privilege to practice your licensed and/or certified profession in this State.

BOARD OF REAL ESTATE APPRAISERS

By: _____

Charles Kirk
Executive Director

Dated: November 2l , 2017

KINDLY ADDRESS AN ORIGINAL AND ONE COPY OF ALL CORRESPONDENCE TO:

NEW JERSEY STATE BOARD OF REAL ESTATE APPRAISERS
Charles Kirk
Executive Director
P.O. Box 45032
Newark, New Jersey 07101

WITH A COPY TO:

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF NEW JERSEY
Attention:  Michael Antenucci, Deputy Attorney General
Division of Law
P.O. Box 45029
Newark, New Jersey 07101

4

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF NEW JERSEY
Division of Law
124 Halsey Street, 5th Floor
P.O. Box 45029
Newark, New Jersey 07102

```
┌─────────────────────────────────┐
│              FILED              │
│  November 21, 2017              │
│           BOARD OF             │
│  REAL ESTATE APPRAISERS        │
│                                 │
│        CHARLES F. KIRK         │
│     Acting Executive Director   │
└─────────────────────────────────┘
```

By:   Michael Antenucci
      Deputy Attorney General
      Attorney ID No. 032862011
      Tel. (973) 648-4741

                          STATE OF NEW JERSEY
                          DEPARTMENT OF LAW AND PUBLIC SAFETY
                          DIVISION OF LAW
                          NEW JERSEY STATE BOARD OF REAL ESTATE
                          APPRAISERS

| | |
|---|---|
| IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE CERTIFICATION OF | Administrative Action |
| **COLLEEN KUDRICK** **CERTIFICATION NO. 42RG00218000** | **COMPLAINT** |
| TO PRACTICE REAL ESTATE APPRAISING IN THE STATE OF NEW JERSEY | |

        Christopher S. Porrino, Attorney General of New Jersey ("Attorney General"), by Michael

Antenucci, Deputy Attorney General, appearing, with offices located at 124 Halsey Street, 5th Floor,

P.O. Box 45029, Newark, New Jersey 07101, by way of Administrative Complaint says as follows:

                          <u>**GENERAL ALLEGATIONS**</u>

        1.      Complainant, the Attorney General, is charged with the duty and responsibility of

enforcing the laws of the State of New Jersey, pursuant to <u>N.J.S.A.</u> 52:17A-4(h), and is empowered

to initiate administrative disciplinary proceedings against persons licensed and/or certified by the

New Jersey State Board of Real Estate Appraisers ("Board"), pursuant to <u>N.J.S.A.</u> 45:1-14 <u>et seq.</u>

1

2.       The Board is charged with the duty and responsibility of regulating the practice of real estate appraising in New Jersey pursuant to <u>N.J.S.A.</u> 45:14F-1 <u>et seq.</u> and <u>N.J.A.C.</u> 13:40A-1.1 <u>et seq.</u>

3.       Furthermore, pursuant to <u>N.J.A.C.</u> 13:40A-6.1(a), all real estate appraisals executed in this State must, at a minimum, conform to the Uniform Standards of Professional Appraisal Practices ("USPAP"). According to <u>N.J.A.C.</u> 13:40A-6.1(b), a failure to comply with the USPAP in rendering a real estate appraisal may be construed by the Board to be professional misconduct, thereby empowering the Board to suspend or revoke a licensee's authority to practice real estate appraising in this State pursuant to <u>N.J.S.A.</u> 45:1-21(e) and <u>N.J.A.C.</u> 13:40A-7.9(d)(5).[1]

4.       Colleen Kudrick, ("Respondent"), became certified as a general real estate appraiser in the State of New Jersey, with License Number 42RG00218000 on March 17, 2008. The current status of Respondent's license is "Active".

5.       During all times relevant hereto, Respondent practiced at Cushman & Wakefield of Pennsylvania, Inc. ("Cushman & Wakefield") at 1717 Arch Street, 30th Floor, Philadelphia, Pennsylvania 19103.

6.       Gerald McNamara, a certified general real estate appraiser in the State of New Jersey with License Number 42RG00081100, was a supervisor of Respondent at Cushman & Wakefield, at all times relevant hereto.

7.       On April 16, 2003, an Agreement of Sale for 9601 Atlantic Avenue, Lower Township, New Jersey ("subject property"), was entered between Diamond Beach Resort, LLC, as seller ("seller"), and Eustace Mita, as buyer ("buyer"), for a contract purchase price of $18,500,000. The agreement encompassed, among other items, a sale of the land and all attached buildings,

---

[1] Since the appraisal under review was prepared in May 2005, it is subject to the 2005 edition of the USPAP, effective January 1, 2005.

2

structures and fixtures, including a197-unit hotel known as the "Grand Hotel", in addition to the seller's rights, title and interest to the hotel.[2]

8.        On March 4, 2004, April 1, 2004, and June 3, 2004, hearings occurred before the Board of Adjustment of the Township of Lower ("zoning board") on the buyer's application for certain use, density and hardship variances to allow construction of the "Grand Resort and Spa" ("Grand Resort" or "development") on the subject property.   As originally proposed, the development consisted of a hotel, residential condominium and spa integrated project, with a 12-story condominium building on the subject property's larger beachfront parcel of land east of Atlantic Avenue, and a 12-story 150-unit hotel on the property's smaller parcel of land west of Atlantic Avenue, with a bridge over Atlantic Avenue connecting the two structures.   During the course of the hearings, however, the buyer withdrew from consideration the hotel portion of the project and its associated variances, and indicated he would return to the zoning board with a substantially downsized structure that would conform to height and setback requirements.  Also, as part of the requested approvals, the buyer agreed to deed restrict portions of the owned beach area, including a 50 foot wide access corridor to the mean high water line and a 50 foot wide strip of beach along the mean high water line of the Atlantic Ocean, which would provide beach access and a free public beach in excess of what was required by the State's "Public Trust Doctrine".

---

[2]   There was also an Addendum to the Agreement of Sale, dated June 30, 2003, which modified the payment and handling of deposit monies and extended the closing date for the sale from March 31, 2004 to March 31, 2005.  Copies of the Agreement of Sale and Addendum were not contained in the work file of Respondent and Mr. McNamara (collectively, "Appraisers") for the appraisal subject to this action.   Those documents were subsequently obtained from Lower Township through an Open Public Records Act ("OPRA") request, pursuant to N.J.S.A. 47:1A-1 et seq., dated August 13, 2012, made by Respondent in connection with the Board's inquiry into this matter.

9.      On June 3, 2004, the zoning board granted approvals on the buyer's application for certain variances pertaining to building height, multiple uses on the same lot, and frontage requirements on the subject property.

10.      On March 30, 2005, the deed to the subject property was transferred to the buyer at a sale price of $18,000,000. The deed of this sale was subsequently recorded with the county clerk's office on April 6, 2005.

11.      On April 7, 2005, the zoning board granted the buyer preliminary and final site plan approval for a 12-story, 125-unit condominium building on the subject property's larger beachfront parcel of land east of Atlantic Avenue. However, no actions were taken and no approvals were granted regarding the smaller parcel of land west of Atlantic Avenue.[3]

12.      On May 4, 2005, Respondent and Mr. McNamara were hired by The Carlyle Group ("Carlyle"), to complete an appraisal ("appraisal report") of the subject property, for the purpose of evaluating potential financing.[4] An engagement letter executed on that date by the Appraisers and Carlyle specified a May 31, 2005 delivery date for the appraisal report, with a "verbal indication of value" to be provided "within one week of receipt of the necessary property information."

13.      On May 13, 2005, Respondent inspected the subject property, and later submitted the prepared report to Carlyle on May 31, 2005. The appraisal report describes the subject property as two non-contiguous parcels of land containing four acres, or 174,196 square feet, in the aggregate.

---

[3] Copies of these approvals were not contained in the Appraisers' work file for the subject appraisal. They were subsequently obtained from Lower Township through an OPRA request dated August 13, 2012, made by Respondent in connection with the Board's inquiry in this matter.

[4] USPAP 2-2 identifies three types of written real property appraisal reports: Self-Contained, Summary, or Restricted Use. These distinctions are based upon the intended users, and the content and level of information provided in the report. Moreover, USPAP Standard Rules may apply differently, depending on the type of report. The appraisal report here was identified as a "Self-Contained Appraisal Report".

4

The larger parcel, containing 2.80 acres and located on the east side of Atlantic Avenue, extends through to Wildwood Crest beach to the north and was improved with a 195-unit beachfront hotel. The smaller parcel, containing 1.20 acres and located directly opposite to the larger parcel on the west side of Atlantic Avenue, was described as vacant and unimproved.  Moreover, despite acknowledging an "April 6, 2005" sale of the subject property for $18,000,000 and the buyer's intent to drastically redevelop the site,[5] the appraisal report was prepared under the hypothetical condition that the entire property was vacant and available for development, with no consideration given to the existing or proposed improvements.[6]

14.    Since the subject property was valued as "vacant" land, the only method of valuation utilized by the Appraisers was the "Sales Comparison Approach", and, accordingly, they did not develop a "Cost Approach" or "Income Capitalization Approach" in the appraisal report.  Under the Sales Comparison Approach, a value indication is derived by comparing similar properties that have recently sold with the property being appraised, and making adjustments to the sale prices of the comparable properties based on relevant, market-derived elements of comparison, such as differences in property rights appraised, the motivations of buyers and sellers, financing terms, market conditions at the time of sale, size, location, physical features, and, if the properties produce income, economic characteristics.  The Sales Comparison Approach may be used to value improved

_____

[5] The appraisal report notes the proposed development would include up to "128 upscale condominium units . . . with an adjoining 150-room hotel . . . to be connected by a gilded crosswalk traversing Atlantic Avenue[,]" as well as a "structured parking garage, gourmet restaurant, poolside bar and grill, health club, full service spa and oceanfront pool complex and entertainment area."

[6] Notably, the appraisal report further acknowledges a market value of the subject property, based on its 2005 property tax assessment with current improvements, at $14,418,182.

properties, vacant land, or land being considered as though vacant when an adequate supply of comparable sales data is available.[7]

15.    To this end, five "vacant" land sales were identified and analyzed in the appraisal report, including parcels with standing structures, which had been or were to be demolished. Moreover, all of the sales were located in Wildwood Crest, the adjacent municipality immediately to the north of the subject property.  After making adjustments to the five comparable sales, the Appraisers concluded a market value of the subject property, as of May 23, 2005, at $375 per square foot, which was then applied to the total site area of 174,196 square feet, resulting in the Appraisers' calculation of a total market value of "$65,323,665",[8] rounded to $65,300,000.[9]

16.    On May 25, 2010, Carlyle filed a complaint with the Board against Respondent and Mr. McNamara alleging that they had "falsified" comparable sales data and market information in their appraisal report, and that they generally failed to comply with USPAP requirements, resulting in a grossly inflated valuation of the subject property, as vacant land, at three and a half times its actual sale price of $18,000,000 just two months prior to the appraisal.

17.    Specifically, Carlyle pointed to evidence of falsification in the Appraisers' identification and analysis of comparable sales 1 and 5.  To illustrate, the manner in which the Appraisers identified and analyzed these comparable sales, and which, in part, led them to achieve a

---

[7] See generally, The Dictionary of Real Estate Appraisal. 5th ed. Chicago: Appraisal Institute, 2010; The Appraisal of Real Estate. 14th ed. Chicago: Appraisal Institute, 2013.

[8] The Appraisers' appear to have miscalculated this figure.  The product of 174,196 square feet, multiplied by $375, results in a value of $65,323,500.

[9] Subsequent to the completion of the appraisal report, and after obtaining all required permits, the buyer eventually demolished the existing Grand Hotel located on the larger beachfront parcel of land, and constructed the 12-story, 125-unit Grand Resort condominium complex that exists today on the subject property.  The smaller parcel of land west of Atlantic Avenue, which had been utilized as a parking lot for the Grand Hotel, was subsequently not improved with a 150-unit hotel, as understood by the Appraisers, but rather a small one-story building utilized as a sales office for the Grand Resort.

6

flawed market value conclusion of $375 per square foot, as alleged by Carlyle, is summarized as follows:

    a.   Comparable sale 1 was reported to be a $5,000,000 sale of an "8,303 square foot parcel" of vacant land at 8500-8506 Atlantic Avenue in Wildwood Crest, New Jersey, in May of 2005, set for "development with condominiums." Based on these figures, the Appraisers computed the per square foot value of the sale at $602.20, which resulted in a comparable "adjusted unit value of $430.36 per square foot."

    b.   Comparable sale 5 was reported to be a November 2004 sale of a "35,837 square foot parcel" at 8401 Atlantic Avenue in Wildwood Crest, New Jersey, for "$7,500,000 or $209.28 per square foot of land area." The Appraisers further note that the sale was for the "site of the former Summer Sands Motel, which was demolished for redevelopment with condominiums" and, after all adjustments, was given a comparable value of $354.98 per square foot, ostensibly, as vacant land.

18.    In response to these findings, Carlyle alleged in its complaint that the Appraisers falsely identified the property subject to comparable sale 1 as an 8,303 square foot site, when in fact the true area of the lot, as recorded in Cape May County land records, was approximately 49,912 square feet, aggregated from two separate land sales totaling $5,000,000. Consequently, the Appraisers' calculation that the property had sold for $602.20 per square foot was grossly overstated, as a result of their inaccurate reporting of the lot size, which in actuality would have shown a $100.18 per square foot value. As to comparable sale 5, Carlyle asserted that the Summer Sands Motel had not

7

been demolished, as stated by the Appraisers, but existed at the time of the appraisal, and was subsequently converted to condominiums.[10]

19.     On June 26, 2012, as part of the Board's investigation into Carlyle's complaint, Respondent and Mr. McNamara, appearing separately, gave sworn testimony to the Board. Respondent, who was the first to appear before the Board, testified that at the time the subject appraisal report was prepared, she did not hold a license or certificate issued by the Board, nor did she secure any temporary permit to appraise the subject property.  Notwithstanding, she completed the majority of the appraisal report, including identifying, inspecting, and analyzing the comparable sale properties.  Moreover, she acknowledged that she had incorrectly reported the size of the property in comparable sale 1 as approximately six times smaller than its actual size, although possessing in her work file deeds detailing that transaction as two separate land sales totaling $5,000,000, and her own visual inspection of the area.  As to comparable sale 5, Respondent further acknowledged that she incorrectly suggested in the appraisal report that the Summer Sands Motel had been demolished at the time of the appraisal, in spite of her alleged inspection of that property. Moreover, among other Board concerns, Respondent could not sufficiently explain the rationale for adjustments she made to all of the comparable sales in the appraisal report, and her failure to analyze, in any significant way, the recent sale of the of the subject property for $18,000,000, as it related to her appraised market value of $65,300,000.

20.     In his appearance before the Board, Mr. McNamara testified that he did not assist in the preparation of the appraisal report, and that, typically, he reviews Respondent's work "at the end,

_____

[10] Carlyle further alleged that the Appraisers "falsified information" in the subject appraisal report by supplying data in it regarding the "residential housing stock within Cape May County" unchanged from a 2001 appraisal report completed by Cushman & Wakefield, but for the attribution of "a more current year."

8

after she's written the report, done her analysis[.]" He further testified that he conducted an "exterior inspection" of the subject property separately from Respondent, but did not select or inspect any of the comparable sales, do market research, or review any zoning approvals in place at the time of the appraisal, and would normally assume the "validity and accuracy" of Respondent's analysis. He also could not recall whether Respondent had a temporary permit to conduct an appraisal in New Jersey, as well as other details of the review process, and thus was unable to answer many of the questions posed regarding his specific work and contributions to the report. Nonetheless, Mr. McNamara signed the appraisal report, and thus took full responsibility for its content.

## COUNT I

21. The Attorney General repeats and re-alleges the General Allegations above as if fully set forth verbatim herein.

22. Pursuant to USPAP 1-1(b), an appraiser must not commit a substantial error of omission or commission that significantly affects the appraisal. Also, according to USPAP 1-1(c), an appraiser must not render appraisal services in a careless or negligent manner, such as by making a series of errors that, although individually might not significantly affect the results of an appraisal, in the aggregate affects the credibility of those results. Lastly, pursuant to USPAP 2-2(a)(iii), an appraisal report must, at a minimum, describe information sufficient to identify the real estate involved in the appraisal, including the physical and economic property characteristics relevant to the assignment. The appraisal report here contains several errors, including significant factual errors regarding the description of the subject property and two of the comparable sales that, in their totality, meaningfully impact the credibility of the appraisal by Respondent and Mr. McNamara.

9

23.     As a preliminary matter, the block and lot identifications of the subject property were not accurately reported and are incomplete in the appraisal report. The block and lot identification errors of the appraisal report are identified as follows:

a.   The appraisal report identifies the subject property as consisting of two non-contiguous parcels of land containing four acres in the aggregate. The first parcel, identified as "Block 700-1, Lot 3", is noted to be a 2.80-acre parcel of land, improved with a 5-story hotel building containing 195 guest rooms. The second parcel, identified as "Block 699, Lot 3" is reported to be an unimproved 1.20-acre parcel of land.

b.   The correct description of subject property, according to the detailed legal description in the property's deed from the March 30, 2005 sale, and which was included in the Appraisers' work file, identifies the first parcel as having 2.796 acres, and consisting of four municipal blocks (Blocks 700.01, 700.02, 705.01, and 705.02), and 32 total lots. The second parcel is identified as a municipal block of 1.157 acres (Block 699), and includes 13 lots. The total aggregate land area of the two parcels is 3.953 acres, or approximately 172,200 square feet.

c.   In addition to these two parcels, and as referenced in detail in the March 30, 2005 deed, the subject property includes a third parcel (Block 700.02, Lots 1.04 and 1.0), which comprises of a privately owned beach that extends 3,495 feet out to the exterior riparian grant line, with a total area of 27.27 acres, including 1.83 acres of beach above the mean high water line. Significantly, the appraisal report makes no mention of this privately owned beach land, suggesting that the Appraisers were unaware of its inclusion in the subject property when they

10

prepared the appraisal report, notwithstanding its reference in the deed to the subject property. This omission is significant as private beach ownership is an amenity that would typically be expected to enhance the value of property, yet this portion of the property is not referenced anywhere in the appraisal report, including the property description, or the analysis and valuation.

24.      In addition to the Appraisers' failure to accurately report an exact description of the subject property and their exclusion of valuable physical and economic characteristics of the subject property from their appraisal analysis, the appraisal report contains numerous factual errors in the reporting and analysis of comparable sales data, namely as to comparable sales 1 and 5, which, collectively, have a substantial effect on the credibility of the Appraisers' conclusions. The manner in which the Appraisers analyzed those sales is described, in pertinent part, as follows:

a.   The Appraisers identified comparable sale 1 as a $5,000,000 sale of an 8,303 square foot parcel of land in May 2005, which would reflect cost of $602.20 per square foot, or $26,231,893 per acre. To the contrary, comparable sale 1 included two parcels of land sold by separate deeds between the same seller and buyer on the same date, April 20, 2005. One parcel included 44,810 square feet of land and sold for $4,500,000, and the other parcel contained 5,103 square feet of land and sold for $500,000, according to the deeds of those sales, which were included in the Appraisers' work file.

b.   Notwithstanding the existence of the two deeds in the Appraisers' work file that contained a detailed legal description of the dimensions and specific reference to all included block and lot identifications, and Respondent's own physical inspection of the property subject to comparable sale 1, the Appraisers

11

ascertained a lot size of 8,303 square feet for that sale by relying on two data sheets from "Win2Data", a computer application available to real estate and mortgage finance professionals nationwide, that provides access to publically recorded deed and mortgage information, according to Respondent's investigative inquiry testimony. These data sheets identify the parcel that sold for $4,500,000 as having 3,201.66 square feet, and the parcel that sold for $500,000 as having 5,100.876 square feet, for a total lot area of 8,302.536 square feet, rounded to 8,303 square feet, and resulting in a price per square foot of $602.20, as reported in the appraisal and utilized in the analysis, instead of an accurate amount of $100.17 per square foot.

c.  As to comparable sale 5, the Appraisers falsely reported it as a 35,837 square foot land sale for "the site of the former Summer Sands Motel" for $7,500,000 in November 2004, which reflected a value of $209.28 per square feet of vacant land area. The Appraisers further claimed in their report, without verifying documentation, and in spite of Respondent's reported physical inspection of that comparable sale property, that the Summer Sands Motel had been "demolished for redevelopment with condominiums." In actuality, the Summer Sands Motel was not demolished, but physically existed at the time of the appraisal report, and was converted to condominiums in October 2005. Ultimately, the fact that the Summer Sands Motel was not demolished undermines the reliability of this sale as an indication of land value alone.

25.     The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or

incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.1(a), N.J.A.C. 13:40A-6.1(b), USPAP 1-1(b), USPAP 1-1(c), and USPAP 2-2(a)(iii). Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8).

## COUNT II

26.     The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One above as if fully set forth verbatim herein.

27.     Pursuant to USPAP 2-2(a)(ix), an appraisal must describe the information analyzed, the appraisal procedures followed, and the reasoning that supports the analyses and opinions, and conclusions. Although the appraisal report here documents information analyzed, appraisal procedures followed, and adjustments made to comparable sales, there is insufficient information provided to enable the intended user to adequately understand the rationale for the adjustments, and the resulting opinions and conclusions. Specifically, the analysis and adjustments made to the comparable sales data contain inconsistencies, apparent contradictions, and adjustments made without discussion or explanation of the reasoning that supports the adjustments. This series of errors in analysis, in addition to the aforementioned factual errors regarding the description of the subject property and comparable sales 1 and 5, in the aggregate, further establish that Respondent and Mr. McNamara rendered their appraisal services in a careless or negligent manner, in violation of USPAP 1-1(c).

28.     To begin with, substantial errors were made in the reporting and analysis of comparable sale 1, resulting in an overstated indication of value. Specifically, the error in

13

determining the lot size of comparable sale 1 and the correspondent gross overstatement of the indicated value of $602.20 per square feet, versus an actual sale value of $100.17 per square feet, carried throughout the analysis and adjustments, and led to an erroneous adjusted unit value of that sale of $430.36 per square feet. The other four sales were adjusted upward 65 to 70 percent, based on this error, resulting in adjusted unit values of $322.26 to $364.38 per square foot. Based on these adjustments, the average adjusted unit price was calculated to be $366.17 per square foot, resulting in a concluded market value opinion for the subject property at $375 per square feet, or $65,300,000.

29.     In addition to the substantial errors made in the reporting and analysis of comparable sale 1, the Appraisers made several adjustments to comparable sales data, without supporting discussion or explanation, that were either inconsistent or contradictory. The manner in which the Appraisers inaccurately or insufficiently analyzed adjustments to comparable sales data is described, in part, as follows:

   a.  The Appraisers supplied a downward adjustment of 25 percent to comparable sale 1 for a "Motivated Buyer", who they described as an "adjacent property owner . . . motivated to acquire that particular tract of land for proposed development." However, the Appraisers give no discussion or reference to the source of this information to support the adjustment.

   b.  The Appraisers also asserted, in a section titled "Discussion of Adjustments", that "an annual adjustment of 3.00 percent" was applied to account for market changes between comparable sales dates of November 2004 to May 2005. However, in the "LAND SALE ADJUSTMENT GRID" the Appraisers actually applied a five percent adjustment for "annual change in market conditions" in their calculations. Moreover, the Appraisers also both acknowledged, during

their appearances before the Board, that even a five percent adjustment was inconsistent with the significant appreciation of value in the local market in early 2005.

c.   In terms of location adjustments, all of the comparable sales, which were all located to the north in Wildwood Crest, were considered inferior to the subject property, and were accordingly adjusted upward between 5 and 10 percent. However, Wildwood Crest is generally recognized, in the Cape May County real estate market, as a more desirable location than Lower Township, and therefore downward adjustments, rather than upward adjustments would be expected.[11]

d.   Although the subject property was reported to include 174,196 square feet, and the comparable sales' lot sizes ranged from 8,303 to 35,837 square feet, the Appraisers make a uniform, upward 25 percent size adjustment to all of the comparable sales, without providing supporting details for each adjustment and how the adjustment relates to the respective comparable sale lot sizes. Moreover, the Appraisers offer the conclusion, in the "Discussion of Adjustments" section, that "larger parcels of land situated within a barrier island beach community will typically sell at a higher unit price than a smaller site. . . [due to a] scarcity of larger sites available for development" in "established seasonal beach communities." However, this conclusion is contradicted by the Appraisers' erroneous data. Specifically, comparable sale 1 was incorrectly noted to be the

_____

[11] The Appraisers, in a section titled "Local Area Characteristics", described the Wildwood area as having greater attractions than the subject property's location in Diamond Beach, including a "World Famous Boardwalk, with five amusement piers, over 150 rides, two water parks, movie theaters, fireworks, hundreds of specialty shops, and a variety of restaurants . . . [and] the Wildwood Convention Center [which] offers a wide variety of special events and activities year round."

15

smallest lot, containing 8,303 square feet, but had the highest unit price at $602.20 per square feet. Yet, the Appraisers fail to identify this apparent contradiction, let alone reconcile it with their prior conclusion regarding the relationship between unit price and lot size in seasonal beach communities.

e.  The Appraisers also summarily concluded that comparable sales 2 through 5 were inferior to the subject property in terms of "utility" and provided a uniform, upward adjustment of those sales of 35 percent. The appraisal report includes no discussion explaining the rationale for such a substantial utility adjustment, other than describing those properties as having an "average utility", presumably compared to the subject property. Alternatively, comparable sale 1, despite being directly adjacent and less than one block from comparable sale 5, was deemed by the Appraisers to have superior utility to the subject property, with no clear factual support, and thus was adjusted downward 25 percent.

f.  The appraisal report also contains no discussion, analysis or adjustments made regarding the status of approvals of the subject property and the comparable sales. This is a factor that warrants consideration in the valuation of land due to the time and cost involved in obtaining approvals. Whether a property sold with or without approvals, or was purchased subject to the buyer obtaining approvals, typically has an impact on the price paid. However, the Appraisers gave no consideration to this factor in their analysis of the comparable sales.

30.   The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and

16

regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.1(a), N.J.A.C. 13:40A-6.1(b), USPAP 1-1(c), and USPAP 2-2(a)(ix). Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8).

**COUNT III**

31.     The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One and Two above as if fully set forth verbatim herein.

32.     Pursuant to USPAP 1-5(b), in developing a real property appraisal, when the value opinion to be developed is market value, an appraiser must analyze all sales of the subject property that occurred within three years prior to the effective date of the appraisal. Moreover, USPAP 2-2(a)(ix) further requires that, when reporting an opinion of market value, a summary of the results of the analysis of the subject sales, in accordance with USPAP 1-5 is required, and if such information is unobtainable, a statement on the efforts undertaken by the appraiser to obtain the information is required, or if such information is irrelevant, a statement acknowledging the existence of the information and citing its lack of relevance is required.

33.     Notwithstanding the extraordinary difference between the $18,000,000 sale price of the subject property less than two months before the appraisal report's value date and the Appraisers' market value conclusion of $65,300,000, the appraisal report lacks any analysis of this implausible leap in value that would assist the intended user in properly understanding this conclusion. Alternatively, the Appraisers give no explanation as to why an analysis of the sale of the subject property, less than two months prior to their appraisal, was irrelevant to their overall market value conclusions.

17

34.     To begin with, the sale of the subject property for $18,000,000 is referenced in the appraisal report only twice, and both times with the date of sale incorrectly identified as April 6, 2005. The appraisal report also lacks reference to or analysis of the April 2003 Agreement of Sale and the two-year period between the formation of the contract and the actual sale of March 30, 2005 in the "RECONCILIATION AND FINAL VALUE OPINION" section ("Reconciliation") of the appraisal report.

35.     The extent of the Appraisers' discussion of the March 30, 2005 sale in the Reconciliation, with regard to development potential of the subject property, includes only that: "no development approvals [were] in place" when the "property was placed under agreement of sale"; "[c]urrent ownership has taken the property through the zoning process and obtained preliminary development approvals for the dwelling units and all amenities." However, the appraisal report does not document a reference to the actual Agreement of Sale or the zoning variances or resolutions obtained by the buyer, which were later acquired by Respondent pursuant to an OPRA request relating to the Board's investigation, to establish the report's claim that ownership has taken the property through the zoning process and received preliminary approvals.

36.     The Appraisers also assert in the Reconciliation that in 2002, the seller had been "sued by the State of New Jersey for allegedly misleading consumers through" false advertisements that "depicted the hotel's facilities as clean and luxurious even though it was in a serious state of disrepair and had been fined for fire code violations." However, the Appraisers provided no documented support for this claim. Respondent testified before the Board that she only came upon this knowledge by an internet search, which was also not included in the Appraisers' work file.

37.     The Appraisers' last contention in the Reconciliation that the "improvements were in very poor condition and the seller was considered to be motivated to achieve a quick sale" is further

18

belied by the fact that the Agreement of Sale was entered on April 16, 2003, approximately two years before the sale date of March 30, 2005, and the hotel remained open and operating through the summer of 2005.

38.     No further explanation and/or analysis is included in the appraisal report that supports how "seller motivation, time, costs incurred, entrepreneurial incentive, and improved market conditions in the subject area," lends to a conclusion that the subject property, as vacant land, is worth an additional $47,300,000 over and above the sale price of $18,000,000, to achieve a value opinion of $65,300,000 as "reasonable and market oriented." This conclusion seems implausible and warrants further relevant explanation, discussion and/or analysis so the intended user can properly understand the Appraisers' reasoning.

39.     The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.1(a), N.J.A.C. 13:40A-6.1(b), USPAP 1-1(c), USPAP 1-5(b), and USPAP 2-2(a)(ix).   Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8).

## COUNT IV

40.     The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One, Two, and Three above as if fully set forth verbatim herein.

41.     Pursuant to USPAP 2-1(a) and USPAP 2-1(b), each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be

misleading, and must contain sufficient information to enable the intended users of the appraisal to understand the report properly, respectively.

42.     Due to the aforementioned errors and inaccuracies in the Appraisers' reporting of significant details of the dimensions and scope of the subject property and the comparable sales, as well as their insufficient analysis relating to adjustments made to comparable sales on various factors and to the March 30, 2005 sale of the subject property for an amount $47,300,000 less than their final value opinion, the appraisal report is misleading to the intended user and results in an implausible market value conclusion.

43.     The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.1(a), N.J.A.C. 13:40A-6.1(b), USPAP 2-1(a), and USPAP 2-1(b).  Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d),  (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8).

## COUNT V

44.     The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One, Two, Three, and Four above as if fully set forth verbatim herein.

45.     Pursuant to USPAP 2-2(a)(xii), a certification, in accordance with USPAP 2-3, must be signed by an appraiser and included with the appraisal report.  The Appraisers' completed and signed a certification; however, there is an inconsistency between the appraisal report and the certification, which affects the credibility of the Appraisers' certification.

20

46.     Specifically, the Appraisers' certification states under paragraph eight: "[Respondent] made a personal inspection of the [subject property].  [Mr. McNamara], MAI, Managing Director, Valuation Services, reviewed and approved the report <u>and inspected the property</u>." (Emphasis added).  Mr. McNamara also testified before the Board that he had inspected the subject property, but not the comparable sales.

47.     However, an earlier section of the appraisal report titled "Dates of Inspection and Valuation", states: "[t]he property was inspected on May 13, 2005 by [Respondent].  [Mr. McNamara], MAI reviewed the report <u>but did not inspect the property</u>." (Emphasis added).[12]

48.     The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, <u>N.J.A.C.</u> 13:40A-6.1(a), <u>N.J.A.C.</u> 13:40A-6.1(b), USPAP 2-2(a)(xii), and USPAP 2-3.  Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to <u>N.J.S.A.</u> 45:1-21 (b), (d), (e), and (h), as well as <u>N.J.A.C.</u> 13:40A-7.9(d)(2), (4), (5), and (8).

## COUNT VI

49.     The Attorney General repeats and re-alleges the General Allegations and the allegations of Count One, Two, Three, Four, and Five as if fully set forth verbatim herein.

50.     Pursuant to <u>N.J.S.A.</u> 45:14F-21(c), only a State certified or licensed real estate appraiser may "perform an appraisal assignment in regard to real estate located in this State", with limited exception for those "assisting" in the preparation of an appraisal under "the direct

---

[12] When confronted about this inconsistency during the Board's inquiry, Mr. McNamara asserted that he had undertaken an "exterior inspection" of the subject property, and further testified that the statement in the appraisal report stating that he did not inspect the subject property was a "typo."

21

supervision" of a certified or licensed appraiser. Moreover, according to N.J.A.C. 13:40A-7.3(a)(5), an appraiser certified in this State "shall not permit his or her name and designation to be used on an appraisal where the appraiser has not participated in the appraisal pursuant to the [USPAP]."

51.    The appraisal report here indicates that the "property was inspected by and the report was prepared by [Respondent] under the supervision of [Mr. McNamara]." In an addendum to the appraisal report titled "Qualifications of the Appraisers", it is documented that, although Mr. McNamara was certified in this State as a general appraiser, Respondent was neither licensed nor certified in this State at the time she prepared the appraisal of the subject property, having certification only in Delaware and Pennsylvania. Respondent further co-signed the appraisal report as a "Senior Appraiser" and necessarily took full responsibility for all of the content of the report.[13]

52.    Further at her investigative inquiry before the Board, Respondent admitted that she did not hold a license or certificate from the Board at the time the appraisal report was prepared, nor did she secure a temporary permit that would authorize her appraisal of the subject property in this State. Notwithstanding, she disclosed that she completed the majority of the appraisal work, including, but not limited to, identifying, inspecting, and analyzing the comparable sale properties. Mr. McNamara also testified, during his appearance before the Board, that he typically reviews Respondent's work "at the end, after she's written the report, done her analysis," and that he did not select or inspect any comparable sales, conduct market research, or review any zoning approvals in place at the time of the appraisal, and would normally assume the "validity and accuracy" of Respondent's analysis.

---

[13] The comments to USPAP 2-3 provide that any appraiser who signs a certification accepts full responsibility for all elements of the certification, for the assignment results, and for the contents of the appraisal report.

53.   Respondent's substantial involvement in the preparation of the appraisal report, and her co-signing of it, are beyond the scope of the more restricted activity that could be considered "assisting" in the preparation of an appraisal. Accordingly, Respondent engaged in the unlicensed practice of real estate appraising in this State.

54.   The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including namely, N.J.S.A. 45:14F-21(c) and N.J.A.C. 13:40A-7.3(b), in her unlicensed practice of real estate appraising in this State. Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), (h), and (n), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), (8), and (12).

WHEREFORE, Complainant respectfully demands the entry of an Order:

1.   Revoking or suspending Respondent's authority to practice real estate appraising in the State of New Jersey pursuant to N.J.S.A. 45:1-21;

2.   Assessing civil penalties against Respondent for each and every separate unlawful act as set forth in the individual counts above, pursuant to N.J.S.A. 45:1-22(b) and N.J.S.A. 45:1-25;

3.   Compelling Respondent to attend and successfully complete professional courses as determined by the Board before resumption of the practice of real estate appraising in the State of New Jersey;

4.   Requiring Respondent to pay costs, including attorney's fees; investigative costs; expert and fact witness fees and costs; costs of trial; and transcript costs, pursuant to N.J.S.A. 45:1-25(d); and

23

5.     Ordering such other and further relief as the Board shall deem just and appropriate under the circumstances.

CHRISTOPHER S. PORRINO
ATTORNEY GENERAL OF NEW JERSEY

By

Michael Antenucci
Deputy Attorney General

Dated: November 20, 2017

24

# EXHIBIT C

Kevin F. Berry
O'HAGAN MEYER
46 West Main Street
Maple Shade, NJ 08052
267-386-4353
kberry@ohaganmeyer.com



FILED
BOARD OF
REAL ESTATE APPRAISERS
CHARLES F. KIRK
Acting Executive Director

Dennis A. Scardilli, Esquire
105 Woods Road
Absecon, NJ 08201
609-568-0432
dennis@scardillilaw.com

### STATE OF NEW JERSEY
### DEPARTMENT OF LAW AND PUBLIC SAFETY
### DIVISION OF CONSUMER AFFAIRS
### NEW JERSEY STATE BOARD OF REAL ESTATE APPRAISERS

| | |
|---|---|
| IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE CERTIFICATION OF | Administrative Action |
| **GERALD McNAMARA CERTIFICATION NO. 42RG00081100** | **RESPONSE OF GERALD McNAMARA TO COMPLAINT** |
| TO PRACTICE REAL ESTATE APPRAISING IN THE STATE OF NEW JERSEY | |

Gerald McNamara ("McNamara"), by and through his attorneys, files this Answer to the

Complaint and avers as follows:

### GENERAL ALLEGATIONS

1.     Denied as to the exercise of authority by the Attorney General of the State of New

Jersey to initiate administrative disciplinary proceedings, as set forth in the Administrative Complaint

("Complaint") against persons licensed and/or certified by the New Jersey State Board of Real Estate

Appraisers (the "Board") when such disciplinary proceedings are based on real estate appraisal

standards, to wit, the Uniform Standards of Professional Appraisal Practice ("USPAP"), which have

Page 1 of 87

been promulgated and/or administered in violation of the US. Constitution (hereinafter

"Unconstitutionally Promulgated"), and/or has been promulgated in violation of Federal law and/or

regulation, and therefore cannot be applied in this action.

2.      Denied as to the Board's ability to regulate the practice of real estate appraisal

under the Uniform Standards of Real Estate Appraisal ("USPAP") as defined in N.J.S.A. 45:14F-29, and

as further applied in N.J.S.A. 45:14F-1, *et seq*. including but not limited to, N.J.S.A. 45:14F-8(l),

"Powers, duties of the Board", and in N.J.S.A. 45:14F-30(b)(4), "Authority of the Board" and as defined

in N.J.A.C. 13:40A-1.2 and as further applied in sections of N.J.A.C. 13:40A-1.1, *et seq*. including but

not limited to N.J.A.C. 13:40A-6.1, as USPAP has been Unconstitutionally Promulgated, and/or has

been promulgated in violation of Federal law and/or regulation, and therefore cannot be applied in this

action.

3.      Denied, as to the Board's ability to require conformance to USPAP under

N.J.A.C. 13:40-6.1(a), as USPAP has been Unconstitutionally Promulgated, and/or has been

promulgated in violation of Federal law and/or regulation, and therefore cannot be applied in this action.

Denied, as to the Board's ability to require conformance to USPAP under N.J.A.C. 13:40-6.1(a), as

USPAP has been Unconstitutionally Promulgated, and/or has been promulgated in violation of Federal

law and/or regulation, and therefore cannot be applied in this action.  Denied, as to the Board's ability to

determine a violation under N.J.S.A. 45:1-21(e) and/or N.J.A.C. 13:40A-7.9(d)(5), both alleging

professional misconduct by McNamara, due to alleged non-conformance to USPAP, which has been

Unconstitutionally Promulgated, and/or has been promulgated in violation of Federal law and/or

regulation, and therefore cannot be applied in this action. Respondent admits that the Board, under the

color of the New Jersey Statute and Administrative Code sections referenced in the Complaint, is basing

the allegation in the Complaint on the 2005 edition of USPAP, effective January 1, 2005, as the

applicable USPAP standard that applied to this assignment, due to the time of McNamara's appraisal, to

the extent USPAP may be applicable at all.

        4.      The averments of paragraph 4 of the Complaint are admitted.

        5.      The averments of paragraph 5 of the Complaint are admitted.

        6.      The averments of paragraph 6 of the Complaint are admitted.

        7.      Denied as stated. The averments of paragraph 7 of the Complaint are admitted to

the extent the allegations are not inconsistent with the documents they reference, in that such documents

are writings which speak for themselves, however, denied as this paragraph of the Complaint fails to

include material elements of the referenced Agreement of Sale for the property appraised (the "Subject

Property"), *to wit,* there were no contingencies as to approvals of any kind, as well as other material

elements including but not limited to the non-refundable deposit of $2,750,000, which would be

considered liquidated damages in the event of buyer default. As to the statements averred in the footnote

to paragraph 7, said allegations are denied. It is averred that the addendums in question were part of the

original file maintained by Respondent in this matter. Because the complaints offered by the Board to

the reports in question were first made after the five (5) year holding period required by USPAP for

files, and said files were destroyed in part by reason of the USPAP-compliant document retention

protocol utilized by Cushman & Wakefield, Inc. ("C&W"), respondent believes and therefore avers, said

documents were part of the original file.

        8.      The averments of paragraph 8 of the Complaint are admitted to the extent the

allegations are not inconsistent with the documents they reference, in that such documents are writings

which speak for themselves.

9.      The averments of paragraph 9 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves, however, denied as this paragraph of the Complaint fails to include material elements of the referenced resolution of Findings and Conclusions of Board of Adjustment of the Township of Lower, *to wit,* use of the Complaint-referenced area above the mean high waterline, and below it, without beach fees, with the applicant providing lifeguards in those areas, and with the applicant allowing members of the public to pay a beach fee to join the condominium beach club.

10.     The averments of paragraph 10 of the Complaint are generally admitted as to the information in the deed, but denied as to the actual sale price of the Subject Property, as the July 30, 2003 Addendum to the April 16, 2003 Agreement of Sale added $2,700,000 to the sale price of the Subject Property and perhaps an additional $50,000 based on the information in that Addendum.

11.     Denied as stated. The averments of paragraph 11 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves. however, denied as this paragraph of the Complaint fails to include material elements of the referenced resolution of Findings and Conclusions of Board of Adjustment of the Township of Lower, dated April 7, 2005, *to wit,* the lack of public objection, the reference to the hotel as being closed and particularly the increase in the number of units approved from the 113 referenced in the June 3, 2004 Resolution approving several variances, as to the statements averred in the footnote to paragraph 11, said allegations are denied. It is averred that the addendums in question were part of the original file maintained by respondent in this matter. Because the complaints offered by the Board to the reports in question were first made after the five (5) year holding period

required by USPAP for files, and said files were destroyed in part by reason of the USPAP-compliant

document retention protocol utilized by C&W, respondent believes and therefore avers, said documents

were part of the original file.

12.     Denied as stated. The averments of paragraph 12 of the Complaint are generally

admitted to the extent the allegations are not inconsistent with the documents they reference, in that such

documents are writings which speak for themselves, but denied as to the averment "…. for the purposes

of evaluating potential financing…", while in fact the May 4, 2005 engagement letter contained in the

addendum of the Cushman Appraisal states that the "Intended Use" of that appraisal assignment was "in

connection with the proposed first mortgage loan to be made by the client". Cushman Appraisal at

Addendum A, page 2. As to the statements averred in the footnote to paragraph 12, no response is due

because those averments are conclusions of law to which no response is necessary. Respondent admits

that the assignment in question was development of a Self-Contained Appraisal Report.

13.     The averments of paragraph 13 of the Complaint are admitted as to the date of

Subject Property inspection by Ms. Kudrick, the date of the Cushman Appraisal and as to the averment

"…. The appraisal report describes the subject property as two non-contiguous parcels of land

containing four acres, or 174,1.96 square feet, in the aggregate". Denied as to Complaint averment

"…The larger parcel, containing 2.80 acres and located on the east side of Atlantic Avenue, extends

through to Wildwood Crest beach to the north… "as the parcel to the east of Atlantic Avenue extends

eastwardly to the "Diamond Beach" beach, as the subject property is located in "Diamond Beach", a

non-contiguous section of Lower Township, N.J. It is adjacent to Wildwood Crest to the north. Denied

as to the statement "…and was improved with a 195-unit beachfront hotel." The Subject Property was a

*former* (emphasis added) 195-unit beachfront hotel, as it had not been in operation as a hotel between at

least 2004 and the Date of Value of the Cushman Appraisal, May 23, 2005. The averment of paragraph 13 of the Complaint, stating "The smaller parcel, containing 1.20 acres and located directly opposite to the larger parcel on the west side of Atlantic Avenue, was described as vacant and unimproved." are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves. Denied as to averment of paragraph 13 of the Complaint, stating "Moreover, despite acknowledging an "April 6, 2005" sale of the subject property for $18,000,000 and the buyer's intent to drastically redevelop the sites, the appraisal report was prepared under the hypothetical condition that the entire property was vacant and available for development, with no consideration given to the existing or proposed improvements" and the related footnotes thereto, because the averment either implies McNamara acted improperly by invoking the referenced Hypothetical Condition given the $18,000,000 sale, for which there is no logical or even regulatory reason for the Board to do so, or that the Board does not accept the USPAP provisions regarding of a Hypothetical Condition in a real estate appraisal. Either way, the Board's averment ignores relevant provisions of USPAP 2005, upon which standards the State has purportedly based its case. Admitted as to averment in Complaint footnote 5, "The appraisal report notes the proposed development would include up to "128 upscale condominium units… with an adjoining 150-room hotel ... to be connected by a gilded crosswalk traversing Atlantic Avenue[,]" as well as a "structured parking garage, gourmet restaurant, poolside bar and grill, health club, full service spa and oceanfront pool complex and entertainment area". Denied as to averment in footnote 6 that the Cushman Appraisal "….further acknowledges a market value of the subject property, based on its 2005 property tax assessment with current improvements, at $14,418,182", as such averment is a misleading statement because the Cushman Appraisal does not acknowledge such a market value, but rather states "…. The foregoing

assessment indicates the township values the property for assessment purposes at $14,418,182....".

Furthermore, the Cushman Appraisal indicates the opposite of the averment, by its statement "...Based

upon our subsequent conclusion of market value for the subject property relative to the current

assessment over it, the subject property appears to be favorably assessed", which means that Respondent

and Ms. Kudrick believed that the assessment was low. Based on the above, in regard to the affirmance

in paragraph 13 of the complaint, respondent denies the averment he acted improperly by valuing the

Subject Property at a figure other than one based on the 2005 property tax assessment, as appraisal of

the Subject Property at such Assessment would have been improper under accepted practice by peer real

estate appraisers and accepted standards of real estate appraisal practice.

14.     The averments of paragraph 14 of the Complaint are admitted to the extent the

allegations are not inconsistent with the documents they reference, in that such documents are writings

which speak for themselves.  Respondent denies averments as to reference to footnote 7's general

citation to *The Appraisal of Real Estate, 14th Edition,* published in 2013, and to *The Dictionary of Real*

*Estate Appraisal, 5th Edition,* published in 2010.  Because the Cushman Original Appraisal Report date

of report was May 23, 2005, the correct version of *The Dictionary of Real Estate Appraisal,* would be

the *4th Edition,* published in 2002, and the correct version of *The Appraisal of Real Estate* would be the

*12th Edition,* published in 2001.

15.     The averments of paragraph 15 of the Complaint are admitted to the extent the

allegations are not inconsistent with the documents they reference, in that such documents are writings

which speak for themselves. Denied as to materiality of footnote 8, as the difference between pre-

rounding product in the Cushman Appraisal and the footnote's pre-rounding product is $165.00, which

is not materials as the rounded value is the same, and the difference ".... is minor and likely due to

rounding…", just as the State's Appraiser determined in regard to a similar minor difference in lot size. Sussman Appraisal Review at 11. This is an example of the Board inappropriately stretching facts to show a number of errors in order to "make its case" for an ethics violation due to a number of "USPAP language errors" and is totally inappropriate both in substance and for such "stretching" to be done by a regulatory board when McNamara's livelihood is at stake.

16.     Denied.  As the Board is aware Carlyle Group did not file the consumer complaint, but rather the Board failed to perform appropriate due diligence in determining who filed the consumer complaint. Further, the Board has been provided with Respondent Counsel's own research regarding who filed the consumer complaint and had previously conceded the consumer complaint had been filed anonymously based on a search of Board records. And, based on such information, Respondent reasonably believes the consumer complaint was filed a competitive developer or by a local appraiser who was upset they did not get the appraisal assignment.

17.     Denied as to averment "…. Carlyle pointed to evidence… ". Denied as to Carlyle filing the consumer complaint for the reasons in Respondent Answer to Complaint paragraph 16, above, as if fully set forth *verbatim* herein, and because the Board is well aware Carlyle Group did not file the consumer complaint, as the Board's reported research of its files led the Board to previously concede this issue. Denied as to averment of "falsification", as alleged in the consumer complaint the Cushman Appraisal had errors, which the consumer complaint improperly categorized as "falsifications" with no evidence of such falsification, and which alleged "falsification" also included use of data from a prior appraisal "Area Analysis", while such reuse is a practice frequently used by everyone who prepares written documents. Denied as to averment "…. the manner in which the Appraisers identified and analyzed these comparable sales, and which, in part, led them to achieve a flawed market value

conclusion of $375 per square foot …", because the Board's unsupported disagreement with Respondent's market value estimate was on the record before the Board hired Mark Sussman, MAI to prepare an appraisal that mirrored the Board's unsupported belief, and therefore the Board's belief Respondent's market value estimate is "flawed" is in itself flawed, and a classic example of what happens when a disciplinary board provides their expert with the board's own opinions, and then obtains the expected or directed result.

       a.     The averments of paragraph 15 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves.

       b.     Denied as to Board categorization of McNamara's adjusted value conclusion "…ostensibly, as vacant land", as this implies error as to Respondent's reported research, which included communications with the buyer of Comparable Sale 5 and said communications including that buyer's intent to tear down the existing improvements and redevelop the property with condominiums.  As to the remainder of Complaint paragraph 17(b), the averments of that paragraph are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves.

     18.     Denied as to averment "…Carlyle alleged in its complaint…" As the Board is aware Carlyle Group did not file the consumer complaint, but rather the Board failed to perform appropriate due diligence in determining who filed the consumer complaint. Further, the Board has been provided with Respondent Counsel's own research regarding who filed the consumer complaint and had previously conceded the consumer complaint had been filed anonymously based on a search of Board

records (the "Anonymous Complaint"). As to the remainder of that first sentence in Complaint paragraph 18, the averments of that paragraph are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves, but Respondent reiterates notice to the Board, as it is already aware, that the incorrect information utilized in the Cushman Original Appraisal Report was based on the original version of this comparable sales data provided by the reporting service Win2Data, which original version was destroyed in the original Work File in accordance with Cushman & Wakefield's document retention policy, and the circumstances behind the Win2Data sheets are further explained in this Answer including, but not limited to, paragraphs 24(a) and 24(b) as stated there and restated here, as it fully repeated verbatim. As to the second sentence in Complaint paragraph 18, beginning with the word "Consequently", Respondent denies the averment that the appraisers' calculation "… was grossly overstated as a result of their inaccurate reporting of the lot size…", as the Board is aware the incorrect information utilized in the Cushman Original Appraisal Report was based on the original version of this comparable sales data provided by the reporting service Win2Data, as stated above and restated here, as it fully repeated verbatim. As to the third sentence in Complaint paragraph 18, beginning with "As to comparable sale 5…", McNamara denies "….. Carlyle asserted …." for the reasons in Respondent Answer to Complaint paragraphs 16 and 17, above, as if fully set forth *verbatim* herein, because the Board is well aware Carlyle did not file the Anonymous Complaint, for the reasons previously stated in those paragraphs. As to the remainder of the third sentence in Complaint paragraph 18, the averments of that paragraph are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves, but Respondent denies the implied averment that the Cushman Appraisers errored in believing the information received from the individual, with whom they verified this sale, that the improvements were to be demolished and the site

redeveloped as condominiums, because the Board is aware the Board's Appraisal Reviewer "…. found nothing to indicate that this was not the information the appraisers received at the time the appraisal was prepared". Denied as to averment at Complaint paragraph 18, footnote 10, stating "Carlyle further alleged …. " for the reasons in Respondent Answer to Complaint paragraphs 16, 17 and 18, above, as if fully set forth *verbatim* herein, because the Board is well aware Carlyle did not file the Anonymous Complaint, for the reasons previously stated in those paragraphs. Denied as to averment at Complaint paragraph 18, footnote 10, stating Anonymous Complaint allegation "…. that the Appraisers "falsified information" in the subject appraisal report by supplying data in it regarding the 'residential housing stock within Cape May County' unchanged from a 2001 appraisal report completed by Cushman & Wakefield, but for the attribution of 'a more current year', because a reading of the Cushman Original Appraisal Report indicates that the Regional Analysis and the Local Market Analysis were clearly updated for this appraisal, including references to housing stock in Cape May County as of calendar year 2004. Cushman Appraisal, pgs. 5-15, p. 14. The inclusion of this allegation in the Anonymous Complaint received by the Board supports Respondent's belief that the actual complainant was a developer, or local appraiser, as Carlyle Group did not have access to the 2001 real estate appraisal report referenced by the anonymous complainant.

   19. Denied as to averment the Anonymous Complaint was filed by the Carlyle Group. The Board is aware Carlyle Group did not file the consumer complaint, but rather the Board failed to perform appropriate due diligence in determining who filed the consumer complaint. Further, the Board has been provided with Respondent Counsel's own research regarding who filed the consumer complaint and had previously conceded the consumer complaint had been filed anonymously based on a search of Board records. Admitted as to the averment Respondent and Ms. Kudrick appeared separately and gave sworn testimony to the Board on June 26, 2012. Admitted as to the averment "…. Ms.

Kudrick, who was the first to appear before the Board, testified that at the time the subject appraisal report was prepared, she did not hold a license or certificate issued by the Board, nor did she secure any temporary permit to appraise the subject property".[1] Denied as to the averment "… Notwithstanding… " as it implies the legal conclusion Ms. Kudrick should have obtained a Temporary Permit to work under Respondent's supervision, which is contrary to the plain meaning of the Board law and regulations made available to New Jersey State Certified Real Estate Appraisers including, but not limited to, Respondent. Admitted as to averment "….she completed the majority of the appraisal report, including identifying, inspecting, and analyzing the comparable sale properties", as is permitted under N.J.S.A. 45:14F-21(c), which states:

> "no person other than a State licensed real estate appraiser, a State certified real estate appraiser or a person who assists in the preparation of an appraisal under the direct supervision of a State licensed or certified appraiser shall perform or offer to perform an appraisal assignment in regard to real estate located in this State including, but not limited to, any transaction involving a third party, person, government or quasi-governmental body, court, quasi-judicial body or financial institution".

Denied as to the averment "… Moreover… "as it implies the legal conclusion Ms. Kudrick should have obtained a Temporary Permit to work under Respondent's supervision, as stated in the preceding sentence as if fully set forth verbatim herein. Denied as to averment "…. she [Ms. Kudrick] acknowledged that she had incorrectly reported the size of the property in comparable sale 1 as approximately six times smaller than its actual size…", as stated in in this Answer's Counts and paragraphs including, but not limited to, Count II, Paragraphs 24, 24(a), 24(b), of this Answer, as if fully set forth verbatim herein, Ms. Kudrick relied on the data provided by the reporting service Win2Data, the original copy of which was in the Original Work File, which was destroyed in accordance with USPAP and the Cushman & Wakefield document retention policy as the Board had previously been advised. Denied as to averment "…. although possessing in her work file deeds detailing that transaction

---

[1] Kudrick T-11, Line 16.

as two separate land sales totaling $5,000,000, and her own visual inspection of the area". In her

testimony before the Board on June 26, 2012, in response to the question "Did you look at the deeds?"

from Board Member Krauser (Kudrick T-30, L 4), Ms. Kudrick testified "… I don't believe at the time

of the appraisal we had copies of the deeds, we used a real estate public service" (Kudrick T-30, 4-7).

First, as previously indicated herein and in Respondents' testimony before the Board that testimony

occurred more than seven years after the Appraisal Assignment, and as noted on numerous occasions

during that testimony her memory as to events during the Appraisal Assignment was unclear. Second, as

previously stated in this paragraph, as if fully set forth verbatim herein, the Original Work File was

destroyed in accordance with USPAP and the Cushman & Wakefield document retention policy, as the

Board had previously been advised. Third, when Ms. Kudrick referred to the "Work File" in her June

26, 2012 testimony before the Board, she was referring to the "Reconstructed Work File", and not the

"Original Work File". Fourth, Respondent and Ms. Kudrick, unlike the Board's Appraiser, are not used

to testifying as to their appraisal assignment results and, consequently, were clearly unnerved and

shaken by the questioning from Board members. Consequently, any contradictory statements as to the

preceding points are attributable to the time that had passed between the Appraisal Assignment, and

testimony before the Board, thus causing Respondent and/or Ms. Kudrick to have inadvertently made

such contradictory statements. As to the testimony of Ms. Kudrick regarding Comparable Sale 5,

McNamara denies the Board's averment regarding Ms. Kudrick's testimony, Ms. Kudrick "….

acknowledged that she incorrectly suggested in the appraisal report that the Summer Sands Motel had

been demolished at the time of the appraisal…. ", because the Complaint takes Ms. Kudrick's statements

out of context, as she then qualifies her remarks regarding verification of Comparable Sale 5 by stating

the following:

> 14 MS. KUDRICK: In the course of verifying
> 15 this sale, I do recall speaking to a participant

16 in the transaction, I don't have a name, I
17 apologize. But when it was placed under contract
18 or sold, that the intent was to demolish the motel
19 for redevelopment with condominiums, similar to
20 the subject property. It does say in our sales
21 chart that the motel was demolished. In fact, it
22 was not.
23 The better language for us was to say
24 that it was to be demolished, that was our
25 understanding at the time. (Kudrick T-36, L14-25)

Thus, the Board has again overreached in an attempt to incorrectly allege violation of purported

appraisal standards errors in support of the Board's unsupported communications during the Cushman

Appraisers testimony that those appraisers conducted material errors in the development of the

Appraisal Assignment. Such allegations caused the Cushman Appraisers shock and created a sense of

fear that made it difficult for them to think clearly in their responses to the Board. Ms. Kudrick's

subsequent testimony clearly indicates she did not believe she errored in reporting the buyer's intent to

tear down the existing improvements and build new, as communicated to her in that verification process

during the appraisal assignment. Denied as to "Complaint Paragraph 19 averment "…. her alleged

inspection of that property ….", as Ms. Kudrick testified under oath, that she inspected comparable sale

5. (Kudrick T-37, L 5-7) (Kudrick T-37, L 16-25, T-38, L1-3). Denied as to averment at the sixth (6th)

and final sentence in Paragraph 19, that "….Ms. Kudrick could not sufficiently explain the rationale for

adjustments she made to all of the comparable sales in the appraisal report ….", because once again, the

Board has incorrectly taken Ms. Kudrick's statements out of context, as the summary of analysis was

particularly related to the sophisticated client, as the only Intended User, in accordance with the

Comment to USPAP 2005 SR 2-2(a)(ix), and furthermore, as previously indicated, over seven years and

passed since she had worked on the appraisal assignment, the Original Work File had been destroyed in

in conformance with Protocol and she was a non-litigation appraiser being "grilled" by the Board.

Denied as to averment at the sixth (6th) and final sentence in Paragraph 19, that "….her [Ms. Kudrick's]

failure to analyze, in any significant way, the recent sale of the of the subject property for $18,000,00, as it related to her appraised market value of $65,300,000". The Board's allegation as to any need to analyze a prior sale of the Subject Property beyond that performed by McNamara and Ms. Kudrick is in conflict with the Board's own assertion of reliance on USPAP, which states as a Standards Rule 1 development requirement that the appraiser is to "…. analyze all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal. USPAP 2005, Standards Rule 1-5(b) at 21. Clearly, the Cushman appraisers analyzed the prior sale. And, the Board's allegation as to any need to include, in an appraisal report, a prior sale of the Subject Property beyond that reported by McNamara and Ms. Kudrick is in conflict with the Board's own assertion of reliance on USPAP, which states as a Standards Rule 2 reporting requirement that the appraiser is to:

> 813 (ix) describe the information analyzed, the appraisal procedures followed, and the
> 814 reasoning that supports the analyses, opinions, and conclusions;
>
> 815 Comment: The appraiser must be certain the information provided is sufficient
> 816 for the client and intended users to adequately understand the rationale for the
> 817 opinion and conclusions, including reconciliation of the data and approaches, in
> 818 accordance with Standards Rule 1-6.
>
> *819 When reporting an opinion of market value, a summary of the results of*
> *820 analyzing the subject sales, options, and listings in accordance with Standards*
> *821 Rule 1-5 is required. If such information is unobtainable, a statement on the*
> *822 efforts undertaken by the appraiser to obtain the information is required. If such*
> *823 information is irrelevant, a statement acknowledging the existence of the*
> *824 information and citing its lack of relevance is required.*
> USPAP 2005, Standards Rule 2-2(a)(ix) at 24-25

The Cushman Appraisers reported the prior sale and analyzed it on page 30 of the Cushman Appraisal. Standards Rule (SR) 1-5(b) requires analysis, as a development requirement and there is no indication the Cushman Appraisers did not analyze the prior sale. SR 2-2(a)(ix) requires the appraiser to summarize the analysis, which the Cushman Appraisers did in conformance with USPAP, and to the level contained in the standards guidance at Advisory Opinion 1 (AO-1). USPAP 2005, AO-1, at 125-

137.  The summary of analysis was particularly related to the sophisticated client, as the only Intended

User, in accordance with the above stated Comment to SR 2-2(a)(ix). Accordingly, in this averment, the

Board has incorrectly averred failure to analyze when there was none.

20.    Denied as to averment that "In his [McNamara's] appearance before the Board,

Respondent testified '…. that he did not assist in the preparation of the appraisal report, and that,

typically, he reviews Ms. Kudrick's work "at the end, after she's written the report, done her

analysis[.]'".  Unfortunately, the Complaint mischaracterizes the nature of the work performed by

McNamara. First, the quotation from McNamara's testimony is misleading. In his testimony before the

Board, McNamara went on to state, "…

> 25 MR. McNAMARA: In terms of -- when you
> 1 say preparation, I'm assuming you mean doing data
> 2 searches?
> 3 MR. FLANZMAN: Data searches?
> 4 MR. McNAMARA: I'm basically doing a
> 5 review.
> 6 MR. FLANZMAN: Inspection of property?
> 7 MR. McNAMARA: I do inspect the
> 8 property.
> 9 MR. FLANZMAN: You did inspect the
> 10 property?
> 11 MR. McNAMARA: Correct.

(McNamara, T-13, L 25, T-14, L1-11)

McNamara went on to explain the general protocol he followed as a supervising

appraiser, but, due to the seven year gap between the Appraisal Assignment and his testimony before the

Board, he was unable to recall specific details as to what occurred during this particular assignment.

(McNamara T-14-17).  The summary of McNamara and Ms. Kudrick's testimony is that the typical

supervisory process in an appraisal assignment would involve Ms. Kudrick collecting the data, preparing

an initial draft, creating preliminary analyses, but with conversation between her and McNamara

throughout the process. When Ms. Kudrick had questions or needed guidance, she would reach out to

McNamara for his expertise. As supervisor, McNamara reviewed the initial draft of the report, made his suggested edits and changes, and discussed the project with Ms. Kudrick, who then made revisions. Thus, the preparation of the appraisal report was a collaborative process.[2] This is the typical process between an associate appraiser and a supervising appraiser in an appraisal firm. The Federal Appraisal Subcommittee (the "ASC") Policy Statement in effect at the time of the Appraisal Assignment required a state real estate appraisal regulatory agency to allow an associate appraiser to assist in the conduct of an appraisal assignment under the direction of a state credentialed real estate appraiser.[3] Respondent reasonably believes he and Ms. Kudrick complied with the ASC and related federal requirements. Respondent reasonably believes ASC review of the Board's compliance with Federal real estate appraisal law and policy includes all cases under the Board's purview.[4] Respondent reasonably believes he complied with the requirements N.J.A.C. 13:40A-4.6(e)(1) regarding the Direct supervision of the appraisal work performed by Ms. Kudrick, even though Ms. Kudrick was not a New Jersey "trainee". Most importantly, the State of New Jersey does not require a real estate appraisal associate to have a real estate appraiser credential when working under the supervision of a credentialed appraiser[5] and to deny

---

[2] Kudrick annotation, Appraiser Outline, December 2013.

[3] Appraisal Subcommittee, *Appraisal Subcommittee Policy Statements Regarding State Certification and Licensing of Real Estate Appraisers,* September 22, 1997, as amended October 24, 2000, stating "Title XI provides that an individual who is not a State certified or licensed appraiser may assist in the preparation of an appraisal if the assistant is under the direct supervision of a licensed or certified appraiser and the final appraisal is approved and signed by that appraiser. The ASC believes that this provision should not be used to legitimize situations where one or more uncertified or unlicensed persons are not actively and directly supervised by a certified or licensed appraiser during the preparation of the significant aspects of the appraisal process, and the certified or licensed appraiser does not substantively review the appraisal in accordance with USPAP.s requirements. The ASC believes that any cursory review should not qualify as direct supervision and that such activities would violate the intent and purposes of Title XI. The ASC, therefore, urges State agencies to ensure that their appraiser regulatory programs can identify situations where direct supervision is not present and to take appropriate steps to remedy them.

[4] An individual who is not a State certified or licensed appraiser may assist in the preparation of an appraisal if –
   o   (1) the assistant is under the direct **supervision** of a licensed or certified individual; and
   o   (2) the final appraisal document is approved and signed by an individual who is certified or licensed.
12 U.S.C.S. §3351.

[5] [5] N.J. S.A. 45:F-21(c) c.  Except as otherwise provided in subsection f. of this section, no person other than a State licensed real estate appraiser, a State certified real estate appraiser or a person who assists in the preparation of an appraisal under the

an out-of-state appraiser the same ability afforded an in-state appraiser would be a violation of other

ASC Policies, the Commerce Clause of the U.S. Constitution and potentially a violation of the U.S.

Supreme Court decision N.C. Bd. Of Dental Examiners v. FTC[6] and related Federal law and regulation

including, but not limited to, those of the FTC. Denied as to averment that McNamara's review of

Kudrick's work at the stage of a first draft is anything other than supervision as indicated in state and

federal law, above. Furthermore, Advisory Opinion 5 (AO-5) in the 2005 version of USPAP clearly

indicates that McNamara properly handled the supervision of Ms. Kudrick, as an advanced associate.[7]

---

direct **supervision** of a State licensed or certified appraiser shall perform or offer to perform an appraisal assignment in
regard to real estate located in this State including, but not limited to, any transaction involving a third party, person,
government or quasi-governmental body, court, quasi-judicial body or financial institution.

N.J.S.A. § 45:14F-21
(e) A supervising appraiser shall have the following duties and responsibilities:
- **1.** The supervising appraiser shall at all times be responsible for and provide direct supervision of the work
  performed by the trainee. For purposes of this section, "direct supervision" means:
  - **i.** To personally review the work product of the trainee;
  - **ii.** To approve, sign, and accept responsibility for each appraisal report including work product prepared by the
    trainee or in which the trainee has made a professional contribution and to sign all such reports and certify
    that all such reports have been independently and impartially prepared in compliance with the Uniform
    Standards of Professional Appraisal Practice, these rules and applicable statutory standards; and
  - **iii.** To indicate, within the certification section of the appraisal report, the name of the trainee providing
    significant real property appraisal assistance. For purposes of this subparagraph, "significant" means the
    exercise of appraisal knowledge and training and does not mean clerical or fact gathering tasks.
    N.J.A.C. § 13:40A-4.6


[6] 135 S. Ct. 110.
[7] As proficiency is demonstrated by an assistant, it is appropriate for the principal appraiser to place greater
65  reliance on the work of that assistant. In the context of a real property appraisal assignment, an assistant
66  who has meaningful appraisal education and extensive work experience may well be competent to inspect
67  the real estate and prepare the appraisal report alone, subject to an appropriate final reconciliation by the
68  principal appraiser who will be signing or cosigning the certification in the report. In this situation, the
69  assistant's contribution is both significant and professional. The appropriate final reconciliation should
70  include a discussion of which aspects of the appraisal process were performed by the assistant and the
71  principal appraiser.
USPAP 2005, AO-5, at p.135
109  Principal Appraiser Jones is a partner in Expert Valuers, Inc., and is state certified. She has 15 years
110  appraisal experience and is responsible for two four-person appraisal teams headed by senior assistants.
111  Jones runs the company orientation program for new assistants and conducts weekly team meetings that
112  provide her with an opportunity to evaluate the appraisal competence of the assistants working with her.
113  Four of the eight assistants have demonstrated a level of education and understanding of the process that
114  enable them to conduct most steps of an appraisal. Jones allows these four assistants to conduct real estate
115  inspections alone and to cosign the certification in appraisal reports. Detailed interior photographs are
116  required by company policy. Jones examines the photos with assistants when discussing preliminary

Admitted generally as to the averment "He further testified that he conducted an "exterior inspection" of

the subject property separately from Ms. Kudrick....", but denied as to averment that McNamara acted

improperly by not inspecting the interior of the to-be-demolished then-existing building, as the appraisal

assignment was clearly to consider the Subject Property as vacant and ready for redevelopment. Denied

as to McNamara's testimony he did not re-do Ms. Kudrick's comparable sales research or verification,

and that he did not re-verify other facts regarding the Subject Property, as there was no need to do so, for

such "re-doing" the associate appraiser's analysis is not performed by peers of the supervising appraiser,

under similar circumstances, in the appraisal industry and there are no requirements, neither in federal

law and/or regulation, nor in state law an and/or regulation, nor in USPAP, requiring the supervising

appraiser to "redo" associate appraisers analyses. McNamara went through Ms. Kudrick's draft, and

verbally grilled her regarding her draft report and underlying assumptions. Denied as to averment

McNamara had responsibility for Ms. Kudrick to obtain a "...... temporary permit to conduct an

appraisal in New Jersey ....", because of the law and regulation cited in this Answer Paragraph, above,

regarding the ability of an appraisal associate to participate in an appraisal assignment under the

supervision of a credentialed appraiser. Furthermore, the McNamara "... could not recall whether Ms.

Kudrick had obtained a temporary permit... as well as other details of the review process..." averment

ignores the fact that the appraisal assignment, which is the subject of the question from the Board was

performed over seven years before McNamara answer that question. As indicated in the ASC Policy

Statement, in effect at the time of the Appraisal Assignment, there is no affirmative requirement to

obtain a temporary permit for an appraiser assistant under the direction supervision of an appraiser

117 conclusions and rough drafts of appraisals, and she always conducts exterior inspections of the subject real
118 estate at minimum. If unique characteristics are noted in an interior inspection conducted by an assistant,
119 Jones reinspects the real estate before the appraisal process is completed. Jones discloses the type and
120 extent of her inspection in the certification of each report (Standards Rule 2-3) and acknowledges and takes
121 full responsibility for the contributions of assistants (Standards Rules 2-3 and 2-2(a)(vii), (b)(vii), or
122 (c)(vii), as applicable).
USPAP 2005, AO-5, at p.136

certified in the state in which the appraised property is located.[8] Denied as to averment McNamara acted improperly regarding his supervision of Ms. Kudrick because McNamara ".... could not recall .... other details of the review process, and thus was unable to answer many of the questions posed regarding his specific work and contributions to the report", when the Board not only accepted the Anonymous Complaint after the end of the five (5) year document retention period set forth in the specific statutory provision for real estate appraisers, but then the Board delayed in having McNamara testify under oath for an additional two (2) years. During the over seven (7) years between the conduct of this Appraisal and McNamara's testimony, he participated in approximately 7,000 appraisal assignments as a supervising appraiser, McNamara was 61 years old when he testified and even a younger person would have difficulty recalling one set of conversations with Ms. Kudrick in one particular appraisal assignment seven years before such Board testimony. And, it is important to note the Transcript of McNamara's testimony indicates a particularly acrimonious exchange with "machine gun-like" questions being fired at him by Board members. Nonetheless, Respondent signed the appraisal repast, and thus took full responsibility for its content. Someone, like McNamara, who has not repeatedly testified in legal proceedings would be extremely cautious in stating that they specifically remembered conversations, words, and facts from seven years ago, under the circumstances noted above. Denied, as to averment "Nonetheless, Respondent signed the appraisal repast, and thus took full responsibility for its content", as the Board averment implies McNamara improperly ".... signed the report and .... took full responsibility for its content," which implication by the Board ignores the facts and circumstances of McNamara's testimony, as cited above in this paragraph.

## COUNT I

---

[8] "Title XI does not require State B to offer temporary practice to persons who are not certified or licensed appraisers, including appraiser assistants not under the direct supervision of an appraiser certified or licensed in State A". ASC Policy Statement, 1997 version as amended in 2000, Statement 5.

21. Denied for the reasons set forth in responses to the General Allegations above as if fully set forth verbatim herein.

22. Admitted as to Board correctly quoting from the 2005 version of USPAP ("USPAP 2005") as to "Standard 1: Real Property Appraisal Development", "Standards Rule 1-1", subsection (b). USPAP 2005, at 16, Lines 521-522. Admitted as to Board correctly quoting from USPAP 2005 Standard 1: Real Property Appraisal Development", "Standards Rule 1-1", subsection (c), Lines 530-532. Admitted as to Board correctly quoting from USPAP 2005 Standard 1: Real Property Appraisal, Reporting", "Standards Rule 2-2", subsection (a)(iii). Denied, as to averment "The appraisal report here contains several errors, including significant factual errors regarding the description of the subject property... that, in their totality, meaningfully impact the credibility of the appraisal by Respondent and Mr. McNamara.", for the reasons set forth any preceding "General Allegations", in other paragraphs of this Count and in the following Counts, as if set forth verbatim here. Complaint at 9.

23. Denied generally as to averment "...the block and lot identifications of the subject property were not accurately reported and are incomplete in the appraisal report....", based on the specific information in the following subparagraph, as if repeated verbatim here.

23(a). Admitted as to averment "The appraisal report identifies the subject property as consisting of two non-contiguous parcels of land containing four acres in the aggregate. The first parcel, identified as Block 700-1, Lot 3", is noted to be a 2.80-acre parcel of land, improved with a 5-story hotel building containing 195 guest rooms. The second parcel, identified as "Block 699, Lot 3" is reported to be an unimproved 1.20-acre parcel of land." Complaint at 10[9]. The engagement letter dated May 4, 2005

---

[9] Citing Cushman Appraisal at first page of Transmittal Letter, under sub-heading (in left column) " Hypothetical Conditions" (PDF pg. 2); Summary of Salient Facts, under subheading (in left column)"Property Description" (PDF pg 4), Hypothetical Conditions (PDF pg 5); Introduction under subheading (In left column)"Property Description" (Report pg 1, PDF pg 12); Legal Description (Report pg. 4, PDF pg 15);  Assumptions and Limiting Conditions (Report page 34, PDF page 45).

specifically indicates "The property to be appraised is two parcels located across from each other on Atlantic Avenue in Wildwood New Jersey. One parcel is improved with an existing 195 unit waterfront hotel built in the 1970s that will be demolished for construction of a 125 unit condominium building data parcel will be improved with a 63 unit condo/hotel". The engagement letter goes on to indicate "Information We Need to Complete the Assignment", and states "we understand you will provide the following information for our review, if available. Plot plan/survey and legal description; site acquisition cost; most recent real estate tax bill or statement; sales history of the subject property over the past three years at a minimum; copy of your guidelines or instructions to appraisers/consultants; On site contract– name and phone number." The Work File, which was generally reconstructed due to the document destruction policy referenced hereinabove, and which was made available to the Board, included copies of original notes taken by McNamara's associate appraiser Colleen (then McCulley) Kudrick. Those notes included an interview with Eustace Mita, the individual who the client Carlyle Group had designated as the source of as the source of information on the project, in response to the requests in the engagement letter. The Information in those notes support McNamara's reference to only the two parcels appraised in the Original Appraisal Report. Further, the handwritten notes include the size and lot designations contained in the Original Appraisal Report, leading the appraisers to utilize those lot designators for the convenience of their client, because it was apparently the developer's designated reference for the various properties.

23(b). Denied as to averment "… correct legal description…", because by making such an assertion, the Board ignores its own purported standards in USPAP, as there is no USPAP requirement for a "…. correct legal description…". Rather, USPAP states:

577 An appraiser may use any combination of a property inspection and documents,
578 such as a physical legal description, address, map reference, copy of a survey or
579 map, property sketch, or photographs, to identify the relevant characteristics of
580 the subject property. Identification of the real property interest appraised can be

581  based on a review of copies or summaries of title descriptions or other
582  documents that set forth any known encumbrances. The information used by an
583  appraiser to identify the property characteristics must be from sources the
584  appraiser reasonably believes are reliable.
USPAP, 2005, Standards Rule 1-2(e)(v), Lines 577-584

The Cushman Appraisers satisfied the requirement for development of the Appraisal, as to

identification of the Subject Property, because they included address, map, photographs and other

indicia to identify the subject property in the Cushman Original Appraisal Report. Furthermore, as

previously noted, the client and only Intended User is one of, if not the most, sophisticated real estate

developer and investor in the world. The Cushman Original Appraisal Report conformed to the USPAP

reporting requirement:

720 Standards Rule 2-1
722 Each written or oral real property appraisal report must:

724 (b) contain sufficient information to enable the intended users of the appraisal to understand the
725 report properly; and

732 Standards Rule 2-2

755 (a) The content of a Self-Contained Appraisal Report must be consistent with the intended use
756 of the appraisal and, at a minimum:
 (iii) describe information sufficient to identify the real estate involved in the appraisal,
767  including the physical and economic property characteristics relevant to the
768  assignment;18
769 Comment: The real estate involved in the appraisal can be specified, for
770 example, by a legal description, address, map reference, copy of a survey or
771 map, property sketch and/or photographs or the like. The information can
772 include a property sketch and photographs in addition to written comments
773 about the legal, physical, and economic attributes of the real estate relevant to
774 the type and definition of value and intended use of the appraisal.
USPAP, 2005,  standards Rule 2-2(a)(iii)

Accordingly, the Cushman Appraisers satisfied the USPAP requirement for developing and reporting

their Original Appraisal Report.  Denied as to the averment "…. according to the detailed legal

description in the property deed from the March 30, 2005 sale", as the Boards averment ignores the fact

that the Hypothetical Condition, in the Cushman Original Appraisal Report, and the condition precedent

of the Engagement Letter controls the identification of the Subject Property in that Report. Denied as to

averment the March 30, 2005 deed was in the Cushman Appraiser's Original Work File. As previously

indicated herein as if stated verbatim, Cushman & Wakefield had a five-year document retention policy,

based on USPAP's Recordkeeping requirements. Because this Complaint was communicated by the

Board to the Appraisers after that five-year retention period, the Original Work File was destroyed. The

March 30, 2015 deed was placed in the reconstructed Work File on August 17, 2012, by McNamara.

Denied as to averment that the precise acreage for the".... first parcel .... " is 2.796 acres as identified in

the March 30, 2015 deed, as that deed contains no such figure. Respondent denies the averments of this

paragraph stating the "subject property .... consisting of four municipal blocks (Blacks 700.41, 700.02,

705.01, and 705.02), and 32 total lots..." as this averment denies the fact of the Hypothetical Condition

of the Cushman Original Appraisal Report is based on the Engagement Letter in the Addendum of that

Report and Ms. Kudrick's handwritten notes in the Reconstructed Work File. Denied as to averment that

the precise acreage for the".... second parcel .... " is 1.157 acres as identified in the March 30, 2015

deed, as that deed contains no such figure and because this averment denies the fact of the Hypothetical

Condition of the Cushman Original Appraisal Report, which is based on the Engagement Letter in the

Addendum of that Report and Ms. Kudrick's handwritten notes in the Reconstructed Work File.. Denied

as to averment that the precise acreage for the combined first and second parcels is 3.953 acres, "...or

approximately 172,200 square feet ...." as identified in this paragraph of the Complaint, as the March

30, 2015 deed, as that deed contains no such figure and, even presuming the Board's averment of

acreage is correct, the Board's calculation of 172,200 is imprecise, as the correct figure is 172,192.68

square feet based on the Board's averment of a total of 3.953 acres, which in itself was rounded. In order

for McNamara to have more precisely determined the size of the subject property, it would have been

necessary for him to utilize a recent survey prepared specifically for the Carlyle Group. From the information available, no such survey was made available to Respondent. Another method of calculating square footage could have been to utilize a computerized "deed plotting" program, however, such programs may themselves be inaccurate and may also create an impression of the appraiser of being able to measure the size of the subject property exactly, a task for which the appraiser is not qualified by education or experience. All of which points out the misleading nature of the Board's averments in this paragraph as being attempting to be improperly precise.

23(c). Denied as to averment the appraisal assignment included appraisal of the "…. third parcel (Block 700.02, Lots 1.04 and 1.0), which comprises of a privately-owned beach that extends 3,495 feet out to the exterior riparian grant line, with a total area of 27.27 acres, including 1.83 acres of beach above the mean high water line…" because the Cushman Original Appraisal Report Engagement Letter specifically identifies the "Property Appraised" as "The property to be appraised is two parcels located across from each other on Atlantic Avenue in Wildwood New Jersey". Significantly, the Cushman Appraisal Report Appraisal does not include "…. the privately-owned beach …." parcel because that parcel was not included in the appraisal Engagement Letter, signed by the client May 4, 2005. This suggests that the Board was unaware of exclusion of the Beach Parcel in the subject property all throughout the course of this Disciplinary Action including, but not limited to, both the Appraisal Review and the Board's Original Appraisal Report. See, Engagement Letter, Cushman Original Appraisal Report, Addendum A. For the reasons previously stated, Respondent denies the Board's averment "…. the Appraisers were unaware of its [the Beach Parcel] inclusion in the Subject Property when they prepared the appraisal report, notwithstanding its reference in the deed to the subject property …. "Denied as to averment " …. This omission is significant …. "because the omission is not significant since the Beach Parcel was not included in the property to be appraised in the Appraisal Assignment.

Respondent neither admits nor denies, but leaves the Board to its proofs, as to averment "…. private

beach ownership is an amenity that would typically be expected to enhance the value of property ….

"because, as noted in the Complaint at paragraph__, the Lower Township Zoning Board had previously

indicated the developer would need to make concessions as to public use of the beach tract, and as of the

Date of Value of the Original Appraisal Report, the developer was still negotiating with the New Jersey

Department of Environmental Protection ("NJDEP") as to the public use of the beach. As the Cushman

Appraisers and their client knew, it is NJDEP who makes the final decision on issues like granting a

CAFRA permit related to beach usage. Consequently, it is understandable the client, Carlyle Group, did

not include the beach in the appraisal assignment. Notwithstanding any reasons why the Beach Parcel

was not included in the Subject Property, the combination of the Engagement Letter and the

Hypothetical Conditions clearly exclude the Beach Parcel from the Subject Property in this Appraisal

Assignment. Admitted as to averment "…this portion of the property [the beach tract] is not referenced

anywhere in the appraisal report, including the property description, or the analysis and valuation". As

previously noted, the Beach Parcel was not included in the Subject Property or the valuation thereof, for

the reasons discussed in this paragraph, of all, as if repeated here verbatim. However, the Cushman

Original Appraisal Report references the proximity of the Subject Property to the beach on several

occasions, including, but not limited to under: "Summary of Salient Facts" (Cushman Original Appraisal

Report, Site Description at unnumbered page iv); "Nearby and Adjacent Uses", as follows "As noted,

the beach and ocean are situated adjacent to the subject property" (Cushman Original Appraisal Report,

Local Area Analysis at 13); "Site Description" as follows, "In addition, this portion of the property has

substantial beach frontage. (Cushman Original Appraisal Report, Site Description at 16); "Land

Valuation" as follows "Factors considered were barriers to entry, and proximity to the seasonal beaches

and recreational areas" (Cushman Original Appraisal Report, Site Description at 25).

24.     Inasmuch as the Board has failed to accurately recognize an exact description of the Subject Property, in accordance with the Appraisal Assignment Engagement Letter and the Hypothetical Conditioners expressed in the Appraisal Report, Respondent denies the averment "…In addition to the Appraisers' failure to accurately report an exact description of the subject properly …. ", for the reasons stated by McNamara in response to Complaint paragraph 23, above, as if stated here verbatim, regarding description of the Subject Property. Denied as to averment "…. exclusion of valuable physical and economic characteristics of the subject property from their appraisal analysis …." for the reasons stated by McNamara in response to Complaint paragraph 23, as if stated here verbatim, particularly in regard to references within the Cushman Original Appraisal Report to the relationship between the Subject Property and the beach. Denied generally as to averment "…the appraisal report contains numerous factual errors in the reporting and analysis of comparable sales data, namely as to comparable sales 1 and 5 …. ". Admitted specifically as to "…. factual errors in the analysis and reporting of the size of comparable sale 1 …. ", with the mitigating factor of the incorrect reporting of comparable sale 1 by the reporting service, Win2Data, with the further explanation of the facts related to that misreporting by Win2Data in paragraphs 24(a) and 24(b) included here, as if fully repeated verbatim. Denied specifically as to averment of "…. factual errors in the analysis and reporting of comparable sale 5 …. ".  As Ms. Kudrick testified before the Board on June 26, 2012, seven years after the date of the Original Appraisal Report, and as indicated in the Reconstructed Work File, she verified comparable sale 5, and the person with whom she verified that sale indicated it was their intent, upon purchase, to demolish the existing improvements and build condominiums on the vacant site.  As we are all aware, the "Great Recession" of 2008 had a significant impact on development throughout the world, and specifically likely on the purchaser of comparable sales 5, as that property was not demolished but rather rehabilitated. It doesn't matter whether the person with whom she verified comparable sales 5

changed their mind or their development plans were affected by the Great Recession, or they were not truthful in statements to her. The fact remains that Ms. Kudrick distinctly recalls the verification indicated the property was to be demolished.  Whether or not it was demolished when she conducted her inspection of the comparable, or demolish afterward is not material to the valuation analysis.  As stated by the State's own appraiser in his Appraisal Review, "The Reviewer found nothing to indicate that this was not the information the appraisers received at the time the appraisal was prepared". Sussman Appraisal Review, page 16. Denied as to averment "[numerous factual errors in the reporting and analysis of comparable sales data, namely] …. as to comparable sales 1 and 5, which, collectively, have a substantial effect on the credibility of the Appraisers' conclusions …. "because there were not "numerous factual errors in the reporting and analysis of comparable sales 1 and 5", as noted above, in this paragraph, as the only error was in regard to the actual size of comparable sale 1, for which there are mitigating factors, as set forth in this Answer, and included here as if set forth verbatim, and there was no development error as to comparable 5 and the reporting error was not material. Denied as to averment "…. The manner in which the Appraisers analyzed those sales is described, in pertinent part, as follows …. ", as the Board's description of the manner in which the "… Appraisers analyzed those sales…" is not accurately described in the following subparagraphs of this paragraph of the Complaint.

      24(a). Admitted as to averment "The Appraisers identified comparable sale 1 as a $5,000,000 sale of an 8,303 square foot parcel of land in May 2005, which would reflect cost of $602.20 per square foot …. according to the deeds of those sales…. "Denied as to the averment"… which [deeds] were included in the Appraisers' work file". Appraisers have previously admitted their belief Comp 1 was 8,303 square feet is an error due to incorrect information in the original version of the reporting service sale information, which had been in the Original Work File and which was destroyed in accordance with Cushman & Wakefield document retention policy. The Reconstructed Work File

provided to the Board was not the Original Work File and the Cushman Appraisers are not certain what was in the Original Work File.  In July 2010, the Cushman Appraisers provided the Reconstructed Work File to the Board including, but not limited to what the Cushman Appraisers reasonably believe where then-recently obtained (i.e., 2010) print-outs of the Win2Data sheets for the two sales that comprised comparable sale 1. The Cushman Appraisers reasonably believe the original Win2Data sheets only included a single lot in each of the two transactions, which the Cushman Appraisers recorded in the Cushman OAR for comparable sale one. Review of the authoritative government form "Division of Taxation, State of New Jersey, Local Property Branch, Form No. SR-1A 2-94" for each of those two transactions indicates only one lot number for each transaction, in the same manner as the Cushman Appraisers reasonably recall the Win2Data sheets for the two sales that comprised comparable sales 1. Accordingly, the Cushman Appraisers reasonably believe there was a revision in the referenced Win2Data sheets between when Ms. Kurdick researched those sales before she went to inspect the Subject Property and comparable sales in May 2005. This is a reasonable belief, because the deeds for those two sales were only recorded literally days before the beginning of this Appraisal Assignment.

24(b). McNamara neither admits nor denies the assertion that the deeds to the properties considered Comp 1 "….. were included in the Appraiser's [Original] Work File", which was destroyed in accordance with the Protocol, but leaves the Board to its proofs. McNamara denies that Ms. Kudrick should have been able to tell the size of Comp 1, by looking at the property, because Ms. Kudrick's recollection is that the verification call had indicated there was to be an assemblage and it would've been logical for her to assume, upon inspection, that the remainder of the land she was looking at was part of the assemblage.  Further, without Ms. Kudrick having the deeds, and relying on the Win2Data, it is illogical, to say the least, for the Board to suggest that she should have known comparable sale one contained a total of 49,913 ft.² in two noncontiguous parcels. McNamara admits "…. the Appraisers

ascertained a lot size of 8,303 square feet for that sale by relying on two data sheets from "Win2Data", a computer application available to real estate and mortgage finance professionals nationwide, that provides access to publically recorded deed and mortgage information, according to Ms. Kudrick's investigative inquiry testimony". McNamara admits "..... These data sheets identify the parcel that sold for $4,500,000 as having 3,201.66 square feet, and the parcel that sold for $500,000 as having 5,100.876 square feet, for a total lot area of 8,302.536 square feet, rounded to 8,303 square feet, and resulting in a price per square foot of $602.20, as reported in the appraisal and utilized in the analysis....". Respondent's discussion of the circumstances surrounding the Win2Data comparable one sale sheets is included here from paragraph 24(b), as if repeated verbatim. McNamara neither admits nor denies the assertion "....instead of an accurate amount of $100.17 per square foot", but instead leaves the Board to its proofs.

24(c). McNamara denies the averment the Cushman Appraisers ".... falsely reported ...." Comparable Sale 5, as they have testified, regarding the statement in their Appraisal that ".... the former Summer Sands Motel, which was demolished for redevelopment with condominiums" should have read ....it was to be demolished...." (T-CK-36) As Ms. Kudrick also testified, "I was told that intent was to demolish the hotel for redevelopment with condominiums similar to the subject." (T-CK-36). As a result of the verification information obtained by Ms. Kudrick, the Cushman Appraisers properly analyzed this sale as a land sale, for the reasons also set forth in paragraph 42 of Count IV of this Answer including, but not limited to the Board's Appraiser's own statement he believes the verification of that Comparable Sale could have reasonably indicated the property was to be demolished and redeveloped as condominiums. (Sussman Appraisal Review at 16) Admitted as to the averment the Appraisers reported Comparable Sale 5 " ..... as a 35,837-square foot land sale for "the site of the former Summer Sands Motel" for $7,500,000 in November 2004, which reflected a value of $209.28 per square feet of vacant

land area". Admitted only as to the averment that the Cushman Appraisal stated "…. that the Summer Sands Motel had been "demolished for redevelopment with condominiums." As previously stated herein, the Appraisal should have read "….it was to be demolished…." (T-CK-36).  As Ms. Kudrick also testified, "I was told that intent was to demolish the hotel for redevelopment with condominiums similar to the subject." (T-CK-36). Admitted as to averment. "In actuality, the Summer Sands Motel was not demolished, but physically existed at the time of the appraisal report….".  in regard to verification of this sale and demolition of the improvements at comparable sale 5, respondent repeats reference to the Board Appraisers own statement regarding such, above, as if stated here verbatim. McNamara neither admits nor denies the averment the Summer Sands Motel "was converted to condominiums in October 2005….""", but leaves the Board to its proofs. McNamara denies the averment "the fact that the Summer Sands Motel was not demolished undermines the reliability of this sale as an indication of land value alone", because when the Cushman Appraisers conducted their "back of the envelope reasonableness check internally"(CK T-51, L13-14), the sale price per unit for comparable sale 5, unadjusted, would have been approximately $312,000, assuming 24 units (rounded) at 1500 ft.² per unit (which 1500 ft.² would have been derived from comparable sale 2, the closest in size to comparable sales 5). It is worth noting that the unadjusted "back of the envelope" sale price per unit for comparable sale 2 would have been over $285,000.

   25. McNamara denies the averment "Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.l(a), N.J.A.C. _13:40A-6.l(b), USPAP 1-l(b), USPAP 1-l(c), and USPAP 2-2(a)(iii)", for the reasons herein stated, in Respondents Answer to this Count, and as otherwise indicated in this

Answer, as if fully repeated verbatim herein and because the Board's allegations of such violations are not supported by law or regulation. McNamara denies the averment "Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), *as* well as NJ.AC. 13:40A-7.9(d)(2), (4), (5), and (8)", for the reasons herein stated, in Respondents Answer to this Count, and as otherwise indicated in this Answer, as if fully repeated verbatim here and because the Board's allegations of such violations are not supported by law or regulation.

## COUNT II

26.     McNamara repeats his responses to the Board's General Allegations and the allegations of Count One above as if fully set forth verbatim herein.

27.     McNamara generally admits the averment "Pursuant to USPAP 2-2(a)(ix), an appraisal must describe the information analyzed, the appraisal procedures followed, and the reasoning that supports the analyses and opinions, and conclusions", but specifically denies that averment because of its failure to include that Standards Rule's related Comment:

> Comment: The appraiser must be certain the information provided is sufficient
> for the client and intended users to adequately understand the rationale for the
> opinion and conclusions, including reconciliation of the data and approaches, in
> accordance with Standards Rule 1-6.

In keeping with the Comment to Standards Rule 2-2(a)(ix), McNamara specifically denies the averment "…Although the appraisal report here documents information analyzed, appraisal procedures followed, and adjustments made to comparable sales, there is insufficient information provided to enable the intended user to adequately understand the rationale for the adjustments, and the resulting opinions and conclusions…", in particular, because the Board is well aware the Client and only Intended User raised no questions regarding the appraisal, and the Board is well aware the Consumer Complaint filed May

25, 2010 was not filed by the Client, but rather the Board has made this assertion without justification or support, and further because of the fact that, if Respondent is found in violation of this Standards Rule, then the Board's own expert must also be found in violation as he has provided an even lesser degree of explanation of adjustments and conclusions so "...there is insufficient information provided to enable the intended user to adequately understand the rationale for the adjustments, and the resulting opinions and conclusions...". See, Sussman Original Appraisal Report, dated November 2, 2016. McNamara denies the averment "Specifically, the analysis and adjustments made to the comparable sales data contain inconsistencies, apparent contradictions, and adjustments made without discussion or explanation of the reasoning that supports the adjustments", as follows. First, McNamara denies this averment because the Board, and its expert, have inappropriately chosen to ignore the Appraisal's Hypothetical Conditions, as stated in the Appraisal Report, and have instead chosen to categorize their misreading as errors of ".... inconsistencies, apparent contradictions...." on the part of Respondent. Second, McNamara denies this averment because the Board's own expert, has prepared an appraisal report with the same, or with an even lesser, level of ".... discussion or explanation of the reasoning that supports the adjustments" and therefore Board's own expert's appraisal report is either similarly deficient or both the Cushman Appraisal and the Board's expert appraisal both have sufficient ".... discussion or explanation of the reasoning that supports the adjustments". McNamara denies the averment "This series of errors in analysis, in addition to the aforementioned factual errors regarding the description of the subject property and comparable sales 1 and 5, in the aggregate, further establish that Respondent and Ms. Kudrick rendered their appraisal services in a careless or negligent manner, in violation of USPAP 1-l(c)". McNamara denies that averment for the reasons set forth above in this paragraph, as if fully repeated verbatim herein. McNamara specifically denies the Board's averment because said averment is even more non-specific and unsupported than the violations of which the

Board has accused Respondent. Further, that while mistakes may have been made, there is no such thing as an appraisal report without mistakes, as can be seen in both the Appraisal Review Report and Original Appraisal Report prepared by the Board's Appraiser. There is a significant level of subjectivity involved in reaching such a conclusion, but first, any such mistakes do not give rise to acts of negligence or incompetence, unless such mistakes are part of a pattern that discloses a bias with aforesaid intent to come in with a "low number," or a biased conclusion, as Respondent believes is evident in the Board Appraiser's Appraisal Review and Original Appraisal Report, and which bias is prohibited by USPAP Standards Rule 1-2(b) Comment, stating "An appraiser must not allow a client's objectives or intended use to cause an analysis to be biased."

        While there were some mistakes contained in the comparable sales data reported, the State's appraiser jumps to certain conclusions, apparently without considering relevant information known by the State. For example, as stated earlier, the Work File provided to the State was reconstructed because the original file had been destroyed in accordance with the Cushman's records retention Protocol, which conforms to USPAP. The Win2Data printout sheets referenced by the State's appraiser are not the original sheets that the C & W appraisers relied upon. The sheets provided to the State contain the data reported five years later. Because the authoritative government document, upon which the Win2Data is based contains the same information utilized by the Cushman appraisers, it is reasonable to believe that the original sheets reported incorrect information (which is not uncommon with 3rd party data providers). Therefore, the State has the burden of proving that the C & W appraisers disregarded the additional lots. Further, the Board and their expert ignored the Hypothetical Condition of the Cushman Appraisal, which addresses the Subject Property identification issue, the fact that the Beach Parcel was not appraised, along with the fact that the Hypothetical Condition presumes development as proposed, which does not require either extensive proof or analysis of existing

approvals.   The Board appraiser made adjustments to all of the comparables he used, which did not require demolition, thus ignoring the Hypothetical Condition that the Subject Property was being appraised as if vacant land. Further, the Board expert, like the Board, ignores the fact that the Subject Property can be developed to a higher intensity than any of the comparable sales  used by the Board Appraiser. There are simply too many coincidental similarities between the Board expert's Appraisal Reports (in both his Appraisal Review and his Original Appraisal Report) and the previously expressed positions of the Board. It is difficult to believe that the Board did not provide the Board expert with their preconceived conclusions, which appear to have included documents related to settlement discussions, which he then adopted into his Appraisal reports. In other words, the Board did not obtain an independent, unbiased analysis of the Cushman Appraisal in this matter. On the contrary, the Board Expert appears to have created a directed report.  At the least, Board's expert did not support his adjustments, and made numerous errors, i.e., the same types of purported appraisal standards violations, of which the Board has accused the Cushman Appraisers.

28.     McNamara admits to the averment that an error was made in the reporting and analysis of Comparable Sale 1, but denies the error was material in regard to the indication of value in the Appraisal Report. McNamara admits as to the averment that there was an error in determining the size of Comparable Sale 1, and that error led to an indicated sale price per square foot of $602.20. McNamara neither admits nor denies as to the averment of the ".... actual sale value of $100.17 per square feet...", but leaves the Board to its proofs. McNamara neither admits nor denies the error was ".... carried throughout the analysis and adjustments and led to an erroneous adjusted unit value of that sale of $430.36 per square feet ....", but leaves the Board to its proofs. McNamara points out that his "back of the envelope" analysis on a per unit basis would have indicated a sales price per dwelling unit of $200,000 for comparable sale one, taking into account the entire site, and $281,250 considering just

the land purchase for demolition and redevelopment of the 16 condo units at that property. McNamara admits "....[t]he other four [comparable] sales were adjusted upward 65 to 70 percent ....", but McNamara denies the averment that such adjustments were "....based on this error ...."McNamara admits the averment that adjustments to the other four sales "....result[ed] in adjusted unit values of $322.26 to $364.38 per square foot. McNamara admits the averment "Based on these adjustments, the average adjusted unit price was calculated to be $366.17 per square foot, resulting in a concluded market value opinion for the subject property at $375 per square feet, or $65,300,000".

29.     McNamara denies the averment ".... substantial errors made in the reporting and analysis of comparable sale 1....", as there was one error in the reporting service information regarding the total size of Comparable 1 and the subsequent analysis was part and parcel of that one error which was mitigated by the circumstances described in paragraph 24(a) and (b) as if fully repeated here verbatim. McNamara denies the averment ".... the Appraisers made several adjustments to comparable sales data, without supporting discussion or explanation.... ", as the Appraisers' supporting discussion and explanation was appropriate given the Intended Use and the Intended User in this Appraisal Assignment, and further, if the Cushman Appraisers' violated USPAP with their supporting discussion and explanation of adjustments, then the Board's Appraiser did so as well, as the Board's expert did not provide supporting discussion and explanation of adjustments to a higher degree of specificity than those of the Cushman Appraisers. See, Sussman Original Appraisal Report, dated November 2, 2016. McNamara denies the averment ".... that [the supporting discussion an explanation of adjustments by the Cushman Appraisers] were either inconsistent or contradictory", as the Cushman Appraisers had difficulty responding to the aggressive questioning in their testimony before the Board because: 1) the Original Work File for the Appraisal Assignment have been destroyed in accordance with Cushman & Wakefield's document destruction policy; 2) the extended time between when the Appraisers conducted

the Appraisal Assignment, and their Statement under Oath on June 26, 2012, resulted in the Cushman

Appraisers inability to recall their actions in an appraisal assignment over seven years before that

appearance; 3) neither Mr. McNamara nor Ms. Kudrick were litigation appraisers and they were not

familiar with the aggressive questioning they faced from the Board. In fact the adjustments to

comparable sales data were not either inconsistent or contradictory because those adjustments are logical

when the facts of the Subject Property and the comparable sales are considered without preconceived

notions or bias, as further discussed in the sub-paragraphs to this paragraph, below.  Respondent denies

"[t]he manner in which the [Cushman] Appraisers inaccurately or insufficiently analyzed adjustments to

comparable sales data is described, in part, as follows....".  First, the Cushman Appraisers did not

inaccurately or insufficiently analyze adjustments to comparable sales data, for the reasons set forth

above, in this paragraph, in this Count, and in this Answer, as if fully repeated here verbatim. Second,

the following subparts of this paragraph do not indicate such inaccurate or insufficient analysis of

adjustments to comparable sales data, but rather reveal an unjustified bias on the part of the Board and

the Board's Appraiser.

    29(a). McNamara admits the averment "The Appraisers supplied a downward adjustment

of 25 percent to comparable sale 1 for a "Motivated Buyer," who they described as an "adjacent property

owner . . . motivated to acquire that particular tract of land for proposed development". McNamara

denies the averment .... "However, the Appraisers give no discussion or reference to the source of this

information to support the adjustment", because the information presented in the Cushman Appraisal

was appropriate given the Intended Use and Intended User in that Appraisal Assignment. In the

Cushman Appraiser's testimony before the Board, they admittedly had difficulty recalling information

in response to the Board's questions because: 1) the Original Work File for the Appraisal Assignment

have been destroyed in accordance with Cushman & Wakefield's document destruction policy, and

therefore, the Cushman Appraisers did not have their actual Original Work File available to refresh their recollection regarding the facts of the Appraisal Assignment pertaining to "… the source of this information to support the adjustment"; 2) the extended time between when the Appraisers conducted the Appraisal Assignment, and their Statement under Oath on June 26, 2012, coupled with the destruction of the Original Work File, resulted in the Cushman Appraisers inability to recall their actions in an appraisal assignment over seven years before that appearance; 3) ~~3)~~ neither Mr. McNamara nor Ms. Kudrick were litigation appraisers and they were not familiar with the aggressive questioning they faced from the Board. The 25%adjustment to Comparable Sale 1 for "Motivated Buyer" was appropriate given Ms. Kudrick's research at the time of the Appraisal Assignment, which included verification of the sale with a party to the transaction. In that confirmation discussion, Ms. Kudrick recalls that party indicating these sales were part of an assemblage. Based on information obtained in verification of comparable sale one that it was part of an assemblage, and given the reporting from Win2Data as to the size of that sale as previously referenced, the Cushman Appraisers logically concluded a downward adjustment for a "Motivated Buyer".

29(b). McNamara admits the averment "…. The Appraisers also asserted, in a section titled "Discussion of Adjustments", that "an annual adjustment of 3.00 percent" was applied to account for market changes between comparable sales dates of November 2004 to May 2005. However, in the "LAND SALE ADJUSTMENT GRID" the Appraisers actually applied a five percent adjustment for "annual change in market conditions" in their calculations". Respondent admits the averment "…. Moreover, the Appraisers also both acknowledged, during their appearances before the Board, that even a five percent adjustment was inconsistent with the significant appreciation of value in the local market in early 2005", however Respondent denies the implication, as indicated above, in this section of the Complaint that the Cushman Appraisers'

analyses were inconsistent and/or contradictory, as we now know, with the benefit of hindsight, that almost at the exact time of this Appraisal Assignment, the market had peaked in what we now call "The Bubble". While some residential prices were still growing, many market participants anticipated a correction in the not-too-distant future, but most did not envision the precipitous decline in prices, extended marketing time, and the little supply of debt capital that was soon to come. At the peak of the market, which the Cushman Appraisers faced in May 2005, it is impossible for even the buyers and sellers of that time, to ascertain whether they took into account the subsequently unprojected "Hot market" when entering into a contingent Contract of Sale, as was the case with the Cushman Appraisers comparable sales and with the Board's Appraiser's comparable sales. The 3% figure in the narrative of the Cushman Appraisal was obviously a typographical error, which was not material, because the actual analysis used 5%. In their Statement under Oath before the Board, Cushman Appraisers agreed in retrospect that perhaps the 5% was insufficient, but that was their professional opinion, and a conservative one, at the time of the Appraisal Assignment.  Both the Board's and the Cushman Appraisers ruminations on June 26, 2012 were merely educated hindsight.

29(c). McNamara admits the averment "….In terms of location adjustments, all of the comparable sales, which were all located to the north in Wildwood Crest, were considered inferior to the subject property, and were accordingly adjusted upward between 5 and 10 percent". As Ms. Kudrick explained in her Statement under Oath, she did not recall the reason for those adjustments, due to the amount of time (over seven years) that had passed between the Appraisal Assignment and her testimony before the Board (Kudrick T-45, L23, T-46, L 1) and the Original Work File had been destroyed as per the Protocol. In addition, as a non-litigation appraiser, Respondent was surprised by the aggressive questioning by the Board.

Subsequent to her testimony, and without being under the pressure of having questions fired at her by the Board, Ms. Kudrick had an opportunity to review the report, and her testimony. She wishes to supplement her testimony on pages 45 to 46, as she is concerned the questioning by the Board members implied the location adjustment was due to proximity to the beach. Instead, Ms. Kudrick believes that the location adjustment was made based on proximity to Diamond Beach, at the southern end of Wildwood Crest. Diamond Beach is much more prestigious then Wildwood City, which abuts Wildwood Crest to the north. Ms. Kudrick made only 5% adjustments for location to comparable sales 1 and 5 because they were closer to Diamond Beach. She made a 10% locational adjustment to comparable sales 2, 3, and 4, because they were farther away from Diamond Beach, and thus closer to Wildwood City.

McNamara denies the averment "....However, Wildwood Crest is generally recognized, in the Cape May County real estate market, as a more desirable location than Lower Township, and therefore downward adjustments, rather than upward adjustments would be expected". As the Board's Appraiser himself indicated, there is no quantifiable markets response to such an allegation,

> "Although the market generally recognizes Wildwood Crest as more desirable than Lower Township, the Diamond Beach section is viewed as comparable to Wildwood Crest and no location adjustment for Diamond Beach as compared to Wildwood Crest is warranted." Sussman Original Appraisal Report at 44.

As the Board Appraiser points out in his Original Appraisal Report, the Diamond Beach section of Lower Township is greatly distinct from the remainder of that Township. Unfortunately for the Boards' Appraiser, it appears as if his Original Appraisal Report reflected his own opinion, while his Appraisal Review of the Cushman Original Appraisal Report reflected that of the Board:

> The Diamond Beach section of Lower Township where the subject property is located is more similar to Wildwood Crest than it is to the rest of Lower Township, and the selection of comparable sales in Wildwood Crest is justified. However, the market generally recognizes Wildwood Crest as more desirable than Lower Township, so if any adjustments for location were to be made at all, they would be expected to be downward adjustments instead of the upward adjustments that were applied.  Sussman Appraisal Review dated November 2, 2016.

McNamara denies the averment, contained in footnote 11, stating "The Appraisers, in a section titled "Local Area. Characteristics", described the Wildwood area as having greater attractions than the subject property's location in Diamond Beach, including a "World Famous Boardwalk, with five amusement piers, over 150 rides, two water parks, movie theaters, fireworks, hundreds of specialty shops, and a variety of restaurants ... [and] the Wildwood Convention Center [which] offers a wide variety of special events and activities year-round".  It is beyond misleading for the Board to suggest that Wildwood Crest property, a few blocks away from the Subject Property, is more desirable because it's closer to the rides on the Wildwood boardwalk. That is particularly so when the averment at footnote 11 purportedly relates back to the Board's unsupported, and misleading, assertion that ".... Wildwood Crest is generally recognized, in the Cape May County real estate market, as a more desirable location than Lower Township...", when, the Boards own Appraiser did not agree with that averment in his Original Appraisal Report.

29 (d). McNamara admits to the averment ".... Although the subject property was reported to include 174,196 square feet, and the comparable sales' lot sizes ranged from 8,303 to 35,837 square feet, the Appraisers make a uniform, upward 25 percent size adjustment to all of the comparable sales....". McNamara denies the averment such adjustments were made "....without providing supporting details for each adjustment and how the adjustment relates to the respective comparable sale lot sizes".

Respondent admits the averment "... The appraisers make a uniform, upward 25% adjustment to all the comparable sales ....", because ".... [larger parcels] ... typically sell at a higher unit price than a smaller site...". Cushman OAR p.25. This is because larger parcels provide greater Floor to Area Ratios (FAR), cost allocation (which spread fixed costs, i.e., approvals, over a greater number of units), site utilization, etc. The larger parcel of the Subject Property has a size advantage, which makes it superior in regards to its potential "intensity of development". In Diamond Beach, a lot in excess of 25,600 ft.² has a by-right height of six floors. The subject parcel was proposed for development, under the Hypothetical Condition of 12 stories, in large part because of its nature as a 4 acre site. Therefore, when comparing the comparables to the subject, it is necessary to take into account the additional investment opportunities afforded by the much larger parcel.

Respondent denies the averment "....without providing supporting details for each adjustment and how the adjustment relates to the respective comparable sale lot sizes...". The issues and analysis of the adjustments for the lot size were referenced in the Cushman Appraisal, as indicated in the proceeding paragraph as if repeated here verbatim, to the satisfaction of the Client and only Intended User, the Carlyle Group. As one of the most sophisticated real estate developers and investors in the world the Carlyle Group obviously preferred to purchase the former "Grand Hotel at Wildwood Crest" site, with a total of 4 acres on which they could reasonably propose to build 188 units, instead of even a one acre site in Wildwood Crest, where they could build between 16 and 25 units. The Subject Property, as proposed for development of 188 units would have 927 ft.² of land area to each proposed dwelling unit. The vacant land area of comparable sale one (site of the 16 units that were ultimately developed there) had 2801 ft.² of land area per dwelling unit. Comparable was at 1524 ft.² of land area per dwelling unit. Comparable sales three and four each had

1042 ft.² per dwelling unit. Comparable sale five, under the verification information that it was to be

torn down and redeveloped as condos could reasonably have been expected to have approximately

1500 ft.² land area for dwelling unit, under typical land use regulations.

      McNamara admits the averment "....the Appraisers offer the conclusion, in the

'Discussion of Adjustments' section, that 'larger parcels of land situated within a barrier island beach

community will typically sell at a higher unit price than a smaller site... [due to a] scarcity of larger

sites available for development' in 'established seasonal beach communities'."

      McNamara denies as to the averment "....However, this conclusion is contradicted by

the Appraisers' erroneous data Specifically, comparable sale 1 was incorrectly noted to be the

smallest lot, containing 8,303 square feet, but had the highest unit price at $602.20 per square feet.

Yet, the Appraisers fail to identify this apparent contradiction, let alone reconcile it with their prior

conclusion regarding the relationship between unit price and lot size in seasonal beach communities",

because: 1) the Cushman Appraisers have recognized the reporting error in the secondary reporting

data utilized in the Appraisal Assignment, but have also pointed out the error does not affect the final

value estimate, or the averment regarding the utility of a larger site for development; 2) the parcels in

comparable sale 1 were erroneously reported by Win2Data, as set forth in Count I, paragraphs 24(a)

and 24(b), and included here , as if fully repeated verbatim; 3) as part of a reported assemblage, as

Ms. Kudrick recalls from her verification call, the high dollar value per square foot of the sale, as

reported by Win2Data, supports the Cushman Appraisers' belief that a larger site has greater value

than a smaller one because an assemblage buyer often pays a higher price per square foot for a

smaller lot in order to achieve the greater utility of a larger parcel through the assemblage process.

29(e). McNamara admits as to the averment "…. The Appraisers also …. concluded that comparable sales 2 through 5 were inferior to the subject property in terms of "utility" and provided a uniform, upward adjustment of those sales of 35 percent". McNamara denies as to the averment that such conclusion was made "summarily", for the reasons that follow in this subparagraph. McNamara denies as to the averment "….The appraisal report includes no discussion explaining the rationale for such a substantial utility adjustment, other than describing those properties as having an "average utility", …… compared to the subject property. The Cushman Appraisal describes the "Utility" adjustment reasoning as follows: "The subject parcel is adequately shaped to accommodate a typical building, and it has good access, frontage and visibility. When a comparable was considered to have superior or inferior utility, the appropriate adjustment was made". Cushman OAR, p.26. The Subject Property had been discussed in the highest and best use analysis as follows: "…a more intensive plan of multi-family development is recommended". The highest and best use of the Cushman Appraisal is redevelopment of the site, as proposed. Cushman OAR P.21. The Cushman appraisal also stated "…utility [is] adjusted for differences which exist…" p.22. There is no question that the Subject Property has direct access to the beach. None of the comparable properties have such direct access. There is a saying at the Jersey Shore "if you're not beachfront then you may as well be in Iowa". That colloquialism is manifested in the second house in from the beach being significantly (estimated 25%) less than the house that is on a beachfront lot. At the Grand, parents can sit on the private beach, and tell their children it's okay to go up to the room to get their iPad, book, etc., which worrying about the kids crossing a road, or having to walk to a condo unit two blocks away. Frontage and access were referenced in the Cushman Appraisal, and these factors resulted in the +35% adjustment to those comparable sales not fronting directly on the

beach. In order to not imply incorrect degree of precision in regard to consumer tastes, the Cushman

Appraisers used across the board 35% utility adjustment for comparable sales 2 through 5.

McNamara denies as to the averment that such " 'average utility', was *presumably* [emphasis added

by Respondent] compared to the subject property." It is clear from a plain reading of the Cushman

Appraisal Report that the comparables were being compared to the subject property, and there is no

need to presume such from a plain reading. Finally, in regard to the last sentence in this subparagraph

29(e), Respondent admits the averment that comparable sale 1 was in close proximity to comparable

sale five, but comparable sale one "…. was deemed by the Cushman Appraisers to have superior

utility to the subject property …." which "…. was adjusted downward 25 percent", to the extent the

allegations are not inconsistent with the document referenced, in that such document is a writing

which speaks for itself.  Respondent denies the averment that the utility adjustment to comparable

sale one had "… No clear factual support…", as the Board is well aware that the Original Work File

had been destroyed at the end of the Cushman five-year retention policy period. In addition to the

unavailability of the Original Work File, over seven years had gone by between the date of the

Appraisal Assignment and the Cushman Appraisers testimony before the Board. Notwithstanding

those facts, Respondent reasonably believes the Original Work File would have contained

information supporting Ms. Kudrick's verification call with the party to the comparable sale one

transaction. As noted in paragraphs 24(a) and (b) of Count I, which is repeated here as if set forth

verbatim, Ms. Kudrick was advised in that verification that comparable sale one was part of an

assemblage and the Cushman Appraisers reasonably believe (even with now 12 years since the

Appraisal Assignment) that the Original Work File contained notes from that verification call which

provided reasoning for the utility adjustment to comparable sale 1.

29(f). McNamara denies the averment "… the appraisal report also contains no discussion analysis or adjustments made regarding the status approvals of the subject property and the comparable sales." As to the subject property, the Cushman Appraisal clearly indicates it was performed under the "Hypothetical Condition" that the property is to be appraised as proposed, as "The Grand Condominiums and Spa". The Engagement Letter creates the Hypothetical Condition of development of 125 units on the beachfront parcel and 63 units on the non-beachfront parcel. As to the comparable sales, the Cushman Appraisal indicates the approval of specific proposed development in the "Discussion of Comparable Sales." The Cushman Appraisers indicated in their testimony they would have confirmed those sales with participants to the transactions. It was standard operating procedure for the Cushman Appraisers to have asked questions about development approvals in the verification process. However as previously noted, the Original Work File was destroyed after the retention period required by USPAP and it was over seven years after the Appraisal Assignment whenthe Cushman Appraisers appeared and testified before the Board. As a result, in Ms. Kudrick's testimony before the Board on June 26, 2012, Ms. Kudrick was reasonably unable to specifically identify the specific verification tasks performed in this appraisal, but was able to affirm their standard procedure. (Kudrick T-26, L 24; Kudrick T-30, L 18; Kudrick T-33, L 7-9; Kudrick T-34, L 6-8). McNamara admits the averment "…. This [regarding the above discussion on property selling with approvals] is a factor that warrants consideration in the valuation of land due to the time and cost involved in obtaining approvals. Whether a property sold with or without approvals, or was purchased subject to the buyer obtaining approvals, typically has an impact on the price paid" and that the Cushman Appraisers took such comparable sale approvals into account in their analyses. However, as previously noted, the Original Work File was destroyed in accordance

with Cushman file retention Protocol, which was based on the USPAP file retention policy, and when the Appraisers testified before the Board, it was over seven years since they had conducted the Appraisal Assignment. As a result of the aforesaid, McNamara denies the averment "....However, the Appraisers gave no consideration to this factor in their analysis of the comparable sales".

30.     McNamara denies the averment ".... The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.l(a), NJ.AC. 13:40A-6.l(b), USPAP 1-l(c), and USPAP 2-2(a)(ix) ), for the reasons previously set forth in this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are not supported by law or regulation.

McNamara specifically denies the averment that his ".... conduct, as described above constitutes ... violations of ...... N.J.A.C. 13:40A-6.l(a), NJ.AC. 13:40A-6.l(b).... ", for the reasons previously set forth in this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are not supported by New Jersey law or regulation. McNamara specifically denies the averment that his ".... conduct, as described above constitutes ... violations of ...... USPAP 1-l(c).... "", for the reasons previously set forth in this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are not supported by New Jersey law or regulation. McNamara specifically denies the averment that his ".... conduct, as described above constitutes ... violations of ...... USPAP 2-2(a)(ix).... "", for the reasons previously set forth in this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are not supported by New Jersey law or regulation.

McNamara denies the averment that any of the above referenced conduct by him in this

Appraisal Assignment "…. thereby empowers the Board to suspend or revoke the Respondent's

authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and

(h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8) ", for the reasons previously set forth in

this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are

not supported by or regulation.

## COUNT III

31.     McNamara repeats his responses to the Board's General Allegations and the

allegations of Count One and Count II above as if fully set forth verbatim herein.

32.     McNamara admits the averment "Pursuant to USPAP 1-5(b), in developing a real

property appraisal, when the value opinion to be developed is market value, an appraiser must analyze

all sales of the subject property that occurred within three years prior *to* the effective date of the

appraisal".

McNamara generally admits the averment "….USPAP 2- 2(a)(ix) further requires that,

when reporting an opinion of market value, a summary of the results of the analysis of the subject sales,

in accordance with USPAP 1-5 is required, and if such information is unobtainable, a statement on the

efforts undertaken by the appraiser to obtain the information is required, or if such information is

irrelevant, a statement acknowledging the existence of the information and citing its lack of relevance is

required". McNamara specifically denies the averment "Moreover…" at the beginning of the

Complaint's sentence referencing USPAP 2- 2(a)(ix), because that averment improperly implies the

provisions of Standards Rule 2 override the provisions of Standards Rule 1, and that is not so, as the

appraisal development standards of Standards Rule 1 create the basis for the appraisal reporting

standards of Standards Rule 2. In this Appraisal Assignment: 1) the Original Work File for the Appraisal

Assignment have been destroyed in accordance with Cushman & Wakefield's document destruction Protocol, which is based on USPAP; 2) the extended time between when the Cushman Appraisers conducted the Appraisal Assignment, and their testimony before the Board on June 23, 2012, resulted in the Cushman Appraisers inability to recall their actions in the Appraisal Assignment over seven years before that appearance; 3) in fact the narrative comments on page 30 of the Cushman OAR are in keeping with the level of detail in the examples provided in USPAP 2005, Advisory Opinion 1. USPAP 2005, pp. 125 to 127.

33.     McNamara denies the averment "Notwithstanding the extraordinary difference between the $18,000,000 sale price of the subject property less than two months before the appraisal report's value date and the Appraisers' market value conclusion of $65,300,000, the appraisal report lacks any analysis of this implausible leap in value that would assist the intended user in properly understanding this conclusion", for the reasons that follow. In fact, the property was placed under agreement approximately two (2) years before by a deed recorded April 6, 2005, for a consideration of $18,000,000, when that transaction went under contact, there were no "…. development approvals in place" and the developer and then-current owner had taken the Property through the land use development process. While non-beachfront Parcel 2 did not have all approvals at the time of the prior sale, the settlement agreement with the adjoining condominium association owners effectively cleared any impediments to approval, as borne out in the 2007 approval for development of that site. Therefore, the effective "meeting of the minds", in the transaction for the prior sale of the Property did not take place "… less than two months before the appraisal reports value date and the Cushman Appraisers market value conclusion of $65,300,000". As a result, it is misleading for the State's Complaint to make that averment, particularly with the Board's knowledge that such "meeting of the minds" took place approximately 2 years before the actual sale date. In the Cushman Appraisal, McNamara goes on to

indicate the following in his analysis of the prior sale of the Subject Property:

> In addition, we would note that in 2002, the Grand Hotel of Wildwood Crest
> was sued by the State of New Jersey for allegedly misleading consumers
> through advertisements that falsely depicted the hotel's facilities as clean
> and luxurious even though it was in a serious state of disrepair and had been
> fined for fire code violations. The improvements were in very poor
> condition and the seller was considered to be motivated to achieve a quick
> sale   After   considering   seller   motivation,   time,   costs   incurred,
> entrepreneurial incentive, and improved market conditions in the subject
> area, in our opinion the foregoing conclusion is reasonable and market
> oriented.

Cushman OAR at p.30

McNamara provided the above analysis in explanation of why there was a difference
between the $18 million meeting of the minds sale in 2003 and the recorded deed in 2005, indicating
that sale did not meet the requisite conditions of a market value sale.

McNamara specifically denies the averment that the Cushman Appraisers did not conduct
a proper USPAP Standards 1 development analysis of the prior sale of the Subject Property, as the
appraisal development standards of Standards Rule 1 create the basis for the appraisal reporting
standards of Standards Rule 2. In this Appraisal Assignment: 1) the Original Work File for the Appraisal
Assignment have been destroyed in accordance with Cushman & Wakefield's document destruction
policy; 2) the extended time between when the Appraisers conducted the Appraisal Assignment, and the
Cushman Appraisers were unable to recall their actions in an appraisal assignment over seven years
before their Statement under Oath on June 26, 2012 ; 3) in fact the narrative comments by McNamara on
page 30 of the Cushman OAR are in keeping with the level of detail in the examples provided in USPAP
2005, Advisory Opinion 1. USPAP 2005, pp. 125 to 127.

Based on the above, McNamara specifically denies the averment "Notwithstanding the
extraordinary difference between the $18 million sale price of the subject property less than two months

before the appraisal reports value date and the appraisers market value conclusion of 6 million $65,300,000".

McNamara specifically denies the averment "Alternatively, the Appraisers give no explanation as to why an analysis of the sale of the subject property, less than two months prior to their appraisal, was irrelevant to their overall market value conclusions", for the reasons set forth above in this paragraph and in McNamara's preceding answer to Count III, paragraph 32 of the Complaint.

34.    McNamara specifically denies the averment "To begin with, the sale of the subject property for $18,000,000 is referenced in the appraisal report only twice, and both times with the date of sale incorrectly identified as April 6, 2005". There is only one reference in the Cushman OAR to April 6, 2005, in the "Introduction", under "Sales History", as follows:

> "The property was purchased by the current owner from Diamond Beach Resort, LLC on April 6, 2005 for a recorded consideration of $18,000,000. This is recorded as Deed Book 3147, Page 8."

The above sentence does not constitute an "incorrect identify[cation]" of the prior sale of the subject property, as it identifies the transaction referenced by the recording date, and any ambiguities as to the distinction between the deed date and the recording date are not only minor, as there was only a six day delay, but such ambiguities would be construed in favor of McNamara. Given that minimal time frame, it would be improper to split hairs over the legal distinction between the deed date and recording date, particularly given the language in the Cushman OAR. Most significantly, the Board once again ignores the fact that the Cushman OAR was written for the Carlyle Group, which is not only one of the most sophisticated real estate developers and investors in the world, but was either a co-developer or equity partner with the purchaser of the Subject Property.  Based on the inappropriate nature of the State's Complaint in the averments referenced in this paragraph, those averments are false assertions and should be stricken from the Complaint.

McNamara denies the averment "The appraisal report also lacks reference to, or analysis of, the April 2003 Agreement of Sale and the two-year period between the formation of the contract and the actual sale of March 30, 2005 in the "RECONCILIATION AND FINAL VALUE OPINION" section ("Reconciliation") of the appraisal report". As to McNamara's denial of the averment "The appraisal report also lacks reference to ……. the April 2003 Agreement of Sale….", the Cushman OAR states: "At the time the property was placed under agreement of sale ….". As to McNamara's denial of the averment "The appraisal report also lacks …. analysis of the April 2003 Agreement of Sale….", because the Cushman OAR includes the following analysis of the April 2005 recorded sale:

- "…. there were no development approvals in place …." (indicating the Agreement of Sale did not include development approvals).

- "…. Current ownership has taken the property through the zoning process, and has obtained preliminary development approvals …." (indicating the Agreement of Sale did not hold the seller responsible for obtaining development approvals);

- "….in 2002, the Grand Hotel of Wildwood Crest was sued by the State of New Jersey for allegedly misleading consumers through advertisements that falsely depicted the hotel's facilities…." (indicating the Agreement of Sale was not at Market Value (see further discussion below) as there was regulatory pressure on the seller, indicating the Agreement of Sale was "….affected by undue stimulus…. "and that the "….seller [was not] typically motivated….". See, Cushman OAR at 3, Definition of Market Value).

- "… The improvements were in very poor condition …." (again indicating the Agreement of Sale was "….affected by undue stimulus…. "and that the "….seller [was not] typically motivated….". *See*, Cushman OAR at 3, Definition of Market Value).

- "…. and the seller was ***considered to be motivated*** [emphasis added] to achieve a quick sale" (which indicates McNamara's analysis of the Agreement of Sale, due to his years of experience as a real estate appraiser, and based on his understanding of the definition of Market Value, as referenced above, and as specifically stated on page 3 of the Cushman OAR.

- "After considering seller motivation, time, costs incurred, entrepreneurial incentive, and improved market conditions in the subject area …." (which indicates McNamara's analysis of the Agreement of Sale, due to his years of experience as a real estate appraiser, his understanding of the circumstances

involved in the Agreement of Sale, as noted above (i.e., no approvals, seller to obtain approvals, regulatory action against and pressure on seller, the physical condition of the Subject, his understanding of the definition of Market Value, the costs incurred by the buyer in obtaining approval, the typical return on investments for the outlays by a buyer on a speculative investment, such as a parcel of real property with no approvals, as a "first in the market" type of finished product, and the change in the market between 2003 and 2005).

- "in our opinion the foregoing conclusion is reasonable and market oriented" (indicating McNamara's Analysis of the Agreement of Sale, in addition to the reconciliation between the sale price in that Agreement and the Cushman Appraisers appraised value in this Appraisal Assignment, specifically McNamara's analysis thus indicating it was reasonable for there to be such a difference between the sale price in the Agreement of Sale and the Cushman Appraisers appraised value in this Appraisal Assignment).

35.   McNamara admits the averment "The extent of the Appraisers' discussion of the March 30, 2005 sale in the Reconciliation, with regard to development potential of the subject property, includes only that: "no development approvals [were] in place" when the "property was placed under agreement of sale"; "[c]urrent ownership has taken the property through the zoning process and obtained preliminary development approvals for the dwelling units and all amenities." McNamara believes that the Cushman OAR has conformed with USPAP 2005 Standard Rule 2-2(a)(ix) because the Comment to that Rule states and the Cushman OAR complied as follows:

| USPAP 2005 Standards Rule 2-2(a)(ix) | Cushman OAR |
|---|---|
| The appraiser must be certain the information provided is sufficient for the client and intended users to adequately understand the rationale for the opinion and conclusions, including reconciliation of the data and approaches, in accordance with Standards Rule 1-6 | Carlyle Group is the client and only Intended User. They are one of the most sophisticated developer/investors on earth and they were co-developer/equity partner with the Buyer. Thus, the Intended User did not need a dissertation on the Agreement of Sale to their co-developer. |
| When reporting an opinion of market value, a summary of the results of analyzing the subject sales, options, and listings in accordance with Standards Rule 1-5 is required. | Summary of results of analyzing subject sale on Cushman OAR, p.30, as noted in the previous paragraph of this Answer, as if repeated here verbatim. |
| If such information is unobtainable, a | The relevant information was provided by the |

| | |
|---|---|
| statement on the efforts undertaken by the appraiser to obtain the information is required. | client and their co-developer. No information was unattainable. |
| If such information is irrelevant, a statement acknowledging the existence of the information and citing its lack of relevance is required. | All relevant information reported. |

McNamara denies the Board's averment that implies the Cushman Appraisers acted improperly in regards to either analysis of the prior sale, or in the "Standard Rule 2, Communication of the Appraisal" requirements as to the"... Actual Agreement of Sale or the zoning variances or resolutions obtained by the buyer". As to file documentation, the Board is aware: 1) the Original Work File for the Appraisal Assignment had been destroyed in accordance with Cushman & Wakefield's document destruction policy; 2) the extended time between when the Cushman Appraisers conducted the Appraisal Assignment, and their Statement under Oath on June 26, 2012 resulted in the Cushman Appraisers inability to recall their actions in an appraisal assignment over seven years before that appearance. Further, the Hypothetical Condition of the Cushman Appraisal Assignment clearly states "The hypothetical condition employed within this analysis, at the specific request of the client, assumes that the entire subject property is vacant and available for development. No consideration is given to the existing or proposed improvements".  Analysis of the prior sale in regard to the Hypothetical Condition would not have taken into account detailed documentation of the zoning variances or resolutions obtained by the buyer. As for the Agreement of Sale, the Cushman OAR appropriately references the Agreement, as noted in the chart above. And, as to the Agreement of Sale being in the Original Work File, McNamara reiterates his previous reference to the Work File that, as the Board is aware: 1) the Original Work File for the Appraisal Assignment had been destroyed in accordance with Cushman & Wakefield's document destruction policy; 2) the extended time between when the Appraisers conducted the Appraisal Assignment, and their Statement under Oath on June 26, 2012, which resulted in the

Cushman Appraisers inability to recall their actions in an appraisal assignment over seven years before that appearance.

McNamara is neither admits nor denies the Board's Averment that the Original Work File did not include the zoning variances or resolutions obtained by the Buyer at the time of the Appraisal, and leaves the Board to its proofs. McNamara denies the Board's Averment it was necessary for Ms. Kudrick to have obtained the zoning variances or resolutions obtained by the buyer at the time of the appraisal, as the hand written notes Ms. Kudrick took in her interview with Mita, the developer, indicate they had a discussion about approvals, and Respondent can only surmise that discussion consisted of more than the mere statement in the hand written notes, and there may well have been an additional detail in the Original Work File, which was destroyed at the end of the Cushman Document Retention Policy period, as indicated herein. Further, in regard to comparison of the prior sale to the appraised value estimate, the Hypothetical Condition of the Cushman Appraisal Assignment clearly states "The hypothetical condition employed within this analysis, at the specific request of the client, assumes that the entire subject property is vacant and available for development. No consideration is given to the existing or proposed improvements". Accordingly, such comparison would not have required actual documentation of the zoning variances or resolutions obtained by the buyer.

36.    McNamara admits the averment "The Appraisers also assert in the Reconciliation that in 2002, the seller had been "sued by the State of New Jersey for allegedly misleading consumers through" false advertisements that "depicted the hotel's facilities as clean and luxurious even though it was in a serious state of disrepair and had been fined for fire code violations". McNamara denies the Board's averment "However, the Appraisers provided no documented support for this claim. Ms. Kudrick testified before the Board that she only came upon this knowledge by an internet search, which was also not included in the Appraisers' work file". Appraiser's Work File information relied upon in the

Appraisal Assignment may be stored anywhere, as long as it is retrievable. As previously noted above, the Cushman Appraisal Work File was destroyed at the end of the five-year USPAP retention period. On March 31, 2003, the New Jersey Department of Law and Public Safety (the Attorney General's Office), Division of Consumer Affairs, announced a total $160,000 dollars settlement between the State and the owner of the property, which was then known as the Grand Hotel at Wildwood Crest. http://njpublicsafety.com/ca/press/diamond.htm. This announcement by the Attorney General's office should have been able to be accessed by the Board, as the press release came from the unit of the Attorney General's Office, which is prosecuting this Complaint.

   37.   McNamara admits as to the averment "The Appraisers' last contention in the Reconciliation that the 'improvements were in very poor condition and the seller was considered to be motivated to achieve a quick sale'. McNamara denies the averment "....[the Cushman Appraisers contention in the Reconciliation referenced in the preceding sentence] is further belied by the fact that the Agreement of Sale was entered on April 16, 2003, approximately two years before the sale date of March 30, 2005 ...." because the Cushman Appraisal Reconciliation of the prior sale analysis and the appraised value of the Subject Property continued with the statement: "After considering seller motivation, time, costs incurred, entrepreneurial incentive, and improved market conditions in the subject area, in our opinion the foregoing conclusion is reasonable and market oriented". Cushman OAR at 30. The Cushman Appraisers' stated in the Reconciliation that the "improvements were in very poor condition and the seller was considered to be motivated to achieve a quick sale". That statement is supported by Internet postings including, but not limited to, blog posts about condition of those improvements, as well as the New Jersey Attorney General's March 31, 2003 Press Release regarding the Consent Agreement with the former owner of what was then known as" The Grand at Wildwood Crest". Such Internet postings support the Cushman Appraisers' subject Property prior sale

reconciliation statements in the Cushman Appraisal. http://njpublicsafety.com/ca/press/diamond.htm
http://businessfinder.nj.com/reviews-grand-hotel-wildwood-nj.html

      McNamara denies the averment "….the hotel remained open and operating through the
summer of 2005". The Lower Township government document, "Resolutions of Findings and
Conclusions of Board of Adjustment of the Township of Lower", dated April 7, 2005, at paragraph 12,
states "the property in question is currently being used as a closed hotel". Postings on this Internet site
indicate that the property was closed for the 2004 season. http://businessfinder.nj.com/reviews-grand-
hotel-wildwood-nj.html. McNamara neither admits nor denies the referenced article was contained in the
Cushman Appraisal Work File, but leaves the Board to its proofs. However, it is not necessary for the
new Jersey Attorney Generals press release, or other information relied upon in the Cushman Appraisal,
to be in the Cushman Appraisal Work File. It is only necessary that the press release can be retrieved as
indicated from URLs in this Answer, that Standard has been met in regard to the circumstances that the
Cushman Appraisers reasonably believed motivated the seller of the "Grand Hotel at Wildwood Crest"
to enter into the Agreement of Sale. McNamara denies the implied averment the Original Work File did
not contain materials such as the referenced blog post. The Board is well aware: 1) the Original Work
File for the Appraisal Assignment had been destroyed in accordance with Cushman & Wakefield's
document retention policy; 2) the extended time between when the Appraisers conducted the Appraisal
Assignment, and their Statement under Oath on June 26, 2012 resulted in the Cushman Appraisers'
inability to recall their actions in an appraisal assignment over seven years before that appearance.

      38.   McNamara admits the averment "After considering seller motivation, time, costs
incurred, entrepreneurial incentive, and improved market conditions in the subject area….".  McNamara
denies the averment that there is" no further explanation and/or analysis… included the appraisal report
that supports…" the above statement. McNamara has addressed seller motivation in the paragraphs of

this Count of this Answer, as if fully repeated verbatim here. Change in market conditions has been

discussed in paragraph 29(b) of this Answer and in the Cushman Appraisal sections on Regional

Analysis (pages 5 - 11) and Market Analysis (pages 14-15). Costs incurred by the purchaser for land use

approvals was referenced in the Reconciliation section on page 30 of the Cushman Appraisal, as further

stated in various paragraphs of this Answer, as if fully repeated verbatim here.  McNamara further

admits that the  averment Cushman Appraisers took into account "entrepreneurial incentive" in their

consideration of the difference between the $18 million, 2003-negotiated sale price, with no conditions

and no contingencies, and their $65,300,000 value estimate. *The Dictionary of Real Estate Appraisal,*

*Fourth Edition*, published in 2002, and in effect during the Appraisal Assignment, defines

"entrepreneurial incentive" as follows:

> "A market driven figure that represents the amount an entrepreneur expects
> to receive for his or her contribution to a project and risk.  *See also*
> entrepreneurial profit". *The Dictionary of Real Estate Appraisal, Fourth
> Edition* (Appraisal Institute, 2002) p. 96.

*The Dictionary of Real Estate Appraisal, Fourth Edition* then, defines "entrepreneurial profit" as

follows:

> 1.  "A market-derived figure that represents the amount an entrepreneur
>     receives for his or her contribution to a project and risk; the difference
>     between the total cost of the property (cost of development) and its market
>     value (property value after completion), which represents the entrepreneur's
>     compensation for the risk and expertise associated with the development.
>
> 2.  In economics, the actual return on successful management practices, often
>     identified with coordination, the fourth factor of production following land,
>     labor, capital; also called entrepreneurial return or entrepreneurial reward.
>     *See also* entrepreneurial incentive." *Id.*

McNamara admits the averment that the explanations and/or analyses contained in the

Cushman Appraisal were written for the Intended User and Client, the Carlyle Group, one of the most

sophisticated real estate developers/investors in the world.  Further, that the Carlyle Group the Client

and Intended User, and their development partner, put together a development project unlike anything anyone else had been able to do on the island that contains Diamond Beach and Wildwood Crest, up to that point in time, at a unique location, and surrounded by other high-end development. McNamara admits the averment that the "lends to a conclusion that the subject property, as vacant land, is worth an additional $47,300,000 over and above the sale price of $18,000,000, to achieve a value opinion of $65,300,000 as "reasonable and market oriented."

McNamara denies the averment "This conclusion [the difference between the $18 million 2003, no contingency, no approvals, risk prone "meeting of the minds" and the Cushman Appraisal value estimate of $65,300,000] seems implausible....", for the reasons stated in response to this paragraph of the Complaint, as well as related information in this Answer regarding the prior sale of the Subject Property, as if repeated here verbatim.

McNamara denies the averment that the Cushman Appraisal conclusion ".... warrants further relevant explanation, discussion and/or analysis so the intended user can properly understand the Appraisers' reasoning", as an indefensible statement on the part of the Board, as the Board is aware that the original 2010 complaint against respondents is an anonymous complaint, and that the Client and only Intended User, the Carlyle Group, has not expressed any indication they did not understand anything in the Cushman Appraisal, but on the contrary fully accepted that Appraisal. Respondent further repeats for the reasons stated in response to this paragraph of the Complaint, as well as related information in this Answer regarding the prior sale of the Subject Property, as if repeated here verbatim.

39.     McNamara denies the averment "The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to,

N.J.A.C. 13:40A-6.l(a), N.J.A.C. 13:40A-6.l(b), USPAP 1-l(c), USPAP l-5(b), and USPAP 2-2(a)(ix) ), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding the prior sale of the Subject Property, as if repeated here verbatim and because the Board's allegations of such violations are not supported by law or regulation.

McNamara denies the averment "Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding the prior sale of the Subject Property, as if repeated here verbatim and because the Board's allegations of such violations are not supported by law or regulation.

### COUNT IV

40.     McNamara repeats his responses to the Board's General Allegations and the allegations of Count I, II and III above as if fully set forth verbatim herein.

41.     McNamara admits the averment "Pursuant to USPAP 2-l(a) and USPAP 2-l(b), each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading, and must contain sufficient information to enable the intended users of the appraisal to understand the report properly, respectively".

42.     McNamara denies the averment "Due to the aforementioned errors and inaccuracies in the Appraisers' reporting of significant details of the dimensions and scope of the subject property and the comparable sales, as well as their insufficient analysis relating to adjustments made to comparable sales on various factors. and to the March 30, 2005 sale of the subject property for an amount $47,300,000 less than their final value opinion, the appraisal report is misleading to the intended

user and results in an implausible market value conclusion".

McNamara specifically denies the averment "Due to the aforementioned errors and inaccuracies in the Appraisers' reporting of significant details of the dimensions and scope of the subject property...". As McNamara denied in the General Allegations, and in the preceding Counts of this Answer and included here as if repeated verbatim, the Cushman Appraisers recognized their error in the land area of comparable sale 1, and in the minor non-material errors regarding McNamara inspecting the Subject Property. Respondent particularly denies this averment because these errors are not material. On the contrary, the errors and inaccuracies of the Board's averments and the appraisal reports prepared by the Board's Appraiser, surpass even the words allegation of unsupported errors and inaccuracies in the Cushman Appraisal. The Board's and the Board's Appraiser errors and inaccuracies include, but are not limited to, inappropriately ignoring the Cushman Appraisal's Hypothetical Condition, which limits the Subject Property of this Appraisal Assignment to the "first parcel" (the beachfront parcel) and the "second parcel" the non-beachfront parcel across Atlantic Avenue from the "first parcel", based on the Engagement Letter dated May 4, 2005, Addendum A of the Cushman Appraisal, as an assignment condition. Thus, both the Board and the Board's Appraiser are incorrect in considering the Subject Property for this Appraisal assignment to include the "Beach Parcel", as such an assertion is contrary to the facts of, and Scope of Work for, the Appraisal Assignment. Respondent further denies this averment, specifically in regard to the size of the Subject Property because the Board's own appraiser, Mark Sussman, stated in his Appraisal Review of the Cushman Appraisal that the difference between the 2.8 acres for Parcel 1 and his computer program calculated size for Parcel 1 was immaterial. The difference between the Cushman Appraisal reporting of the total size of the Subject Property, and the same size estimate contained within the Board Appraiser's Appraisal Review, is minimal. Accordingly, the Board has no foundation for this averment.

McNamara denies the averment "Due to the aforementioned errors and inaccuracies in the Appraisers' reporting of significant details of the dimensions and scope of the ... comparable sales, as well as their insufficient analysis relating to adjustments made to comparable sales on various factors ....". McNamara specifically admits as to the Cushman Appraisal error regarding the size of Comparable Sale 1, but states as a mitigating factor the incorrect reporting of this Comparable Sale by the data provider, as contained in the Original Work File, which was destroyed five years after the Assignment in accordance with the provisions of USPAP 2005. Further mitigating factors and support for the misreporting by Win2Data are stated in paragraphs 24(a) and (b) of this Answer.

McNamara specifically denies the averment of"... errors and inaccuracies in the Appraisers' reporting of significant details of the scope of.... "the subject property based on this answer, in particular responses under Count I, stated here as if fully repeated verbatim.

McNamara specifically denies the averment of"... errors and inaccuracies in the Appraisers' reporting of significant details of the scope of.... ".Comparable Sale 5, for the reasons set forth in various statements in this Answer, stated here as if fully repeated verbatim, including, but not limited to, paragraph 18 of Count II of this Answer, stated here as if fully repeated verbatim, which includes, but not limited to the Board's Appraiser's own statement he believes the verification of that Comparable Sale 5 could have reasonably indicated that property was to be demolished and redeveloped as condominiums.

McNamara specifically admits the implied averment regarding a typographical error stating Comparable Sale 5 had already been torn down, at the time of the Appraisal Assignment.

McNamara denies the averment the Cushman Appraisers conducted "insufficient analysis relating to adjustments made to comparable sales on various factors ....", for the reasons set forth in various statements in this Answer including, but not limited to, paragraphs 24 through 29, Count II of

this Answer, as if fully repeated here verbatim.

McNamara denies the averment of the Cushman Appraisers ".... errors and inaccuracies..." "as well as their insufficient analysis relating to adjustments...." In regard to ".... the March 30, 2005 sale of the subject property for an amount $47,300,000 less than their final value opinion..."....", for the reasons set forth in in various statements in this Answer including, but not limited to, the paragraphs of Count III of this Answer, as if fully repeated here verbatim.

McNamara denies the averment ".... the appraisal report is misleading to the intended user and results in an implausible market value conclusion", for the reasons set forth in various statements in this Answer including, but not limited to, paragraph 33, Count III of this Answer above as if fully repeated here verbatim.

43.    McNamara denies the averment "The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.l(a), N.J.A.C. 13:40A-6.l(b), USPAP 1-l(c), USPAP l-5(b), and USPAP 2-2(a)(ix), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding those averments, as if fully repeated here verbatim.

McNamara denies the averment "Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding those averments, as if repeated here verbatim and because the averment is contrary to law and regulation, which is correct.

## COUNT V

44.     McNamara repeats his responses to the Board's General Allegations and the allegations of Count I, II, III and IV above as if fully set forth verbatim herein.

45.     McNamara admits the averment "Pursuant to USPAP 2-2(a)(xii), a certification, in accordance with USPAP 2-3, must be signed by an appraiser and included with the appraisal report.

McNamara admits the averment "The Appraisers' completed and signed a certification;

McNamara admits the averment ".... there is an inconsistency between the appraisal report and the certification .... ", and as McNamara indicated in his Statement under Oath before the Board, and McNamara apologized for the typographical error in the report indicating he had not inspected the Subject Property (Cushman OAR, page 2), while the Certification indicates he had inspected the Subject Property (Cushman OAR, page 35), which is correct.

McNamara denies the averment the above admitted inconsistency between the body of the report and the Certification ".... affects the credibility of the Appraisers' certification....", due to the typographical error.  The Certification speaks for itself.

46.     McNamara admits the averment ".... the Appraisers' certification states under paragraph eight: "[Ms. Kudrick] made a personal inspection of the [subject property].  [Respondent], MAI, Managing Director, Valuation Services, reviewed and approved the report *and inspected the property."* (*Emphasis added*). Respondent also testified before the Board that he had inspected the subject property but not the comparable sales".

47.     McNamara admits the averment ".... an earlier section of the appraisal report titled "Dates of inspection and Valuation", states: "[t]he property was inspected on May 13, 2005 by [Ms. Kudrick]. [Respondent], MAI reviewed the report but did not inspect the property." (*Emphasis added* [by the Board]). As McNamara has stated in response to paragraph 45 of the Complaint, this was

a typographical error, which is also acknowledged in Respondent's testimony as stated in footnote 12, to this paragraph. This typographical error was clearly not of concern to the Intended User, as they made no comment to Cushman regarding it, and the Carlyle Group paid its bill for this Appraisal Assignment without any such comment or question regarding this typographical error. Accordingly, it is reasonable to believe the Client and only Intended User, as one of the most sophisticated real estate developers and investors in the world understood typographical errors such as this did not materially affect the substance of this Appraisal Report.

McNamara admits the averment "Respondent asserted that he had undertaken an "exterior inspection" of the subject property...." Complaint paragraph 47 at 21, Footnote 12. As stated throughout this Answer including, but not limited to, paragraph 13 of General Allegations in this Answer and paragraph 35 of Count III of this Answer, and at other parts hereof, this was an appraisal of vacant land, based on the Hypothetical Condition stated in the Transmittal Letter and in the body of the Appraisal Report as follows:

> "The hypothetical condition employed within this analysis, at the specific request of the client, assumes that the entire subject property is vacant and available for development. Thus, no consideration is given to the existing or proposed improvements." Cushman OAR, Transmittal Letter, p1; Summary of Salient Facts, p.iv; Assumptions and Limiting Conditions, p.34

As a result, McNamara properly only conducted an exterior inspection of the Subject Property.

48.    McNamara denies the averment "The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.l(a), N.J.A.C. 13:40A-6.l(b), USPAP 1-l(c), USPAP 1-5(b), and USPAP 2-2(a)(ix), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as

well as related information in this Answer regarding those averments, as if repeated here verbatim, and because such averment is contrary to law and regulation.

McNamara denies the averment "Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding those averments, as if repeated here verbatim, and because such averment is contrary to law and regulation.

## COUNT VI

49.     McNamara repeats his responses to the Board's General Allegations and the allegations of Count I, II, III, IV and V above as if fully set forth verbatim herein.

50.     McNamara admits the averment that the plain language of N.J.S.A. 45:14F-21(c), states "no person other than a State licensed real estate appraiser, a State certified real estate appraiser or a person who assists in the preparation of an appraisal under the direct supervision of a State licensed or certified appraiser shall perform or offer to perform an appraisal assignment in regard to real estate located in this State including, but not limited to, any transaction involving a third party, person, government or quasi-governmental body, court, quasi-judicial body or financial institution".

No response is due to the averments of paragraph 50 of the Complaint regarding the interpretation of the plain language of the plain language of that statute as "… with limited exception only certified or licensed appraiser", because the averments of "limited exception" and the "quotes" around the word "assisting" and "the direct supervision" are conclusions of law to which no response is necessary, but Respondent denies those averments to the extent to which a real estate appraiser peer would understand the plain language of the statute.

McNamara admits the averment as to the plain language of the regulation ".... NJ.AC. 13:40A-7.3(a)(5), an appraiser certified in this State "shall not permit his or her name and designation to be used on an appraisal where the appraiser has not participated in the appraisal pursuant to the [USPAP]", but McNamara specifically denies the Board's averment that he permitted his name to be used on an appraisal where the appraiser has not participated in the appraisal pursuant to the [USPAP]".

51.     McNamara admits the averment "The appraisal report here indicates that the "property was inspected by and the report was prepared by [Ms. Kudrick] under the supervision of [Respondent]." In an addendum to the appraisal report titled "Qualifications of the Appraisers", it is documented that, although Respondent was certified in this State as a general appraiser, Ms. Kudrick was neither licensed nor certified in this State at the time she prepared the appraisal of the subject property, having certification only in Delaware and Pennsylvania. Ms. Kudrick further co-signed the appraisal report as a "Senior Appraiser" and necessarily took full responsibility for all of the content of the report".

McNamara admits the averment in footnote 13 "The comments to USPAP 2-3 provide that any appraiser who signs a certification accepts full responsibility for all elements of the certification, for the assignment results, and for the contents of the appraisal report".

52.     McNamara admits the averment, based only on his reliance on the accuracy of the transcript of her appearance before the Board on June 26, 2012 "Further at her investigative inquiry before the Board, Ms. Kudrick admitted that she did not hold a license or certificate from the Board at the time the appraisal report was prepared, nor did she secure a temporary permit..."

McNamara denies the averment ".... a temporary permit .... would authorize [Ms. Kudrick's] appraisal of the subject property in this State, based on the plain language of N.J.S.A. 45:14F-21(c), which states "no person other than a State licensed real estate appraiser, a State certified

real estate appraiser or a person who assists in the preparation of an appraisal under the direct supervision of a State licensed or certified appraiser shall perform or offer to perform an appraisal assignment in regard to real estate located in this State including, but not limited to, any transaction involving a third party, person, government or quasi-governmental body, court, quasi-judicial body or financial institution".

McNamara admits the averment, based only on his reliance on the accuracy of the transcript of Ms. Kudrick's appearance before the Board on June 26, 2012, "she disclosed that she completed the majority of the appraisal work, including, but not limited to, identifying, inspecting, and analyzing the comparable sale properties. Respondent also provided, during his appearance before the Board, that he typically reviews Ms. Kudrick's work "at the end, after she's written the report, done her analysis," and that he did not select or inspect any comparable sales, conduct market research, or review any zoning approvals in place at the time of the appraisal, and would normally assume the "validity and accuracy" of Ms. Kudrick's analysis".

McNamara denies the averment that the typical review of Ms. Kudrick's work on this Appraisal Assignment caused him to only review her work at the end. As stated in Ms. Kudrick testimony before the Board, significant interim discussions typically take place between McNamara and Ms. Kudrick during the course of the Appraisal Assignment. Further, USPAP 2005, Advisory Opinion 5, Assistance in the Preparation of an Appraisal, addresses the issue of the appropriate amount of assistance permissible under USPAP;

> As proficiency is demonstrated by an assistant, it is appropriate for the principal appraiser to place greater reliance on the work of that assistant. In the context of a real property appraisal assignment, an assistant who has meaningful appraisal education and extensive work experience may well be competent to inspect the real estate and prepare the appraisal report alone, subject to an appropriate final reconciliation by the principal appraiser who will be signing or cosigning the certification in the report. In this situation, the assistant's contribution is both significant and professional. The

appropriate final reconciliation should include a discussion of which aspects
of the appraisal process were performed by the assistant and the principal
appraiser. USPAP 2005, Advisory Opinion 5, p. 135

The above Advisory Opinion makes it clear the Board, based on the laws and regulations

under which it operates, cannot just make an assertion, 12 years after an Appraisal Assignment, that it

has the right to contradict the guidance documents in the standards upon which it purportedly relies.

53.     No response is due to the averments of paragraph 53 of the Complaint regarding

the Board's interpretation of the plain language of N.J.S.A. 45:14F-21(c), as the Board's averments are

conclusions of law to which no response is necessary, but Respondent denies those averments to the

extent to which a real estate appraiser peer understand the plain language of the statute. N.J.S.A. 45:14F-

21(c) states

> "No person other than a State licensed real estate appraiser, a State certified
> real estate appraiser or a person who assists in the preparation of an
> appraisal under the direct supervision of a State licensed or certified
> appraiser shall perform or offer to perform an appraisal assignment in regard
> to real estate located in this State including, but not limited to, any
> transaction involving a third party, person, government or quasi-
> governmental body, court, quasi-judicial body or financial institution."

The Board's averment was "Ms. Kudrick's substantial involvement in the preparation of the appraisal

report, and her co-signing of it, are beyond the scope of the more restricted activity that could be

considered "assisting" in the preparation of an appraisal. Accordingly, Respondent permitted an

unlicensed person to perform an act for which a license or certification is required by the Board".

54.     McNamara denies the averment "The Respondent's conduct, as described above,

constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of

negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d)

violations of the statutes and regulations administered by the Board, including, but not limited to,

N.J.A.C. 13:40A-6.l(a), N.J.A.C. 13:40A-6.l(b), USPAP 1-l(c), USPAP 1-5(b), and USPAP 2-2(a)(ix) ),

based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding those averments, as if repeated here verbatim, and because such averment is contrary to law and regulation.

55.    McNamara denies the averment "Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding those averments, as if repeated here verbatim, and because such averment is contrary to law and regulation.

## AFFIRMATIVE DEFENSES

### VIOLATION OF DUE PROCESS AND IMPROPER DELEGATION

56.    Permitting a self-interested entity to regulate competitors violates due process. The current regulatory scheme co-opts the state's coercive power to impose a disadvantageous regulatory regime on market competitors. Further, the lack of a De Novo proceeding, upon appeal is a denial of Respondent's Due Process and Equal Protection rights under the U.S. Constitution.

57.    Moreover, the current regulatory scheme allows a self-interested entity to regulate competitors (other appraisers).

58.    TITLE XI of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) promulgated real estate appraisal requirements for Federally Related Transactions (FRTs). The stated purpose of FIRREA was to protect Federal financial and public policy interests in real estate related transactions. The statute established the Appraisal Subcommittee (ASC) of the Federal Financial Institutions Examinations Council ("FFIEC") consisting of the representatives of the heads of the agencies comprising the FFIEC (the Office of the Comptroller of the Currency, the Board of Governors

of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift

Supervision, and the National Credit Union Administration Board.)

59.     Each Federal financial institution regulatory agency is required to establish

appraisal standards that meet the minimum requirements adopted by the Appraisal Foundation.

60.     The Appraisal Foundation is a non-profit organization established in 1987 by the

nation's largest valuation organizations. In 1986, nine leading professional appraisal organizations in the

United States and Canada formed the Ad Hoc Committee on the Uniform Standards of Professional

Appraisal Practice. These nine organizations were:

- Appraisal Institute of Canada

- American Institute of Real Estate Appraisers (AIREA)

- American Society of Appraisers

- American Society of Farm Managers and Rural Appraisers

- International Association of Assessing Officers

- International Right of Way Association

- National Association of Independent Fee Appraisers

- National Society of Real Estate Appraisers

- Society of Real Estate Appraisers

Agreeing upon a generally accepted set of standards, the eight United States committee

members adopted those standards and thereafter established The Appraisal Foundation (TAF) in 1987 to

implement the Uniform Standards of Professional Appraisal Practice (USPAP).  The Appraiser

Qualifications Board was included in the Foundation structure to develop and promote meaningful

criteria by which the competence of appraisers could be measured. USPAP was adopted by the

Appraisal Standards Board (the "ASB") of the Foundation on January 30, 1989.

61.    According to its bylaws, The TAF:

"is a private, not-for-profit corporation charged by [Title XI of FIRREA] with the responsibility of establishing, improving and promoting minimum uniform appraisal standards and appraiser qualifications criteria" .......... The mission statement of the Foundation is

Promoting professionalism and ensuring public trust in the valuation profession. This is accomplished through the · promulgation of standards, appraiser qualifications, and guidance regarding valuation methods and techniques.

Adopted by the TAF Board of Trustees May 19, 2012.

62.    FIRREA designated the ASB of TAF as the entity responsible to promulgate appraisal standards, which are presently called USPAP. 12 U.S.C.§ 3339(1)(3). As a result of such designation in FIRREA, USPAP is now recognized throughout the United States as the generally accepted standards of professional appraisal practice.

63.    In *Department of Transportation v. Association of American Railroads*, No. 13-1080, 575 U.S. ___, 135 S.Ct. 1225 (2015), Justice Alito commented that, "Both the Oath and Commission Clauses confirm an important point: Those who exercise the power of Government are set apart from ordinary citizens. Because they exercise greater power, they are subject to special restraints. There should never be a question whether someone is an officer of the United States because, to be an officer, the person should have sworn an oath and possess a commission."[10]  It seems clear that that no one who promulgates USPAP, or otherwise has a direct involvement in the establishment of USPAP, satisfies the requirements of the Oath and Commission Clause.

_____

[10] In accordance with provisions of FIRREA the ASB publishes proposed changes in appraisal standards, receives comments, conducts public hearings and then adopts such changes. While ASB/TAF may look like a government agency as to such outward appearances, it does not have ".... its priorities, operations, and decisions ... extensively supervised and substantiality followed by the political branches." *Dep't of Transp. v. Ass'n of Am. Railroads*, 135 S. Ct. 1225, 1232-33, 191 L. Ed. 2d 153 (2015).

64.     Justice Thomas agreed with Justice Alito's call to rein in non-delegated private entities. He wrote: "Although no provision of the Constitution expressly forbids the exercise of governmental power by a private entity, our so-called "private non-delegation doctrine" flows logically from the three Vesting Clauses. Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior court established by Congress, the Vesting Clauses would categorically preclude it from exercising the legislative, executive, or judicial powers of the Federal Government. In short, the "private non-delegation doctrine" is merely one application of the provisions of the Constitution that forbid Congress to allocate power to an ineligible entity, whether governmental or private."

65.     TAF's openly states it is a private entity and it operates like one, in particular as to the promulgation of USPAP. Its Board of Trustee ("BOT") members are appointed by TAF member appraisal industry trade organizations. The CEO of TAF is appointed by its BOT. Officers and employees of TAF are appointed by the CEO. ASB members are appointed by the BOT of The Appraisal Foundation. TAF establishes a nominating committee, comprised of members of its BOT. That nominating committee then prepares a slate of candidates, which is then presented to the BOT. The BOT then adopts the slate of candidates prepared by the nominating committee.

66.     The chair of the ASB is appointed by the BOT. The ASB promulgates USPAP, with no official signoff by the ASC. Because TAF/ASB is effectively "...an autonomous private enterprise... .", with minimal oversight, as noted above, USPAP fails the non-delegation test. 135 S. Ct. 1225, 1232-33.

67.     Not only is TAF a private entity by definition, it is not properly constituted to exercise the power that it possesses. It can establish and amend USPAP standards from time to time

without oversight, standards that form part of the regulations governing the practice of real estate appraising.

68. A review of the granting of authority to TAF is in order:

Under FIRREA, as amended:

"Each Federal financial institution regulatory agency and the Resolution Trust Corporation shall prescribe appropriate standards for the performance of real estate appraisals in connection with federally related transactions under the jurisdiction of each such agency or instrumentality. These rules shall require, at a minimum- that real estate appraisals be performed in accordance with generally accepted appraisal standards as evidenced by the appraisal standards promulgated by the Appraisal Standards Board of the Appraisal Foundation;...".

Title XI of FIRREA, § 1110, 12 U.S.C. §3339.

69. Thus, Federal financial institutions regulatory agencies may only"...prescribe appropriate standards for the performance of real estate appraisals in connection with federally related transactions... ", which include " ... the appraisal standards promulgated by the Appraisal Standards Board of the Appraisal Foundation ... ". 12 U.S.C. §3339. Appraisals performed under those "generally accepted appraisal standards" must be in compliance with the USPAP which is promulgated by ASB. 12 U.S.C. §3339(3). USPAP, has generally been accepted as the standard of care for real estate appraisals under the real estate appraiser regulatory regime established pursuant to FIRREA.

70. Federal Financial Institution Regulatory Agencies were given the power to accept or reject the authority of state real estate appraiser regulatory entities based on the determination of whether such state entities "..... recognize the standards..." and "....make decisions concerning appraisal standards... ", which are in conformance with USPAP. FIRREA 1118, 12 USC §3347(b).

71. When Congress initially authorized FIRREA, it established a funding mechanism for the creation of appraisal standards through the Appraisal Subcommittee:

> "....to make grants in such amounts as it deems appropriate to the Appraisal Foundation, to help defray those costs of the foundation relating to the activities of its Appraisal Standards and Appraiser Qualification Boards....".

FIRREA 1109, 12 USC 3338(b)(4).

72.     Thus, TAF has received Federal government funding to establish appraisal standards through its ASB. Embodiment of ASB authority into law was further enhanced by amendments to FIRREA in the Mortgage Act of 2010.

> "....the Appraisal Standards Board of the Appraisal Foundation shall promulgate regulations to implement the quality control standards required under this section."

73.     USPAP was originally created in 1987 by many of the original appraisal industry organizations, which comprise the membership of TAF. The then-developing "S&L Crisis" caused those organizations to lobby Congress in opposition to a national license process for real estate appraisers. As a part of that process, those organizations created The Appraisal Foundation, and put together their various documents on standards to create USPAP. Members of those organizations even extensively traveled the United States in support of what was ultimately passed as the final version of FIRREA, as an alternative to national appraiser licensing.

74.     As indicated above, TAF is a private nonprofit entity. Its funding comes from a variety of sources, including funds through the Appraisal Sub-Committee. Significantly, the majority of TAF's funding comes from the sale of USPAP. Board of Trustee members ("BOT") are appointed by TAF member appraisal industry trade organizations. The CEO of TAF is appointed by its BOT. Officers and employees of TAF are appointed by the CEO.

75.     ASB members are appointed by the BOT of The Appraisal Foundation. TAF establishes a nominating committee, comprised of members of its BOT. That nominating committee then prepares a slate of candidates, which is then presented to the BOT. The BOT then adopts the slate

of candidates prepared by the nominating committee. The chair of the ASB is appointed by the BOT.

The ASB has been publishing USPAP on a 2-year cycle basis, since 2008. In accordance with provisions

of FIRREA the ASB publishes proposed changes in appraisal standards, receives comments, conducts

public hearing and then adopts such changes. There, however, is no evidence of Article 2 Officers

approving USPAP at any time in its publication history.

76. None of the members of the ASB are Article 2 Officers under the US

Constitution. None of the members of TAF's BOT, and none of the officers of TAF are Article 2

Officers under the Constitution. TAF receives Federal funds. USPAP is enforced under the color of law

by Federal and State governments in violation of the due process and vesting clauses of the Constitution.

77. The New Jersey Legislature created the State Real Estate Appraiser Board

("NJAB" or the "Board") to regulate the appraisal profession and evaluate the credentials of applicants

for licensure and certification. N.J.S.A. 45:14F-1.

78. The Board is responsible for the regulation of real estate appraisers in New Jersey.

N.J.S.A. 45:14F-3. The board consists of nine members who are residents of the State, two of whom

shall be public members and one of whom shall be a State executive department member appointed

pursuant to the provisions of section 2 of P.L.1971, c.60 (C.45:1-2.2). Of the remaining six members,

three shall be, except for those first appointed, State licensed real estate appraisers and three shall be,

except for those first appointed, State certified real estate appraisers. *Id.*

79. The Board is empowered to suspend, revoke or refuse to issue or renew a license

or certificate and exercise investigative powers pursuant to the provisions of P.L.1978, c.73 (C.45:1-14

et seq.), establish standards for the certification of real estate appraisers which meet the standards

established by the Appraisal Foundation, and establish standards for the licensing of real estate

appraisers which meet standards acceptable to the Appraisal Subcommittee; and, Conduct hearings

pursuant to the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.). N.J.S.A. 45:14F-8. It suffers the same disabilities as does the federal regulatory scheme. Moreover, competitors of Respondent have been placed in an adjudicative role in determining Respondent's compliance with USPAP, another violation of the due process clause.

80.    The Board has violated Respondents due process and equal protection under the law in numerous instances in this disciplinary action including, but not limited to, the facts that the Board

a.  Is aware Carlyle Group did not file the consumer complaint, but rather the Board failed to perform appropriate due diligence in determining who filed the consumer complaint. Further, the Board has been provided with Respondent Counsel's own research regarding who filed the consumer complaint and had previously conceded the consumer complaint had been filed anonymously based on a search of Board records;

b.  Had an initial impression at the Carlyle Group had filed a complaint, but would not give that up that allegation even when presented with evidence the Carlyle had not filed the complaint;

c.  Has no reasonable support for its improper disagreement with Respondent's market value estimate (there is no law and/or regulation authorizing the Board to adjudicate value estimates), and such disagreement was on the record before the Board hired Mark Sussman, MAI to prepare an appraisal that mirrored the Board's unsupported belief, and therefore the Board's belief Respondent's market value estimate is

"flawed" is in itself flawed, and a classic example of what happens when a

disciplinary board provides their expert with the boards own opinions, and

then obtains the expected or directed result, instead of an independent

objective review of a consumer complaint against a real estate appraiser;

d.   Denial of an out-of-state appraiser, to have the same ability afforded an in-

state appraiser, would be a violation of ASC Policies, the Commerce

Clause of the U.S. Constitution and potentially a violation of the U.S.

Supreme Court decision N.C. Bd. Of Dental Examiners v. FTC[11] and

related Federal law and regulation including, but not limited to, those of

the FTC;

e.   And the Board's Appraiser's, errors and inaccuracies include, but are not

limited to, inappropriately ignoring the Cushman Appraisal's Hypothetical

Condition, which limits the Subject Property of this Appraisal Assignment

to the "first parcel" (the beachfront parcel) and the "second parcel" (the

non-beachfront parcel) across Atlantic Avenue from the "first parcel",

based on the Engagement Letter dated May 4, 2005, Addendum A of the

Cushman Appraisal, as an assignment condition.

81.   The Board has violated Respondent's due process and equal protection rights

under the U.S. Constitution because the process in which the Board conducts the investigative

process "stacks the deck" against the Respondent by violating Respondent rights under the US

---

[11] 135 S. Ct. 110.

Constitution, as amended, in regard to do process and equal protection. The Board does not act as an independent decision-maker pre-prosecution. The investigative process is not conducted by an independent individual or entity, such as a contract fee appraiser, with specific instructions to conduct an impartial inquiry as to the alleged relations in a consumer complaint. The Board acts as fact-finding investigator and adjudicator. As of 2013, the appraiser Board sent 50% of its revenue to the state general fund[12], so there is no justification for the Board not having sufficient funds to hire such independent, and impartial analysis of a consumer complaint. This particular consumer complaint was anonymous. Thus, denying Respondent the ability to defend against the complaint, by argument of mitigating factors due to identification of the complaint. Upon referral to prosecution, the State provides the appraisal expert with direction, either implicit or explicit, as to the results of the appraisal expert's appraisal assignment. As such, the State subordinates the appraisers violation of USPAP's Ethics Rule. The State's appraiser expert is not directed to conduct an appropriate Appraisal Review, in accordance with USPAP, recognizing the "peer review" standard, but rather the State prejudices the Appraisal Review process by encouraging their appraiser expert to utilize a "litigation appraisal" model, and not a"peer review" model of appraisal review. Further, the Board has inappropriately stretched facts to show a number of errors in order to "make its case" for an ethics violation due to a number of "USPAP minor errors" and is totally inappropriate both in

---

[12] In contradiction to Board regulatory funding process in the State's recently adopted "Appraisal Management Company Registration Regulation Act, P/L. 2017, C.72, Section 9(e), which states: "Except as otherwise requited by federal law, all1 fees paid by appraisal management companies shall be dedicated to use by the board for regulation of appraisal management companies and State certified and licensed real estate appraisers regulated by the board pursuant to State and federal law."

substance and for such "stretching" to be done by a regulatory board when McNamara's livelihood is at stake.

82.     The board has further violated Respondent's due process and equal protection rights under the U.S. Constitution because the Boards Appraiser, Mark Sussman, cannot be considered an "Appraiser Peer" for either of McNamara or Ms. Kudrick.   Since Sussman's appraisal practice consists almost entirely of litigation appraisal assignments, by necessity to meet levels required by the Courts, he practices at a higher level. In litigation appraisal, because the appraiser will face cross examination, the appraiser conducts additional and more comprehensive research substantially beyond that which is typically conducted or even expected for non-litigation appraisal assignments, i.e., the Cushman Appraisers in this case. The need for this elevated level of knowledge and attention to detail is necessary to sufficiently demonstrate "the why's and wherefores" supporting all of the appraiser's decisions and ultimately opinions to an extent acceptable by the Court, all while under fire of cross examination, thus avoiding the risk that the appraiser's opinions may barred from the matter by the opposing party's motion in limine. Non-litigation peer appraisers do not go to the level of detail which a litigation appraiser conducts appraisal development and reporting.  Arguably, the level of detail and reporting by the Cushman Appraisers is typical of their non-litigation appraiser peers. This is exemplified by the differences in the "intended Use". For the Cushman Appraisal and the Board expert Original Appraisal Report and Appraisal Review the former is clearly non-litigation, while the latter is clearly for a litigation proceeding. One additional significant difference between litigation appraisers and non-litigation appraisers flows from the Scope of Work required. In the instant case,

because a current valuation date was needed, the Cushman Appraisers conducted their

research contemporaneously with the valuation date and with a relatively short turnaround

time typical of client demands for non-litigation mortgage appraisal work Often, the Scope

of Work required for a litigation appraisal calls for a retrospective valuation date. Not only

does that time lag provide the litigation appraiser with the benefit of hindsight, the time lag

also permits the appraiser to utilize multiple sources to corroborate and correct data, have a

more complete understanding of the transactions that might be used in the appraisal and

more time develop and write the analysis. Also, in many instances the litigation appraiser

has the benefit of having been provided with the opposing party's appraisal, so as to not

only benefit from the research done by the first appraiser and further develop it, but to

prepare a "reactive" appraisal that, with no client advocacy whatsoever, exploits the

shortcomings in the opposing party's appraisal. That occurrence is very similar to events in

the instant case, where the Cushman Appraisers prepared an appraisal with data and

analysis in "real time" with the valuation date and not anticipating cross examination of

their work product, whereas the State's appraiser (both in his appraisal and review

appraisal) had an extended period (from engagement to production of the final appraisal and

review appraisal) to conduct exhaustive research and to have twelve years of hindsight

while preparing his analyses and the potential opportunity for his work to be reviewed by

others.

      83.      The Board has violated Respondent's due process and equal protection rights,

under the U.S. Constitution, if the State finds this Respondent has committed errors and violations of

appraisal standards from USPAP but the Board does not find the State's Appraiser has also

committed such errors and violations including, but not limited to, the following;

    a.   the State's appraiser generally makes unsupported statements in the

        Appraisal Review challenging the veracity of some of information

        provided in C & W's appraisal, while accusing Respondent of making

        unsupported statements similar to those made by the Board Appraiser.

    b.  Page 17 point 4 subpoint 1 at the bullet he states "Independent

        confirmation indicated there was no atypical motivation on the buyers part

        in connection with Sale 1." Since the State's Appraiser fails to provide any

        additional information necessary to evaluate that statement (confirmation

        source, what part they played in the transaction, what motivations they

        may have, their relation to the instant complaint, their relation to any

        members of the appraisal board, and most importantly, a disclosure of the

        entire conversation in order to understand the context of the remark that led

        the State's appraiser to the conclusion he stated in the Appraisal Review),

        the veracity of the appraiser's statement is called into question.

        Furthermore, the State's Appraiser did the same thing when he did not

        provide any of the details necessary to properly understand his

        interpretation of confirmation, in his criticism of the C & W appraisers in

        the third paragraph on Page 16 where he states "The appraisers stated that

        in verifying this sale at the time the appraisal was prepared, it was

        indicated to them that the intent was to demolish the existing motel for

redevelopment condominiums, **although they had no supporting documentation**." (emphasis added).

c.   The Board's Appraiser makes numerous statements in his Appraisal Review in regard to lack of support for an adjustment (last paragraph under 2. Market Conditions (Time) on page 17; last paragraph under 3. Location on page 18; last paragraph under 4. Size on page 17; last paragraph under 5. Utility on page 19; the only paragraph under 7 Approval Status), when in fact, his appraisal provides similar narrative descriptions but without any demonstrable objective analysis. That criticism is particularly galling because while he discusses its importance under 7 Approval Status when his appraisal provides nothing more than an absolutely unsupported net opinion!

d.   The State expert contradicts the Board's fraud allegation by failing to understand the impact of the market conditions adjustment. If the C & W's motivation was to produce an artificially high value conclusion, given the substantial increases in value as concluded by the State's appraiser and as subsequently revealed in C and W's testimony, then the C & W appraisers, would not have <u>purposefully understated</u> their market condition's adjustment.

e.   The State expert fails to address the difference in the "intensity of development" between the comparable sale land use regulations in Wildwood Crest including, but not limited to local zoning, but also

including New Jersey DEP prohibitions against high-rise development in
the low density areas of development such as Wildwood Crest.

    f.   The State expert follows the lead of the Board by ignoring the
"Hypothetical Condition" of the Cushman OAR come up for check yearly
in regard to the Subject Property of the Appraisal Assignment, as well as
the stated Hypothetical Condition that's the subject property is being
appraised as vacant land and as proposed.

    g.   The State expert essentially "parrots" the unsupported contentions of the
Board as communicated in proffered Consent Orders during the course of
settlement discussions.

    84.    The State's expert actually has committed worse violations than those of
which Respondent has been accused. Based on Respondent's Answer, the only mistake in the
Cushman Appraisal was due to utilization of an industry standard, and well accepted, third-party
reporting service, which can be said to have reasonably relied upon an official government document
any incorrect reporting of the size of comparable sale one.  Conversely, the State's appraiser, at the
least committed the same type of errors, of which Respondent has been accused in regard to
unsupported opinions, lack of discussion of analyses and bias. In particular, the State's expert has
committed an ethics violation by preparing a directed appraisal.

    85.    Respondent has been severely prejudiced in his ability to defend himself in this
action due to the States actions which have denied due process and equal protection because of the
unconstitutional regulatory regime, the structure and process of the state regulatory system for real

estate appraisers, the states directed appraisal and the resulting bias of the state expert[13].

## LACHES

86.    The action by the State of New Jersey is barred by the doctrine of laches. Laches is an equitable defense that has been defined as an inexcusable delay in asserting a right coupled with prejudice to the respondent.

87.    The appraisal report that forms the basis of the actions of the State was delivered and dated May 31, 2005.

88.    Under USPAP, appraisers are required to maintain files for a period of five years.

89.    At the time of performing the appraisal, Respondent was employed by Cushman & Wakefield of Pennsylvania, Inc. ("C&W").

90.    C&W maintained a document retention protocol (the "Protocol") for its valuation and appraisal group that was specifically designed to comply with the requirements of USPAP.

91.    In accordance with the Protocol, the files relating to the assignment at issue, were destroyed in the normal course of business and prior to notice to C&W or Respondent of the complaint lodged by the Board.

92.    The Board purportedly received a "complaint" from C&W's client, the Carlyle Group, concerning the appraisal report in question (the "Cushman Appraisal Report") on May 25, 2013. On further investigation, it was concluded, and the Board has conceded, that the C&W client never

---

[13] The regulatory framework for the NJAB is also violative of the Constitution and federal antitrust statutes under the Supreme Court decision in *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1114 (2015) (state board on which a controlling number of decision makers are active market participants in the occupation the board regulates must satisfy *Midcal's Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980) active supervision requirement in order to invoke state-action antitrust immunity).

made any complaint to any governmental agency, to C&W, or to the Respondent concerning the quality of the Appraisal Report or its content or conclusions.

93.     The Board notified C&W and the Respondent on July 14, 2010 of the purported "complaint" for the first time.

94.     The Board waited two years to conduct a hearing on the allegations.  The Board waited another two years to contact C&W and the Respondent to discuss the matter further.

95.     The Board waited until the Fall of 2017 to file its charges against the Respondent and includes in its allegations, unsubstantiated and false claims as to the contents of Respondent's files and the quality of his testimony before the Board when the files were destroyed in accordance with USPAP, were subsequently partially reconstructed and the testimony solicited by the Board occurred nine (9) years after the report was prepared and delivered.

96.     Respondent has been severely prejudiced in his ability to defend himself in this action due to the delay in notifying him of the charges and in prosecuting the charges some twelve (12) years following the lodging of the purported "complaint."


                              O'HAGAN MEYER

          By:
                              Kevin F. Berry, Esquire
                              46 West Main Street
                              Maple Shade, NJ  08052
                              267-385-4354
                              kberry@ohaganmeyer.com



                              Law Office of DENINIS A. SCARDILLI, LLC

By: _____

Dennis A. Scardilli, Esquire
105 Woods Road
Absecon, NJ  08201
609-568-0432
dennis@scardillilaw.com

*Attorneys for Respondent,*
*Gerald McNamara*

# EXHIBIT D

Kevin F. Berry
O'HAGAN MEYER
46 West Main Street
Maple Shade, NJ  08052
267-386-4353
kberry@ohaganmeyer.com

Dennis A. Scardilli, Esquire
105 Woods Road
Absecon, NJ  08201
609-568-0432
dennis@scardillilaw.com

```
                    ┌─────────────────────────┐
                    │        FILED  2|28|18    │
                    │       BOARD OF           │
                    │    REAL ESTATE APPRAISERS│
                    │       CHARLES F. KIRK    │
                    │    Acting Executive Director │
                    └─────────────────────────┘
```

**STATE OF NEW JERSEY**
**DEPARTMENT OF LAW AND PUBLIC SAFETY**
**DIVISION OF CONSUMER AFFAIRS**
**NEW JERSEY STATE BOARD OF REAL ESTATE APPRAISERS**

| | | |
|---|---|---|
| IN THE MATTER OF THE SUSPENSION OR REVOCATION OF THE CERTIFICATION OF | : : : | Administrative Action |
| **COLLEEN KUDRICK CERTIFICATION NO. 42RG0021800** | : : : | **RESPONSE OF COLLEEN KUDRICK** |
| TO PRACTICE REAL ESTATE APPRAISING IN THE STATE OF NEW JERSEY | : : : : | **TO COMPLAINT** |

Colleen Kudrick ("Kudrick"), by and through her attorneys, files this Answer to the Complaint and avers as follows:

**GENERAL ALLEGATIONS**

1.      Denied as to the exercise of authority by the Attorney General of the State of New Jersey to initiate administrative disciplinary proceedings, as set forth in the Administrative Complaint ("Complaint")  against persons licensed and/or certified by the New Jersey State Board of Real Estate Appraisers (the "Board") when such disciplinary proceedings are based on real estate appraisal standards, to wit, the Uniform Standards of Professional Appraisal Practice ("USPAP"), which have

Page 1 of 86

been promulgated and/or administered in violation of the US. Constitution (hereinafter

"Unconstitutionally Promulgated"), and/or has been promulgated in violation of Federal law and/or

regulation, and therefore cannot be applied in this action.

      2.      Denied as to the Board's ability to regulate the practice of real estate appraisal

under the Uniform Standards of Real Estate Appraisal ("USPAP") as defined in N.J.S.A. 45:14F-29, and

as further applied in N.J.S.A. 45:14F-1, *et seq.* including but not limited to, N.J.S.A. 45:14F-8(l),

"Powers, duties of the Board", and in N.J.S.A. 45:14F-30(b)(4), "Authority of the Board" and as defined

in N.J.A.C. 13:40A-1.2 and as further applied in sections of N.J.A.C. 13:40A-1.1, *et seq.* including but

not limited to N.J.A.C. 13:40A-6.1, as USPAP has been Unconstitutionally Promulgated, and/or has

been promulgated in violation of Federal law and/or regulation, and therefore cannot be applied in this

action.

      3.      Denied, as to the Board's ability to require conformance to USPAP under

N.J.A.C. 13:40-6.1(a), as USPAP has been Unconstitutionally Promulgated, and/or has been

promulgated in violation of Federal law and/or regulation, and therefore cannot be applied in this action.

Denied, as to the Board's ability to require conformance to USPAP under N.J.A.C. 13:40-6.1(a), as

USPAP has been Unconstitutionally Promulgated, and/or has been promulgated in violation of Federal

law and/or regulation, and therefore cannot be applied in this action.  Denied, as to the Board's ability to

determine a violation under N.J.S.A. 45:1-21(e) and/or N.J.A.C. 13:40A-7.9(d)(5), both alleging

professional misconduct by Kudrick, due to alleged non-conformance to USPAP, which has been

Unconstitutionally Promulgated, and/or has been promulgated in violation of Federal law and/or

regulation, and therefore cannot be applied in this action. Respondent admits that the Board, under the

color of the New Jersey Statute and Administrative Code sections referenced in the Complaint, is basing

the allegation in the Complaint on the 2005 edition of USPAP, effective January 1, 2005, as the applicable USPAP standard that applied to this assignment, due to the time of Kudrick's appraisal, to the extent USPAP may be applicable at all.

      4.     The averments of paragraph 4 of the Complaint are admitted.

      5.     The averments of paragraph 5 of the Complaint are admitted.

      6.     The averments of paragraph 6 of the Complaint are admitted.

      7.     Denied as stated. The averments of paragraph 7 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves, however, denied as this paragraph of the Complaint fails to include material elements of the referenced Agreement of Sale for the property appraised (the "Subject Property"), *to wit,* there were no contingencies as to approvals of any kind, as well as other material elements including but not limited to the non-refundable deposit of $2,750,000, which would be considered liquidated damages in the event of buyer default. As to the statements averred in the footnote to paragraph 7, said allegations are denied. It is averred that the addendums in question were part of the original file maintained by Respondent in this matter. Because the complaints offered by the Board to the reports in question were first made after the five (5) year holding period required by USPAP for files, and said files were destroyed in part by reason of the USPAP-compliant document retention protocol utilized by Cushman & Wakefield, Inc. ("C&W"), respondent believes and therefore avers, said documents were part of the original file.

      8.     The averments of paragraph 8 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves.

9.      The averments of paragraph 9 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves, however, denied as this paragraph of the Complaint fails to include material elements of the referenced resolution of Findings and Conclusions of Board of Adjustment of the Township of Lower, *to wit,* use of the Complaint-referenced area above the mean high waterline, and below it, without beach fees, with the applicant providing lifeguards in those areas, and with the applicant allowing members of the public to pay a beach fee to join the condominium beach club.

10.     The averments of paragraph 10 of the Complaint are generally admitted as to the information in the deed, but denied as to the actual sale price of the Subject Property, as the July 30, 2003 Addendum to the April 16, 2003 Agreement of Sale added $2,700,000 to the sale price of the Subject Property and perhaps an additional $50,000 based on the information in that Addendum.

11.     Denied as stated. The averments of paragraph 11 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves. however, denied as this paragraph of the Complaint fails to include material elements of the referenced resolution of Findings and Conclusions of Board of Adjustment of the Township of Lower, dated April 7, 2005, *to wit,* the lack of public objection, the reference to the hotel as being closed and particularly the increase in the number of units approved from the 113 referenced in the June 3, 2004 Resolution approving several variances, as to the statements averred in the footnote to paragraph 11, said allegations are denied. It is averred that the addendums in question were part of the original file maintained by respondent in this matter. Because the complaints offered by the Board to the reports in question were first made after the five (5) year holding period required by USPAP for files, and said files were destroyed in part by reason of the USPAP-compliant

document retention protocol utilized by C&W, respondent believes and therefore avers, said documents were part of the original file.

      12.     Denied as stated. The averments of paragraph 12 of the Complaint are generally admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves, but denied as to the averment "…. for the purposes of evaluating potential financing…", while in fact the May 4, 2005 engagement letter contained in the addendum of the Cushman Appraisal states that the "Intended Use" of that appraisal assignment was "in connection with the proposed first mortgage loan to be made by the client". Cushman Appraisal at Addendum A, page 2. As to the statements averred in the footnote to paragraph 12, no response is due because those averments are conclusions of law to which no response is necessary. Respondent admits that the assignment in question was development of a Self-Contained Appraisal Report.

      13.     The averments of paragraph 13 of the Complaint are admitted as to the date of Subject Property inspection by Ms. Kudrick, the date of the Cushman Appraisal and as to the averment "…. The appraisal report describes the subject property as two non-contiguous parcels of land containing four acres, or 174,1.96 square feet, in the aggregate". Denied as to Complaint averment "…The larger parcel, containing 2.80 acres and located on the east side of Atlantic Avenue, extends through to Wildwood Crest beach to the north… "as the parcel to the east of Atlantic Avenue extends eastwardly to the "Diamond Beach" beach, as the subject property is located in "Diamond Beach", a non-contiguous section of Lower Township, N.J. It is adjacent to Wildwood Crest to the north. Denied as to the statement "…and was improved with a 195-unit beachfront hotel." The Subject Property was a *former* (emphasis added) 195-unit beachfront hotel, as it had not been in operation as a hotel between at least 2004 and the Date of Value of the Cushman Appraisal, May 23, 2005. The averment of paragraph

13 of the Complaint, stating "The smaller parcel, containing 1.20 acres and located directly opposite to the larger parcel on the west side of Atlantic Avenue, was described as vacant and unimproved." are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves. Denied as to averment of paragraph 13 of the Complaint, stating "Moreover, despite acknowledging an "April 6, 2005" sale of the subject property for $18,000,000 and the buyer's intent to drastically redevelop the sites, the appraisal report was prepared under the hypothetical condition that the entire property was vacant and available for development, with no consideration given to the existing or proposed improvements" and the related footnotes thereto, because the averment either implies Kudrick acted improperly by invoking the referenced Hypothetical Condition given the $18,000,000 sale, for which there is no logical or even regulatory reason for the Board to do so, or that the Board does not accept the USPAP provisions regarding of a Hypothetical Condition in a real estate appraisal. Either way, the Board's averment ignores relevant provisions of USPAP 2005, upon which standards the State has purportedly based its case. Admitted as to averment in Complaint footnote 5, "The appraisal report notes the proposed development would include up to "128 upscale condominium units… with an adjoining 150-room hotel ... to be connected by a gilded crosswalk traversing Atlantic Avenue[,]" as well as a "structured parking garage, gourmet restaurant, poolside bar and grill, health club, full service spa and oceanfront pool complex and entertainment area". Denied as to averment in footnote 6 that the Cushman Appraisal "….further acknowledges a market value of the subject property, based on its 2005 property tax assessment with current improvements, at $14,418,182", as such averment is a misleading statement because the Cushman Appraisal does not acknowledge such a market value, but rather states "…. The foregoing assessment indicates the township values the property for assessment purposes at $14,418,182….". Furthermore, the Cushman

Appraisal indicates the opposite of the averment, by its statement "…Based upon our subsequent conclusion of market value for the subject property relative to the current assessment over it, the subject property appears to be favorably assessed", which means that Respondent and Ms. Kudrick believed that the assessment was low. Based on the above, in regard to the affirmance in paragraph 13 of the complaint, respondent denies the averment he acted improperly by valuing the Subject Property at a figure other than one based on the 2005 property tax assessment, as appraisal of the Subject Property at such Assessment would have been improper under accepted practice by peer real estate appraisers and accepted standards of real estate appraisal practice.

14.     The averments of paragraph 14 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves.  Respondent denies averments as to reference to footnote 7's general citation to *The Appraisal of Real Estate*, *14ᵗʰ Edition*, published in 2013, and to *The Dictionary of Real Estate Appraisal*, *5ᵗʰ Edition*, published in 2010.  Because the Cushman Original Appraisal Report date of report was May 23, 2005, the correct version of *The Dictionary of Real Estate Appraisal,* would be the *4ᵗʰ Edition*, published in 2002, and the correct version of *The Appraisal of Real Estate* would be the *12ᵗʰ Edition,* published in 2001.

15.     The averments of paragraph 15 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves. Denied as to materiality of footnote 8, as the difference between pre-rounding product in the Cushman Appraisal and the footnote's pre-rounding product is $165.00, which is not materials as the rounded value is the same, and the difference "…. is minor and likely due to rounding…", just as the State's Appraiser determined in regard to a similar minor difference in lot size.

Sussman Appraisal Review at 11. This is an example of the Board inappropriately stretching facts to show a number of errors in order to "make its case" for an ethics violation due to a number of "USPAP language errors" and is totally inappropriate both in substance and for such "stretching" to be done by a regulatory board when Kudrick's livelihood is at stake.

16.     Denied.  As the Board is aware Carlyle Group did not file the consumer complaint, but rather the Board failed to perform appropriate due diligence in determining who filed the consumer complaint. Further, the Board has been provided with Respondent Counsel's own research regarding who filed the consumer complaint and had previously conceded the consumer complaint had been filed anonymously based on a search of Board records. And, based on such information, Respondent reasonably believes the consumer complaint was filed a competitive developer or by a local appraiser who was upset they did not get the appraisal assignment.

17.     Denied as to averment ".... Carlyle pointed to evidence... ". Denied as to Carlyle filing the consumer complaint for the reasons in Respondent Answer to Complaint paragraph 16, above, as if fully set forth *verbatim* herein, and because the Board is well aware Carlyle Group did not file the consumer complaint, as the Board's reported research of its files led the Board to previously concede this issue. Denied as to averment of "falsification", as alleged in the consumer complaint the Cushman Appraisal had errors, which the consumer complaint improperly categorized as "falsifications" with no evidence of such falsification, and which alleged "falsification" also included use of data from a prior appraisal "Area Analysis", while such reuse is a practice frequently used by everyone who prepares written documents. Denied as to averment ".... the manner in which the Appraisers identified and analyzed these comparable sales, and which, in part, led them to achieve a flawed market value conclusion of $375 per square foot ...", because the Board's unsupported disagreement with

Respondent's market value estimate was on the record before the Board hired Mark Sussman, MAI to prepare an appraisal that mirrored the Board's unsupported belief, and therefore the Board's belief Respondent's market value estimate is "flawed" is in itself flawed, and a classic example of what happens when a disciplinary board provides their expert with the board's own opinions, and then obtains the expected or directed result.

      a.    The averments of paragraph 15 of the Complaint are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves.

      b.    Denied as to Board categorization of Kudrick's adjusted value conclusion "…ostensibly, as vacant land", as this implies error as to Respondent's reported research, which included communications with the buyer of Comparable Sale 5 and said communications including that buyer's intent to tear down the existing improvements and redevelop the property with condominiums.  As to the remainder of Complaint paragraph 17(b), the averments of that paragraph are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves.

18.    Denied as to averment "…Carlyle alleged in its complaint…" As the Board is aware Carlyle Group did not file the consumer complaint, but rather the Board failed to perform appropriate due diligence in determining who filed the consumer complaint. Further, the Board has been provided with Respondent Counsel's own research regarding who filed the consumer complaint and had previously conceded the consumer complaint had been filed anonymously based on a search of Board records (the "Anonymous Complaint"). As to the remainder of that first sentence in Complaint

paragraph 18, the averments of that paragraph are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves, but Respondent reiterates notice to the Board, as it is already aware, that the incorrect information utilized in the Cushman Original Appraisal Report was based on the original version of this comparable sales data provided by the reporting service Win2Data, which original version was destroyed in the original Work File in accordance with Cushman & Wakefield's document retention policy, and the circumstances behind the Win2Data sheets are further explained in this Answer including, but not limited to, paragraphs 24(a) and 24(b) as stated there and restated here, as it fully repeated verbatim. As to the second sentence in Complaint paragraph 18, beginning with the word "Consequently", Respondent denies the averment that the appraisers' calculation "… was grossly overstated as a result of their inaccurate reporting of the lot size…", as the Board is aware the incorrect information utilized in the Cushman Original Appraisal Report was based on the original version of this comparable sales data provided by the reporting service Win2Data, as stated above and restated here, as it fully repeated verbatim. As to the third sentence in Complaint paragraph 18, beginning with "As to comparable sale 5…", Kudrick denies "….. Carlyle asserted …." for the reasons in Respondent Answer to Complaint paragraphs 16 and 17, above, as if fully set forth *verbatim* herein, because the Board is well aware Carlyle did not file the Anonymous Complaint, for the reasons previously stated in those paragraphs. As to the remainder of the third sentence in Complaint paragraph 18, the averments of that paragraph are admitted to the extent the allegations are not inconsistent with the documents they reference, in that such documents are writings which speak for themselves, but Respondent denies the implied averment that the Cushman Appraisers errored in believing the information received from the individual, with whom they verified this sale, that the improvements were to be demolished and the site redeveloped as condominiums, because the Board is aware the Board's Appraisal Reviewer "…. found

nothing to indicate that this was not the information the appraisers received at the time the appraisal was prepared". Denied as to averment at Complaint paragraph 18, footnote 10, stating "Carlyle further alleged …. " for the reasons in Respondent Answer to Complaint paragraphs 16, 17 and 18, above, as if fully set forth *verbatim* herein, because the Board is well aware Carlyle did not file the Anonymous Complaint, for the reasons previously stated in those paragraphs. Denied as to averment at Complaint paragraph 18, footnote 10, stating Anonymous Complaint allegation "…. that the Appraisers "falsified information" in the subject appraisal report by supplying data in it regarding the 'residential housing stock within Cape May County' unchanged from a 2001 appraisal report completed by Cushman & Wakefield, but for the attribution of 'a more current year', because a reading of the Cushman Original Appraisal Report indicates that the Regional Analysis and the Local Market Analysis were clearly updated for this appraisal, including references to housing stock in Cape May County as of calendar year 2004. Cushman Appraisal, pgs. 5-15, p. 14.  The inclusion of this allegation in the Anonymous Complaint received by the Board supports Respondent's belief that the actual complainant was a developer, or local appraiser, as Carlisle Group did not have access to the 2001 real estate appraisal report referenced by the anonymous complainant.

19.     Denied as to averment the Anonymous Complaint was filed by the Carlyle Group. The Board is aware Carlyle Group did not file the consumer complaint, but rather the Board failed to perform appropriate due diligence in determining who filed the consumer complaint. Further, the Board has been provided with Respondent Counsel's own research regarding who filed the consumer complaint and had previously conceded the consumer complaint had been filed anonymously based on a search of Board records. Admitted as to the averment Respondent and Ms. Kudrick appeared separately and gave sworn testimony to the Board on June 26, 2012. Admitted as to the averment "…. Ms. Kudrick, who was the first to appear before the Board, testified that at the time the subject appraisal

report was prepared, she did not hold a license or certificate issued by the Board, nor did she secure any temporary permit to appraise the subject property".[1] Denied as to the averment "... Notwithstanding... " as it implies the legal conclusion Ms. Kudrick should have obtained a Temporary Permit to work under Respondent's supervision, which is contrary to the plain meaning of the Board law and regulations made available to New Jersey State Certified Real Estate Appraisers including, but not limited to, Respondent. Admitted as to averment "....she completed the majority of the appraisal report, including identifying, inspecting, and analyzing the comparable sale properties", as is permitted under N.J.S.A. 45:14F-21(c), which states:

> "no person other than a State licensed real estate appraiser, a State certified real estate appraiser or a person who assists in the preparation of an appraisal under the direct supervision of a State licensed or certified appraiser shall perform or offer to perform an appraisal assignment in regard to real estate located in this State including, but not limited to, any transaction involving a third party, person, government or quasi-governmental body, court, quasi-judicial body or financial institution".

Denied as to the averment "... Moreover... "as it implies the legal conclusion Ms. Kudrick should have obtained a Temporary Permit to work under Respondent's supervision, as stated in the preceding sentence as if fully set forth verbatim herein. Denied as to averment ".... she [Ms. Kudrick] acknowledged that she had incorrectly reported the size of the property in comparable sale 1 as approximately six times smaller than its actual size...", as stated in in this Answer's Counts and paragraphs including, but not limited to, Count II, Paragraphs 24, 24(a), 24(b), of this Answer, as if fully set forth verbatim herein, Ms. Kudrick relied on the data provided by the reporting service Win2Data, the original copy of which was in the Original Work File, which was destroyed in accordance with USPAP and the Cushman & Wakefield document retention policy as the Board had previously been advised. Denied as to averment ".... although possessing in her work file deeds detailing that transaction as two separate land sales totaling $5,000,000, and her own visual inspection of the area". In her

---

[1] Kudrick T-11, Line 16.

testimony before the Board on June 26, 2012, in response to the question "Did you look at the deeds?"
from Board Member Krauser (Kudrick T-30, L 4), Ms. Kudrick testified "… I don't believe at the time
of the appraisal we had copies of the deeds, we used a real estate public service" (Kudrick T-30, 4-7).
First, as previously indicated herein and in Respondents' testimony before the Board that testimony
occurred more than seven years after the Appraisal Assignment, and as noted on numerous occasions
during that testimony her memory as to events during the Appraisal Assignment was unclear. Second, as
previously stated in this paragraph, as if fully set forth verbatim herein, the Original Work File was
destroyed in accordance with USPAP and the Cushman & Wakefield document retention policy, as the
Board had previously been advised. Third, when Ms. Kudrick referred to the "Work File" in her June
26, 2012 testimony before the Board, she was referring to the "Reconstructed Work File", and not the
"Original Work File". Fourth, Respondent and Mr. McNamara, unlike the Board's Appraiser, are not
used to testifying as to their appraisal assignment results and, consequently, were clearly unnerved and
shaken by the questioning from Board members. Consequently, any contradictory statements as to the
preceding points are attributable to the time that had passed between the Appraisal Assignment, and
testimony before the Board, thus causing Respondent and/or Ms. Kudrick to have inadvertently made
such contradictory statements. As to the testimony of Ms. Kudrick regarding Comparable Sale 5,
Kudrick denies the Board's averment regarding Ms. Kudrick's testimony, Ms. Kudrick "….
acknowledged that she incorrectly suggested in the appraisal report that the Summer Sands Motel had
been demolished at the time of the appraisal…. ", because the Complaint takes Ms. Kudrick's statements
out of context, as she then qualifies her remarks regarding verification of Comparable Sale 5 by stating
the following:

> 14 MS. KUDRICK: In the course of verifying
> 15 this sale, I do recall speaking to a participant
> 16 in the transaction, I don't have a name, I
> 17 apologize. But when it was placed under contract

18 or sold, that the intent was to demolish the motel
19 for redevelopment with condominiums, similar to
20 the subject property. It does say in our sales
21 chart that the motel was demolished. In fact, it
22 was not.
23 The better language for us to say
24 that it was to be demolished, that was our
25 understanding at the time. (Kudrick T-36, L14-25)

Thus, the Board has again overreached in an attempt to incorrectly allege violation of purported

appraisal standards errors in support of the Board's unsupported communications during the Cushman

Appraisers testimony that those appraisers conducted material errors in the development of the

Appraisal Assignment. Such allegations caused the Cushman Appraisers shock and created a sense of

fear that made it difficult for them to think clearly in their responses to the Board. Ms. Kudrick's

subsequent testimony clearly indicates she did not believe she errored in reporting the buyer's intent to

tear down the existing improvements and build new, as communicated to her in that verification process

during the appraisal assignment. Denied as to "Complaint Paragraph 19 averment "…. her alleged

inspection of that property ….", as Ms. Kudrick testified under oath, that she inspected comparable sale

5. (Kudrick T-37, L 5-7) (Kudrick T-37, L 16-25, T-38, L1-3) Denied as to averment at the sixth (6th)

and final sentence in Paragraph 19, that "….Ms. Kudrick could not sufficiently explain the rationale for

adjustments she made to all of the comparable sales in the appraisal report ….", because once again, the

Board has incorrectly taken Ms. Kudrick's statements out of context, as the summary of analysis was

particularly related to the sophisticated client, as the only Intended User, in accordance with the

Comment to USPAP 2005 SR 2-2(a)(ix), and furthermore, as previously indicated, over seven years and

passed since she had worked on the appraisal assignment, the Original Work File had been destroyed in

in conformance with Protocol and she was a non-litigation appraiser being "grilled" by the Board.

Denied as to averment at the sixth (6th) and final sentence in Paragraph 19, that "….her [Ms. Kudrick's]

failure to analyze, in any significant way, the recent sale of the of the subject property for $18,000,00, as

it related to her appraised market value of $65,300,000". The Board's allegation as to any need to

analyze a prior sale of the Subject Property beyond that performed by McNamara and Ms. Kudrick is in

conflict with the Board's own assertion of reliance on USPAP, which states as a Standards Rule 1

development requirement that the appraiser is to "…. analyze all sales of the subject property that

occurred within the three (3) years prior to the effective date of the appraisal. USPAP 2005, Standards

Rule 1-5(b) at 21. Clearly, the Cushman appraisers analyzed the prior sale. And, the Board's allegation

as to any need to include, in an appraisal report, a prior sale of the Subject Property beyond that reported

by McNamara and Ms. Kudrick is in conflict with the Board's own assertion of reliance on USPAP,

which states as a Standards Rule 2 reporting requirement that the appraiser is to:

> 813 (ix) describe the information analyzed, the appraisal procedures followed, and the
> 814 reasoning that supports the analyses, opinions, and conclusions;
>
> 815 Comment: The appraiser must be certain the information provided is sufficient
> 816 for the client and intended users to adequately understand the rationale for the
> 817 opinion and conclusions, including reconciliation of the data and approaches, in
> 818 accordance with Standards Rule 1-6.
>
> 819 ***When reporting an opinion of market value, a summary of the results of***
> 820 ***analyzing the subject sales, options, and listings in accordance with Standards***
> 821 ***Rule 1-5 is required. If such information is unobtainable, a statement on the***
> 822 ***efforts undertaken by the appraiser to obtain the information is required. If such***
> 823 ***information is irrelevant, a statement acknowledging the existence of the***
> 824 ***information and citing its lack of relevance is required.***
> USPAP 2005, Standards Rule 2-2(a)(ix) at 24-25

The Cushman Appraisers reported the prior sale and analyzed it on page 30 of the Cushman Appraisal.

Standards Rule (SR) 1-5(b) requires analysis, as a development requirement and there is no indication

the Cushman Appraisers did not analyze the prior sale. SR 2-2(a)(ix) requires the appraiser to

summarize the analysis, which the Cushman Appraisers did in conformance with USPAP, and to the

level contained in the standards guidance at Advisory Opinion 1 (AO-1). USPAP 2005, AO-1, at 125-

137.  The summary of analysis was particularly related to the sophisticated client, as the only Intended

User, in accordance with the above stated Comment to SR 2-2(a)(ix). Accordingly, in this averment, the Board has incorrectly averred failure to analyze when there was none.

20.     Denied as to averment that "In his [McNamara's] appearance before the Board, Respondent testified '…. that he did not assist in the preparation of the appraisal report, and that, typically, he reviews Ms. Kudrick's work "at the end, after she's written the report, done her analysis[.]'". Unfortunately, the Complaint mischaracterizes the nature of the work performed by McNamara. First, the quotation from McNamara's testimony is misleading. In his testimony before the Board, McNamara went on to state, "…

> 25 MR. McNAMARA: In terms of -- when you
> 1 say preparation, I'm assuming you mean doing data
> 2 searches?
> 3 MR. FLANZMAN: Data searches?
> 4 MR. McNAMARA: I'm basically doing a
> 5 review.
> 6 MR. FLANZMAN: Inspection of property?
> 7 MR. McNAMARA: I do inspect the
> 8 property.
> 9 MR. FLANZMAN: You did inspect the
> 10 property?
> 11 MR. McNAMARA: Correct.

(McNamara, T-13, L 25, T-14, L1-11)

McNamara went on to explain the general protocol he followed as a supervising appraiser, but, due to the seven year gap between the Appraisal Assignment and his testimony before the Board, he was unable to recall specific details as to what occurred during this particular assignment. (McNamara T-14-17). The summary of McNamara and Ms. Kudrick's testimony is that the typical supervisory process in an appraisal assignment would involve Ms. Kudrick collecting the data, preparing an initial draft, creating preliminary analyses, but with conversation between her and McNamara throughout the process. When Ms. Kudrick had questions or needed guidance, she would reach out to McNamara for his expertise. As supervisor, McNamara reviewed the initial draft of the report, made his

suggested edits and changes, and discussed the project with Ms. Kudrick, who then made revisions.

Thus, the preparation of the appraisal report was a collaborative process.[2] This is the typical process

between an associate appraiser and a supervising appraiser in an appraisal firm. The Federal Appraisal

Subcommittee (the "ASC") Policy Statement in effect at the time of the Appraisal Assignment required

a state real estate appraisal regulatory agency to allow an associate appraiser to assist in the conduct of

an appraisal assignment under the direction of a state credentialed real estate appraiser.[3] Respondent

reasonably believes he and Ms. Kudrick complied with the ASC and related federal requirements.

Respondent reasonably believes ASC review of the Board's compliance with Federal real estate

appraisal law and policy includes all cases under the Board's purview.[4]  Respondent reasonably believes

he complied with the requirements N.J.A.C. 13:40A-4.6(e)(1) regarding the Direct supervision of the

appraisal work performed by Ms. Kudrick, even though Ms. Kudrick was not a New Jersey "trainee".

Most importantly, the State of New Jersey does not require a real estate appraisal associate to have a real

estate appraiser credential when working under the supervision of a credentialed appraiser[5] and to deny

---

[2] Kudrick annotation, Appraiser Outline, December 2013.

[3] Appraisal Subcommittee, *Appraisal Subcommittee Policy Statements Regarding State Certification and Licensing of Real Estate Appraisers*, September 22, 1997, as amended October 24, 2000, stating "Title XI provides that an individual who is not a State certified or licensed appraiser may assist in the preparation of an appraisal if the assistant is under the direct supervision of a licensed or certified appraiser and the final appraisal is approved and signed by that appraiser. The ASC believes that this provision should not be used to legitimize situations where one or more uncertified or unlicensed persons are not actively and directly supervised by a certified or licensed appraiser during the preparation of the significant aspects of the appraisal process, and the certified or licensed appraiser does not substantively review the appraisal in accordance with USPAP.s requirements. The ASC believes that any cursory review should not qualify as direct supervision and that such activities would violate the intent and purposes of Title XI. The ASC, therefore, urges State agencies to ensure that their appraiser regulatory programs can identify situations where direct supervision is not present and to take appropriate steps to remedy them.

[4] An individual who is not a State certified or licensed appraiser may assist in the preparation of an appraisal if –
  o   (1) the assistant is under the direct **supervision** of a licensed or certified individual; and
  o   (2) the final appraisal document is approved and signed by an individual who is certified or licensed.
12 U.S.C.S. §3351.

[5] N.J. S.A. 45:F-21(c) **c.**  Except as otherwise provided in subsection f. of this section, no person other than a State licensed real estate appraiser, a State certified real estate appraiser or a person who assists in the preparation of an appraisal under the direct **supervision** of a State licensed or certified appraiser shall perform or offer to perform an appraisal assignment in

an out-of-state appraiser the same ability afforded an in-state appraiser would be a violation of other

ASC Policies, the Commerce Clause of the U.S. Constitution and potentially a violation of the U.S.

Supreme Court decision N.C. Bd. Of Dental Examiners v. FTC[6] and related Federal law and regulation

including, but not limited to, those of the FTC. Denied as to averment that McNamara's review of

Kudrick's work at the stage of a first draft is anything other than supervision as indicated in state and

federal law, above. Furthermore, Advisory Opinion 5 (AO-5) in the 2005 version of USPAP clearly

indicates that McNamara properly handled the supervision of Ms. Kudrick, as an advanced associate.[7]

---

regard to real estate located in this State including, but not limited to, any transaction involving a third party, person, government or quasi-governmental body, court, quasi-judicial body or financial institution.

N.J.S.A. § 45:14F-21
(e) A supervising appraiser shall have the following duties and responsibilities:
- **1.** The supervising appraiser shall at all times be responsible for and provide direct supervision of the work performed by the trainee. For purposes of this section, "direct supervision" means:
  - o  **i.** To personally review the work product of the trainee;
  - o  **ii.** To approve, sign, and accept responsibility for each appraisal report including work product prepared by the trainee or in which the trainee has made a professional contribution and to sign all such reports and certify that all such reports have been independently and impartially prepared in compliance with the Uniform Standards of Professional Appraisal Practice, these rules and applicable statutory standards; and
  - o  **iii.** To indicate, within the certification section of the appraisal report, the name of the trainee providing significant real property appraisal assistance. For purposes of this subparagraph, "significant" means the exercise of appraisal knowledge and training and does not mean clerical or fact gathering tasks.
    N.J.A.C. § 13:40A-4.6.

[6] 135 S. Ct. 110.

[7] As proficiency is demonstrated by an assistant, it is appropriate for the principal appraiser to place greater
65  reliance on the work of that assistant. In the context of a real property appraisal assignment, an assistant
66  who has meaningful appraisal education and extensive work experience may well be competent to inspect
67  the real estate and prepare the appraisal report alone, subject to an appropriate final reconciliation by the
68  principal appraiser who will be signing or cosigning the certification in the report. In this situation, the
69  assistant's contribution is both significant and professional. The appropriate final reconciliation should
70  include a discussion of which aspects of the appraisal process were performed by the assistant and the
71  principal appraiser.
USPAP 2005, AO-5, at p.135
109  Principal Appraiser Jones is a partner in Expert Valuers, Inc., and is state certified. She has 15 years
110  appraisal experience and is responsible for two four-person appraisal teams headed by senior assistants.
111  Jones runs the company orientation program for new assistants and conducts weekly team meetings that
112  provide her with an opportunity to evaluate the appraisal competence of the assistants working with her.
113  Four of the eight assistants have demonstrated a level of education and understanding of the process that
114  enable them to conduct most steps of an appraisal. Jones allows these four assistants to conduct real estate
115  inspections alone and to cosign the certification in appraisal reports. Detailed interior photographs are
116  required by company policy. Jones examines the photos with assistants when discussing preliminary
117  conclusions and rough drafts of appraisals, and she always conducts exterior inspections of the subject real

Admitted generally as to the averment "He further testified that he conducted an "exterior inspection" of the subject property separately from Ms. Kudrick….", but denied as to averment that McNamara acted improperly by not inspecting the interior of the to-be-demolished then-existing building, as the appraisal assignment was clearly to consider the Subject Property as vacant and ready for redevelopment. Denied as to McNamara's testimony he did not re-do Ms. Kudrick's comparable sales research or verification, and that he did not re-verify other facts regarding the Subject Property, as there was no need to do so, for such "re-doing" the associate appraiser's analysis is not performed by peers of the supervising appraiser, under similar circumstances, in the appraisal industry and there are no requirements, neither in federal law and/or regulation, nor in state law an and/or regulation, nor in USPAP, requiring the supervising appraiser to "redo" associate appraisers analyses. McNamara went through Ms. Kudrick's draft, and verbally grilled her regarding her draft report and underlying assumptions. Denied as to averment McNamara had responsibility for Ms. Kudrick to obtain a "…… temporary permit to conduct an appraisal in New Jersey ….", because of the law and regulation cited in this Answer Paragraph, above, regarding the ability of an appraisal associate to participate in an appraisal assignment under the supervision of a credentialed appraiser. Furthermore, McNamara "… could not recall whether Ms. Kudrick had obtained a temporary permit… as well as other details of the review process…" averment ignores the fact that the appraisal assignment, which is the subject of the question from the Board was performed over seven years before McNamara answered that question. As indicated in the ASC Policy Statement, in effect at the time of the Appraisal Assignment, there is no affirmative requirement to obtain a temporary permit for an appraiser assistant under the direction supervision of an appraiser

---

118  estate at minimum. If unique characteristics are noted in an interior inspection conducted by an assistant,
119  Jones reinspects the real estate before the appraisal process is completed. Jones discloses the type and
120  extent of her inspection in the certification of each report (Standards Rule 2-3) and acknowledges and takes
121  full responsibility for the contributions of assistants (Standards Rules 2-3 and 2-2(a)(vii), (b)(vii), or
122  (c)(vii), as applicable).
USPAP 2005, AO-5, at p.136

certified in the state in which the appraised property is located.[8] Denied as to averment McNamara acted

improperly regarding his supervision of Ms. Kudrick because McNamara "…. could not recall …. other

details of the review process, and thus was unable to answer many of the questions posed regarding his

specific work and contributions to the report", when the Board not only accepted the Anonymous

Complaint after the end of the five (5) year document retention period set forth in the specific statutory

provision for real estate appraisers, but then the Board delayed in having McNamara testify under oath

for an additional two (2) years. During the over seven (7) years between the conduct of this Appraisal

and McNamara's testimony, he participated in approximately 7,000 appraisal assignments as a

supervising appraiser, McNamara was 61 years old when he testified and even a younger person would

have difficulty recalling one set of conversations with Ms. Kudrick in one particular appraisal

assignment seven years before such Board testimony. And, it is important to note the Transcript of

McNamara's testimony indicates a particularly acrimonious exchange with "machine gun-like"

questions being fired at him by Board members. Nonetheless, Respondent signed the appraisal repast,

and thus took full responsibility for its content. Someone, like McNamara, who has not repeatedly

testified in legal proceedings would be extremely cautious in stating that they specifically remembered

conversations, words, and facts from seven years ago, under the circumstances noted above. Denied, as

to averment "Nonetheless, Respondent signed the appraisal repast, and thus took full responsibility for

its content", as the Board averment implies McNamara improperly "…. signed the report and …. took

full responsibility for its content," which implication by the Board ignores the facts and circumstances of

McNamara's testimony, as cited above in this paragraph.

## COUNT I

---

[8] "Title XI does not require State B to offer temporary practice to persons who are not certified or licensed appraisers, including appraiser assistants not under the direct supervision of an appraiser certified or licensed in State A". ASC Policy Statement, 1997 version as amended in 2000, Statement 5.

21. Denied for the reasons set forth in responses to the General Allegations above as if fully set forth verbatim herein.

22. Admitted as to Board correctly quoting from the 2005 version of USPAP ("USPAP 2005") as to "Standard 1: Real Property Appraisal Development", "Standards Rule 1-1", subsection (b). USPAP 2005, at 16, Lines 521-522. Admitted as to Board correctly quoting from USPAP 2005 Standard 1: Real Property Appraisal Development", "Standards Rule 1-1", subsection (c), Lines 530-532. Admitted as to Board correctly quoting from USPAP 2005 Standard 1: Real Property Appraisal, Reporting", "Standards Rule 2-2", subsection (a)(iii). Denied, as to averment "The appraisal report here contains several errors, including significant factual errors regarding the description of the subject property… that, in their totality, meaningfully impact the credibility of the appraisal by Respondent and Mr. McNamara.", for the reasons set forth any preceding "General Allegations", in other paragraphs of this Count and in the following Counts, as if set forth verbatim here. Complaint at 9.

23. Denied generally as to averment "…the block and lot identifications of the subject property were not accurately reported and are incomplete in the appraisal report….", based on the specific information in the following subparagraph, as if repeated verbatim here.

23(a). Admitted as to averment "The appraisal report identifies the subject property as consisting of two non-contiguous parcels of land containing four acres in the aggregate. The first parcel, identified as Block 700-1, Lot 3", is noted to be a 2.80-acre parcel of land, improved with a 5-story hotel building containing 195 guest rooms. The second parcel, identified as "Block 699, Lot 3" is reported to be an unimproved 1.20-acre parcel of land." Complaint at 10[9]. The engagement letter dated May 4, 2005

---

[9] Citing Cushman Appraisal at first page of Transmittal Letter, under sub-heading (in left column) " Hypothetical Conditions" (PDF pg. 2); Summary of Salient Facts, under subheading (in left column)"Property Description" (PDF pg 4), Hypothetical Conditions (PDF pg 5); Introduction under subheading (In left column)"Property Description" (Report pg 1, PDF pg 12); Legal Description (Report pg. 4, PDF pg 15);  Assumptions and Limiting Conditions (Report page 34, PDF page 45).

specifically indicates "The property to be appraised is two parcels located across from each other on Atlantic Avenue in Wildwood New Jersey. One parcel is improved with an existing 195 unit waterfront hotel built in the 1970s that will be demolished for construction of a 125 unit condominium building data parcel will be improved with a 63 unit condo/hotel". The engagement letter goes on to indicate "Information We Need to Complete the Assignment", and states "we understand you will provide the following information for our review, if available. Plot plan/survey and legal description; site acquisition cost; most recent real estate tax bill or statement; sales history of the subject property over the past three years at a minimum; copy of your guidelines or instructions to appraisers/consultants; On site contract–name and phone number." The Work File, which was generally reconstructed due to the document destruction policy referenced hereinabove, and which was made available to the Board, included copies of original notes taken by Respondent Colleen (then McCulley) Kudrick.  Those notes included an interview with Eustace Mita, the individual who the client Carlyle Group had designated as the source of as the source of information on the project, in response to the requests in the engagement letter. The Information in those notes support McNamara's reference to only the two parcels appraised in the Original Appraisal Report. Further, the handwritten notes include the size and lot designations contained in the Original Appraisal Report, leading the appraisers to utilize those lot designators for the convenience of their client, because it was apparently the developer's designated reference for the various properties.

   23(b). Denied as to averment "… correct legal description…", because by making such an assertion, the Board ignores its own purported standards in USPAP, as there is no USPAP requirement for a "…. correct legal description…". Rather, USPAP states:

> 577 An appraiser may use any combination of a property inspection and documents,
> 578 such as a physical legal description, address, map reference, copy of a survey or
> 579 map, property sketch, or photographs, to identify the relevant characteristics of
> 580 the subject property. Identification of the real property interest appraised can be

581 based on a review of copies or summaries of title descriptions or other
582 documents that set forth any known encumbrances. The information used by an
583 appraiser to identify the property characteristics must be from sources the
584 appraiser reasonably believes are reliable.
USPAP, 2005, Standards Rule 1-2(e)(v), Lines 577-584

The Cushman Appraisers satisfied the requirement for development of the Appraisal, as to identification of the Subject Property, because they included address, map, photographs and other indicia to identify the subject property in the Cushman Original Appraisal Report. Furthermore, as previously noted, the client and only Intended User is one of, if not the most, sophisticated real estate developer and investor in the world. The Cushman Original Appraisal Report conformed to the USPAP reporting requirement:

720 Standards Rule 2-1
722 Each written or oral real property appraisal report must:
724 (b) contain sufficient information to enable the intended users of the appraisal to understand the
725 report properly; and
732 Standards Rule 2-2
755 (a) The content of a Self-Contained Appraisal Report must be consistent with the intended use
756 of the appraisal and, at a minimum:
 (iii) describe information sufficient to identify the real estate involved in the appraisal,
767 including the physical and economic property characteristics relevant to the
768 assignment;18
769 Comment: The real estate involved in the appraisal can be specified, for
770 example, by a legal description, address, map reference, copy of a survey or
771 map, property sketch and/or photographs or the like. The information can
772 include a property sketch and photographs in addition to written comments
773 about the legal, physical, and economic attributes of the real estate relevant to
774 the type and definition of value and intended use of the appraisal.
USPAP, 2005, standards Rule 2-2(a)(iii)

Accordingly, the Cushman Appraisers satisfied the USPAP requirement for developing and reporting their Original Appraisal Report.  Denied as to the averment ".... according to the detailed legal description in the property deed from the March 30, 2005 sale", as the Boards averment ignores the fact that the Hypothetical Condition, in the Cushman Original Appraisal Report, and the condition precedent

of the Engagement Letter controls the identification of the Subject Property in that Report. Denied as to

averment the March 30, 2005 deed was in the Cushman Appraiser's Original Work File. As previously

indicated herein as if stated verbatim, Cushman & Wakefield had a five-year document retention policy,

based on USPAP's Recordkeeping requirements. Because this Complaint was communicated by the

Board to the Appraisers after that five-year retention period, the Original Work File was destroyed. The

March 30, 2015 deed was placed in the reconstructed Work File on August 17, 2012 by McNamara.

Denied as to averment that the precise acreage for the"…. first parcel …. " is 2.796 acres as identified in

the March 30, 2015 deed, as that deed contains no such figure. Respondent denies the averments of this

paragraph stating the "subject property …. consisting of four municipal blocks (Blacks 700.41, 700.02,

705.01, and 705.02), and 32 total lots…" as this averment denies the fact of the Hypothetical Condition

of the Cushman Original Appraisal Report is based on the Engagement Letter in the Addendum of that

Report and Ms. Kudrick's handwritten notes in the Reconstructed Work File. Denied as to averment that

the precise acreage for the"…. second parcel …. " is 1.157 acres as identified in the March 30, 2015

deed, as that deed contains no such figure and because this averment denies the fact of the Hypothetical

Condition of the Cushman Original Appraisal Report, which is based on the Engagement Letter in the

Addendum of that Report and Ms. Kudrick's handwritten notes in the Reconstructed Work File.. Denied

as to averment that the precise acreage for the combined first and second parcels is 3.953 acres, "…or

approximately 172,200 square feet …." as identified in this paragraph of the Complaint, as the March

30, 2015 deed, as that deed contains no such figure and, even presuming the Board's averment of

acreage is correct, the Board's calculation of 172,200 is imprecise, as the correct figure is 172,192.68

square feet based on the Board's averment of a total of 3.953 acres, which in itself was rounded. In order

for Kudrick to have more precisely determined the size of the subject property, it would have been

necessary for her to utilize a recent survey prepared specifically for the Carlyle Group. From the

information available, no such survey was made available to Respondent. Another method of calculating square footage could have been to utilize a computerized "deed plotting" program, however, such programs may themselves be inaccurate and may also create an impression of the appraiser of being able to measure the size of the subject property exactly, a task for which the appraiser is not qualified by education or experience. All of which points out the misleading nature of the Board's averments in this paragraph as being attempting to be improperly precise.

        23(c). Denied as to averment the appraisal assignment included appraisal of the "…. third parcel (Block 700.02, Lots 1.04 and 1.0), which comprises of a privately-owned beach that extends 3,495 feet out to the exterior riparian grant line, with a total area of 27.27 acres, including 1.83 acres of beach above the mean high water line…" because the Cushman Original Appraisal Report Engagement Letter specifically identifies the "Property Appraised" as "The property to be appraised is two parcels located across from each other on Atlantic Avenue in Wildwood New Jersey".   Significantly, the Cushman Appraisal Report Appraisal does not include "…. the privately-owned beach …." parcel because that parcel was not included in the appraisal Engagement Letter, signed by the client May 4, 2005. This suggests that the Board was unaware of exclusion of the Beach Parcel in the subject property all throughout the course of this Disciplinary Action including, but not limited to, both the Appraisal Review and the Board's Original Appraisal Report. See, Engagement Letter, Cushman Original Appraisal Report, Addendum A. For the reasons previously stated, Respondent denies the Board's averment "…. the Appraisers were unaware of its [the Beach Parcel] inclusion in the Subject Property when they prepared the appraisal report, notwithstanding its reference in the deed to the subject property …. "Denied as to averment" …. This omission is significant …. "because the omission is not significant since the Beach Parcel was not included in the property to be appraised in the Appraisal Assignment. Respondent neither admits nor denies, but leaves the Board to its proofs, as to averment "…. private

beach ownership is an amenity that would typically be expected to enhance the value of property ....
"because, as noted in the Complaint at paragraph__, the Lower Township Zoning Board had previously
indicated the developer would need to make concessions as to public use of the beach tract, and as of the
Date of Value of the Original Appraisal Report, the developer was still negotiating with the New Jersey
Department of Environmental Protection ("NJDEP") as to the public use of the beach. As the Cushman
Appraisers and their client knew, it is NJDEP who makes the final decision on issues like granting a
CAFRA permit related to beach usage. Consequently, it is understandable the client, Carlyle Group, did
not include the beach in the appraisal assignment. Notwithstanding any reasons why the Beach Parcel
was not included in the Subject Property, the combination of the Engagement Letter and the
Hypothetical Conditions clearly exclude the Beach Parcel from the Subject Property in this Appraisal
Assignment. Admitted as to averment "...this portion of the property [the beach tract] is not referenced
anywhere in the appraisal report, including the property description, or the analysis and valuation". As
previously noted, the Beach Parcel was not included in the Subject Property or the valuation thereof, for
the reasons discussed in this paragraph, of all, as if repeated here verbatim. However, the Cushman
Original Appraisal Report references the proximity of the Subject Property to the beach on several
occasions, including, but not limited to under: "Summary of Salient Facts" (Cushman Original Appraisal
Report, Site Description at unnumbered page iv); "Nearby and Adjacent Uses", as follows "As noted,
the beach and ocean are situated adjacent to the subject property" (Cushman Original Appraisal Report,
Local Area Analysis at 13); "Site Description" as follows, "In addition, this portion of the property has
substantial beach frontage. (Cushman Original Appraisal Report, Site Description at 16); "Land
Valuation" as follows "Factors considered were barriers to entry, and proximity to the seasonal beaches
and recreational areas" (Cushman Original Appraisal Report, Site Description at 25).

      24.     Inasmuch as the Board has failed to accurately recognize an exact description of

the Subject Property, in accordance with the Appraisal Assignment Engagement Letter and the

Hypothetical Conditioners expressed in the Appraisal Report, Respondent denies the averment "…In

addition to the Appraisers' failure to accurately report an exact description of the subject properly …. ",

for the reasons stated by Kudrick in response to Complaint paragraph 23, above, as if stated here

verbatim, regarding description of the Subject Property. Denied as to averment ".… exclusion of

valuable physical and economic characteristics of the subject property from their appraisal analysis .…"

for the reasons stated by Kudrick in response to Complaint paragraph 23, as if stated here verbatim,

particularly in regard to references within the Cushman Original Appraisal Report to the relationship

between the Subject Property and the beach. Denied generally as to averment "…the appraisal report

contains numerous factual errors in the reporting and analysis of comparable sales data, namely as to

comparable sales 1 and 5 …. ". Admitted specifically as to ".… factual errors in the analysis and

reporting of the size of comparable sale 1 …. ", with the mitigating factor of the incorrect reporting of

comparable sale 1 by the reporting service, Win2Data, with the further explanation of the facts related to

that misreporting by Win2Data in paragraphs 24(a) and 24(b) included here, as if fully repeated

verbatim. Denied specifically as to averment of ".… factual errors in the analysis and reporting of

comparable sale 5 …. ".  As Ms. Kudrick testified before the Board on June 26, 2012, seven years after

the date of the Original Appraisal Report, and as indicated in the Reconstructed Work File, she verified

comparable sale 5, and the person with whom she verified that sale indicated it was their intent, upon

purchase, to demolish the existing improvements and build condominiums on the vacant site.  As we are

all aware, the "Great Recession" of 2008 had a significant impact on development throughout the world,

and specifically likely on the purchaser of comparable sales 5, as that property was not demolished but

rather rehabilitated. It doesn't matter whether the person with whom she verified comparable sales 5

changed their mind or their development plans were affected by the Great Recession, or they were not

truthful in statements to her. The fact remains that Ms. Kudrick distinctly recalls the verification

indicated the property was to be demolished.  Whether or not it was demolished when she conducted her

inspection of the comparable, or demolish afterward is not material to the valuation analysis.  As stated

by the State's own appraiser in her Appraisal Review, "The Reviewer found nothing to indicate that this

was not the information the appraisers received at the time the appraisal was prepared". Sussman

Appraisal Review, page 16. Denied as to averment "[numerous factual errors in the reporting and

analysis of comparable sales data, namely] …. as to comparable sales 1 and 5, which, collectively, have

a substantial effect on the credibility of the Appraisers' conclusions …. "because there were not

"numerous factual errors in the reporting and analysis of comparable sales 1 and 5", as noted above, in

this paragraph, as the only error was in regard to the actual size of comparable sale 1, for which there are

mitigating factors, as set forth in this Answer, and included here as if set forth verbatim, and there was

no development error as to comparable 5 and the reporting error was not material. Denied as to averment

"…. The manner in which the Appraisers analyzed those sales is described, in pertinent part, as follows

…. ", as the Board's description of the manner in which the "… Appraisers analyzed those sales…" is

not accurately described in the following subparagraphs of this paragraph of the Complaint.

24(a). Admitted as to averment "The Appraisers identified comparable sale 1 as a

$5,000,000 sale of an 8,303 square foot parcel of land in May 2005, which would reflect cost of $602.20

per square foot …. according to the deeds of those sales…. "Denied as to the averment"… which

[deeds] were included in the Appraisers' work file". Appraisers have previously admitted their belief

Comp 1 was 8,303 square feet is an error due to incorrect information in the original version of the

reporting service sale information, which had been in the Original Work File and which was destroyed

in accordance with Cushman & Wakefield document retention policy. The Reconstructed Work File

provided to the Board was not the Original Work File and the Cushman Appraisers are not certain what

was in the Original Work File.  In July 2010, the Cushman Appraisers provided the Reconstructed Work File to the Board including, but not limited to what the Cushman Appraisers reasonably believe where then-recently obtained (i.e., 2010) print-outs of the Win2Data sheets for the two sales that comprised comparable sale 1. The Cushman Appraisers reasonably believe the original Win2Data sheets only included a single lot in each of the two transactions, which the Cushman Appraisers recorded in the Cushman OAR for comparable sale one. Review of the authoritative government form "Division of Taxation, State of New Jersey, Local Property Branch, Form No. SR-1A 2-94" for each of those two transactions indicates only one lot number for each transaction, in the same manner as the Cushman Appraisers reasonably recall the Win2Data sheets for the two sales that comprised comparable sales 1. Accordingly, the Cushman Appraisers reasonably believe there was a revision in the referenced Win2Data sheets between when Ms. Kurdick researched those sales before she went to inspect the Subject Property and comparable sales in May 2005. This is a reasonable belief, because the deeds for those two sales were only recorded literally days before the beginning of this Appraisal Assignment and, in 2005, Cape May County deeds were not available online.

24(b). Kudrick neither admits nor denies the assertion that the deeds to the properties considered Comp 1"….. were included in the Appraiser's [Original] Work File", which was destroyed in accordance with the Protocol, but leaves the Board to its proofs. Kudrick denies that she should have been able to tell the size of Comp 1, by looking at the property, because Ms. Kudrick's recollection is that the verification call had indicated there was to be an assemblage and it would've been logical for her to assume, upon inspection, that the remainder of the land she was looking at was part of the assemblage.  Further, without Ms. Kudrick having the deeds, and relying on the Win2Data, it is illogical, to say the least, for the Board to suggest that she should have known comparable sale one contained a total of 49,913 ft.² in two noncontiguous parcels.  Kudrick admits "…. the Appraisers ascertained a lot

size of 8,303 square feet for that sale by relying on two data sheets from "Win2Data", a computer application available to real estate and mortgage finance professionals nationwide, that provides access to publically recorded deed and mortgage information, according to Ms. Kudrick's investigative inquiry testimony". Kudrick admits "….. These data sheets identify the parcel that sold for $4,500,000 as having 3,201.66 square feet, and the parcel that sold for $500,000 as having 5,100.876 square feet, for a total lot area of 8,302.536 square feet, rounded to 8,303 square feet, and resulting in a price per square foot of $602.20, as reported in the appraisal and utilized in the analysis….". Respondent's discussion of the circumstances surrounding the Win2Data comparable one sale sheets is included here from paragraph 24(b), as if repeated verbatim. Kudrick neither admits nor denies the assertion "….instead of an accurate amount of $100.17 per square foot", but instead leaves the Board to its proofs.

24(c). Kudrick denies the averment the Cushman Appraisers "…. falsely reported …." Comparable Sale 5, as they have testified, regarding the statement in their Appraisal that "…. the former Summer Sands Motel, which was demolished for redevelopment with condominiums" should have read ….it was to be demolished…." (T-CK-36) As Ms. Kudrick also testified, "I was told that intent was to demolish the hotel for redevelopment with condominiums similar to the subject." (T-CK-36). As a result of the verification information obtained by Ms. Kudrick, the Cushman Appraisers properly analyzed this sale as a land sale, for the reasons also set forth in paragraph 42 of Count IV of this Answer including, but not limited to the Board's Appraiser's own statement he believes the verification of that Comparable Sale could have reasonably indicated the property was to be demolished and redeveloped as condominiums. (Sussman Appraisal Review at 16) Admitted as to the averment the Appraisers reported Comparable Sale 5 " ….. as a 35,837-square foot land sale for "the site of the former Summer Sands Motel" for $7,500,000 in November 2004, which reflected a value of $209.28 per square feet of vacant land area". Admitted only as to the averment that the Cushman Appraisal stated "…. that the Summer

Sands Motel had been "demolished for redevelopment with condominiums." As previously stated

herein, the Appraisal should have read "….it was to be demolished…." (T-CK-36)  As Ms. Kudrick also

testified, "I was told that intent was to demolish the hotel for redevelopment with condominiums similar

to the subject." (T-CK-36). Admitted as to averment. "In actuality, the Summer Sands Motel was not

demolished, but physically existed at the time of the appraisal report….".  in regard to verification of

this sale and demolition of the improvements at comparable sale 5, respondent repeats reference to the

Board Appraisers own statement regarding such, above, as if stated here verbatim. Kudrick neither

admits nor denies the averment the Summer Sands Motel "was converted to condominiums in October

2005…."", but leaves the Board to its proofs. Kudrick denies the averment "the fact that the Summer

Sands Motel was not demolished undermines the reliability of this sale as an indication of land value

alone", because when the Cushman Appraisers conducted their "back of the envelope reasonableness

check internally"(CK T-51, L13-14), the sale price per unit for comparable sale 5, unadjusted, would

have been approximately $312,000, assuming 24 units (rounded) at 1500 ft.$^2$ per unit (which 1500 ft.$^2$

would have been derived from comparable sale 2, the closest in size to comparable sales 5). It is worth

noting that the unadjusted "back of the envelope" sale price per unit for comparable sale 2 would have

been over $285,000.

25.     Kudrick denies the averment "Respondent's conduct, as described above,

constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of

negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d)

violations of the statutes and regulations administered by the Board, including, but not limited to,

N.J.A.C. 13:40A-6.l(a), N.J.A.C. _13:40A-6.l(b), USPAP 1-l(b), USPAP 1-l(c), and USPAP 2-2(a)(iii)",

for the reasons herein stated, in Respondents Answer to this Count, and as otherwise indicated in this

Answer, as if fully repeated verbatim herein and because the Board's allegations of such violations are

not supported by law or regulation. Kudrick denies the averment "Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), *as* well as NJ.AC. 13:40A-7.9(d)(2), (4), (5), and (8)", for the reasons herein stated, in Respondents Answer to this Count, and as otherwise indicated in this Answer, as if fully repeated verbatim here and because the Board's allegations of such violations are not supported by law or regulation.

## COUNT II

26.    Kudrick repeats her responses to the Board's General Allegations and the allegations of Count One above as if fully set forth verbatim herein.

27.    Kudrick generally admits the averment "Pursuant to USPAP 2-2(a)(ix), an appraisal must describe the information analyzed, the appraisal procedures followed, and the reasoning that supports the analyses and opinions, and conclusions", but specifically denies that averment because of its failure to include that Standards Rule's related Comment:

> Comment: The appraiser must be certain the information provided is sufficient for the client and intended users to adequately understand the rationale for the opinion and conclusions, including reconciliation of the data and approaches, in accordance with Standards Rule 1-6.

In keeping with the Comment to Standards Rule 2-2(a)(ix), Kudrick specifically denies the averment "...Although the appraisal report here documents information analyzed, appraisal procedures followed, and adjustments made to comparable sales, there is insufficient information provided to enable the intended user to adequately understand the rationale for the adjustments, and the resulting opinions and conclusions...", in particular, because the Board is well aware the Client and only Intended User raised no questions regarding the appraisal, and the Board is well aware the Consumer Complaint filed May 25, 2010 was not filed by the Client, but rather the Board has made this assertion without justification or

support, and further because of the fact that, if Respondent is found in violation of this Standards Rule, then the Board's own expert must also be found in violation as he has provided an even lesser degree of explanation of adjustments and conclusions so "…there is insufficient information provided to enable the intended user to adequately understand the rationale for the adjustments, and the resulting opinions and conclusions…". See, Sussman Original Appraisal Report, dated November 2, 2016.  Kudrick denies the averment "Specifically, the analysis and adjustments made to the comparable sales data contain inconsistencies, apparent contradictions, and adjustments made without discussion or explanation of the reasoning that supports the adjustments", as follows. First, Kudrick denies this averment because the Board, and its expert, have inappropriately chosen to ignore the Appraisal's Hypothetical Conditions, as stated in the Appraisal Report, and have instead chosen to categorize their misreading as errors of "…. inconsistencies, apparent contradictions…." on the part of Respondent. Second, Kudrick denies this averment because the Board's own expert, has prepared an appraisal report with the same, or with an even lesser, level of "…. discussion or explanation of the reasoning that supports the adjustments" and therefore Board's own expert's appraisal report is either similarly deficient or both the Cushman Appraisal and the Board's expert appraisal both have sufficient "…. discussion or explanation of the reasoning that supports the adjustments". Kudrick denies the averment "This series of errors in analysis, in addition to the aforementioned factual errors regarding the description of the subject property and comparable sales 1 and 5, in the aggregate, further establish that Respondent and Ms. Kudrick rendered their appraisal services in a careless or negligent manner, in violation of USPAP 1-l(c)". Kudrick denies that averment for the reasons set forth above in this paragraph, as if fully repeated verbatim herein. Kudrick specifically denies the Board's averment because said averment is even more non-specific and unsupported than the violations of which the Board has accused Respondent. Further, that while mistakes may have been made, there is no such thing as an appraisal report without mistakes, as can be

seen in both the Appraisal Review Report and Original Appraisal Report prepared by the Board's Appraiser. There is a significant level of subjectivity involved in reaching such a conclusion, but first, any such mistakes do not give rise to acts of negligence or incompetence, unless such mistakes are part of a pattern that discloses a bias with aforesaid intent to come in with a "low number," or a biased conclusion, as Respondent believes is evident in the Board Appraiser's Appraisal Review and Original Appraisal Report, and which bias is prohibited by USPAP Standards Rule 1-2(b) Comment, stating "An appraiser must not allow a client's objectives or intended use to cause an analysis to be biased."

Although there were some mistakes contained in the comparable sales data reported, the State's appraiser jumps to certain conclusions, apparently without considering relevant information known by the State. For example, as stated earlier, the Work File provided to the State was reconstructed because the original file had been destroyed in accordance with the Cushman's records retention Protocol, which conforms to USPAP. The Win2Data printout sheets referenced by the State's appraiser are not the original sheets that the C & W appraisers relied upon. The sheets provided to the State contain the data reported five years later. Because the authoritative government document, upon which the Win2Data is based contains the same information utilized by the Cushman appraisers, it is reasonable to believe that the original sheets reported incorrect information (which is not uncommon with 3rd party data providers). Therefore, the State has the burden of proving that the C & W appraisers disregarded the additional lots. Further, the Board and their expert ignored the Hypothetical Condition of the Cushman Appraisal, which addresses the Subject Property identification issue, the fact that the Beach Parcel was not appraised, along with the fact that the Hypothetical Condition presumes development as proposed, which does not require either extensive proof or analysis of existing approvals.   The Board appraiser made adjustments to all of the comparables he used, which did not require demolition, thus ignoring the Hypothetical Condition that the Subject Property was being appraised as if vacant land. Further, the

Board expert, like the Board, ignores the fact that the Subject Property can be developed to a higher intensity than any of the comparable sales used by the Board Appraiser. There are simply too many coincidental similarities between the Board expert's Appraisal Reports (in both her Appraisal Review and her Original Appraisal Report) and the previously expressed positions of the Board. It is difficult to believe that the Board did not provide the Board expert with their preconceived conclusions, which appear to have included documents related to settlement discussions, which she then adopted into her Appraisal reports. In other words, the Board did not obtain an independent, unbiased analysis of the Cushman Appraisal in this matter. On the contrary, the Board Expert appears to have created a directed report.  At the least, Board's expert did not support her adjustments, and made numerous errors, i.e., the same types of purported appraisal standards violations, of which the Board has accused the Cushman Appraisers.

Kudrick admits to the averment that an error was made in the reporting and analysis of Comparable Sale 1, but denies the error was material in regard to the indication of value in the Appraisal Report. Kudrick admits as to the averment that there was an error in determining the size of Comparable Sale 1, and that error led to an indicated sale price per square foot of $602.20. Kudrick neither admits nor denies as to the averment of the "…. actual sale value of $100.17 per square feet…", but leaves the Board to its proofs. Kudrick neither admits nor denies the error was "…. carried throughout the analysis and adjustments and led to an erroneous adjusted unit value of that sale of $430.36 per square feet ….", but leaves the Board to its proofs. Kudrick points out that her "back of the envelope" analysis on a per unit basis would have indicated a sales price per dwelling unit of $200,000 for comparable sale one, taking into account the entire site, and $281,250 considering just the land purchase for demolition and redevelopment of the 16 condo units at that property. Kudrick admits "….[t]he other four [comparable] sales were adjusted upward 65 to 70 percent ….", but Kudrick denies the averment that such

adjustments were "....based on this error ...." Kudrick admits the averment that adjustments to the other

four sales "....result[ed] in adjusted unit values of $322.26 to $364.38 per square foot. Kudrick admits

the averment "Based on these adjustments, the average adjusted unit price was calculated to be $366.17

per square foot, resulting in a concluded market value opinion for the subject property at $375 per

square feet, or $65,300,000".

       28.     Kudrick denies the averment ".... substantial errors made in the reporting and

analysis of comparable sale 1....", as there was one error in the reporting service information regarding

the total size of Comparable 1 and the subsequent analysis was part and parcel of that one error which

was mitigated by the circumstances described in paragraph 24(a) and (b) as if fully repeated here

verbatim. Kudrick denies the averment ".... the Appraisers made several adjustments to comparable

sales data, without supporting discussion or explanation.... ", as the Appraisers' supporting discussion

and explanation was appropriate given the Intended Use and the Intended User in this Appraisal

Assignment, and further, if the Cushman Appraisers' violated USPAP with their supporting discussion

and explanation of adjustments, then the Board's Appraiser did so as well, as the Board's expert did not

provide supporting discussion and explanation of adjustments to a higher degree of specificity than those

of the Cushman Appraisers. See, Sussman Original Appraisal Report, dated November 2, 2016. Kudrick

denies the averment ".... that [the supporting discussion an explanation of adjustments by the Cushman

Appraisers] were either inconsistent or contradictory", as the Cushman Appraisers had difficulty

responding to the aggressive questioning in their testimony before the Board because: 1) the Original

Work File for the Appraisal Assignment have been destroyed in accordance with Cushman &

Wakefield's document destruction policy; 2) the extended time between when the Appraisers conducted

the Appraisal Assignment, and their Statement under Oath on June 26, 2012, resulted in the Cushman

Appraisers inability to recall their actions in an appraisal assignment over seven years before that

appearance; 3) neither Mr. McNamara nor Ms. Kudrick were litigation appraisers and they were not familiar with the aggressive questioning they faced from the Board. In fact the adjustments to comparable sales data were not either inconsistent or contradictory because those adjustments are logical when the facts of the Subject Property and the comparable sales are considered without preconceived notions or bias, as further discussed in the sub-paragraphs to this paragraph, below.  Respondent denies "[t]he manner in which the [Cushman] Appraisers inaccurately or insufficiently analyzed adjustments to comparable sales data is described, in part, as follows....".  First, the Cushman Appraisers did not inaccurately or insufficiently analyze adjustments to comparable sales data, for the reasons set forth above, in this paragraph, in this Count, and in this Answer, as if fully repeated here verbatim. Second, the following subparts of this paragraph do not indicate such inaccurate or insufficient analysis of adjustments to comparable sales data, but rather reveal an unjustified bias on the part of the Board and the Board's Appraiser.

29(a). Kudrick admits the averment "The Appraisers supplied a downward adjustment of 25 percent to comparable sale 1 for a "Motivated Buyer," who they described as an "adjacent property owner . . . motivated to acquire that particular tract of land for proposed development". Kudrick denies the averment .... "However, the Appraisers give no discussion or reference to the source of this information to support the adjustment", because the information presented in the Cushman Appraisal was appropriate given the Intended Use and Intended User in that Appraisal Assignment. In the Cushman Appraiser's testimony before the Board, they admittedly had difficulty recalling information in response to the Board's questions because: 1) the Original Work File for the Appraisal Assignment have been destroyed in accordance with Cushman & Wakefield's document destruction policy, and therefore, the Cushman Appraisers did not have their actual Original Work File available to refresh their recollection regarding the facts of the Appraisal Assignment pertaining to "... the source of this

information to support the adjustment"; 2) the extended time between when the Appraisers conducted

the Appraisal Assignment, and their Statement under Oath on June 26, 2012, coupled with the

destruction of the Original Work File, resulted in the Cushman Appraisers inability to recall their actions

in an appraisal assignment over seven years before that appearance; 3) 3) neither Mr. McNamara nor

Ms. Kudrick were litigation appraisers and they were not familiar with the aggressive questioning they

faced from the Board.  The 25%adjustment to Comparable Sale 1 for "Motivated Buyer" was

appropriate given Ms. Kudrick's research at the time of the Appraisal Assignment, which included

verification of the sale with a party to the transaction.  In that confirmation discussion, Ms. Kudrick

recalls that party indicating these sales were part of an assemblage. Based on information obtained in

verification of comparable sale one that it was part of an assemblage, and given the reporting from

Win2Data as to the size of that sale as previously referenced, the Cushman Appraisers logically

concluded a downward adjustment for a "Motivated Buyer".

     29(b). Kudrick admits the averment "…. The Appraisers also asserted, in a section

titled "Discussion of Adjustments", that "an annual adjustment of 3.00 percent" was applied to

account for market changes between comparable sales dates of November 2004 to May 2005.

However, in the "LAND SALE ADJUSTMENT GRID" the Appraisers actually applied a five

percent adjustment for "annual change in market conditions" in their calculations". Respondent

admits the averment "…. Moreover, the Appraisers also both acknowledged, during their

appearances before the Board, that even a five percent adjustment was inconsistent with the

significant appreciation of value in the local market in early 2005", however Respondent denies the

implication, as indicated above, in this section of the Complaint that the Cushman Appraisers'

analyses were inconsistent and/or contradictory, as we now know, with the benefit of hindsight, that

almost at the exact time of this Appraisal Assignment, the market had peaked in what we now call

"The Bubble". While some residential prices were still growing, many market participants anticipated a correction in the not-too-distant future, but most did not envision the precipitous decline in prices, extended marketing time, and the little supply of debt capital that was soon to come.. At the peak of the market, which the Cushman Appraisers faced in May 2005, it is impossible for even the buyers and sellers of that time, to ascertain whether they took into account the subsequently unprojected "Hot market" when entering into a contingent Contract of Sale, as was the case with the Cushman Appraisers comparable sales and with the Board's Appraiser's comparable sales. The 3% figure in the narrative of the Cushman Appraisal was obviously a typographical error, which was not material, because the actual analysis used 5%. In their Statement under Oath before the Board, Cushman Appraisers agreed in retrospect that perhaps the 5% was insufficient, but that was their professional opinion, and a conservative one, at the time of the Appraisal Assignment.  Both the Board's and the Cushman Appraisers ruminations on June 26, 2012 were merely educated hindsight.

29(c). Kudrick admits the averment "....In terms of location adjustments, all of the comparable sales, which were all located to the north in Wildwood Crest, were considered inferior to the subject property, and were accordingly adjusted upward between 5 and 10 percent". As Ms. Kudrick explained in her Statement under Oath, she did not recall the reason for those adjustments, due to the amount of time (over seven years) that had passed between the Appraisal Assignment and her testimony before the Board (Kudrick T-45, L23, T-46, L 1) and the Original Work File had been destroyed as per the Protocol. In addition, as a non-litigation appraiser, Respondent was surprised by the aggressive questioning by the Board.

Subsequent to her testimony, and without being under the pressure of having questions fired at her by the Board, Ms. Kudrick had an opportunity to review the report, and her

testimony. She wishes to supplement her testimony on pages 45 to 46, as she is concerned the

questioning by the Board members implied the location adjustment was due to proximity to the

beach. Instead, Ms. Kudrick believes that the location adjustment was made based on proximity

to Diamond Beach, at the southern end of Wildwood Crest. Diamond Beach is much more

prestigious then Wildwood City, which abuts Wildwood Crest to the north. Ms. Kudrick made

only 5% adjustments for location to comparable sales 1 and 5 because they were closer to

Diamond Beach. She made a 10% locational adjustment to comparable sales 2, 3, and 4, because

they were farther away from Diamond Beach, and thus closer to Wildwood City.

Kudrick denies the averment "….However, Wildwood Crest is generally recognized,

in the Cape May County real estate market, as a more desirable location than Lower Township, and

therefore downward adjustments, rather than upward adjustments would be expected". As the

Board's Appraiser himself indicated, there is no quantifiable markets response to such an allegation,

> "Although the market generally recognizes Wildwood Crest as more
> desirable than Lower Township, the Diamond Beach section is viewed as
> comparable to Wildwood Crest and no location adjustment for Diamond
> Beach as compared to Wildwood Crest is warranted." Sussman Original
> Appraisal Report at 44.

As the Board Appraiser points out in her Original Appraisal Report, the Diamond Beach section of

Lower Township is greatly distinct from the remainder of that Township. Unfortunately for the

Boards' Appraiser, it appears as if his Original Appraisal Report reflected his own opinion, while his

Appraisal Review of the Cushman Original Appraisal Report reflected that of the Board:

> The Diamond Beach section of Lower Township where the subject property
> is located is more similar to Wildwood Crest than it is to the rest of Lower
> Township, and the selection of comparable sales in Wildwood Crest is
> justified. However, the market generally recognizes Wildwood Crest as
> more desirable than Lower Township, so if any adjustments for location
> were to be made at all, they would be expected to be downward adjustments

instead of the upward adjustments that were applied.  Sussman Appraisal
Review dated November 2, 2016.

Kudrick denies the averment, contained in footnote 11, stating "The Appraisers, in a section titled

"Local Area. Characteristics", described the Wildwood area as having greater attractions than the

subject property's location in Diamond Beach, including a "World Famous Boardwalk, with five

amusement piers, over 150 rides, two water parks, movie theaters, fireworks, hundreds of specialty

shops, and a variety of restaurants ... [and] the Wildwood Convention Center [which] offers a wide

variety of special events and activities year-round".  It is beyond misleading for the Board to suggest

that Wildwood Crest property, a few blocks away from the Subject Property, is more desirable

because it's closer to the rides on the Wildwood boardwalk. That is particularly so when the

averment at footnote 11 purportedly relates back to the Board's unsupported, and misleading,

assertion that ".... Wildwood Crest is generally recognized, in the Cape May County real estate

market, as a more desirable location than Lower Township...", when, the Boards own Appraiser did

not agree with that averment in his Original Appraisal Report.

29 (d). Kudrick admits to the averment ".... Although the subject property was

reported to include 174,196 square feet, and the comparable sales' lot sizes ranged from 8,303 to

35,837 square feet, the Appraisers make a uniform, upward 25 percent size adjustment to all of the

comparable sales....". Kudrick denies the averment such adjustments were made "....without

providing supporting details for each adjustment and how the adjustment relates to the respective

comparable sale lot sizes".

Respondent admits the averment"... The appraisers make a uniform, upward 25%

adjustment to all the comparable sales ....", because ".... [larger parcels] ... typically sell at a higher

unit price than a smaller site…". Cushman OAR p.25. This is because larger parcels provide greater

Floor to Area Ratios (FAR), cost allocation (which spread fixed costs, i.e., approvals, over a greater

number of units), site utilization, etc. The larger parcel of the Subject Property has a size advantage,

which makes it superior in regards to its potential "intensity of development".  In Diamond Beach, a

lot in excess of 25,600 ft.² has a by-right height of six floors. The subject parcel was proposed for

development, under the Hypothetical Condition of 12 stories, in large part because of its nature as a 4

acre site.  Therefore, when comparing the comparables to the subject, it is necessary to take into

account the additional investment opportunities afforded by the much larger parcel.

Respondent denies the averment "….without providing supporting details for each

adjustment and how the adjustment relates to the respective comparable sale lot sizes…". The issues

and analysis of the adjustments for the lot size were referenced in the Cushman Appraisal, as

indicated in the preceding paragraph as if repeated here verbatim, to the satisfaction of the Client and

only Intended User, the Carlyle Group. As one of the most sophisticated real estate developers and

investors in the world the Carlisle Group obviously preferred to purchase the former "Grand Hotel at

Wildwood Crest" site, with a total of 4 acres on which they could reasonably propose to build 188

units, instead of even a one acre site in Wildwood Crest, where they could build between 16 and 25

units. The Subject Property, as proposed for development of 188 units would have 927 ft.² of land

area to each proposed dwelling unit. The vacant land area of comparable sale one (site of the 16 units

that were ultimately developed there) had 2801 ft.² of land area per dwelling unit. Comparable was at

1524 ft.² of land area per dwelling unit. Comparable sales three and four each had 1042 ft.² per

dwelling unit. Comparable sale five, under the verification information that it was to be torn down

and redeveloped as condos could reasonably have been expected to have approximately 1500 ft.² land

area for dwelling unit, under typical land use regulations.

Kudrick admits the averment "….the Appraisers offer the conclusion, in the 'Discussion of Adjustments' section, that 'larger parcels of land situated within a barrier island beach community will typically sell at a higher unit price than a smaller site… [due to a] scarcity of larger sites available for development' in 'established seasonal beach communities'."

Kudrick denies as to the averment "….However, this conclusion is contradicted by the Appraisers' erroneous data Specifically, comparable sale 1 was incorrectly noted to be the smallest lot, containing 8,303 square feet, but had the highest unit price at $602.20 per square feet. Yet, the Appraisers fail to identify this apparent contradiction, let alone reconcile it with their prior conclusion regarding the relationship between unit price and lot size in seasonal beach communities", because: 1) the Cushman Appraisers have recognized the reporting error in the secondary reporting data utilized in the Appraisal Assignment, but have also pointed out the error does not affect the final value estimate, or the averment regarding the utility of a larger site for development; 2) the parcels in comparable sale 1 were erroneously reported by Win2Data, as set forth in Count I, paragraphs 24(a) and 24(b), and included here , as if fully repeated verbatim; 3) as part of a reported assemblage, as Ms. Kudrick recalls from her verification call, the high dollar value per square foot of the sale, as reported by Win2Data, supports the Cushman Appraisers' belief that a larger site has greater value than a smaller one because an assemblage buyer often pays a higher price per square foot for a smaller lot in order to achieve the greeter utility of a larger parcel through the assemblage process.

29(e). Kudrick admits as to the averment "…. The Appraisers also …. concluded that comparable sales 2 through 5 were inferior to the subject property in terms of "utility" and provided a uniform, upward adjustment of those sales of 35 percent". Kudrick denies as to the averment that

such conclusion was made "summarily", for the reasons that follow in this subparagraph. Kudrick denies as to the averment "….The appraisal report includes no discussion explaining the rationale for such a substantial utility adjustment, other than describing those properties as having an "average utility", …… compared to the subject property. The Cushman Appraisal describes the "Utility" adjustment reasoning as follows: "The subject parcel is adequately shaped to accommodate a typical building, and it has good access, frontage and visibility. When a comparable was considered to have superior or inferior utility, the appropriate adjustment was made". Cushman OAR, p.26. The Subject Property had been discussed in the highest and best use analysis as follows: "…a more intensive plan of multi-family development is recommended". The highest and best use of the Cushman Appraisal is redevelopment of the site, as proposed. Cushman OAR P.21. The Cushman appraisal also stated "...utility [is] adjusted for differences which exist…" p.22.  There is no question that the Subject Property has direct access to the beach. None of the comparable properties have such direct access. There is a saying at the Jersey Shore "if you're not beachfront then you may as well be in Iowa". That colloquialism is manifested in the second house in from the beach being significantly (estimated 25%) less than the house that is on a beachfront lot. At the Grand, parents can sit on the private beach, and tell their children it's okay to go up to the room to get their iPad, book, etc., which worrying about the kids crossing a road, or having to walk to a condo unit two blocks away. Frontage and access were referenced in the Cushman Appraisal, and these factors resulted in the +35% adjustment to those comparable sales not fronting directly on the beach. In order to not imply incorrect degree of precision in regard to consumer tastes, the Cushman Appraisers used across the board 35% utility adjustment for comparable sales 2 through 5. Kudrick denies as to the averment that such " 'average utility', was *presumably* [emphasis added by Respondent] compared to the

subject property." It is clear from a plain reading of the Cushman Appraisal Report that the

comparables were being compared to the subject property, and there is no need to presume such from

a plain reading. Finally, in regard to the last sentence in this subparagraph 29(e), Respondent admits

the averment that comparable sale 1 was in close proximity to comparable sale five, but comparable

sale one "…. was deemed by the Cushman Appraisers to have superior utility to the subject property

…." which "…. was adjusted downward 25 percent", to the extent the allegations are not inconsistent

with the document referenced, in that such document is a writing which speaks for itself.  Respondent

denies the averment that the utility adjustment to comparable sale one had "… No clear factual

support…", as the Board is well aware that the Original Work File had been destroyed at the end of

the Cushman five-year retention policy period. In addition to the unavailability of the Original Work

File, over seven years had gone by between the date of the Appraisal Assignment and the Cushman

Appraisers testimony before the Board. Notwithstanding those facts, Respondent reasonably believes

the Original Work File would have contained information supporting Ms. Kudrick's verification call

with the party to the comparable sale one transaction. As noted in paragraphs 24(a) and (b) of Count

I, which is repeated here as if set forth verbatim, Ms. Kudrick was advised in that verification that

comparable sale one was part of an assemblage and the Cushman Appraisers reasonably believe

(even with now 12 years since the Appraisal Assignment) that the Original Work File contained

notes from that verification call which provided reasoning for the utility adjustment to comparable

sale 1.

    29(f). Kudrick denies the averment "… the appraisal report also contains no

discussion analysis or adjustments made regarding the status approvals of the subject property and

the comparable sales."  As to the subject property, the Cushman Appraisal clearly indicates it was

performed under the "Hypothetical Condition" that the property is to be appraised as proposed, as

"The Grand Condominiums and Spa".  The Engagement Letter creates the Hypothetical Condition of

development of 125 units on the beachfront parcel and 63 units on the non-beachfront parcel. As to

the comparable sales, the Cushman Appraisal indicates the approval of specific proposed

development in the "Discussion of Comparable Sales." The Cushman Appraisers indicated in their

testimony they would have confirmed those sales with participants to the transactions. It was

standard operating procedure for the Cushman Appraisers to have asked questions about

development approvals in the verification process. However as previously noted, the Original Work

File was destroyed after the retention period required by USPAP and it was over seven years after the

Appraisal Assignment when the Cushman Appraisers appeared and testified before the Board. As a

result, in Ms. Kudrick's testimony before the Board on June 26, 2012, Ms. Kudrick was reasonably

unable to specifically identify the specific verification tasks performed in this appraisal, but was able

to affirm their standard procedure. (Kudrick T-26, L 24; Kudrick T-30, L 18; Kudrick T-33, L 7-9;

Kudrick T-34, L 6-8). Kudrick admits the averment ".... This [regarding the above discussion on

property selling with approvals] is a factor that warrants consideration in the valuation of land due to

the time and cost involved in obtaining approvals. Whether a property sold with or without

approvals, or was purchased subject to the buyer obtaining approvals, typically has an impact on the

price paid" and that the Cushman Appraisers took such comparable sale approvals into account in

their analyses. However, as previously noted, the Original Work File was destroyed in accordance

with Cushman file retention Protocol, which was based on the USPAP file retention policy, and when

the Appraisers testified before the Board, it was over seven years since they had conducted the

Appraisal Assignment. As a result of the aforesaid, Kudrick denies the averment "....However, the

Appraisers gave no consideration to this factor in their analysis of the comparable sales".

29.    Kudrick denies the averment "…. The Respondent's conduct, as described above, constitutes: (a) the use  or  employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations  administered  by the Board, including, but  not limited  to, <u>N.J.A.C.</u> 13:40A-6.l(a), <u>NJ.AC.</u> 13:40A-6.l(b), USPAP 1-l(c), and USPAP 2-2(a)(ix) ), for the reasons previously set forth in this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are not supported by law or regulation.

Kudrick specifically denies the averment that her "…. conduct, as described above constitutes … violations of …… <u>N.J.A.C.</u> 13:40A-6.l(a), <u>NJ.AC.</u> 13:40A-6.l(b)…. ", for the reasons previously set forth in this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are not supported by New Jersey law or regulation. Kudrick specifically denies the averment that her "…. conduct, as described above constitutes … violations of …… USPAP 1-l(c)…. "", for the reasons previously set forth in this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are not supported by New Jersey law or regulation. Kudrick specifically denies the averment that her "…. conduct, as described above constitutes … violations of …… USPAP 2-2(a)(ix)…. "", for the reasons previously set forth in this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are not supported by New Jersey law or regulation.

Kudrick denies the averment that any of the above referenced conduct by him in this Appraisal Assignment "…. thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to <u>N.J.S.A.</u> 45:1-21 (b), (d), (e), and

(h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8) ", for the reasons previously set forth in

this paragraph, as if repeated here verbatim and because the Board's allegations of such violations are

not supported by or regulation.

## COUNT III

30.     Kudrick repeats her responses to the Board's General Allegations and the

allegations of Count One and Count II above as if fully set forth verbatim herein.

31.     Kudrick admits the averment "Pursuant to USPAP 1-5(b), in developing a real

property appraisal, when the value opinion to be developed is market value, an appraiser must analyze

all sales of the subject property that occurred within three years prior *to* the effective date of the

appraisal".

Kudrick generally admits the averment "….USPAP 2- 2(a)(ix) further requires that, when

reporting an opinion of market value, a summary of the results of the analysis of the subject sales, in

accordance with USPAP 1-5 is required, and if such information is unobtainable, a statement on the

efforts undertaken by the appraiser to obtain the information is required, or if such information is

irrelevant, a statement acknowledging the existence of the information and citing its lack of relevance is

required". Kudrick specifically denies the averment "Moreover…" at the beginning of the Complaint's

sentence referencing USPAP 2- 2(a)(ix), because that averment improperly implies the provisions of

Standards Rule 2 override the provisions of Standards Rule 1, and that is not so, as the appraisal

development standards of Standards Rule 1 create the basis for the appraisal reporting standards of

Standards Rule 2. In this Appraisal Assignment: 1) the Original Work File for the Appraisal Assignment

have been destroyed in accordance with Cushman & Wakefield's document destruction Protocol, which

is based on USPAP; 2) the extended time between when the Cushman Appraisers conducted the

Appraisal Assignment, and their testimony before the Board on June 23, 2012, resulted in the Cushman

Appraisers inability to recall their actions in the Appraisal Assignment over seven years before that appearance; 3) in fact the narrative comments on page 30 of the Cushman OAR are in keeping with the level of detail in the examples provided in USPAP 2005, Advisory Opinion 1. USPAP 2005, pp. 125 to 127.

32.     Kudrick generally denies the averment "Notwithstanding the extraordinary difference between the $18,000,000 sale price of the subject property less than two months before the appraisal report's value date and the Appraisers' market value conclusion of $65,300,000, the appraisal report lacks any analysis of this implausible leap in value that would assist the intended user in properly understanding this conclusion", for the reasons that follow. In fact, the property was placed under agreement approximately two (2) years before by a deed recorded April 6, 2005, for a consideration of $18,000,000, when that transaction went under contact, there were no "…. development approvals in place" and the developer and then-current owner had taken the Property through the land use development process. While non-beachfront Parcel 2 did not have all approvals at the time of the prior sale, the settlement agreement with the adjoining condominium association owners effectively cleared any impediments to approval, as borne out in the 2007 approval for development of that site. Therefore, the effective "meeting of the minds", in the transaction for the prior sale of the Property did not take place "… less than two months before the appraisal reports value date and the Cushman Appraisers market value conclusion of $65,300,000". As a result, it is misleading for the State's Complaint to make that averment, particularly with the Board's knowledge that such "meeting of the minds" took place approximately 2 years before the actual sale date. In the Cushman Appraisal, Kudrick goes on to indicate the following in her analysis of the prior sale of the Subject Property:

> In addition, we would note that in 2002, the Grand Hotel of Wildwood Crest
> was sued by the State of New Jersey for allegedly misleading consumers
> through advertisements that falsely depicted the hotel's facilities as clean
> and luxurious even though it was in a serious state of disrepair and had been

fined for fire code violations. The improvements were in very poor condition and the seller was considered to be motivated to achieve a quick sale After considering seller motivation, time, costs incurred, entrepreneurial incentive, and improved market conditions in the subject area, in our opinion the foregoing conclusion is reasonable and market oriented.

Cushman OAR at p.30

Kudrick provided the above analysis in explanation of why there was a difference between the $18 million meeting of the minds sale in 2003 and the recorded deed in 2005 indicating that sale did not meet the requisite conditions of a market value sale.

Kudrick specifically denies the averment that the Cushman Appraisers did not conduct a proper USPAP Standards 1 development analysis of the prior sale of the Subject Property, as the appraisal development standards of Standards Rule 1 create the basis for the appraisal reporting standards of Standards Rule 2. In this Appraisal Assignment: 1) the Original Work File for the Appraisal Assignment have been destroyed in accordance with Cushman & Wakefield's document destruction policy; 2) the extended time between when the Appraisers conducted the Appraisal Assignment, and the Cushman Appraisers were unable to recall their actions in an appraisal assignment over seven years before their Statement under Oath on June 26, 2012 ; 3) in fact the narrative comments by Kudrick on page 30 of the Cushman OAR are in keeping with the level of detail in the examples provided in USPAP 2005, Advisory Opinion 1. USPAP 2005, pp. 125 to 127.

Based on the above, Kudrick specifically denies the averment "Notwithstanding the extraordinary difference between the $18 million sale price of the subject property less than two months before the appraisal reports value date and the appraisers market value conclusion of 6 million $65,300,000".

Kudrick specifically denies the averment "Alternatively, the Appraisers give no explanation as to why an analysis of the sale of the subject property, less than two months prior to their

appraisal, was irrelevant to their overall market value conclusions", for the reasons set forth above in this paragraph and in Kudrick's preceding answer to Count III, paragraph 32 of the Complaint.

33.     Kudrick specifically denies the averment "To begin with, the sale of the subject property for $18,000,000 is referenced in the appraisal report only twice, and both times with the date of sale incorrectly identified as April 6, 2005". There is only one reference in the Cushman OAR to April 6, 2005, in the "Introduction", under "Sales History", as follows:

> "The property was purchased by the current owner from Diamond Beach Resort, LLC on April 6, 2005 for a recorded consideration of $18,000,000. This is recorded as Deed Book 3147, Page 8."

The above sentence does not constitute an "incorrect identify[cation]" of the prior sale of the subject property, as it identifies the transaction referenced by the recording date, and any ambiguities as to the distinction between the deed date and the recording date are not only minor, as there was only a six day delay, but such ambiguities would be construed in favor of Kudrick. Given that minimal time frame, it would be improper to split hairs over the legal distinction between the deed date and recording date, particularly given the language in the Cushman OAR. Most significantly, the Board once again ignores the fact that the Cushman OAR was written for the Carlyle Group, which is not only one of the most sophisticated real estate developers and investors in the world, but was either a co-developer or equity partner with the purchaser of the Subject Property.  Based on the inappropriate nature of the State's Complaint in the averments referenced in this paragraph, those averments are false assertions and should be stricken from the Complaint.

Kudrick denies the averment "The appraisal report also lacks reference to, or analysis of, the April 2003 Agreement of Sale and the two-year period between the formation of the contract and the actual sale of March 30, 2005 in the "RECONCILIATION AND FINAL VALUE OPINION" section ("Reconciliation") of the appraisal report". As to Kudrick's denial of the averment "The appraisal report

also lacks reference to ……. the April 2003 Agreement of Sale….", the Cushman OAR states: "At the time the property was placed under agreement of sale ….". As to Kudrick's denial of the averment "The appraisal report also lacks …. analysis of the April 2003 Agreement of Sale….", because the Cushman OAR includes the following analysis of the April 2005 recorded sale:

- "…. there were no development approvals in place …." (indicating the Agreement of Sale did not include development approvals).

- "…. Current ownership has taken the property through the zoning process, and has obtained preliminary development approvals …." (indicating the Agreement of Sale did not hold the seller responsible for obtaining development approvals);

- "…in 2002, the Grand Hotel of Wildwood Crest was sued by the State of New Jersey for allegedly misleading consumers through advertisements that falsely depicted the hotel's facilities…." (indicating the Agreement of Sale was not at Market Value (see further discussion below) as there was regulatory pressure on the seller, indicating the Agreement of Sale was "….affected by undue stimulus…. "and that the  "….seller [was not] typically motivated….". See, Cushman OAR at 3, Definition of Market Value).

- "… The improvements were in very poor condition …." (again indicating the Agreement of Sale was "….affected by undue stimulus…. "and that the "….seller [was not] typically motivated….". *See*, Cushman OAR at 3, Definition of Market Value).

- "…. and the seller was ***considered to be motivated*** [emphasis added] to achieve a quick sale" (which indicates McNamara's analysis of the Agreement of Sale, due to his years of experience as a real estate appraiser, and based on his understanding of the definition of Market Value, as referenced above, and as specifically stated on page 3 of the Cushman OAR.

- "After considering seller motivation, time, costs incurred, entrepreneurial incentive, and improved market conditions in the subject area …." (which indicates McNamara's analysis of the Agreement of Sale, due to his years of experience as a real estate appraiser, his understanding of the circumstances involved in the Agreement of Sale, as noted above (i.e., no approvals, seller to obtain approvals, regulatory action against and pressure on seller, the physical condition of the Subject, his understanding of the definition of Market Value, the costs incurred by the buyer in obtaining approval, the typical return on investments for the outlays by a buyer on a speculative investment, such as a parcel of real property with no approvals, as a "first in the market" type of finished product, and the change in the market between 2003 and 2005).

- "in our opinion the foregoing conclusion is reasonable and market oriented" (indicating McNamara's Analysis of the Agreement of Sale, in addition to the reconciliation between the sale price in that Agreement and the Cushman Appraisers appraised value in this Appraisal Assignment, specifically McNamara's analysis thus indicating it was reasonable for there to be such a difference between the sale price in the Agreement of Sale and the Cushman Appraisers appraised value in this Appraisal Assignment).

34.    Kudrick admits the averment "The extent of the Appraisers' discussion of the March 30, 2005 sale in the Reconciliation, with regard to development potential of the subject property, includes only that: "no development approvals [were] in place" when the "property was placed under agreement of sale"; "[c]urrent ownership has taken the property through the zoning process and obtained preliminary development approvals for the dwelling units and all amenities." Kudrick believes that the Cushman OAR has conformed with USPAP 2005 Standard Rule 2-2(a)(ix) because the Comment to that Rule states and the Cushman OAR complied as follows:

| USPAP 2005 Standards Rule 2-2(a)(ix) | Cushman OAR |
|---|---|
| The appraiser must be certain the information provided is sufficient for the client and intended users to adequately understand the rationale for the opinion and conclusions, including reconciliation of the data and approaches, in accordance with Standards Rule 1-6 | Carlyle Group is the client and only Intended User. They are one of the most sophisticated developer/investors on earth and they were co-developer/equity partner with the Buyer. Thus, the Intended User did not need a dissertation on the Agreement of Sale to their co-developer. |
| When reporting an opinion of market value, a summary of the results of analyzing the subject sales, options, and listings in accordance with Standards Rule 1-5 is required. | Summary of results of analyzing subject sale on Cushman OAR, p.30, as noted in the previous paragraph of this Answer, as if repeated here verbatim. |
| If such information is unobtainable, a statement on the efforts undertaken by the appraiser to obtain the information is required. | The relevant information was provided by the client and their co-developer. No information was unattainable. |
| If such information is irrelevant, a statement acknowledging the existence of the information and citing its lack of relevance is required. | All relevant information reported. |

|  |  |
|---|---|
|  |  |

Kudrick denies the Board's averment that implies the Cushman Appraisers acted improperly in regards to either analysis of the prior sale, or in the "Standard Rule 2, Communication of the Appraisal" requirements as to the"… Actual Agreement of Sale or the zoning variances or resolutions obtained by the buyer". As to file documentation, the Board is aware: 1) the Original Work File for the Appraisal Assignment had been destroyed in accordance with Cushman & Wakefield's document destruction policy; 2) the extended time between when the Cushman Appraisers conducted the Appraisal Assignment, and their Statement under Oath on June 26, 2012 resulted in the Cushman Appraisers inability to recall their actions in an appraisal assignment over seven years before that appearance. Further, the Hypothetical Condition of the Cushman Appraisal Assignment clearly states "The hypothetical condition employed within this analysis, at the specific request of the client, assumes that the entire subject property is vacant and available for development. No consideration is given to the existing or proposed improvements".  Analysis of the prior sale in regard to the Hypothetical Condition would not have taken into account detailed documentation of the zoning variances or resolutions obtained by the buyer. As for the Agreement of Sale, the Cushman OAR appropriately references the Agreement, as noted in the chart above. And, as to the Agreement of Sale being in the Original Work File, Kudrick reiterates her previous reference to the Work File that, as the Board is aware: 1) the Original Work File for the Appraisal Assignment had been destroyed in accordance with Cushman & Wakefield's document destruction policy; 2) the extended time between when the Appraisers conducted the Appraisal Assignment, and their Statement under Oath on June 26, 2012, which resulted in the Cushman Appraisers inability to recall their actions in an appraisal assignment over seven years before that appearance.

Kudrick neither admits nor denies the Board's Averment that the Original Work File did not include the zoning variances or resolutions obtained by the Buyer at the time of the Appraisal, and

leaves the Board to its proofs. Kudrick denies the Board's Averment it was necessary for Ms. Kudrick to have obtained the zoning variances or resolutions obtained by the buyer at the time of the appraisal, as the hand written notes Ms. Kudrick took in her interview with Mita, the developer, indicate they had a discussion about approvals, and Respondent can only surmise that discussion consisted of more than the mere statement in the hand written notes, and there may well have been an additional detail in the Original Work File, which was destroyed at the end of the Cushman Document Retention Policy period, as indicated herein. Further, in regard to comparison of the prior sale to the appraised value estimate, the Hypothetical Condition of the Cushman Appraisal Assignment clearly states "The hypothetical condition employed within this analysis, at the specific request of the client, assumes that the entire subject property is vacant and available for development. No consideration is given to the existing or proposed improvements". Accordingly, such comparison would not have required actual documentation of the zoning variances or resolutions obtained by the buyer.

35.    Kudrick admits the averment "The Appraisers also assert in the Reconciliation that in 2002, the seller had been "sued by the State of New Jersey for allegedly misleading consumers through" false advertisements that "depicted the hotel's facilities as clean and luxurious even though it was in a serious state of disrepair and had been fined for fire code violations". Kudrick denies the Board's averment "However, the Appraisers provided no documented support for this claim. Ms. Kudrick testified before the Board that she only came upon this knowledge by an internet search, which was also not included in the Appraisers' work file". Appraiser's Work File information relied upon in the Appraisal Assignment may be stored anywhere, as long as it is retrievable. As previously noted above, the Cushman Appraisal Work File was destroyed at the end of the five-year USPAP retention period. On March 31, 2003, the New Jersey Department of Law and Public Safety (the Attorney General's Office), Division of Consumer Affairs, announced a total $160,000 dollars settlement between the State and the

owner of the property, which was then known as the Grand Hotel at Wildwood Crest.

http://njpublicsafety.com/ca/press/diamond.htm.  This announcement by the Attorney General's office

should have been able to be accessed by the Board, as the press release came from the unit of the

Attorney General's Office, which is prosecuting this Complaint.

      36.      Kudrick admits as to the averment "The Appraisers' last contention in the

Reconciliation that the 'improvements were in very poor condition and the seller was considered to be

motivated to achieve a quick sale'. Kudrick denies the averment "….[the Cushman Appraisers

contention in the Reconciliation referenced in the preceding sentence] is further belied by the fact that

the Agreement of Sale was entered on April 16, 2003, approximately two years before the sale date of

March 30, 2005 …." because the Cushman Appraisal Reconciliation of the prior sale analysis and the

appraised value of the Subject Property continued with the statement: "After considering seller

motivation, time, costs incurred, entrepreneurial incentive, and improved market conditions in the

subject area, in our opinion the foregoing conclusion is reasonable and market oriented".  Cushman

OAR at 30. The Cushman Appraisers' stated in the Reconciliation that the "improvements were in very

poor condition and the seller was considered to be motivated to achieve a quick sale". That statement is

supported by Internet postings including, but not limited to, blog posts about condition of those

improvements, as well as the New Jersey Attorney General's March 31, 2003 Press Release regarding

the Consent Agreement with the former owner of what was then known as" The Grand at Wildwood

Crest". Such Internet postings support the Cushman Appraisers' subject Property prior sale

reconciliation statements in the Cushman Appraisal. http://njpublicsafety.com/ca/press/diamond.htm

http://businessfinder.nj.com/reviews-grand-hotel-wildwood-nj.html

      Kudrick denies the averment "….the hotel remained open and operating through the

summer of 2005". The Lower Township government document, "Resolutions of Findings and

Conclusions of Board of Adjustment of the Township of Lower", dated April 7, 2005, at paragraph 12, states "the property in question is currently being used as a closed hotel". Postings on this Internet site indicate that the property was closed for the 2004 season. http://businessfinder.nj.com/reviews-grand-hotel-wildwood-nj.html. Kudrick neither admits nor denies the referenced article was contained in the Cushman Appraisal Work File, but leaves the Board to its proofs. However, it is not necessary for the new Jersey Attorney Generals press release, or other information relied upon in the Cushman Appraisal, to be in the Cushman Appraisal Work File. It is only necessary that the press release can be retrieved as indicated from URLs in this Answer, that Standard has been met in regard to the circumstances that the Cushman Appraisers reasonably believed motivated the seller of the "Grand Hotel at Wildwood Crest" to enter into the Agreement of Sale. Kudrick denies the implied averment the Original Work File did not contain materials such as the referenced blog post. The Board is well aware: 1) the Original Work File for the Appraisal Assignment had been destroyed in accordance with Cushman & Wakefield's document retention policy; 2) the extended time between when the Appraisers conducted the Appraisal Assignment, and their Statement under Oath on June 26, 2012 resulted in the Cushman Appraisers' inability to recall their actions in an appraisal assignment over seven years before that appearance.

37.     Kudrick admits the averment "After considering seller motivation, time, costs incurred, entrepreneurial incentive, and improved market conditions in the subject area….". Kudrick denies the averment that there is" no further explanation and/or analysis… included the appraisal report that supports…" the above statement. Kudrick has addressed seller motivation in the paragraphs of this Count of this Answer, as if fully repeated verbatim here. Change in market conditions has been discussed in paragraph 29(b) of this Answer and in the Cushman Appraisal sections on Regional Analysis (pages 5 - 11) and Market Analysis (pages 14-15). Costs incurred by the purchaser for land use approvals was referenced in the Reconciliation section on page 30 of the Cushman Appraisal, as further

stated in various paragraphs of this Answer, as if fully repeated verbatim here. Kudrick further admits that the averment Cushman Appraisers took into account "entrepreneurial incentive" in their consideration of the difference between the $18 million, 2003-negotiated sale price, with no conditions and no contingencies, and their $65,300,000 value estimate. *The Dictionary of Real Estate Appraisal, Fourth Edition*, published in 2002, and in effect during the Appraisal Assignment, defines "entrepreneurial incentive" as follows:

> "A market driven figure that represents the amount an entrepreneur expects to receive for his or her contribution to a project and risk. *See also* entrepreneurial profit". *The Dictionary of Real Estate Appraisal, Fourth Edition* (Appraisal Institute, 2002) p. 96.

*The Dictionary of Real Estate Appraisal, Fourth Edition* then, defines "entrepreneurial profit" as follows:

1. "A market-derived figure that represents the amount an entrepreneur receives for his or her contribution to a project and risk; the difference between the total cost of the property (cost of development) and its market value (property value after completion), which represents the entrepreneur's compensation for the risk and expertise associated with the development.

2. In economics, the actual return on successful management practices, often identified with coordination, the fourth factor of production following land, labor, capital; also called entrepreneurial return or entrepreneurial reward. *See also* entrepreneurial incentive." *Id.*

Kudrick admits the averment that the explanations and/or analyses contained in the Cushman Appraisal were written for the Intended User and Client, the Carlisle Group, one of the most sophisticated real estate developers/investors in the world. Further, that the Carlisle Group the Client and Intended User, and their development partner, put together a development project unlike anything anyone else had been able to do on the island that contains Diamond Beach and Wildwood Crest, up to that point in time, at a unique location, and surrounded by other high-end development. Kudrick admits the averment that the "lends to a conclusion that the subject property, as vacant land, is worth an

additional $47,300,000 over and above the sale price of $18,000,000, to achieve a value opinion of $65,300,000 as "reasonable and market oriented."

Kudrick denies the averment "This conclusion [the difference between the $18 million 2003, no contingency, no approvals, risk prone "meeting of the minds" and the Cushman Appraisal value estimate of $65,300,000] seems implausible….", for the reasons stated in response to this paragraph of the Complaint, as well as related information in this Answer regarding the prior sale of the Subject Property, as if repeated here verbatim.

Kudrick denies the averment that the Cushman Appraisal conclusion "…. warrants further relevant explanation, discussion and/or analysis so the intended user can properly understand the Appraisers' reasoning", as an indefensible statement on the part of the Board, as the Board is aware that the original 2010 complaint against respondents is an anonymous complaint, and that the Client and only Intended User, the Carlyle Group, has not expressed any indication they did not understand anything in the Cushman Appraisal, but on the contrary fully accepted that Appraisal. Respondent further repeats for the reasons stated in response to this paragraph of the Complaint, as well as related information in this Answer regarding the prior sale of the Subject Property, as if repeated here verbatim.

38.     Kudrick denies the averment "The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.l(a), N.J.A.C. 13:40A-6.l(b), USPAP 1-l(c), USPAP l-5(b), and USPAP 2-2(a)(ix) ), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding the prior sale of the Subject Property, as if repeated

here verbatim and because the Board's allegations of such violations are not supported by law or regulation.

Kudrick denies the averment "Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding the prior sale of the Subject Property, as if repeated here verbatim and because the Board's allegations of such violations are not supported by law or regulation.

## COUNT IV

40.    Kudrick repeats her responses to the Board's General Allegations and the allegations of Count I, II and III above as if fully set forth verbatim herein.

41.    Kudrick admits the averment "Pursuant to USPAP 2-l(a) and USPAP 2-l(b), each written or oral real property appraisal report must clearly and accurately set forth the appraisal in a manner that will not be misleading, and must contain sufficient information to enable the intended users of the appraisal to understand the report properly, respectively".

42.    Kudrick denies the averment "Due to the aforementioned errors and inaccuracies in the Appraisers' reporting of significant details of the dimensions and scope of the subject property and the comparable sales, as well as their insufficient analysis relating to adjustments made to comparable sales on various factors. and to the March 30, 2005 sale of the subject property for an amount $47,300,000 less than their final value opinion, the appraisal report is misleading to the intended user and results in an implausible market value conclusion".

Kudrick specifically denies the averment "Due to the aforementioned errors and inaccuracies in the Appraisers' reporting of significant details of the dimensions and scope of the subject

property…". As Kudrick denied in the General Allegations, and in the preceding Counts of this Answer and included here as if repeated verbatim, the Cushman Appraisers recognized their error in the land area of comparable sale 1, and in the minor non-material errors regarding Kudrick inspecting the Subject Property. Respondent particularly denies this averment because these errors are not material. On the contrary, the errors and inaccuracies of the Board's averments and the appraisal reports prepared by the Board's Appraiser, surpass even the alleged errors and inaccuracies in the Cushman Appraisal. The Board's and the Board's Appraiser errors and inaccuracies include, but are not limited to, inappropriately ignoring the Cushman Appraisal's Hypothetical Condition, which limits the Subject Property of this Appraisal Assignment to the "first parcel" (the beachfront parcel) and the "second parcel" the non-beachfront parcel across Atlantic Avenue from the "first parcel", based on the Engagement Letter dated May 4, 2005, Addendum A of the Cushman Appraisal, as an assignment condition. Thus, both the Board and the Board's Appraiser are incorrect in considering the Subject Property for this Appraisal assignment to include the "Beach Parcel", as such an assertion is contrary to the facts of, and Scope of Work for, the Appraisal Assignment. Respondent further denies this averment, specifically in regard to the size of the Subject Property because the Board's own appraiser, Mark Sussman, stated in his Appraisal Review of the Cushman Appraisal that the difference between the 2.8 acres for Parcel 1 and his computer program calculated size for Parcel 1 was immaterial. The difference between the Cushman Appraisal reporting of the total size of the Subject Property, and the same size estimate contained within the Board Appraiser's Appraisal Review, is minimal. Accordingly, the Board has no foundation for this averment.

Kudrick denies the averment "Due to the aforementioned errors and inaccuracies in the Appraisers' reporting of significant details of the dimensions and scope of the … comparable sales, as well as their insufficient analysis relating to adjustments made to comparable sales on various factors

….". Kudrick specifically admits as to the Cushman Appraisal error regarding the size of Comparable Sale 1, but states as a mitigating factor the incorrect reporting of this Comparable Sale by the data provider, as contained in the Original Work File, which was destroyed five years after the Assignment in accordance with the provisions of USPAP 2005. . Further mitigating factors and support for the misreporting by Win2Data are stated in paragraphs 24(a) and (b) of this Answer.

Kudrick specifically denies the averment of"… errors and inaccuracies in the Appraisers' reporting of significant details of the scope of…. "the subject property based on this answer, in particular responses under Count I, stated here as if fully repeated verbatim.

Kudrick specifically denies the averment of"… errors and inaccuracies in the Appraisers' reporting of significant details of the scope of…. ".Comparable Sale 5, for the reasons set forth in various statements in this Answer, stated here as if fully repeated verbatim, including, but not limited to, paragraph 18 of Count II of this Answer, stated here as if fully repeated verbatim, which includes, but not limited to the Board's Appraiser's own statement he believes the verification of that Comparable Sale 5 could have reasonably indicated that property was to be demolished and redeveloped as condominiums.

Kudrick specifically admits the implied averment regarding a typographical error stating Comparable Sale 5 had already been torn down, at the time of the Appraisal Assignment.

Kudrick denies the averment the Cushman Appraisers conducted "insufficient analysis relating to adjustments made to comparable sales on various factors ….", for the reasons set forth in various statements in this Answer including, but not limited to, paragraphs 24 through 29, Count II of this Answer, as if fully repeated here verbatim.

Kudrick denies the averment of the Cushman Appraisers "…. errors and inaccuracies…" "as well as their insufficient analysis relating to adjustments…." In regard to "…. the March 30, 2005

sale of the subject property for an amount $47,300,000 less than their final value opinion…”….”, for the

reasons set forth in in various statements in this Answer including, but not limited to, the paragraphs of

Count III of this Answer, as if fully repeated here verbatim.

       Kudrick denies the averment “…. the appraisal report is misleading to the intended user

and results in an implausible market value conclusion”, for the reasons set forth in various statements in

this Answer including, but not limited to, paragraph 33, Count III of this Answer above as if fully

repeated here verbatim.

       43.     Kudrick denies the averment “The Respondent's conduct, as described above,

constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of

negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d)

violations of the statutes and regulations administered by the Board, including, but not limited to,

N.J.A.C. 13:40A-6.l(a), N.J.A.C. 13:40A-6.l(b), USPAP 1-l(c), USPAP l-5(b), and USPAP 2-2(a)(ix),

based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as

well as related information in this Answer regarding those averments, as if fully repeated here verbatim.

       Kudrick denies the averment “Such conduct thereby empowers the Board to suspend or

revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A.

45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8), based on

Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as

related information in this Answer regarding those averments, as if repeated here verbatim and because

the averment is contrary to law and regulation, which is correct.

## COUNT V

       44.     Kudrick repeats her responses to the Board's General Allegations and the

allegations of Count I, II, III and IV above as if fully set forth verbatim herein.

45.     Kudrick admits the averment "Pursuant to USPAP 2-2(a)(xii), a certification, in accordance with USPAP 2-3, must be signed by an appraiser and included with the appraisal report.

Kudrick admits the averment "The Appraisers' completed and signed a certification";

Kudrick admits the averment ".... there is an inconsistency between the appraisal report and the certification .... ", and as McNamara indicated in his Statement under Oath before the Board, and McNamara apologized for the typographical error in the report indicating he had not inspected the Subject Property (Cushman OAR, page 2), while the Certification indicates he had inspected the Subject Property (Cushman OAR, page 35), which is correct.

Kudrick denies the averment the above admitted inconsistency between the body of the report and the Certification ".... affects the credibility of the Appraisers' certification....", due to the typographical error.  The Certification speaks for itself.

46.     Kudrick admits the averment ".... the Appraisers' certification states under paragraph eight:" [Ms. Kudrick] made a personal inspection of the [subject property].  [Respondent], MAI, Managing Director, Valuation Services, reviewed and approved the report *and inspected the property." (Emphasis added)*. Respondent also testified before the Board that he had inspected the subject property but not the comparable sales".

47.     Kudrick admits the averment ".... an earlier section of the appraisal report titled "Dates of inspection and Valuation", states: "[t]he property was inspected on May 13, 2005 by [Ms. Kudrick]. [Respondent], MAI reviewed the report but did not inspect the property." *(Emphasis added* [by the Board])). As Kudrick has stated in response to paragraph 45 of the Complaint, this was a typographical error, which is also acknowledged in Respondent's testimony as stated in footnote 12, to this paragraph.  This typographical error was clearly not of concern to the Intended User, as they made no comment to Cushman regarding it, and the Carlisle Group paid its bill for this Appraisal Assignment

without any such comment or question regarding this typographical error. Accordingly, it is reasonable to believe the Client and only Intended User, as one of the most sophisticated real estate developers and investors in the world understood typographical errors such as this did not materially affect the substance of this Appraisal Report.

Kudrick admits the averment "Respondent asserted that he had undertaken an "exterior inspection" of the subject property...." Complaint paragraph 47 at 21, Footnote 12. As stated throughout this Answer including, but not limited to, paragraph 13 of General Allegations in this Answer and paragraph 35 of Count III of this Answer, and at other parts hereof, this was an appraisal of vacant land, based on the Hypothetical Condition stated in the Transmittal Letter and in the body of the Appraisal Report as follows:

> "The hypothetical condition employed within this analysis, at the specific request of the client, assumes that the entire subject property is vacant and available for development. Thus, no consideration is given to the existing or proposed improvements." Cushman OAR, Transmittal Letter, p1; Summary of Salient Facts, p.iv; Assumptions and Limiting Conditions, p.34

As a result, Kudrick properly only conducted an exterior inspection of the Subject Property.

48.     Kudrick denies the averment "The Respondent's conduct, as described above, constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d) violations of the statutes and regulations administered by the Board, including, but not limited to, N.J.A.C. 13:40A-6.l(a), N.J.A.C. 13:40A-6.l(b), USPAP 1-l(c), USPAP l-5(b), and USPAP 2-2(a)(ix), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding those averments, as if repeated here verbatim, and because such averment is contrary to law and regulation.

Kudrick denies the averment "Such conduct thereby empowers the Board to suspend or

revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding those averments, as if repeated here verbatim, and because such averment is contrary to law and regulation.

## COUNT VI

49.    Kudrick repeats her responses to the Board's General Allegations and the allegations of Count I, II, III, IV and V above as if fully set forth verbatim herein.

50.    Kudrick admits the averment that the plain language of N.J.S.A. 45:14F-21(c), states "no person other than a State licensed real estate appraiser, a State certified real estate appraiser or a person who assists in the preparation of an appraisal under the direct supervision of a State licensed or certified appraiser shall perform or offer to perform an appraisal assignment in regard to real estate located in this State including, but not limited to, any transaction involving a third party, person, government or quasi-governmental body, court, quasi-judicial body or financial institution".

No response is due to the averments of paragraph 50 of the Complaint regarding the interpretation of the plain language of the plain language of that statute as "... with limited exception only certified or licensed appraiser", because the averments of "limited exception" and the "quotes" around the word "assisting" and "the direct supervision" are conclusions of law to which no response is necessary, but Respondent denies those averments to the extent to which a real estate appraiser peer would understand the plain language of the statute.

Kudrick admits the averment as to the plain language of the regulation ".... NJ.AC. 13:40A-7.3(a)(5), an appraiser certified in this State "shall not permit his or her name and designation to be used on an appraisal where the appraiser has not participated in the appraisal pursuant to the

[USPAP]", but Kudrick specifically denies the Board's averment that she permitted her name to be used on an appraisal where the appraiser has not participated in the appraisal pursuant to the [USPAP]".

51.     Kudrick admits the averment "The appraisal report here indicates that the "property was inspected by and the report was prepared by [Ms. Kudrick] under the supervision of [Respondent]." In an addendum to the appraisal report titled "Qualifications of the Appraisers", it is documented that, although Respondent was certified in this State as a general appraiser, Ms. Kudrick was neither licensed nor certified in this State at the time she prepared the appraisal of the subject property, having certification only in Delaware and Pennsylvania. Ms. Kudrick further co-signed the appraisal report as a "Senior Appraiser" and necessarily took full responsibility for all of the content of the report".

Kudrick admits the averment in footnote 13 "The comments to USPAP 2-3 provide that any appraiser who signs a certification accepts full responsibility for all elements of the certification, for the assignment results, and for the contents of the appraisal report".

52.     Kudrick admits the averment, based only on her reliance on the accuracy of the transcript of her appearance before the Board on June 26, 2012 "Further at her investigative inquiry before the Board, Ms. Kudrick admitted that she did not hold a license or certificate from the Board at the time the appraisal report was prepared, nor did she secure a temporary permit..."

Kudrick denies the averment ".... a temporary permit .... would authorize [Ms. Kudrick's] appraisal of the subject property in this State, based on the plain language of N.J.S.A. 45:14F-21(c), which states "no person other than a State licensed real estate appraiser, a State certified real estate appraiser or a person who assists in the preparation of an appraisal under the direct supervision of a State licensed or certified appraiser shall perform or offer to perform an appraisal assignment in regard to real estate located in this State including, but not limited to, any transaction

involving a third party, person, government or quasi-governmental body, court, quasi-judicial body or financial institution".

Kudrick admits the averment, based only on her reliance on the accuracy of the transcript of Ms. Kudrick's appearance before the Board on June 26, 2012, "she disclosed that she completed the majority of the appraisal work, including, but not limited to, identifying, inspecting, and analyzing the comparable sale properties. Mr. McNamara also provided, during his appearance before the Board, that he typically reviews Ms. Kudrick's work "at the end, after she's written the report, done her analysis," and that he did not select or inspect any comparable sales, conduct market research, or review any zoning approvals in place at the time of the appraisal, and would normally assume the "validity and accuracy" of Ms. Kudrick's analysis".

Kudrick denies the averment that the typical review of Ms. Kudrick's work on this Appraisal Assignment caused Mr. McNamara to only review her work at the end. As stated in Ms. Kudrick testimony before the Board, significant interim discussions typically take place between McNamara and Ms. Kudrick during the course of the Appraisal Assignment. Further, USPAP 2005, Advisory Opinion 5, Assistance in the Preparation of an Appraisal, addresses the issue of the appropriate amount of assistance permissible under USPAP;

> As proficiency is demonstrated by an assistant, it is appropriate for the principal appraiser to place greater reliance on the work of that assistant. In the context of a real property appraisal assignment, an assistant who has meaningful appraisal education and extensive work experience may well be competent to inspect the real estate and prepare the appraisal report alone, subject to an appropriate final reconciliation by the principal appraiser who will be signing or cosigning the certification in the report. In this situation, the assistant's contribution is both significant and professional. The appropriate final reconciliation should include a discussion of which aspects of the appraisal process were performed by the assistant and the principal appraiser. USPAP 2005, Advisory Opinion 5, p. 135

The above Advisory Opinion makes it clear the Board, based on the laws and regulations

under which it operates, cannot just make an assertion, 12 years after an Appraisal Assignment, that it

has the right to contradict the guidance documents in the standards upon which it purportedly relies.

      53. ·   No response is due to the averments of paragraph 53 of the Complaint regarding

the Board's interpretation of the plain language of N.J.S.A. 45:14F-21(c), as the Board's averments are

conclusions of law to which no response is necessary, but Respondent denies those averments to the

extent to which a real estate appraiser peer understand the plain language of the statute. N.J.S.A. 45:14F-

21(c) states

> "No person other than a State licensed real estate appraiser, a State certified
> real estate appraiser or a person who assists in the preparation of an
> appraisal under the direct supervision of a State licensed or certified
> appraiser shall perform or offer to perform an appraisal assignment in regard
> to real estate located in this State including, but not limited to, any
> transaction involving a third party, person, government or quasi-
> governmental body, court, quasi-judicial body or financial institution."

The Board's averment was "Ms. Kudrick's substantial involvement in the preparation of the appraisal

report, and her co-signing of it, are beyond the scope of the more restricted activity that could be

considered "assisting" in the preparation of an appraisal. Accordingly, Respondent permitted an

unlicensed person to perform an act for which a license or certification is required by the Board".

      54.   Kudrick denies the averment "The Respondent's conduct, as described above,

constitutes: (a) the use or employment of fraud, deception, and misrepresentation; (b) repeated acts of

negligence, malpractice, or incompetence; (c) professional or occupational misconduct; and (d)

violations of the statutes and regulations administered by the Board, including, but not limited to,

N.J.A.C. 13:40A-6.l(a), N.J.A.C. 13:40A-6.l(b), USPAP 1-l(c), USPAP l-5(b), and USPAP 2-2(a)(ix) ),

based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as

well as related information in this Answer regarding those averments, as if repeated here verbatim, and

because such averment is contrary to law and regulation..

55.     Kudrick denies the averment "Such conduct thereby empowers the Board to suspend or revoke the Respondent's authority to practice real estate appraising in this State pursuant to N.J.S.A. 45:1-21 (b), (d), (e), and (h), as well as N.J.A.C. 13:40A-7.9(d)(2), (4), (5), and (8), based on Respondent's Answers to the specific Board averments in the paragraphs under this Count, as well as related information in this Answer regarding those averments, as if repeated here verbatim, and because such averment is contrary to law and regulation.

## AFFIRMATIVE DEFENSES

## VIOLATION OF DUE PROCESS AND IMPROPER DELEGATION

56.     Permitting a self-interested entity to regulate competitors violates due process. The current regulatory scheme co-opts the state's coercive power to impose a disadvantageous regulatory regime on market competitors. Further, the lack of a De Novo proceeding, upon appeal is a denial of Respondent's Due Process and Equal Protection rights under the U.S. Constitution.


57.     Moreover, the current regulatory scheme allows a self-interested entity to regulate competitors (other appraisers).

58.     TITLE XI of the Financial Institutions Reform, Recovery and Enforcement Act (FIRREA) promulgated real estate appraisal requirements for Federally Related Transactions (FRTs). The stated purpose of FIRREA was to protect Federal financial and public policy interests in real estate related transactions. The statute established the Appraisal Subcommittee (ASC) of the Federal Financial Institutions Examinations Council ("FFIEC") consisting of the representatives of the heads of the agencies comprising the FFIEC (the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of Thrift Supervision, and the National Credit Union Administration Board.)

59.    Each Federal financial institution regulatory agency is required to establish

appraisal standards that meet the minimum requirements adopted by the Appraisal Foundation.

60.    The Appraisal Foundation is a non-profit organization established in 1987 by the

nation's largest valuation organizations. In 1986, nine leading professional appraisal organizations in the

United States and Canada formed the Ad Hoc Committee on the Uniform Standards of Professional

Appraisal Practice. These nine organizations were:

- Appraisal Institute of Canada

- American Institute of Real Estate Appraisers (AIREA)

- American Society of Appraisers

- American Society of Farm Managers and Rural Appraisers

- International Association of Assessing Officers

- International Right of Way Association

- National Association of Independent Fee Appraisers

- National Society of Real Estate Appraisers

- Society of Real Estate Appraisers

Agreeing upon a generally accepted set of standards, the eight United States committee

members adopted those standards and thereafter established The Appraisal Foundation (TAF) in 1987 to

implement the Uniform Standards of Professional Appraisal Practice (USPAP).  The Appraiser

Qualifications Board was included in the Foundation structure to develop and promote meaningful

criteria by which the competence of appraisers could be measured. USPAP was adopted by the

Appraisal Standards Board (the "ASB") of the Foundation on January 30, 1989.

61.    According to its bylaws, The TAF:

"is a private, not-for-profit corporation charged by [Title XI of
FIRREA] with the responsibility of establishing, improving and

> promoting minimum uniform appraisal standards and appraiser qualifications criteria" .......... The mission statement of the Foundation is
>
> Promoting professionalism and ensuring public trust in the valuation profession. This is accomplished through the · promulgation of standards, appraiser qualifications, and guidance regarding valuation methods and techniques.

Adopted by the TAF Board of Trustees May 19, 2012.

62.     FIRREA designated the ASB of TAF as the entity responsible to promulgate appraisal standards, which are presently called USPAP. 12 U.S.C.§ 3339(1)(3). As a result of such designation in FIRREA, USPAP is now recognized throughout the United States as the generally accepted standards of professional appraisal practice.

63.     In *Department of Transportation v. Association of American Railroads*, No. 13-1080, 575 U.S. ___, 135 S.Ct. 1225 (2015), Justice Alito commented that, "Both the Oath and Commission Clauses confirm an important point: Those who exercise the power of Government are set apart from ordinary citizens. Because they exercise greater power, they are subject to special restraints. There should never be a question whether someone is an officer of the United States because, to be an officer, the person should have sworn an oath and possess a commission."[10]  It seems clear that that no one who promulgates USPAP, or otherwise has a direct involvement in the establishment of USPAP, satisfies the requirements of the Oath and Commission Clause.

64.     Justice Thomas agreed with Justice Alito's call to rein in non-delegated private entities.  He wrote: "Although no provision of the Constitution expressly forbids the exercise of

---

[10] In accordance with provisions of FIRREA the ASB publishes proposed changes in appraisal standards, receives comments, conducts public hearings and then adopts such changes. While ASB/TAF may look like a government agency as to such outward appearances, it does not have ".... its priorities, operations, and decisions ... extensively supervised and substantiality followed by the political branches." *Dep't of Transp. v. Ass'n of Am. Railroads*, 135 S. Ct. 1225, 1232-33, 191 L. Ed. 2d 153 (2015).

governmental power by a private entity, our so-called "private non-delegation doctrine" flows logically from the three Vesting Clauses. Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior court established by Congress, the Vesting Clauses would categorically preclude it from exercising the legislative, executive, or judicial powers of the Federal Government. In short, the "private non-delegation doctrine" is merely one application of the provisions of the Constitution that forbid Congress to allocate power to an ineligible entity, whether governmental or private."

65.     TAF's openly states it is a private entity and it operates like one, in particular as to the promulgation of USPAP. Its Board of Trustee ("BOT") members are appointed by TAF member appraisal industry trade organizations. The CEO of TAF is appointed by its BOT. Officers and employees of TAF are appointed by the CEO. ASB members are appointed by the BOT of The Appraisal Foundation. TAF establishes a nominating committee, comprised of members of its BOT. That nominating committee then prepares a slate of candidates, which is then presented to the BOT. The BOT then adopts the slate of candidates prepared by the nominating committee.

66.     The chair of the ASB is appointed by the BOT. The ASB promulgates USPAP, with no official signoff by the ASC. Because TAF/ASB is effectively "...an autonomous private enterprise... .", with minimal oversight, as noted above, USPAP fails the non-delegation test. 135 S. Ct. 1225, 1232-33.

67.     Not only is TAF a private entity by definition, it is not properly constituted to exercise the power that it possesses. It can establish and amend USPAP standards from time to time without oversight, standards that form part of the regulations governing the practice of real estate appraising.

68.     A review of the granting of authority to TAF is in order:

Under FIRREA, as amended:

"Each Federal financial institution regulatory agency and the Resolution Trust Corporation shall prescribe appropriate standards for the performance of real estate appraisals in connection with federally related transactions under the jurisdiction of each such agency or instrumentality. These rules shall require, at a minimum- that real estate appraisals be performed in accordance with generally accepted appraisal standards as evidenced by the appraisal standards promulgated by the Appraisal Standards Board of the Appraisal Foundation;...".

Title XI of FIRREA, § 1110, 12 U.S.C. §3339.

69.    Thus, Federal financial institutions regulatory agencies may only"...prescribe appropriate standards for the performance of real estate appraisals in connection with federally related transactions... ", which include " ... the appraisal standards promulgated by the Appraisal Standards Board of the Appraisal Foundation ... ". 12 U.S.C. §3339. Appraisals performed under those "generally accepted appraisal standards" must be in compliance with the USPAP which is promulgated by ASB. 12 U.S.C. §3339(3). USPAP, has generally been accepted as the standard of care for real estate appraisals under the real estate appraiser regulatory regime established pursuant to FIRREA.

70.    Federal Financial Institution Regulatory Agencies were given the power to accept or reject the authority of state real estate appraiser regulatory entities based on the determination of whether such state entities "..... recognize the standards..." and "....make decisions concerning appraisal standards... ", which are in conformance with USPAP. FIRREA 1118, 12 USC §3347(b).

71.    When Congress initially authorized FIRREA, it established a funding mechanism for the creation of appraisal standards through the Appraisal Subcommittee:

"....to make grants in such amounts as it deems appropriate to the Appraisal Foundation, to help defray those costs of the foundation relating to the activities of its Appraisal Standards and Appraiser Qualification Boards....".

FIRREA 1109, 12 USC 3338(b)(4).

72.     Thus, TAF has received Federal government funding to establish appraisal standards through its ASB. Embodiment of ASB authority into law was further enhanced by amendments to FIRREA in the Mortgage Act of 2010.

> "....the Appraisal Standards Board of the Appraisal Foundation shall promulgate regulations to implement the quality control standards required under this section."

73.     USPAP was originally created in 1987 by many of the original appraisal industry organizations, which comprise the membership of TAF. The then-developing "S&L Crisis" caused those organizations to lobby Congress in opposition to a national license process for real estate appraisers. As a part of that process, those organizations created The Appraisal Foundation, and put together their various documents on standards to create USPAP. Members of those organizations even extensively traveled the United States in support of what was ultimately passed as the final version of FIRREA, as an alternative to national appraiser licensing.

74.     As indicated above, TAF is a private nonprofit entity. Its funding comes from a variety of sources, including funds through the Appraisal Sub-Committee. Significantly, the majority of TAF's funding comes from the sale of USPAP. Board of Trustee members ("BOT") are appointed by TAF member appraisal industry trade organizations. The CEO of TAF is appointed by its BOT. Officers and employees of TAF are appointed by the CEO.

75.     ASB members are appointed by the BOT of The Appraisal Foundation. TAF establishes a nominating committee, comprised of members of its BOT. That nominating committee then prepares a slate of candidates, which is then presented to the BOT. The BOT then adopts the slate of candidates prepared by the nominating committee.  The chair of the ASB is appointed by the BOT. The ASB has been publishing USPAP on a 2-year cycle basis, since 2008. In accordance with provisions of FIRREA the ASB publishes proposed changes in appraisal standards, receives comments, conducts

public hearing and then adopts such changes. There, however, is no evidence of Article 2 Officers approving USPAP at any time in its publication history.

76.     None of the members of the ASB are Article 2 Officers under the US Constitution. None of the members of TAF's BOT, and none of the officers of TAF are Article 2 Officers under the Constitution. TAF receives Federal funds. USPAP is enforced under the color of law by Federal and State governments in violation of the due process and vesting clauses of the Constitution.

77.     The New Jersey Legislature created the State Real Estate Appraiser Board ("NJAB" or the "Board") to regulate the appraisal profession and evaluate the credentials of applicants for licensure and certification. N.J.S.A. 45:14F-1.

78.     The Board is responsible for the regulation of real estate appraisers in New Jersey. N.J.S.A. 45:14F-3. The board consists of nine members who are residents of the State, two of whom shall be public members and one of whom shall be a State executive department member appointed pursuant to the provisions of section 2 of P.L.1971, c.60 (C.45:1-2.2). Of the remaining six members, three shall be, except for those first appointed, State licensed real estate appraisers and three shall be, except for those first appointed, State certified real estate appraisers. *Id.*

79.     The Board is empowered to suspend, revoke or refuse to issue or renew a license or certificate and exercise investigative powers pursuant to the provisions of P.L.1978, c.73 (C.45:1-14 et seq.), establish standards for the certification of real estate appraisers which meet the standards established by the Appraisal Foundation, and establish standards for the licensing of real estate appraisers which meet standards acceptable to the Appraisal Subcommittee; and, Conduct hearings pursuant to the "Administrative Procedure Act," P.L.1968, c.410 (C.52:14B-1 et seq.). N.J.S.A. 45:14F-8. It suffers the same disabilities as does the federal regulatory scheme. Moreover, competitors of Respondent have been placed in an adjudicative role in determining Respondent's compliance with

USPAP, another violation of the due process clause.

80.     The Board has violated Respondents due process and equal protection under the law in numerous instances in this disciplinary action including, but not limited to, the facts that the Board

a. Is aware Carlyle Group did not file the consumer complaint, but rather the Board failed to perform appropriate due diligence in determining who filed the consumer complaint. Further, the Board has been provided with Respondent Counsel's own research regarding who filed the consumer complaint and had previously conceded the consumer complaint had been filed anonymously based on a search of Board records;

b. Had an initial impression at the Carlyle Group had filed a complaint, but would not give that up that allegation even when presented with evidence the Carlyle had not filed the complaint;

c. Has no reasonable support for its improper disagreement with Respondent's market value estimate (there is no law and/or regulation authorizing the Board to adjudicate value estimates), and such disagreement was on the record before the Board hired Mark Sussman, MAI to prepare an appraisal that mirrored the Board's unsupported belief, and therefore the Board's belief Respondent's market value estimate is "flawed" is in itself flawed, and a classic example of what happens when a disciplinary board provides their expert with the boards own opinions, and then obtains the expected or directed result, instead of an independent

objective review of a consumer complaint against a real estate appraiser;

d.  Denial of an out-of-state appraiser, to have the same ability afforded an in-state appraiser, would be a violation of ASC Policies, the Commerce Clause of the U.S. Constitution and potentially a violation of the U.S. Supreme Court decision N.C. Bd. Of Dental Examiners v. FTC[11] and related Federal law and regulation including, but not limited to, those of the FTC;

e.  And the Board's Appraiser's, errors and inaccuracies include, but are not limited to, inappropriately ignoring the Cushman Appraisal's Hypothetical Condition, which limits the Subject Property of this Appraisal Assignment to the "first parcel" (the beachfront parcel) and the "second parcel" (the non-beachfront parcel) across Atlantic Avenue from the "first parcel", based on the Engagement Letter dated May 4, 2005, Addendum A of the Cushman Appraisal, as an assignment condition.

81.   The Board has violated Respondent's due process and equal protection rights under the U.S. Constitution because the process in which the Board conducts the investigative process "stacks the deck" against the Respondent by violating Respondent rights under the US Constitution, as amended, in regard to do process and equal protection.  The Board does not act as an independent decision-maker pre-prosecution. The investigative process is not conducted by an independent individual or entity, such as a contract fee appraiser, with specific instructions to

---

[11] 135 S. Ct. 110.

conduct an impartial inquiry as to the alleged relations in a consumer complaint. The Board acts as

fact-finding investigator and adjudicator. As of 2013, the appraiser Board sent 50% of its revenue to

the state general fund, so there is no justification for the Board not having sufficient funds to hire

such independent, and impartial analysis of a consumer complaint. This particular consumer

complaint was anonymous. Thus, denying Respondent the ability to defend against the complaint, by

argument of mitigating factors due to identification of the complaint.  Upon referral to prosecution,

the State provides the appraisal expert with direction, either implicit or explicit, as to the results of

the appraisal expert's appraisal assignment. As such, the State subordinates the appraiser's violation

of USPAP's Ethics Rule.  The States appraiser expert is not directed to conduct an appropriate

Appraisal Review, in accordance with USPAP, recognizing the "peer review" standard, but rather the

State prejudices the Appraisal Review process by encouraging their appraiser expert to utilize a

"litigation appraisal" model, and not a "peer review" model of appraisal review. Further, the Board

has inappropriately stretched facts to show a number of errors in order to "make its case" for an

ethics violation due to a number of "USPAP minor errors" and is totally inappropriate both in

substance and for such "stretching" to be done by a regulatory board when Kudrick's livelihood is at

stake.

     82.     The board has further violated Respondent's due process and equal protection

rights under the U.S. Constitution because the Boards Appraiser, Mark Sussman, cannot be

considered an "Appraiser Peer" for either of McNamara or Ms. Kudrick.   Since Sussman's appraisal

practice consists almost entirely of litigation appraisal assignments, by necessity to meet levels

required by the Courts, he practices at a higher level. In litigation appraisal, because the appraiser

will face cross examination, the appraiser conducts additional and more comprehensive research

substantially beyond that which is typically conducted or even expected for non-litigation appraisal

assignments, i.e., the Cushman Appraisers in this case. The need for this elevated level of knowledge

and attention to detail is necessary to sufficiently demonstrate "the why's and wherefores" supporting

all of the appraiser's decisions and ultimately opinions to an extent acceptable by the Court, all while

under fire of cross examination, thus avoiding the risk that the appraiser's opinions may barred from

the matter by the opposing party's motion in limine. Non-litigation peer appraisers do not go to the

level of detail which a litigation appraiser conducts appraisal development and reporting.  Arguably,

the level of detail and reporting by the Cushman Appraisers is typical of their non-litigation appraiser

peers. This is exemplified by the differences in the "intended Use" For the Cushman Appraisal and

the Board expert Original Appraisal Report and Appraisal Review the former is clearly non-litigation

while the latter is clearly for a litigation proceeding. One additional significant difference between

litigation appraisers and non-litigation appraisers flows from the Scope of Work required. In the

instant case, because a current valuation date was needed, the Cushman Appraisers

conducted their research contemporaneously with the valuation date and with a relatively

short turnaround time typical of client demands for non-litigation mortgage appraisal work Often, the

Scope of Work required for a litigation appraisal calls for a retrospective valuation date. Not only

does that time lag provide the litigation appraiser with the benefit of hindsight, the time lag also

permits the appraiser to utilize multiple sources to corroborate and correct data, have a more

complete understanding of the transactions that might be used in the appraisal and more time develop

and write the analysis. Also, in many instances the litigation appraiser has the benefit of having been

provided with the opposing party's appraisal, so as to not only benefit from the research done by the

first appraiser and further develop it, but to prepare a "reactive" appraisal that, with no client

advocacy whatsoever, exploits the shortcomings in the opposing party's appraisal. That occurrence is very similar to events in the instant case, where the Cushman Appraisers prepared an appraisal with data and analysis in "real time" with the valuation date and not anticipating cross examination of their work product, whereas the State's appraiser (both in his appraisal and review appraisal) had an extended period (from engagement to production of the final appraisal and review appraisal) to conduct exhaustive research and to have twelve years of hindsight while preparing his analyses and the potential opportunity for his work to be reviewed by others.

   83. The Board has violated Respondent's due process and equal protection rights, under the U.S. Constitution, if the State finds this Respondent has committed errors and violations of appraisal standards from USPAP but the Board does not find the State's Appraiser has also committed such errors and violations including, but not limited to, the following;

    a. the State's appraiser generally makes unsupported statements in the Appraisal Review challenging the veracity of some of information provided in C & W's appraisal, while accusing Respondent of making unsupported statements similar to those made by the Board Appraiser.

    b. Page 17 point 4 subpoint 1 at the bullet he states "Independent confirmation indicated there was no atypical motivation on the buyer's part in connection with Sale 1." Since the State's Appraiser fails to provide any additional information necessary to evaluate that statement (confirmation source, what part they played in the transaction, what motivations they may have, their relation to the instant complaint, their relation to any members of the appraisal board, and most importantly, a disclosure of the

entire conversation in order to understand the context of the remark that led

the State's appraiser to the conclusion he stated in the Appraisal Review),

the veracity of the appraiser's statement is called into question.

Furthermore, the State's Appraiser did the same thing when he did not

provide any of the details necessary to properly understand his

interpretation of confirmation, in his criticism of the C & W appraisers in

the third paragraph on Page 16 where he states "The appraisers stated that

in verifying this sale at the time the appraisal was prepared, it was

indicated to them that the intent was to demolish the existing motel for

redevelopment condominiums, **although they had no supporting**

**documentation**." (emphasis added).

c. The Board's Appraiser makes numerous statements in his Appraisal

Review in regard to lack of support for an adjustment (last paragraph under

2. Market Conditions (Time) on page 17; last paragraph under 3. Location

on page 18; last paragraph under 4. Size on page 17; last paragraph under

5. Utility on page 19; the only paragraph under 7 Approval Status), when

in fact, his appraisal provides similar narrative descriptions but without any

demonstrable objective analysis. That criticisim is particularly galling

because while he discusses its importance under 7 Approval Status when

his appraisal provides nothing more than an absolutely unsupported net

opinion!

d. The State expert contradicts the Board's fraud allegation by failing to

understand the impact of the market conditions adjustment. If the C & W's

motivation was to produce an artificially high value conclusion, given the

substantial increases in value as concluded by the State's appraiser and as

subsequently revealed in C and W's testimony, then the C & W appraisers,

would not have purposefully understated their market condition's

adjustment.

e.   The State expert fails to address the difference in the "intensity of

development" between the comparable sale land use regulations in

Wildwood Crest including, but not limited to local zoning, but also

including New Jersey DEP prohibitions against high-rise development in

the low density areas of development such as Wildwood Crest.

f.    The State expert follows the lead of the Board by ignoring the

"Hypothetical Condition" of the Cushman OAR come up for check yearly

in regard to the Subject Property of the Appraisal Assignment, as well as

the stated Hypothetical Condition that's the subject property is being

appraised as vacant land and as proposed.

g.   The State expert essentially "parrots" the unsupported contentions of the

Board as communicated in proffered Consent Orders during the course of

settlement discussions.

84.    The State's expert actually has committed worse violations than those of

which Respondent has been accused. Based on Respondent's Answer, the only mistake in the

Cushman Appraisal was due to utilization of an industry standard, and well accepted, third-party

reporting service, which can be said to have reasonably relied upon an official government document any incorrect reporting of the size of comparable sale one. Conversely, the State's appraiser, at the least committed the same type of errors, of which Respondent has been accused in regard to unsupported opinions, lack of discussion of analyses and bias. In particular, the State's expert has committed an ethics violation by preparing a directed appraisal.

85.    Respondent has been severely prejudiced in her ability to defend herself in this action due to the States actions which have denied due process and equal protection because of the unconstitutional regulatory regime, the structure and process of the state regulatory system for real estate appraisers, the states directed appraisal and the resulting bias of the state expert[12].

## LACHES

86.    The action by the State of New Jersey is barred by the doctrine of laches. Laches is an equitable defense that has been defined as an inexcusable delay in asserting a right coupled with prejudice to the respondent.

87.    The appraisal report that forms the basis of the actions of the State was delivered and dated May 31, 2005.

88.    Under USPAP, appraisers are required to maintain files for a period of five years.

89.    At the time of performing the appraisal, Respondent was employed by Cushman & Wakefield of Pennsylvania, Inc. ("C&W").

90.    C&W maintained a document retention protocol (the "Protocol") for its valuation

---

[12] The regulatory framework for the NJAB is also violative of the Constitution and federal antitrust statutes under the Supreme Court decision in *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1114 (2015) (state board on which a controlling number of decision makers are active market participants in the occupation the board regulates must satisfy *Midcal's Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980) active supervision requirement in order to invoke state-action antitrust immunity).

and appraisal group that was specifically designed to comply with the requirements of USPAP.

91.     In accordance with the Protocol, the files relating to the assignment at issue, were destroyed in the normal course of business and prior to notice to C&W or Respondent of the complaint lodged by the Board.

92.     The Board purportedly received a "complaint" from C&W's client, the Carlyle Group, concerning the appraisal report in question (the "Cushman Appraisal Report") on May 25, 2013. On further investigation, it was concluded, and the Board has conceded, that the C&W client never made any complaint to any governmental agency, to C&W, or to the Respondent concerning the quality of the Appraisal Report or its content or conclusions.

93.     The Board notified C&W and the Respondent on July 14, 2010 of the purported "complaint" for the first time.

94.     The Board waited two years to conduct a hearing on the allegations. The Board waited another two years to contact C&W and the Respondent to discuss the matter further.

95.     The Board waited until the Fall of 2017 to file its charges against the Respondent and includes in its allegations, unsubstantiated and false claims as to the contents of Respondent's files and the quality of her testimony before the Board when the files were destroyed in accordance with USPAP, were subsequently partially reconstructed and the testimony solicited by the Board occurred nine (9) years after the report was prepared and delivered.

96.     Respondent has been severely prejudiced in her ability to defend herself in this action due to the delay in notifying him of the charges and in prosecuting the charges some twelve (12) years following the lodging of the purported "complaint."

**O'HAGAN MEYER**

By: _____

Kevin F. Berry, Esquire
46 West Main Street
Maple Shade, NJ  08052
267-385-4354
kberry@ohaganmeyer.com

**Law Office of DENINIS A. SCARDILLI, LLC**

By: _____

Dennis A. Scardilli, Esquire
105 Woods Road
Absecon, NJ  08201
609-568-0432
dennis@scardillilaw.com

*Attorneys for Respondent,*
*Gerald McNamara*

# ADDENDUM A

**Addendum A**
**Members at the Appraiser Board Meetings**

| Date | Member 1 | Member 2 | Member 3 | Member 4 | Member 5 | Member 6 | Member 7 | Member 8 | Member 9 |
|------|----------|----------|----------|----------|----------|----------|----------|----------|----------|
| 02-13-2001 | Curini | Hamilton | McCann | Rapagna | Scrivens | Siegel | Anderson | Krauser | |
| 01-08-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | | |
| 02-13-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 04-09-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 05-14-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 06-11-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 07-09-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 08-06-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 09-10-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 10-08-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 12-10-2002 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 02-11-2003 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 03-11-2003 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 04-08-2003 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | |
| 07-08-2003 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 09-09-2003 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 10-14-2003 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 11-12-2003 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 12-09-2003 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 01-13-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 02-10-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 04-13-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 05-11-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 06-08-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 07-13-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 09-14-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |

A-1

| Date | Member 1 | Member 2 | Member 3 | Member 4 | Member 5 | Member 6 | Member 7 | Member 8 | Member 9 |
|---|---|---|---|---|---|---|---|---|---|
| 10-12-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 11-09-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 12-14-2004 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 01-11-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 02-08-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 03-08-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 04-12-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 05-10-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 06-14-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 07-12-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 09-13-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 10-11-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 11-09-2005 | Curini | Hamilton | McCann | Scrivens | Siegel | Krauser | Willis | Gaburo | Giocondo |
| 01-10-2006 | McCann | Siegel | Krauser | Willis | Gaburo | Giocondo | Scrivens | Randolph-Sharpe | |
| 04-11-2006 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 05-09-2006 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 06-13-2006 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 07-13-2006 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 09-12-2006 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 11-14-2006 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 12-12-2006 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 02-13-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 03-13-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 04-10-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 05-08-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 06-12-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 07-10-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 09-11-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |

A-2

| Date | Member 1 | Member 2 | Member 3 | Member 4 | Member 5 | Member 6 | Member 7 | Member 8 | Member 9 |
|------|----------|----------|----------|----------|----------|----------|----------|----------|----------|
| 10-09-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 11-13-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 12-18-2007 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 01-08-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 02-13-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 03-11-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 04-08-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 05-13-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 06-10-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 07-08-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 09-09-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 10-14-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 11-12-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Scrivens | Randolph-Sharpe | Mannion | |
| 12-09-2008 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 01-13-2009 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 02-10-2009 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 03-10-2009 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 06-09-2009 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 07-14-2009 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 10-13-2009 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 11-10-2009 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 12-08-2009 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 01-26-2010 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 02-23-2010 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 03-11-2010 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 04-27-2010 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 05-25-2010 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 06-22-2010 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |

A-3

| Date | Member 1 | Member 2 | Member 3 | Member 4 | Member 5 | Member 6 | Member 7 | Member 8 | Member 9 |
|---|---|---|---|---|---|---|---|---|---|
| 07-20-2010 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 09-28-2010 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Mannion | | |
| 11-30-2010 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | | | |
| 01-25-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | | | |
| 02-22-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | | | |
| 03-22-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | | | |
| 04-26-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | |
| 05-24-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | |
| 06-28-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | |
| 07-26-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | |
| 09-27-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | |
| 10-25-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | |
| 11-22-2011 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | |
| 01-24-2012 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | |
| 02-28-2012 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | Young | |
| 03-28-2012 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | Young | |
| 04-24-2012 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | Young | |
| 05-22-2012 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | Young | |
| 06-26-2012 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | Young | |
| 07-24-2012 | McCann | Siegel | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | |
| 09-25-2012 | McCann | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | | |
| 10-23-2012 | McCann | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | | |
| 11-27-2012 | McCann | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | | |
| 01-22-2013 | McCann | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | | |
| 02-26-2013 | McCann | Krauser | Willis | Giocondo | Randolph-Sharpe | Palumbo | | | |
| 03-26-2013 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 04-23-2013 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 05-28-2013 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |

A-4

| Date | Member 1 | Member 2 | Member 3 | Member 4 | Member 5 | Member 6 | Member 7 | Member 8 | Member 9 |
|------|----------|----------|----------|----------|----------|----------|----------|----------|----------|
| 06-25-2013 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 07-23-2013 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 09-24-2013 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 10-22-2013 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 01-28-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 02-25-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 03-25-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 04-22-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 05-27-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 06-24-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 07-22-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 09-24-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 10-28-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 11-25-2014 | McCann | Krauser | Giocondo | Randolph-Sharpe | Palumbo | | | | |
| 02-24-2015 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 03-31-2015 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 04-28-2015 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 05-26-2015 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 06-23-2015 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 07-28-2015 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 09-22-2015 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 10-27-2015 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 11-24-2015 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 02-17-2016 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 03-29-2016 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 04-20-2016 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 05-18-2016 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 07-20-2016 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |

| Date | Member 1 | Member 2 | Member 3 | Member 4 | Member 5 | Member 6 | Member 7 | Member 8 | Member 9 |
|------|----------|----------|----------|----------|----------|----------|----------|----------|----------|
| 09-29-2016 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 10-19-2016 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 11-16-2016 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 01-18-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 02-15-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 03-29-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 04-19-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 05-17-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 06-21-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 07-19-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 09-19-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 10-18-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 11-15-2017 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| **11-21-2017** | **New Jersey State Real Estate Appraiser Board files Complaints against McNamara and Kudrick charging them with violating N.J.A.C. § 13:40A-6.1 & USPAP standards.** | | | | | | | | |
| 01-17-2018 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 02-21-2018 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 04-18-2018 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 05-16-2018 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 06-20-2018 | McCann | Krauser | Randolph-Sharpe | Palumbo | | | | | |
| 07-18-2018 | McCann | Krauser | Palumbo | | | | | | |
| 09-12-2018 | McCann | Krauser | Palumbo | | | | | | |
| 10-17-2018 | McCann | Krauser | Palumbo | | | | | | |
| 11-16-2018 | McCann | Krauser | Palumbo | | | | | | |
| 01-16-2019 | McCann | Krauser | Palumbo | | | | | | |
| 04-17-2019 | McCann | Krauser | Palumbo | | | | | | |
| 05-15-2019 | McCann | Krauser | Palumbo | | | | | | |
| 06-19-2019 | McCann | Krauser | Palumbo | | | | | | |

| Date | Member 1 | Member 2 | Member 3 | Member 4 | Member 5 | Member 6 | Member 7 | Member 8 | Member 9 |
|------|----------|----------|----------|----------|----------|----------|----------|----------|----------|
| 07-17-2019 | McCann | Krauser | Palumbo | | | | | | |
| 08-20-2019 | McCann | Krauser | Palumbo | | | | | | |
| 09-19-2019 | McCann | Krauser | Palumbo | | | | | | |
| 10-16-2019 | McCann | Krauser | Palumbo | | | | | | |
| 11-20-2019 | McCann | Krauser | Palumbo | | | | | | |
| 01-15-2020 | McCann | Krauser | Palumbo | | | | | | |

## CERTIFICATE OF SERVICE

I, Kevin F. Berry, Esquire, certify that a true and correct copy of the foregoing Amended

Complaint for Declaratory and Injunctive Relief was caused to be served on the below counsel of

record via the Court's ECF system on May 6, 2020:

> Barbara J.K. Lopez, Esquire
> Deputy Attorney General
> 124 Halsey Street, 5th Floor
> Newark, NJ 07101
> 973-648-3696
> Barbara.lopez@law.njoag.gov

> _/s/ Kevin F. Berry_____
> Kevin F. Berry

Dated:  May 6, 2020